**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN SOLOMON,

                    Plaintiff,

     v.

MERRICK GARLAND, *et al.*,

                  Defendants.

No. 23-cv-00759-RJL

<u>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**</u>

## INTRODUCTION

Plaintiff asks this Court to order the transfer of federal records from the Department of Justice to the National Archives and Records Administration.  Underlying the request is Plaintiff's apparent position that the prior Presidential administration should have interpreted the Presidential Records Act differently, and should not have returned to DOJ the binder of "materials related to the Federal Bureau of Investigation's Crossfire Hurricane investigation." Mem., Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation, 86 FR 6843 (Jan. 19, 2021).[1]  In effect, the Complaint would have this Court change the legal status of the records at issue, transforming them from federal records subject to the Federal Records Act into Presidential records.  No precedent or statute authorizes such relief.

In Count I, Plaintiff attempts to use a replevin action, but not to secure the return of property that Plaintiff owns, or that Plaintiff has an immediate (or any) right to possess.  Instead, Plaintiff urges replevin as a mechanism to transfer property that undisputedly belongs to the United States from one Defendant agency to another.  This request falls so far outside the bounds of a cognizable replevin claim that Plaintiff's Verified Complaint conclusively demonstrates that Plaintiff cannot satisfy the requirements necessary to state such a claim under D.C. law.  Plaintiff fails to plead that *he* owns the subject property; fails to request that the property be returned to

---

[1] The records at issue in this case are the subject of the January 20, 2021, Meadows Memorandum, by which White House Chief of Staff Mark Meadows returned "the bulk of the binder" to the Department of Justice with the instruction that the Department "expeditiously conduct a Privacy Act review under the standards that the Department would normally apply, redact material appropriately, and release the remaining material with redactions applied."  Email from Gary Stern to John Solomon (Aug. 17, 2022), Compl., Ex. 2, ECF No. 1-2 at 1 (quoting January 20, 2021, Meadows Memorandum); Email from Gary Stern to Kash Patel (July 14, 2022), Compl., Ex. 2, ECF No. 1-2 at 9 (quoting January 20, 2021, Meadows Memorandum). As noted below, that review was overtaken by an ongoing FOIA request, which has resulted in the posting of most of the binder in the FBI's FOIA public reading room.

him; and fails to attest that he is entitled to possession of the property.  Rather, Plaintiff alleges

that a Defendant agency owns the property, that a Defendant agency is entitled to possession of

the property, and that the property should be transferred to the Defendant agency.  These

allegations do not just fail to state a claim—they "contradict the claim asserted." *Browning v.*

*Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

      In Count II, Plaintiff, who alleges that former President Trump designated him as his

Presidential Records Act representative, asserts that he is entitled to a writ of mandamus

effecting the transfer of the subject records from the Department of Justice to the National

Archives.  That claim depends on Plaintiff's assertion that the materials at issue are Presidential

records, subject to the Presidential Records Act, "because they were received by President

Trump in conducting his official duties as President."  Compl. ¶ 24 (citing 44 U.S.C. § 2201(2)).

But the D.C. Circuit has repeatedly held that there is no jurisdiction to review third party

challenges to day-to-day White House recordkeeping decisions, such as the initial White House

determination—challenged by Plaintiff here—to treat the subject records as agency records.

Furthermore, even if there were jurisdiction to review such a challenge, the same provision of the

Presidential Records Act that defines "Presidential records" expressly "does not include any

documentary materials that are . . . official records of an agency," 44 U.S.C. § 2201(2)(B)(i), and

the D.C. Circuit has recognized "the PRA exclusion of records subject to the FOIA from the

class of materials that may be treated as presidential records." *Armstrong v. Exec. Office of the*

*President* ("*Armstrong II*"), 1 F.3d 1274, 1292 (D.C. Cir. 1993).  Against this backdrop,

Plaintiff's claim seeking a writ of mandamus falls far short of the clear and indisputable right to relief and clear duty to act necessary to establish mandamus jurisdiction.

