IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN SOLOMON,<br><br>      Plaintiff,<br><br>v.<br><br>MERRICK GARLAND, *et al.*,<br><br>      Defendants. | No. 23-cv-00759-RJL |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

Plaintiff's Opposition confirms what is clear from the Complaint: neither replevin nor mandamus—nor indeed any authority—supports the extraordinary relief that Plaintiff seeks. As Plaintiff acknowledges, then-White House Chief of Staff Mark Meadows sent the records at the heart of this case to the Department of Justice ("DOJ")—not with an instruction that they be returned to the White House—but in anticipation of the agency exercising its discretion to apply redactions and only then make a public release. Those records are now the subject of pending Freedom of Information Act ("FOIA") litigation, and the bulk of them have been processed via FOIA and released, with redaction, on the Federal Bureau of Investigation's FOIA public reading room.

Plaintiff seeks to transfer the records from one federal agency to another through a replevin claim. In response to Defendants' observation that he fails to fulfill the elements of the applicable D.C. statute, Plaintiff insists that he need not do so. But Plaintiff is mistaken. To the contrary, the pleading requirements applicable to the D.C. replevin statute are strict, and even a cursory examination demonstrates that they would be impossible to satisfy in this setting. As

Defendants argued in their Motion, Plaintiff's Complaint does not allege that the records belong to him; that they should be returned to him; or that he is entitled to possess them. As to the last-listed element, Plaintiff, in his Opposition, attempts to rely on his status as the former President's representative under the Presidential Records Act to satisfy the possession element. But that statute would be of no help to Plaintiff even if it applied.[1] That is, even if the records at issue were Presidential records, the Presidential Records Act provides: "The United States shall reserve and retain complete ownership, *possession*, and control of Presidential records." 44 U.S.C. § 2202 (emphasis added). Against this backdrop, Plaintiff does not and cannot state a viable replevin claim.

Nor is Plaintiff's mandamus claim viable. As Defendants explained in their Motion, for mandamus jurisdiction to exist, the right to relief must be "indisputable," and the duty to act must be clear. Yet here, Circuit precedent provides that there is no jurisdiction for the Court to review the then-Chief-of-Staff's decision to send the subject records to DOJ. Plaintiff responds by arguing that the Court should nonetheless find that those materials were Presidential records notwithstanding Mr. Meadows' return of those records to DOJ, by applying in reverse the D.C. Circuit control test for assessing whether records are agency records subject to FOIA. As explained herein, the D.C. Circuit formulated that test to ensure that records controlled by a non-agency did not inappropriately get treated as agency records for FOIA purposes. Plaintiff urges this Court to invert that test, and hold that records that the Government is treating as federal

---

[1] Even while Plaintiff relies on the Presidential Records Act in his Opposition, he contends that this statute "raises separation of powers concerns." Pl.'s Opp'n at 8 n.4. Plaintiff is mistaken. The Supreme Court carefully considered and rejected a separation of powers challenge to the Presidential Records Act's predecessor statute in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977). Subsequently Congress relied on the Supreme Court's reasoning in that case when enacting the Presidential Records Act. *See* H.R. Rep. No. 95-1487 at 6.

2

records subject to FOIA should instead be treated as Presidential records, removed from the agency where they are currently being processed, and transferred to the National Archives and Records Administration ("NARA"). Given the disconnect with the purpose of the test—to protect confidentiality of records properly belonging to entities not covered by FOIA—it is highly questionable whether the test Plaintiff proffers ever should be applied in the manner that Plaintiff suggests. Certainly, it would be improper to employ it in this novel, inverted way for the first time in a mandamus setting, where jurisdiction attaches only if the right to relief is clear and indisputable. Even if applied, however, it would fail the test – the White House did not intend to retain control of records, did not demand their return, and instructed the agency to apply its discretion in processing the records for public release.

Accordingly, for all the reasons explained herein and in Defendants' initial submission, the Court should dismiss Plaintiff's Complaint with prejudice.