For all these reasons, this Court should dismiss the Complaint in its entirety.

## STATUTORY BACKGROUND

Executive branch records are governed by either the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101–2120, 2901–2911, 3101–3107, 3301–3314, or the Presidential Records Act of 1978 ("PRA"), as amended, 44 U.S.C. §§ 2201–2209. As the D.C. Circuit has explained, "[t]he FRA and the PRA apply to distinct categories of documentary materials." *Armstrong II*, 1 F.3d at 1290. Specifically, the FRA governs records that are "made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A).

The PRA, in turn, applies to Presidential records—materials that are "created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). The PRA expressly excludes from the definition of Presidential records any materials that qualify as

"official records of an agency (as defined in [the Freedom of Information Act])." 44 U.S.C.
§ 2201(2)(B).

The two statutes create two separate records regimes—one, under the FRA, governing
federal records, and the other, under the PRA, governing Presidential records.  The existence of
two separate records regimes is significant because the two regimes create distinct systems of
records management and access, reflecting constitutional separation of powers issues related to
the President's authority to manage the records of his office during his term in office.

## I.   The Federal Records Act

The FRA sets out federal agencies' "records creation, management, and disposal duties."
*Armstrong II*, 1 F.3d at 1278.  It is designed "to assure, among other things, '[a]ccurate and
complete documentation of the policies and transactions of the Federal Government,' '[c]ontrol
of the quantity and quality of records produced by the Federal Government,' and '[j]udicious
preservation and disposal of records.'"  *Id.* (quoting 44 U.S.C. § 2902(1), (2), (5)).  It defines the
term "records" to include information "made or *received* by a Federal Agency."  44 U.S.C.
§ 3301(a)(1)(A) (emphasis added).

Under the FRA, "[t]he head of each Federal agency shall make and preserve records
containing adequate and proper documentation of the organization, functions, policies, decisions,
procedures, and essential transactions of the agency and designed to furnish the information
necessary to protect the legal and financial rights of the Government and of persons directly
affected by the agency's activities."  44 U.S.C. § 3101.  The statute further provides, among
other things, that agency heads must "establish safeguards against the removal or loss of records
the head of such agency determines to be necessary and required by regulations of the
Archivist."  *Id.* § 3105; *see Armstrong II*, 1 F.3d at 1278–79 (providing overview of FRA).

Federal records "may not be alienated or destroyed except" as provided under the FRA, 44 U.S.C. § 3314, and "the FRA requires the agency to procure the approval of the Archivist [of the United States] before disposing of any record." *Armstrong II*, 1 F.3d at 1279 (describing procedures).

## II.  The Presidential Records Act

The Presidential Records Act of 1978, 44 U.S.C. §§ 2201–2209 (the "PRA"), changed the legal ownership of the official records of the President from private to public, and established a new statutory structure under which Presidents, and subsequently NARA, manage the records of their Administrations.  "The United States shall reserve and retain complete ownership, possession, and control of Presidential records. . . ." 44 U.S.C. § 2202.

The D.C. Circuit has recognized that "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong I*, 924 F.2d at 290; *see CREW*, 924 F.3d at 603–04 ("Although the PRA makes clear that the United States, 'retain[s] complete ownership, possession, and control of Presidential records,' 44 U.S.C. § 2202, it also provides that the President, during his term in office, shall assume 'exclusive[] responsib[ility] for custody, control, and access to such Presidential records."). This control encompasses "creation" decisions, as well as "management, and disposal decisions." *Armstrong I*, 924 F.2d at 290.  Thus, the courts may not impose limits on "which records to maintain or destroy." *CREW v. Trump*, 302 F. Supp. 3d 127, 137 (D.D.C. 2018), *aff'd* 924 F.3d 602 (D.C. Cir. 2019); *cf. Armstrong II*, 1 F.3d at 1294 (explaining that "'[m]anagement decisions' describes the day-to-day process by

which presidential records are maintained," and "'disposal decisions' describes the process outlined in 44 U.S.C. § 2203(c)–(e) for disposing of presidential records").