### A. The Requirements for a Replevin Cause of Action Under D.C. Law are Strict, and Are Not Satisfied in this Case.

In their Motion, Defendants cited D.C. Code Sections 16-3701 *et seq.* setting forth the replevin cause of action. *See* Defs' Mem. in Support of Their Mot. to Dismiss, ECF No. 10, ("Defs' Mot.") at 10–13 (discussing D.C. Code §§ 16-3702, 16-3703 and case law). Defendants explained that the Complaint falls short of the D.C. Code's requirements because Plaintiff fails to plead: (1) that *he* owns the records at issue; (2) that the records must "be taken from the defendants and delivered *to him*"; and (3) that he "is entitled to recover possession" of the records "proposed to be replevied." *See id.* 11–12 (quoting D.C. Code §§ 16-3702, 16-3703) (emphasis added).

In response, Plaintiff effectively concedes that he has failed to plead the elements enumerated in the D.C. Code. *See* Pl.'s Mem. in Opp'n to the Defs' Mot. to Dismiss, ECF No.

13 ("Pl.'s Opp'n") at 11.  Instead, Plaintiff asserts: "a replevin claim need not specifically plead every element of D.C. Code §16-3702."  *Id.*  Plaintiff is mistaken.  In support of his position, Plaintiff cites only *United States v. Navarro*, 2023 WL 2424625 (D.D.C. Mar. 9, 2023).  But, in *Navarro*, the Court did not lower the "strict" standard for pleading a replevin claim under D.C. law.  *BMO Harris Bank N.A. v. Dist. Logistics, LLC*, 2021 WL 7448012, at *4 (D.D.C. July 23, 2021), *report and recommendation adopted*, 2021 WL 7448010 (D.D.C. Dec. 22, 2021); *see also Deegan v. Strategic Azimuth LLC*, 768 F. Supp. 2d 107, 117 (D.D.C. 2011).  To the contrary: the Court in *Navarro* recognized that "Courts in this Circuit considering a claim of replevin under the D.C. Code look to D.C. law . . . to determine whether a party has stated a viable replevin claim."  2023 WL 2424625, at *10.  The Court then quoted D.C. Code Section 16-3702—the same statute on which Defendants rely here—and considered the argument, advanced in that case, that D.C. law requires a party to allege a monetary value for the property to be replevied.  *See id.*

The Court in *Navarro* concluded that an allegation as to monetary value was not required in the circumstances presented there because, "[p]ursuant to D.C. Code § 16-3702, a replevin plaintiff must demand *either* of two remedies: '[that the property] be taken from the defendant and delivered to him; or, *if they are eloigned*,[2] that he may have judgment of their value and all mesne profits and damages, which he estimates at [a certain amount of] dollars, besides costs.'"  *Navarro*, 2023 WL 2424625, at *11 (quoting D.C. Code § 16-3702) (emphasis the Court's).  On

---

[2] Black's Law Dictionary defines "to eloign" as "[t]o remove (a person or property) from a court's or sheriff's jurisdiction."  Black's Law Dictionary (11th ed. 2019).  Thus, when the statute refers to a situation in which property "[is] eloigned," the statute is addressing circumstances in which "property cannot be returned to the plaintiff," and "compensation is the sole available remedy."  *Navarro*, 2023 WL 2424625, at *11.

that basis, the Court held that where the "remedy sought . . . is explicitly and solely the return of the wrongfully withheld property," "the monetary value of the property is . . . irrelevant" and need not be pled.

That principle cannot salvage Plaintiff's replevin claim here. Defendants do not contend that Plaintiff should have alleged a monetary value for the records that he seeks to be replevied. *See* Defs' Mot. at 11–12. Instead, Plaintiff's replevin claim is analogous to that in *BMO Harris Bank*, where the plaintiff failed to state a cause of action because it "failed to meet *either* requirement of the D.C. statute"—"it neither stated the value of the equipment at issue nor did it claim that the equipment should be taken and delivered to it." *Navarro*, 2023 WL 2424625, at *11 (discussing *BMO Harris Bank*, 2021 WL 7448012, at *9) (emphasis added).