Unlike the FRA, the PRA contemplates a limited role for the Archivist during a President's time in office, including in connection with the potential destruction of records. During the President's term in office, the President may dispose of records that he determines "no longer have administrative, historical, informational, or evidentiary value," provided that he first obtains the written views of the Archivist of the United States. *Id.* § 2203(c). Although the Archivist may then "inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision." *Armstrong I*, 924 F.2d at 290. Nor may "the Archivist [or] an agency head . . . initiate any action through the Attorney General to effect recovery or to ensure preservation of presidential records." *Armstrong II*, 1 F.3d at 1291 (noting that such actions are authorized for federal records under the FRA, but not for Presidential records under the PRA). Ownership of the Trump Presidential records at all times vests in the United States. *Id*. § 2202. Once a President leaves office, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to, the Presidential records of the President." *Id.* § 2203(g); *see also id.* § 2112(c).[2]

## **FACTUAL BACKGROUND**

On January 19, 2021, then-President Trump issued a Memorandum concerning a binder of materials related to the Federal Bureau of Investigation's Crossfire Hurricane investigation.

---

[2] The FOIA does not apply to Presidential records while the President is in office. *See Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980) (FOIA does not apply to the President and those White Office offices that advise and assist him). Pursuant to the PRA, Presidential records become subject to public access under FOIA five years following the President's final term in office, *see* 44 U.S.C. § 2204(b)(2). Notwithstanding any such restrictions on public access, however, the PRA enumerates certain exceptions, including

These were federal records that the Department of Justice had provided to the White House at the President's request.  Mem., Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation, 86 FR 6843 (Jan. 19, 2021).  Therein, President Trump noted that he had "requested the documents so that a declassification review could be performed," *id.*, and that— with the exception of the portions that the Federal Bureau of Investigation in consultation with the Intelligence Community had determined "most crucial" to protect—he was ordering declassification of the materials in the binder.  *Id.*  He clarified, however, that the decision to disclose materials in the binder "[did] not extend to materials that must be protected from disclosure pursuant to orders of the Foreign Intelligence Surveillance Court and [did] not require the disclosure of certain personally identifiable information or any other materials that must be protected from disclosure under applicable law."  *Id.*

The next day, then-Chief of Staff Mark Meadows returned the "bulk of the binder" to the Department of Justice with instructions that the Department conduct a Privacy Act review and then release the remaining material with redactions applied.  *See* Compl., ECF No. 1-2 at 1; *see also* Compl., ECF No. 1, ¶ 7.  Since then, NARA received and maintains as Presidential records "roughly 2700 undifferentiated pages" that appear to be multiple copies of the documents from the binder at various stages of declassification review.  Compl. ¶¶ 27, 28.  The records in the binder that then-Chief of Staff Meadows transferred back to DOJ—consistent with "routine practice for agency records that are undergoing declassification or similar review by other agencies or the White House," Compl., ECF No. 1-2 at 1—have properly remained with the Department of Justice as agency records subject to the Federal Records Act.  Indeed, at the time

that Presidential records "shall be available to such former President or the former President's designated representative."  *Id.* § 2205(3).

of the correspondence attached to the Complaint, these records were already "the subject of a [Freedom of Information Act (FOIA)] lawsuit with DOJ," Compl., Ex. 2 at 1, and most of the materials have now been released in redacted form on the Federal Bureau of Investigation's FOIA reading room:  https://vault.fbi.gov/crossfire-hurricane-part-01.[3]

## STANDARD OF REVIEW

Defendants move for dismissal of both counts of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that Plaintiff has failed to state a claim upon which relief can be granted.  A Rule 12(b)(6) challenge "tests the legal sufficiency of a complaint."  *Browning*, 292 F.3d at 242.  In evaluating such a claim, the court must "treat the complaint's factual allegations as true," *Khodorkovskaya v. Gay*, 5 F.4th 80 (D.C. Cir. 2021), but need not "accept as true a legal conclusion couched as a factual allegation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.  The plaintiff's allegations must be sufficiently detailed "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Furthermore, "dismissal is appropriate where the allegations contradict the claim asserted." *Browning*, 292 F.3d at 242.