So, too, with Plaintiff's claim. The Complaint alleges neither a value for the records at issue, nor that the records must "be taken from the defendants and delivered to [plaintiff]." Instead, Plaintiff alleges that the records must be taken from one Defendant agency, reclassified as Presidential records, and delivered *to another Defendant agency*. *See* Compl., Prayer for Relief (ii) (requesting an order "to ensure the immediate return of the [subject records] to the National Archives"). Therefore, like the Complaint in *BMO Harris Bank*, the Complaint in this case fails to state a claim for replevin under D.C. law.

Plaintiff's replevin claim also fails because he omits two other elements required under D.C. law: First, Plaintiff fails to plead that he owns the records at issue. *See* D.C. Code § 16-3702 ("[a] complaint in replevin shall be in the following or equivalent form: The plaintiff sues the defendant for (wrongly taking and detaining) (unjustly detaining) *the plaintiff's* goods and chattels . . .") (emphasis added). Nothing in *Navarro* qualifies or suspends this statutory requirement. Rather, in that case, that element was indisputably satisfied; as the Court observed:

"a party ha[d] wrongfully detained property belonging to the United States, [and] the United States ha[d] sued for the return of the property." *Navarro*, 2023 WL 2424625, at *10.

Second, Plaintiff also fails to allege that he "is entitled to recover possession" of the records "proposed to be replevied." D.C. Code § 16-3703; *see also, e.g. Smith, Kirkpatrick & Co. v. Cont'l Autos, Ltd.*, 184 F. Supp. 764, 766 (D.D.C. 1960) ("to recover, the plaintiff must have a right to immediate possession of the property at the commencement of the action"); *see also* 66 Am. Jur. 2d Replevin § 13. This deficiency constitutes an additional, independent reason why Plaintiff fails to state a claim.

Plaintiff attempts to bridge this deficiency in his Opposition, asserting that he "has alleged he is entitled to immediate possession of the records," based solely on his citation to Section 2205 of the Presidential Records Act. Pl.'s Opp'n at 11. That provision states: "the Presidential records of a former President shall be available to such former President or the former President's designated representative." 44 U.S.C. § 2205(3). But even if the records at issue were Presidential records—and they are not for the reasons explained in Defendants' Motion, *see* Defs' Mot. at 7–8, 15—this provision would entitle Plaintiff to *access* rather than possession. A different provision of the Presidential Records Act conclusively establishes that only the United States is entitled to possession of Presidential records; according to Section 2202: "The United States shall reserve and retain complete ownership, *possession*, and control of Presidential records." 44 U.S.C. § 2202 (emphasis added). Plaintiff does not dispute this proposition. *See* Pl.'s Opp'n, *generally*.

And Plaintiff's assertion that Section 2205 entitles him to "immediate possession" of the records is inconsistent not only with the text of Section 2202—which unequivocally states that only the United States is entitled to possession of Presidential records—it is also inconsistent

with Section 2205, which provides only that the records "shall be available" to the former President, which establishes neither possession nor ownership. Plaintiff also contradicts the plain meaning of the word "possession" as used in the Complaint. Black's Law Dictionary defines "immediate possession," as "[p]ossession that is acquired or retained *directly* or *personally*." Black's Law Dictionary (11th ed. 2019) (emphasis added). It defines "possession" as "1. [t]he fact of having or holding property in one's power; the exercise of dominion over property. 2. The right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object." *Id.* Plaintiff seeks no relief in the Complaint that would provide him "direct or personal" "power" or "dominion" over the subject records. Rather, the Complaint seeks the transfer of the subject records from DOJ to NARA. *See* Compl., Prayer for Relief (ii).

For all these reasons, and the reasons explained in Defendants' Motion, Plaintiff has failed to state a claim for replevin.