Defendants also move for dismissal of Count II under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  In reviewing a motion to dismiss under Rule 12(b)(1), a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  Thus, a federal court must presume that it

---

[3] *See Covad Commc'ns Co. v. Bell Atl. Corp.,* 407 F.3d 1220, 1222 (D.C. Cir. 2005) (noting that on a motion to dismiss, a court may take judicial notice of facts on the public record).

"lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).  The burden of demonstrating the contrary rests upon the party asserting jurisdiction.  *Id.*  When considering jurisdiction based on the face of a plaintiff's complaint, a court must accept "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  However, as on a motion under Rule 12(b)(6), the court need not accept legal conclusions stated as factual allegations," *see Iqbal*, 556 U.S. at 678, or accept inferences that are unsupported by the facts pled.  *See Gonzales*, 477 F.3d at 732.

"In deciding a motion to dismiss, a court may . . . consider documents 'attached to or incorporated in the complaint.'" *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  A court may also consider facts of which it can take judicial notice.  *See Covad Commc'ns Co.,* 407 F.3d at 1222.

## ARGUMENT

### I.     Plaintiff Fails to State a Claim for Replevin.

Replevin "is, in general, an action in which the owner, or a person who has a general or special interest in some personalty either taken or detained by another, seeks to recover possession." *United States v. Navarro*, --- F. Supp.3d ---, 2023 WL 2424625, at \*10 (D.D.C. Mar. 9, 2023) (quoting Replevin, 7 American Law of Torts § 24:17 (West 2022)).  In other words, a replevin action is a demand that the Court order the return of one's own property, or property that one has an immediate right to possess.  66 Am. Jur. 2d Replevin § 13 ("In order to maintain a replevin action, the plaintiff must, at the time of the institution of the suit, be entitled to the immediate possession of the property claimed").  And for this reason, Plaintiff's Count I fails.  The property at issue is not Plaintiff's, and he does not—and, indeed, cannot—seek

immediate possession of it; instead, he seeks the transfer of property from one Defendant to another.  The cause of action he invokes does not extend so far.

D.C. Code 16-3701 and subsequent sections set forth the replevin cause of action under D.C. law.[4]  The pleading requirements are specifically delineated and "strict[ly]" enforced.  *See BMO Harris Bank N.A. v. Dist. Logistics, LLC*, 2021 WL 7448012, at *4 (D.D.C. July 23, 2021), *report and recommendation adopted*, 2021 WL 7448010 (D.D.C. Dec. 22, 2021); *see also Deegan v. Strategic Azimuth LLC*, 768 F. Supp. 2d 107, 117 (D.D.C. 2011) ("the D.C. Code is very particular about how any complaint in replevin must be phrased").  The D.C. Code requires that "[a] complaint in replevin shall be in the following or equivalent form:"

> "The plaintiff sues the defendant for (wrongly taking and detaining) (unjustly detaining) **the plaintiff's** goods and chattels, to wit: (describe them) of the value of ___ dollars. And the plaintiff claims that the same be taken from the defendant **and delivered to him**; or, if they are eloigned, that he may have judgment of their value and all mesne profits and damages, which he estimates at ___ dollars, besides costs."

D.C. Code 16-3702 (emphasis added).  Additionally, a plaintiff must submit either an affidavit or a verified complaint averring, *inter alia*, that "according to [affiant's or plaintiff's] information and belief, the plaintiff is entitled to recover possession of chattels proposed to be replevied." D.C. Code 16-3703; *see also BMO Harris Bank*, 2021 WL 7448012, at *4.  The latter provision

---

[4] The Complaint does not specify whether Plaintiff intends a replevin claim under federal common law or under the D.C. statute.  As another Judge of this Court recently noted when addressing a replevin claim under the D.C. Code rather than the common law, "a federal court generally should not fashion federal common law where state law will do."  *United States v. Navarro*, 2023 WL 2663014, at *3 (D.D.C. Mar. 28, 2023).  If Plaintiff's claim were evaluated under the common law, his claim would fare no better since "the gist of an action of replevin is the right of possession of property in the plaintiff."  66 Am. Jur. 2d Replevin § 1.  As discussed herein, Plaintiff asserts not a right of possession in himself, but to transfer property belonging to the United States among the Defendants.  Plaintiff therefore lacks the most rudimentary element of a replevin claim whether under statute or common law.