### B. Plaintiff's Allegations Fall Far Short of the Requirements for Mandamus Jurisdiction.

In their Motion, Defendants identified three reasons why Plaintiff cannot establish the elements necessary for mandamus jurisdiction. Defendants explained that Plaintiff cannot demonstrate a "clear and indisputable right to relief" because D.C. Circuit precedent precludes review of a President's day-to-day operations under the Presidential Records Act, including the decision by the then-President's Chief of Staff to return the records at issue to the DOJ. *See* Defs' Mot. at 14–15. Defendants further discussed that Plaintiff cannot demonstrate a clear and indisputable right to relief because the Presidential Records Act excludes federal records that are subject to FOIA from its definition of "Presidential records." *See id.* at 15. And, finally, Defendants explained that there is no duty, clear or otherwise, for the Department of Justice to

7

transfer these materials—which have been treated as federal records and are being processed under FOIA—to NARA. *See id.* at 16–17.

In response, Plaintiff insists that the Court has mandamus jurisdiction here because the records in question are Presidential records notwithstanding that then-Chief of Staff Meadows returned them to DOJ. *See* Pl.'s Opp'n at 8–9. Plaintiff does not respond directly to the D.C. Circuit precedent holding that there is no jurisdiction to review such day-to-day decisions as Mr. Meadows's return of the records to DOJ. *See id.* at 12. However, Plaintiff's position appears to be that because, in his view, the return of the records did not affect their legal status, Plaintiff is not actually asking the Court to review Mr. Meadows's decision. Plaintiff also presents a second argument from the definition of "Presidential record" in the Presidential Records Act. *See id.* at 10. Then, from the premise that the records are currently Presidential records, Plaintiff concludes that there is a clear duty for NARA to make the records available to him. Plaintiff errs for several reasons.

1. **Plaintiff Cannot Meet His Burden to Establish a "Clear and Indisputable Right to Relief" Forming the Basis of Mandamus Jurisdiction.**

    a) **Especially in the context of a request for a writ of mandamus, importing the "modified control test" cannot salvage Plaintiff's claim.**

First, Plaintiff's contention, that whether the subject records are Presidential records notwithstanding that Mr. Meadows returned them to DOJ, depends on importing a doctrine from another context, and applying it in a way that no court previously has done. Because mandamus jurisdiction depends on "clear and indisputable" right to relief, the Plaintiff's reliance on an approach never adopted by any court is itself fatal to his claim. *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997), the mandamus case on which Plaintiff relies, illustrates just how ill-suited Plaintiff's arguments are to this context. In *North States Power Co.*,

where the mandamus relief requested was granted in part, the D.C. Circuit explained that it was so ordering "because DOE ha[d] not abided by [the D.C. Circuit's] prior conclusion that the [statute at issue] impose[d] an unconditional obligation on the Department to begin disposal of the [spent nuclear fuel] by [a date certain]." *Id.* at 761.  In other words, the Court was essentially giving effect to a prior Court order interpreting the statute at issue. *See id.*

Here, by contrast, although Plaintiff omits to say so in his brief discussion of mandamus, *see* Pl.'s Opp'n at 12, Plaintiff's contention that the subject records should be treated as Presidential records is based on an inversion of a test from a different setting:  Plaintiff contends that this Court should use the test for determining whether a record is subject to FOIA, to determine whether—after a record was transferred by the White House to an agency—that record should be transferred *back* from the agency to the White House, or, in this case, NARA. *See* Pl's Opp'n at 6, 8 (citing *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208 (D.C. Cir. 2013) and *United We Stand America, Inc. v. I.R.S.*, 359 F.3d 595 (D.C. Cir. 2004)).  To the Defendants' knowledge, no Court has used that test as Plaintiff proposes, and there is good reason to decline to do so.