"lists express statements that should be attested to *verbatim.*"  *BMO Harris Bank*, 2021 WL

7448012, at *4 n.2 (emphasis the Court's).

Thus, in *BMO Harris Bank*, the Court held that the plaintiff had failed to state a cause of

action for replevin where the complaint "fail[ed] to adhere to the D.C. Code's strict requirements

for pleading replevin, in three respects."  *BMO Harris Bank*, 2021 WL 7448012, at *4.  Among

the deficiencies the Court noted were that the plaintiff had failed to allege that the property at

issue (equipment, in that case) should be delivered to plaintiff, and that plaintiff had failed to

provide the attestation required under D.C. Code 16-3703.  *See id.*  The Court so held

notwithstanding that the plaintiff in that case described the property at issue and alleged that the

defendant was denying the plaintiff access to that property.  *See id.*

Here, too, Plaintiff's replevin claim is plainly deficient when measured against the

statutory requirements, in at least three respects.  First, D.C. Code 16-3702 requires that a

complaint plead (or contain an averment "equivalent" to) an assertion that the subject property

comprises the "*the plaintiff's* goods and chattels."  D.C. Code 16-3702 (emphasis added).  Not

only does Plaintiff fail to so allege, but Plaintiff actually asserts that *one of the Defendants* owns

the subject property.  *See* Compl. ¶ 37 ("The Presidential records at issue in this case are the

property of the National Archives.").[5]  Indeed, the statute leaves no room for any other

conclusion.  22 U.S.C. § 2202 ("The United States shall reserve and retain complete ownership .

_____

[5] As discussed above, the materials in question are Federal records, and Plaintiff errs in
characterizing those materials as Presidential records belonging to the National Archives.  *See
supra*.  However, whether they are Federal records or Presidential records, it is undisputed that
the records at issue belong to the United States rather than to Plaintiff.  Taken as true for
purposes of evaluating a motion to dismiss, the Plaintiff's allegation regarding ownership is fatal
to his claim.

. . of Presidential records. . .").  And nothing about the Plaintiff's designation as a representative of the former President creates an ownership right.  *See id.* § 2205(3).

Second, the same provision requires a plaintiff to claim the subject property "be taken from the defendant and delivered to him."  D.C. Code 16-3702.  Here too, Plaintiff not only omits the required language, or its "equivalent"—he asks that the Court order one Defendant to deliver the subject property to a *different* party, viz. a co-Defendant.  *See* Compl., Prayer for Relief (ii) (seeking "to ensure the immediate return of the Presidential records to the National Archives").  Third, D.C. Code 16-3703 requires Plaintiff to attest either in the verified complaint or a separate affidavit that "the plaintiff is entitled to recover possession of chattels proposed to be replevied."  Here, too, the Complaint not only misses the mark, but works against Plaintiff, alleging as it does that *one of the Defendants* "has the duty to assume responsibility for the custody, control, and preservation of, and access to, these records."  *Id.* ¶ 38.  Each of these deficiencies, standing alone, would be sufficient to warrant dismissal.