The "modified control test" on which Plaintiff relies, *see* Pl.'s Opp'n at 6, 8–10, was crafted by the D.C. Circuit to address the applicability of FOIA to "documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA," *Judicial Watch, Inc.*, 726 F.3d at 221.  The D.C. Circuit explained that, in such cases whether a record is subject to FOIA turns on whether the governmental entity not covered by FOIA "manifested a clear intent to control the document." *Id.* (quoting *United We Stand*, 359 F.3d at 596.).  The doctrine originated in cases where the governmental entity not covered by FOIA was Congress, and developed to protect Congress's "constitutional prerogative

9

of maintaining secrecy" lest public disclosure through FOIA "impair[] its oversight role." *See id.* (quoting *United We Stand*, 359 F.3d at 599). In *Judicial Watch*, the D.C. Circuit recognized that "the Office of the President has comparable constitutional prerogatives" including to "safeguard the confidentiality of its communications." *Id.* (quotation omitted); *see also id.* at 224. The D.C. Circuit observed that "special considerations control in such circumstances," *id.* at 224, and underscored that "Congress crafted FOIA to avoid intruding on the confidentiality of presidential communications." *Id.*

Plaintiff would have this Court turn that doctrine on its head; there is no allegation here that the White House intended to keep the subject records confidential. To the contrary, Plaintiff contends that "[t]he binder resulted from a Presidential directive, created to *make public*" information in the subject records. Pl.'s Opp'n at 6 (emphasis added). In that context, a test designed with the purpose of protecting confidentiality is a poor fit.

Moreover, even if the test applied, it would not aid Plaintiff's cause. As to the "intent of the record's creator," *United We Stand*, 359 F.3d at 599, while Plaintiff argues that the former President was the "creator" of the records at issue because he directed the creation of the binder, *see* Pl.'s Opp'n at 8, it was DOJ that compiled the materials and DOJ that created the binder's contents in the first instance. And, when the binder's contents were first created, they were in aid of an FBI investigation, rather than with the intention that they ultimately be transferred to the White House.

As to the second factor that Plaintiff cites as "determinative," the ability of the agency to "use and dispose of the record as it sees fit," Pl.'s Opp's at 8, Plaintiff misapprehends the meaning of this element, and therefore errs in arguing that this factor favors his position. The D.C. Circuit in *United We Stand* explained that the purpose of this analysis is to give effect to

10

"the general proposition that the agency to whom the FOIA request is directed must have exclusive control of the disputed documents." *United We Stand*, 359 F.3d at 600. The Court's subsequent discussion makes clear that what is meant by "control" in this setting—consistent with the purpose discussed above, *see supra* 9–10—is the extent to which the entity not subject to FOIA intended to control the materials *in order to maintain their confidentiality*. *See*, *e.g. United We Stand*, 359 F.3d at 600–01(analyzing the scope of Congress's "confidentiality directive" relative to the records at issue); *Goland v. CIA*, 607 F.2d 339, 343 (D.C. Cir. 1978) (discussing that Congress clearly intended to retain control of a document that it had marked "secret"); *Judicial Watch, Inc.*, 726 F.3d at 231–32 ("It is the presentence of this unacceptable choice" —"which would put the President on the horns of a dilemma between surrendering his confidentiality and jeopardizing his safety" —"that is central to our understanding that the President exercises control over these visitor logs"). The instruction with which Mr. Meadows returned the records in this case to DOJ is just the opposite: he returned the binder to the agency that had created it, and instructed that the binder be released with redaction.³ Such instruction cannot qualify as an intent to "control" the documents under the case law on which Plaintiff

---

³ Plaintiff relies heavily on then-President Trump's instruction on January 19, 2021, that the subject records be "return[ed]" so that the binder "may be disclosed *by the White House*." Pl.'s Opp'n at 7 (quoting Mem., Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation, 86 F.R. 6843 (Jan. 19, 2021)) (emphasis Plaintiff's); *see also id.* at 8 (quoting direction to the Attorney General to "*return to the White House* an appropriately redacted copy" of the binder) (quoting 86 F.R. at 6843) (emphasis Plaintiff's); *see also id.* at 8–9. But that argument overlooks that on the next day, the then-White House Chief of Staff issued a superseding directive that the binder *not* be returned, but instead be retained by the agency for redaction and subsequent release. Thus, even if the President had previously announced a different intention, the instruction ultimately given was for the documents to remain with the Department of Justice and then released without being returned to the White House. *See* Compl., ECF No. 1-2 at 1; *see also id.* (explaining that, in reality, this "is a routine practice for agency records that are undergoing declassification or similar review by other agencies or the White House").