It is of no moment that Plaintiff asserts he would have a right of access to the records if they were held by the Defendant agency to which he seeks to have them transferred.  *See* Compl. ¶¶ 3, 9, Prayer for Relief (ii).  Such a right to access property—when divorced from the right to possess that property—cannot support a replevin action.  *See* 66 Am. Jur. 2d Replevin § 13 ("Unless the plaintiff shows a right to immediate possession, the defendant . . . will not be compelled to deliver the property . . . where replevin is brought [even] one day before the plaintiff has the right to possession of the property, the action must fail").  The right to (and demand for) immediate *possession* is an indispensable element of the claim.  *See* D.C. Code 16-

3702, 16-3703.  In its absence, especially in light of the D.C. Code's "strict" pleading

requirements, *see supra*, Plaintiff cannot state a claim for replevin.[6]

## II.  Plaintiff Fails to Establish the Elements Necessary for Mandamus Jurisdiction.

Count II seeks mandamus relief that would compel Defendants "to immediately return

the subject Presidential records to the National Archives and the National Archives to

immediately provide the Plaintiff unrestricted access to them."  Compl., Prayer for Relief (iii).

Mandamus jurisdiction "is strictly confined. . . mandamus is 'drastic'; it is available only in

'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus

jurisdiction must have a 'clear and indisputable' right to relief.'"  *In re Cheney*, 406 F.3d 723,

729 (D.C. Cir. 2005) (en banc); *Citizens for Resp. & Ethics in Washington v. Trump* ("*CREW*"),

924 F.3d 602, 606 (D.C. Cir. 2019) ("[T]he remedy of mandamus is a drastic one, to be invoked

only in extraordinary situations.").

In order to establish a court's jurisdiction over such a claim, a plaintiff seeking

mandamus relief must show (1) "a 'clear and indisputable right to relief,'" (2) "that the defendant

has a "'clear duty to act,'" and (3) "that 'no adequate alternative remedy exists.'"  *Id.* (quoting

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)); *see also Lovitsky v. Trump*,

949 F.3d 753, 759 (D.C. Cir. 2020).  "These three threshold requirements are jurisdictional;

unless all are met, a court must dismiss the case for lack of jurisdiction."  *CREW*, 924 F.3d at

606.  And, even when these requirements are met, "a court may grant relief only when it finds

---

[6] Although the Court in *BMO Harris Bank*, discussed above, dismissed without prejudice and permitted the plaintiff in that case leave to submit an amended complaint addressing the deficiencies in its pleadings, *see* 2021 WL 7448012, at *4, in that case, the necessary elements were simply absent.  Here, by contrast, amendment would be futile, since Plaintiff has submitted a verified complaint effectively attesting that he cannot fulfill three elements required for a replevin claim under D.C. law.

compelling equitable grounds." *Lovitsky*, 949 F.3d at 759.  As discussed below, Plaintiff fails to establish either the first or the second requirement.

### A.      Plaintiff Cannot Establish a Clear Right to Relief.

In assessing whether Plaintiff is entitled to mandamus, the first question is whether Plaintiff has a "clear and indisputable" right to relief.  *In re Cheney*, 406 F.3d at 729.  "[T]he party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Lovitsky*, 949 F.3d at 759–60 (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)) (internal quotation omitted).  Here, Plaintiff cannot make such a showing.

Plaintiff's fundamental grievance appears to be that the White House failed to retain the original records at issue, which they contend became Presidential records "because they were received by President Trump in conducting his official duties as President," Compl., ¶ 24 (44 U.S.C. § 2201(2)), and then-Chief of Staff Meadows—in Plaintiff's view—mistakenly treated them as agency records when he returned them to the Department of Justice.

However, the D.C. Circuit has been clear that, when private parties sue under the Presidential Records Act, "courts have no jurisdiction to review the President's 'day-to-day operations.'" *CREW*, 924 F.3d at 609.  As the Court explained:  Congress was "keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations," and "therefore sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office." *Armstrong I*, 924 F.2d at 290.[7]  Plaintiff's request that the Court effectively intercede and reverse

---

[7] The Court carved out a narrow exception to that rule in *Armstrong II*, allowing the review of "guidelines outlining what is, and what is not, a "presidential record" to ensure that materials that are not subject to the PRA [*i.e.,* agency records] are not treated as presidential

the then-Chief of Staff's decision would amount to the very kind of interference in day-to-day operations that is barred under the PRA.