relies. Moreover, Mr. Meadows made clear in his memorandum that he was relinquishing control of the binder, not retaining it. He instructed DOJ to use its discretion to apply redactions as it saw fit. Moreover, he did not demand that the binder be returned to the White House, as he could have had he intended that it be treated as a Presidential record. He left it in the hands of DOJ to redact and release, as DOJ has done and continues to do under FOIA.

In sum, then, Plaintiff is mistaken in arguing that the "modified control test" has any application here, but, if it did apply, this test would not support recharacterizing the subject materials as Presidential records. Indeed, even if the analysis did not so clearly cut against Plaintiff, in the mandamus setting Plaintiff could not establish jurisdiction. *Cf. In re Trump*, 958 F.3d 274, 287 (4th Cir. 2020) ("When assessing whether to issue a writ of mandamus, a court does not balance the respective merits of the parties' arguments but instead determines whether the petitioner has established a clear and indisputable right to the writ."); *United States v. Horak*, 833 F.2d 1235, 1250 (7th Cir. 1987) (denying mandamus relief where the Court found party's construction of a statute "certainly persuasive although not sufficiently 'indisputable' to demand a writ of mandamus").

### b) Nor can the definition of "Presidential record" supplied by the Presidential Records Act support mandamus jurisdiction.

In addition to his argument based on the modified control test, Plaintiff also argues that the subject records are "Presidential records" based on the definition provided in Section 2201 of the Presidential Records Act. *See* Pl.'s Opp'n at 10. Plaintiff correctly quotes the first part of the statutory definition, which encompasses, *inter alia*, "'documentary materials' that are 'created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President' and 'which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.'" *See*

12

*id.* (quoting 44 U.S.C. § 2201(2)).  But Plaintiff omits a subsequent portion of the definition, which Defendants had discussed in their opening brief, *see* Defs' Mot. at 15, that expressly excludes "any documentary materials that are . . . official records of an agency."  44 U.S.C. § 2201(2)(B)(i).  *See also Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1 F.3d 1274, 1292 (D.C. Cir. 1993) (recognizing "the PRA exclusion of records subject to the FOIA from the class of materials that may be treated as presidential records").  Therefore, far from supporting Plaintiff's argument that the records at issue here are Presidential records, the text of the Presidential Records Act excludes them because, as noted above, they are being processed in response to a FOIA request.[4]

### 2. Plaintiff Cannot Establish the Clear Duty to Act Necessary to Support Mandamus Jurisdiction.

Because, as discussed above, the records at issue are federal records rather than Presidential records, Plaintiff cannot establish a duty, much less a "clear duty," to reclassify the records and transfer them from DOJ to NARA.  *See also* Defs' Mot. at 16–17 (discussing case law).

Evidently in aid of his effort to characterize Defendants as avoiding their statutory duties, Plaintiff attempts to paint Defendants as giving inconsistent reasons as to why he has not had access to the subject records.  *See* Pl.'s Opp'n at 3–4.  On Plaintiff's telling, NARA first denied that it had the binder, and then reversed course and said it had the binder or copies of materials from the binder, but that the binder's contents were classified.  *See id.*  Plaintiff is demonstrably wrong, and his confusion is puzzling.

---

[4] Even if Plaintiff disagrees that they should have been so processed, the fact that they have been processed under FOIA makes it far from "indisputable" that the subject records fit within the Presidential Records Act definition of "Presidential records."