Additionally, the PRA, in the very provision that defines "Presidential records," excludes from that definition "any documentary materials that are . . . official records of an agency," 44 U.S.C. § 2201(2)(B)(i), and the D.C. Circuit has recognized "the PRA exclusion of records subject to the FOIA from the class of materials that may be treated as presidential records." *Armstrong II*, 1 F.3d at 1292. As reflected in the Complaint and attachments, and discussed above, the records at issue here have indeed been treated as agency records, subject to the FOIA, since then-Chief of Staff Meadows returned them to the Department of Justice on January 20, 2021. *See supra* 7–8. And, as NARA's General Counsel explained to Plaintiff, the process followed with respect to these materials was consistent with "routine practice for agency records that are undergoing declassification or similar review by other agencies or the White House." Compl., ECF No. 1-2 at 1. Thus, even if there were jurisdiction to review the prior administration's treatment of these records, Plaintiff would not be entitled to relief.

In sum, Plaintiff's Complaint does not support *any* right to relief, much less the clear and indisputable right needed to support mandamus jurisdiction. *See, e.g., CREW*, 924 F.3d at 608

---

records." *Armstrong II*, 1 F.3d at 1294. That exception was motivated by a concern that agency records subject to FOIA would be inappropriately shielded from disclosure if incorrectly treated as Presidential records under the PRA. *See id.* at 1293–94. That exception has no application here. Indeed, the exemption addresses the *opposite* circumstance to the situation alleged in the Complaint, in which Plaintiff alleges that documents were treated as agency records when Plaintiff contends they should have been viewed as Presidential records.

(affirming rejection of mandamus claim where challenged policy was "facially PRA-compliant").

### B.  Plaintiff Cannot Establish a Clear Duty to Act.

Because Plaintiff cannot establish a clear right to relief, the Court "may 'begin and end with the first' of the three mandamus requirements," and may dismiss Count II without addressing the other two requirements.  *CREW*, 924 F.3d at 609.  Plaintiff, however, also fails to establish the second prong of mandamus jurisdiction—that Defendants are violating a clear duty to act.  *See Am. Hosp. Ass'n*, 812 F.3d at 189.  In the context of mandamus, the duty to be performed must be "ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)).  A ministerial duty "is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Plaintiff relies on the notion that the PRA imposes a "mandatory" duty on Defendants to make available Presidential records to which Plaintiff requests access as former President Trump's PRA representative.  *See, e.g.*, Compl. ¶ 9.  But that assertion begs the question; Plaintiff's underlying premise is that the records at issue *are* Presidential records subject to the PRA in the first instance.  For the reasons discussed above, they are not, and Plaintiff has no right under the PRA to challenge the former administration's treatment of the records.  Defendants, moreover, have correctly treated these records as agency records subject to the FOIA, and the FBI continues to process them for public release pursuant to FOIA.  There is no duty, ministerial or otherwise, to make such records available to Plaintiff under the PRA.  To the extent Plaintiff's challenge is meant to include the former President's duty to properly categorize

16

records as agency records subject to the FRA or Presidential records subject to the PRA, even

were such relief available (and it is not), "[t]his duty necessarily involves the application of

judgment," *CREW*, 438 F. Supp. 3d at 68, and lies well beyond the ministerial obligations that

can support mandamus jurisdiction.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint in its entirety, with

prejudice.


Dated:  June 6, 2023                              Respectfully submitted,

                                                           BRIAN M. BOYNTON
          Principal Deputy Assistant Attorney General

          ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
          Deputy Director
          Federal Programs Branch

          */s/  Julia A. Heiman*
          JULIA A. HEIMAN (D.C. Bar No. 986228)
          Federal Programs Branch
          U.S. Department of Justice, Civil Division
          1100 L Street, N.W.
          Washington, DC  20005
          Tel. (202) 616-8480 / Fax (202) 616-8470
          julia.heiman@usdoj.gov
          *Attorneys for Defendants*