In the first email responding to Plaintiff's inquiry about the subject records, NARA's General Counsel explained that NARA had previously searched for the binder, and "learned that the binder had been returned to the Department of Justice on January 20, 2021, per [the] memo from Chief of Staff Mark Meadows." *See* Email from G. Stern to J. Solomon (Jun. 23, 2022), Compl., Ex. 2, ECF No. 1-2 at 13. In the *same* communication, he reported that although NARA did "not have the binder containing the declassified records," "what [NARA was] able to locate is a box that contains roughly 2700 undifferentiated pages of documents with varying types of classification and declassification markings." *Id.* He continued: "we could not be certain of the classification status of any of the information in the box. We are therefore obligated under Executive Order 13526 to treat the contents of the box as classified at the TS/SCI level." *Id.* Plaintiff is simply wrong to assert that NARA only later disclosed that it had copies of certain records in the binder, *see* Pl.'s Opp'n at 3, or that those copies must be treated as classified. *See id.* All of that information appeared in the initial response to Plaintiff's request for access. *See* Email from G. Stern to J. Solomon (Jun. 23, 2022), Compl., Ex. 2, ECF No. 1-2 at 13.

Nor can Plaintiff claim surprise that the records at DOJ have been processed under FOIA, as Plaintiff appears to do in his Opposition. *See* Pl.'s Opp'n at 3–4 ("[T]he Archives assured Mr. Solomon that it would 'have a fully releasable set of records' as soon as the Department of Justice completed its review. Now, the Defendants say that they 'have correctly treated these records as agency records subject to the FOIA.'") (citation omitted). In reality, the context of the initially quoted language was as follows: "I have asked DOJ to complete its review as quickly as possible, so that we can all have a fully releasable set of records. But, as previously noted, the documents are now the subject of a FOIA lawsuit with DOJ." *See* Email from G. Stern to J. Solomon (Aug. 17, 2022), Compl., Ex. 2, ECF No. 1-2 at 1. Over a month before that

14

communication, NARA's General Counsel had written: "It's my understanding that the DOJ Office of Information Policy is processing the binder in response to the FOIA request and lawsuit, as described in the Joint Status Report that I shared with you yesterday . . . . The binder that was sent back to DOJ is a federal record of that agency, which is managed separately under the Federal Records Act." Email from G. Stern to K. Patel (July 14, 2022), Compl., Ex. 2, ECF No. 1-2 at 9. And, again, even before that, NARA's General Counsel wrote to Plaintiff:

> The binder that is now in DOJ custody is subject to FOIA, and I have been informed by DOJ that it is the subject of an ongoing FOIA request and lawsuit, which means that DOJ is currently conducting the type of review that you have requested. The lawsuit is *Judicial Watch v. DOJ*, and attached is the most recent Joint Status Report that was filed with the court on May 31, 2022. It is my understanding that the "approximately 880 pages [referred] for consultation to other federal agencies and agency components, including the Federal Bureau of Investigation ('FBI'),' is a reference to the binder. Accordingly, it probably makes most sense for you to try to obtain a copy of whatever the DOJ is releasing in this case.

Email from G. Stern to J. Solomon (July 12, 2022), Compl., Ex. 2, ECF No. 1-2 at 11.

Accordingly, to the extent Plaintiff relies on alleged changes in the Government's position as to the status of these records in aid of his request for mandamus, the Court should give no weight to that argument. The full text of the correspondence that Plaintiff attaches to the Complaint demonstrates that his allegations are wholly without merit.

## CONCLUSION

For the foregoing reasons and for the reasons explained in Defendants' Motion, the Court should dismiss the Complaint in its entirety, with prejudice.

Dated: July 5, 2023                               Respectfully submitted,

                                                  BRIAN M. BOYNTON
                                                  Principal Deputy Assistant Attorney General

        ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
Deputy Director
Federal Programs Branch

*/s/  Julia A. Heiman*
JULIA A. HEIMAN (D.C. Bar No. 986228)
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 616-8480 / Fax (202) 616-8470
julia.heiman@usdoj.gov
*Attorneys for Defendants*