## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN SOLOMON,

                    *Plaintiff,*

          v.

MERRICK GARLAND, *et al.*

                    *Defendants.*

Case No.: 1:23-cv-00759-RJL

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MR. SOLOMON'S PARTIAL MOTION FOR SUMMARY JUDGMENT

### Introduction

A binder of documents compiled for and declassified by the President is not transformed into an agency record by a memorandum from the President's chief-of-staff directing the agency to make redactions consistent with Privacy Act standards and then release them to the public. 44 U.S.C. § 2201(2)(B); *Jud. Watch, Inc. v. U.S. Secret Serv.,* 726 F.3d 208, 231 (D.C. Cir. 2013) (Garland, C.J.). Mr. Solomon has a clear right to review the Crossfire Hurricane binder; the defendants must turn it over to him. Therefore, he should be granted summary judgment. *See Am. Hosp. Ass'n v. Burwell,* 812 F.3d 183, 189 (D.C. Cir. 2016).

### Standard of Review

Mr. Solomon has pled a mandamus claim for relief under 28 U.S.C. § 1361. This court has found, and the government has acknowledged, that a plaintiff may seek mandamus for Presidential Records Act violations. *Citizens for Resp. & Ethics*

*in Washington v. Cheney*, 593 F. Supp. 2d. 194, 217 (D.D.C. 2009) (Kollar-Kotelly, J.) (quoting the government's brief). A plaintiff is entitled to mandamus when there is "a clear and indisputable right to relief," "a clear duty to act," "no adequate alternative remedy," and "compelling equitable grounds for relief." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see also Citizens for Resp. & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 135 (D.D.C. 2018), *aff'd,* 924 F.3d 602 (D.C. Cir. 2019), and *aff'd,* 924 F.3d 602 (D.C. Cir. 2019).

Summary judgment should be granted if there is no genuine dispute as to any material fact, and Mr. Solomon is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute about a material fact is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (cleaned up); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

## Facts

Former President Trump decided to declassify Crossfire Hurricane records and make them public so Americans would know the truth. Pl.'s Statement of Undisputed Material Facts ¶ 10. Accordingly, at the President's request, the Department of Justice provided the White House with a binder of materials related to the Federal Bureau of Investigation's Crossfire Hurricane investigation on December 30, 2020. *See* Memorandum of January 19, 2021: Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation, 86 Fed. Reg. 6,843 (Jan. 25, 2021) (the

"Declassification Memo") (attached as Exhibit 3); Pl.'s Statement of Undisputed Material Facts ¶¶ 6–9.

The President requested these documents because portions had been classified and withheld from Congress and the public; he reviewed them and decided that the binder should be declassified to the maximum extent possible. Declassification Memo § 1. In response, and as part of the iterative process of the declassification review, under a cover letter dated January 17, 2021, the Bureau noted its continuing objection to any further declassification of the materials in the binder and, on a review that included Intelligence Community equities, identified the passages that it believed it was most crucial to keep from public disclosure. Declassification Memo § 1; Pl.'s Statement of Undisputed Material Facts ¶ 11.

Among other things, the binder contained embarrassing information about the Bureau's officials and the government's conduct in the case. Pl.'s Statement of Undisputed Material Facts ¶ 12. In any event, the President accepted the proposed minimal redactions and declassified the rest of the binder. Declassification Memo § 1; Pl.'s Statement of Undisputed Material Facts ¶ 13. He directed the Attorney General to make the redactions proposed in the Bureau's January 17 letter and return the binder to the White House. Declassification Memo § 1; Pl.'s Statement of Undisputed Material Facts ¶ 13. The President's Crossfire Hurricane binder contained about 2,700 pages and was approximately ten inches thick. Pl.'s Statement of Undisputed Material Facts ¶ 15.

In mid-January 2021, Mr. Solomon was informed by White House Chief of Staff Mark Meadows that former President Trump was going to authorize the declassification of Crossfire Hurricane investigation documents. Meadows told him that the White House had gathered the records from agencies, that Trump was preparing a declassification order, and that the records would be made available to him and other reporters before President Trump left office on January 20, 2021, after they had been reviewed and declassified by White House staff. *Id.* ¶¶ 18–19.

In the final 48 hours before President Trump left office, Mr. Solomon was told by the President and Meadows that the Crossfire Hurricane binder had been declassified. On January 19, 2021, Meadows invited Mr. Solomon to the White House to review several hundred pages of declassified documents and to discuss a plan for publicly disseminating the entire binder to the American public on the morning of January 20, 2021. *Id.* ¶¶ 20–21.

At the White House, Mr. Solomon quickly thumbed through the Crossfire Hurricane binder to understand the nature and quantity of the records after being assured by Meadows and a White House lawyer that the binder had been declassified and after being shown a copy of the President's signed declassification order. Mr. Solomon saw "lightly redacted" versions of the fourth Crossfire Hurricane FISA warrants, a 2017 FBI 302 interview report with Christopher Steele, several tasking orders related to a second Confidential Human Source named Stefan Halper, and other documents. *Id.* ¶¶ 22–23. The records had markings consistent with documents Mr. Solomon had previously seen on declassified government documents, such as

lines through words like "NOFORN." Mr. Meadows told Mr. Solomon that the White House had made the final decisions on which passages to declassify and which to keep redacted in each document. *Id.* ¶¶ 24–25.

Mr. Meadows discussed a strategy for publicly releasing the documents with Mr. Solomon via the Just the News Web site. The plan included getting him a copy of the binder on an embargoed basis that his staff could begin scanning the evening of January 19, 2021, for release the following morning; and getting Mr. Solomon a smaller second set of records that he could write about that night. *Id.* ¶¶ 26–28.

Mr. Solomon's staff went to the White House early in the evening of January 19, 2021, to get the binder and begin scanning. The now declassified records were given to them in a paper bag; separately, a Department of Justice envelope was delivered to Mr. Solomon's office containing the documents he was permitted to write about that evening. Mr. Solomon scanned them and began writing a quick story. *Id.* ¶¶ 30–32, 34. Mr. Solomon confirmed that the records in the Department's envelope were identical to those in the binder. *Id.* ¶ 33.

Also on the night of January 19, 2021, Mr. Solomon's staff began setting up a scanning operation for the complete set of documents to be released the next morning. But as they set up the equipment, they received a call from the White House asking that the documents—still under embargo—be returned because the White House wished to make some additional redactions to unclassified information under the Privacy Act. *Id.* ¶¶ 35–36.

According to the Department of Justice Office of Legal Counsel, the Crossfire Hurricane binder was not subject to the Privacy Act. Memorandum from the Chief of Staff to the Attorney General, Privacy Act Review of Certain Declassified Materials Related to the FBI's Crossfire Hurricane Investigation at 1 (Jan. 20, 2021) (the "Meadows Memo") (attached as Exhibit 4), https://bit.ly/3sd1Ggf (last visited August 10, 2023). Nevertheless, on his initiative and without the President's knowledge or consent, one of the President's subordinates decided that redactions consistent with the standards of the Privacy Act should be applied to the binder before it was publicly released, the Office of Legal Counsel's opinion notwithstanding. Pl.'s Statement of Undisputed Material Facts ¶ 37; *see also* JUST THE VIEWS, *Brief: One on One with John Solomon and Mark Meadow* (July 19, 2021), https://bit.ly/3OwnTgV. The scanning operation was halted, and the records returned to the White House. Mr. Meadows promised Mr. Solomon that he would receive the revised binder. However, this never occurred. Pl.'s Statement of Undisputed Material Facts ¶¶ 38–39.

On January 20, 2021, and without the President's knowledge or consent, Mr. Meadows sent the binder to the Department of Justice with a cover memorandum directing the Attorney General to apply redactions consistent with the standards of the Privacy Act and then publicly release it. Meadows Memo at 1; Pl.'s Statement of Undisputed Material Facts ¶¶ 41, 43–44. The Department of Justice received it that morning, with the expectation that the documents would be disseminated with the redactions made within a few days. *Id.* ¶¶ 41–42; JUST THE VIEWS, *supra*. Also, on January 20, Mr. Meadows placed a copy of the binder's contents in a box for transfer

6

to the Archives as Presidential records. Pl.'s Statement of Undisputed Material Facts ¶ 45.

On June 17, 2022, Evan Corcoran, the former President's attorney, e-mailed Gary Stern, General Counsel of the National Archives and Records Administration stating that the former President intended to sign a letter designating Kash Patel and Mr. Solomon as his representatives, and informing him that they would like to begin reviewing the documents at the Archives on June 21, 2022. *Id*. ¶ 46. On June 17, 2022, Mr. Stern replied that the Archives could begin the process of providing them with access to Trump's Presidential records once it received both the former President's letter and a specific description of the documents for review. *Id*. ¶ 47.

On June 19, 2022, the former President designated Mr. Patel and Mr. Solomon as his representatives for access to Presidential records from his administration. *Id*. ¶ 48. On June 22, 2022, Mr. Solomon e-mailed Mr. Stern stating that he understood the former President's authorization letter had been received and that the first request was for "a binder of documents from the Russia investigation that the President declassified with an order in his last few days in office. It is about 10 inches thick. It includes documents such as the last two approved FISA warrants the FBI sought in their fully declassified state, the debriefing documents, tasking orders and validation reports for confidential human sources Christopher Steele and Stefan Halper and other documents." Mr. Solomon stated that he intended to make copies of every document declassified by the former President's order. *Id*. ¶ 49.

On June 23, 2022, Mr. Stern e-mailed Mr. Solomon that the Archives did not have the binder because it had been "returned" to the Department of Justice on January 20, 2021, per Chief of Staff Mark Meadows's memorandum to the Attorney General. Mr. Stern also stated that the Archives was separately able to locate a box that contained roughly 2,700 "undifferentiated pages of documents with varying types of classification and declassification markings." Mr. Stern also stated that because the Archives could not ascertain the classification status of any information in the box, it would treat its contents as "classified at the TS/SCI level." *Id*. ¶¶ 50–52. The Archives could have ascertained the classification status of these records at any time simply by comparing the binder with the boxed papers. *Id*. ¶ 53. However, it has never chosen to do so. *Id*. ¶ 54.

On July 7, 2022, Mr. Solomon e-mailed Mr. Stern stating that he believed the records held by the Archives were the same documents that the former President had declassified and that they were copied from the binder in preparation for release to the news media on the morning of January 20, 2021. Mr. Solomon further requested a Mandatory Declassification Review of those documents to confirm that they were the same as the declassified records. Mr. Solomon further asked that Kash Patel— who had an active TS/SCI clearance and was familiar with the documents in the binder—simultaneously review them to confirm their provenance. *Id*. ¶¶ 55–57. On July 12, 2022, Mr. Stern replied that "the Trump Presidential records" were unavailable for the Mandatory Declassification Review procedures under the Presidential Records Act. Mr. Stern also stated that the binder was now subject to a

FOIA lawsuit, which meant that the Department of Justice was conducting the type of review Mr. Solomon requested and that he should try and obtain a copy of the records released by the Department of Justice in that case. *Id.* ¶¶ 58–59.

On July 14, 2022, Mr. Stern e-mailed Mr. Patel stating that, while the Archives did receive multiple copies of documents from the binder in a box, they were unorganized. Mr. Stern also noted that the Archive's review of the box found instances of the same document being redacted differently, and some documents did not have the required declassification marking. Mr. Stern also stated that the binder sent to the Department of Justice by Mr. Meadows for the specific purpose of Privacy Act redactions and public release was a federal record managed separately under the Federal Records Act. *Id.* ¶¶ 60–62.

On August 14, 2022, Mr. Solomon e-mailed Mr. Stern stating that the declassified Crossfire Hurricane records were Presidential records and asking what efforts had been made to retrieve them from the Department of Justice. On August 17, 2022, Mr. Stern replied that the "bulk of the binder" returned according to Meadows's January 20, 2021, memorandum was intended to remain with the Department of Justice. Mr. Stern also stated that while the White House separately retained copies of those documents as Presidential records, the records were "not in an easily discernible manner." Mr. Stern also stated that he had asked the Department of Justice to complete its review as quickly as possible and release the records, as they were subject to a FOIA lawsuit. *Id.* ¶¶ 63–66.

The Trump White House always considered the Crossfire Hurricane binder a Presidential record and never intended to give up control over it. *Id*. ¶ 17; Declassification Memo § 1; Meadows Memo at 1. Mr. Meadow's decision to send the binder for review consistent with the standards of the Privacy Act and release by the Attorney General was unauthorized. Pl.'s Statement of Undisputed Material Facts ¶¶ 43–44. But this did not turn the binder into an agency record, for he left the agency no discretion over it. Meadows Memo at 1; Pl.'s Statement of Undisputed Material Facts ¶ 41.

The Bureau has been releasing Crossfire Hurricane records under the Freedom of Information Act and posting them in its online Freedom of Information Act Vault at https://vault.fbi.gov/crossfire-hurricane-part-01. But the government has not released the binder. Rather, it has seemingly released only a small part of the binder's contents with substantial additional redactions, including redactions for FOIA exemptions unrelated to those specified by Mr. Meadows. Pl.'s Statement of Undisputed Material Facts ¶¶ 67–69; *compare* Solomon Aff., <u>Appendix A</u> (binder records) and <u>Appendix B</u> (Vault records). What Meadows sent the Attorney General on January 20, 2021, and what the Bureau posted in its Vault are not the same thing.

Mr. Solomon properly requested access to the former President's Crossfire Hurricane binder. The Biden Administration had no authority to alter or destroy it, so Mr. Solomon assumes it still exists just as it was received. Yet, making ever-changing excuses, the defendants have stonewalled Mr. Solomon, denying him access

in violation of the Presidential Records Act. Accordingly, Mr. Solomon seeks a writ of mandamus.

## Argument

### I.     Mr. Solomon Deserves a Writ of Mandamus.

#### A.     Mr. Solomon has a clear right to relief.

Mr. Solomon has a clear right to relief. He fully complied with the Presidential Records Act, but the Defendants have refused to perform their reciprocal (and mandatory) duties. *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997). It is undisputed that Mr. Solomon is former President Trump's "designated representative" concerning the Crossfire Hurricane binder; that he has appropriately requested that the subject records be made available to him under 44 U.S.C. § 2205(3), *see Cook v. NARA,* 758 F.3d 168, 177 (2d Cir. 2014); and that the Defendants will not make it available to him. Therefore, Mr. Solomon has a clear right to relief.

#### B.     The defendants have a clear duty to act.

The Presidential Records Act provides that the Presidential records of a former President "*shall* be available" to the former President or his designated representative. 44 U.S.C. § 2205(3) (emphasis added). Thus, the Defendants' duty to act could not be clearer—they *must* make the binder available to Mr. Solomon. *See Northern States,* 128 F.3d at 758; *accord Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 400 (2008); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

The Defendants resist for two reasons. *First*, they rely on a *post hoc* "we processed some Crossfire Hurricane records under the Freedom of Information Act; therefore, the binder is an agency record" argument. They claim that because some heavily redacted Crossfire Hurricane records will eventually be "on the Federal Bureau of Investigation's FOIA public reading room," the passage of time washes away their unlawful conduct and eviscerates Mr. Solomon's claim to the binder. Defs.' Reply Supp. Mot. Dismiss at 1, 13. *Second*, they pretend that the legal standard is not whether the President intended to reserve control over the records but whether he anticipated that an agency directed to apply very specific redactions would exercise "discretion" concerning the disposition thereof. Defs.' Reply Supp. Mot. Dismiss at 1, 3, 12.

These arguments are meritless. The Defendants concede that the D.C. Circuit's modified control test controls. *See Jud. Watch*, 726 F.3d at 231. And the undisputed facts are that the former President ordered the creation of the Crossfire Hurricane binder to conduct his official duties and that the White House intended to retain control over the binder and its records at all relevant times. The Attorney General *never* could use and dispose of the binder as he saw fit. Declassification Memo § 1; Meadows Memo at 1; *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013). Thus, the fully declassified binder is a Presidential record under 44 U.S.C. § 2201(2) that should be made available to Mr. Solomon.

12

### 1. Agency records compiled for the President's declassification review and public release are Presidential records.

The Defendants claim that because some Crossfire Hurricane records are now "being processed in response to a FOIA request," the binder cannot be a Presidential record. Defs.' Reply Supp. Mot. Dismiss at 13, citing 44 U.S.C. § 2201(2)(B)(i). The Presidential Records Act provides that "materials" "received by the President" in his official, constitutional, or statutory duties are Presidential records. 44 U.S.C. § 2201(2). While it is true that "official records of an agency" are excluded from the scope of presidential records, *see* 44 U.S.C. § 2201(2)(B)(i), if the Defendants' *post hoc* arguments applied *ex-ante* were right, then agency records "received by the President" could *never* be Presidential records. This is not the law. 44 U.S.C. § 2201(2). When an agency is ordered to compile a binder for the President so that he may conduct a declassification review, directed to apply specific redactions, and then ordered to make the redacted binder public, the indicia of White House intent are clear and compelling. *Accord U.S. Secret Serv.,* 726 F.3d at 223 (records created by the Secret Service but then transferred to the White House Office of Records Management are not agency records); *Buzzfeed, Inc. v. Fed. Bureau of Investigation*, 613 F. Supp. 3d 453, 466 (D.D.C. 2020) (records created by the FBI that the President uses for official constitutional duties are not disclosable under FOIA).

The Declassification Memo directed the Attorney General to redact and return. Declassification Memo § 1. The Meadows Memo directed the Attorney General to redact and release:

We understand that the Office of Legal Counsel has advised that the Privacy Act does not apply to the White House and thus would not apply to any disclosure of documents by the White House. Nevertheless, we do not intend to disclose materials that would violate the standards of the Privacy Act and, in particular, materials the disclosure of which would constitute "an unwarranted invasion of personal privacy." Accordingly, I am returning the bulk of the binder of declassified documents to the Department of Justice (including all that appear to have a potential to raise privacy concerns) *with the instruction that the Department must expeditiously conduct a Privacy Act review under the standards that the Department of Justice would normally apply, redact material appropriately, and release the remaining material with redactions applied.*

Meadows Memo at 1 (emphasis added). Given these instructions, the President's Crossfire Hurricane binder could be "processed" as an agency record under the Freedom of Information Act only if the Defendants violate the law.

The D.C. Circuit has never looked at an agency's after-the-fact intention in assessing questions of control. *Judicial Watch,* 726 F.3d at 216–17. Only the President's intention matters. And here, the President's intention was always crystal clear. Declassification Memo § 1; Meadows Memo at 1; Pl.'s Statement of Undisputed Material Facts ¶¶ 10, 17. Therefore, the Defendants' argument[1] that the former President's Crossfire Hurricane binder is an agency record simply because they say so is not merely erroneous but egregiously so.

### 2.  The White House intended to control the Crossfire Hurricane binder.

The Defendants accuse Mr. Solomon of inverting the D.C. Circuit's control test, arguing that the Bureau is "processing the records for public release" and that a

---

[1] *See* Defs.' Reply Supp. Mot. Dismiss at 13, n. 4 ("Even if Plaintiff disagrees that they *should* have been processed, the fact that they *have been* processed under FOIA makes it far from 'indisputable' that the subject records fit within the Presidential Records Act definition of 'Presidential records.'") (emphasis added).

remedy would require removing those records from an agency. Defs.' Reply Supp. Mot. Dismiss at 3. But this is wrong on every level.

First, the evidence is that the Department of Justice received the President's Crossfire Hurricane binder on January 20, 2021, with specific instructions to redact and publicly release it. These instructions should have been followed, then the President's binder should have been transferred to the Archives. But this is not what happened; as a result, now it is unclear what precisely the Bureau is redacting and releasing. Only the Defendants know what occurred once Mr. Meadows sent the former President's Crossfire Hurricane binder to the Attorney General; they have never disclosed to Mr. Solomon who decided to disregard both the Declassification Memo and the Meadows Memo, why and on what authority those directives were disobeyed, and where the binder is now. In truth, there may not even be anything to "remove" from the Bureau.

Second, records being in an agency's possession yet still subject to presidential control is a well-established hallmark of this Circuit's jurisprudence. *See U.S. Secret Serv.,* 726 F.3d at 223–224 (applying the control test to White House visitor records in the possession of the United States Secret Service). Any inversion of this Circuit's authorities occurs only because the Defendants, apparently to obstruct the truth, have decided that the Crossfire Hurricane binder is "subject to FOIA," Defs.' Reply Supp. Mot. Dismiss 7, or FOIA "processing," *id*. at 3, and therefore not a Presidential record.

No case holds that when a Chief of Staff, or any other White House official, sends a binder compiled at the order of and for the use of the President to an agency with specific instructions for redactions and public release, the binder ceases being a Presidential record. *See* Defs.' Reply Supp. Mot. Dismiss at 8. Instead, the operative question is whether the White House intended to retain control of it. *United We Stand Am., Inc. v. I.R.S.*, 359 F.3d 595, 599 (D.C. Cir. 2004); Defs.' Reply Supp. Mot. Dismiss at 9 (citing *Judicial Watch, Inc.*, 726 F.3d at 221). The undisputed evidence is that former President Trump ordered the binder created so that he could declassify critical evidence of government abuse and misconduct concerning the Crossfire Hurricane "investigation" of fabricated Russia collusion and make it public. These facts render untenable the Defendants' claim that the President intended to cede control over the binder because the Attorney General was asked (without the President's knowledge or consent) to make very specific redactions and then release it to the public.

### 3.    The Defendant National Archives has no excuse.

The Defendant National Archives has excused its failure to make the Crossfire Hurricane binder available by claiming it lacks custody and control over the subject records. Defs.' Reply Supp. Mot. Dismiss at 14. This is no excuse.

In *Northern States*, the agency argued that it was absolved of statutory and contractual obligations to dispose of nuclear waste because no permanent repository was available for the waste, as required by statute. Yet, the unavailability of the repository was because the Department of Energy itself had failed to finish constructing the facility. 128 F.3d at 759–60. The D.C. Circuit issued a writ of

mandamus because "[u]nder the Department's interpretation ... the government [could] always absolve itself from bearing the costs of its delay if the delay [were] caused by the government's acts. This cannot be a valid interpretation, as it would allow the Executive Branch to void an unequivocal obligation imposed by Congress." *Id.* at 760.

So too here. The Defendant National Archives may not plead lack of custody and blame the Department of Justice for failing to comply with the Presidential Records Act. To hold otherwise would give the party in power a perverse *de facto* power to ignore the law and an absolute veto over any former President's access to his records. The Presidential Records Act makes it clear that Congress did not grant a sitting president the all-encompassing power over the records of his predecessors that the Defendants claim here.

### 4.   The Defendants' alchemy creates constitutional issues.

The Defendants fail to explain precisely when the binder became an agency record. Perhaps it was on January 19, 2021, when the President directed the Attorney General to redact and return. Or perhaps it was on January 20, 2021, when Mr. Meadows directed the Attorney General (without the President's knowledge or consent) to redact and release it. Or like Schrodinger's Cat, perhaps both, at the same time. The Defendants do not say. Regardless, the Defendants' claim that the binder transformed from a Presidential record into an agency record is alchemy unsupported by controlling statutory text or Circuit precedent.

But if the Defendants are correct, then this becomes a separation of powers case. The undisputed facts are that the Crossfire Hurricane binder was created for the President, that the President considered and treated it as a Presidential record, and that the White House never intended to give up control over it. Declassification Memo § 1; Meadows Memo at 1; Pl.'s Statement of Undisputed Material Facts at ¶¶ 10–17. Consequently, the defendants lacked the authority to ignore his instructions.

The nub of the matter is this: either the Defendants' conduct is *ultra vires* and a violation of the Presidential Records Act, or, if the Presidential Records Act or the Freedom of Information Act sanction their conduct, then those statutes are unconstitutional. *See, e.g., Humphrey's Executor v. United States,* 295 U.S. 602, 629-630 (1935); *Kilbourn v. Thompson,* 103 U.S. 168, 192 (1880). History, custom, and usage unequivocally demonstrate that presidents historically exercised complete dominion and control over their papers and records. *See Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992); Jonathan Turley, *Presidential Papers and Popular Government: The Convergence of Constitutional and Property Theory in Claims of Ownership and Control of Presidential Records*, 88 CORNELL L. REV. 651, 657-58 (2003) (footnotes omitted). Neither the Presidential Records Act nor the Freedom of Information Act could lawfully authorize the Defendants to alter or destroy the Crossfire Hurricane binder or to keep the binder from Mr. Solomon; this is a matter of Constitutional first principles. U.S. CONST. art. II, § 3; *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

**C.      Mr. Solomon lacks an alternative remedy.**

If, as the Defendants argue, they are immune from replevin, Defs.' Reply Supp.

Mot. Dismiss at 3–7, then Mr. Solomon has no adequate alternative remedy other

than mandamus. The Presidential Records Act expressly protects a former

President's right to review his records, "*[n]otwithstanding* any restrictions on access."

44 U.S.C. § 2205 (emphasis added). The Bureau has not released the Crossfire

Hurricane binder in its Vault, and for the few disaggregated parts that the

Defendants have released, they have altered them with additional redactions. Defs.'

Reply Supp. Mot. Dismiss at 13; Pl.'s Statement of Undisputed Material Facts ¶¶ 68–

69; Solomon Aff. Apps. A, B. Thus, the Defendants' claim that Mr. Solomon should

view some redacted Crossfire Hurricane records that may have come from the binder

and be satisfied, Defs.' Mot. Dismiss at 9, is nonsense.

**D.      There are compelling equitable grounds for the writ.**

This Court has compelling equitable grounds for issuing a writ of mandamus.

First, the government has *never* denied a former President access to his

unclassified records.

Second, it is undisputed that the former President had the Crossfire Hurricane

binder created and then declassified it to shed light on the intelligence community's

role in advancing one of the most divisive and malicious political dirty tricks in

American history; that a physical binder of declassified Crossfire Hurricane records

was given to the Attorney General on January 20, 2021, for specific redactions and

public release; and that this binder has not been publicly released, not on the morning of January 20 and not after the Biden Administration took power at noon on that day.

Instead of releasing the binder as required by law, the Archives raised a series of pretextual justifications for withholding it from Mr. Solomon. First, the Archives claimed it lacked custody. Then, the Archives claimed that it was waiting for the Department of Justice to conduct a "declassification review" of the records declassified by the President on January 19, 2021. Now, the Defendants proffer the creative fiction that a binder prepared for the President, declassified by the President, designated for public release by the President, and sent to an agency for the ministerial application of very carefully specified redactions and public release, is an agency record, not a Presidential one. Pl.'s Statement of Undisputed Material Facts, ¶¶ 51–73.

Crossfire Hurricane resulted from a conspiracy between Democrat political operatives and senior intelligence community officials to falsely smear a Republican presidential candidate as a Russian asset. Special Counsel John H. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns*, U.S. DEP'T OF JUSTICE, at 8–10, 17–19, 81–84, 89–91, 170–71, 265–66, 305 (May 12, 2023), https://bit.ly/3QyLaBm (the "Durham Report");[2] *see*

---

[2] A "serious lack of analytical rigor, apparent confirmation bias, and an over-willingness to rely on information from individuals connected to political opponents" caused the government "to act without appropriate objectivity or restraint in pursuing allegations of collusion or conspiracy between a U.S. political campaign and a foreign power." Durham Report at 18. Among other things:

- Neither U.S. law enforcement nor the intelligence community appears to have ever possessed any actual evidence of collusion between Donald Trump and Russia. Yet

*also United States of America v. Michael Sussman,* No. 1:21-cr-00582-CRC, Doc. 97 at 1–2, 5–11, 13–15, 18 (D.D.C. Apr. 25, 2022), Doc. 70 at 20 (D.D.C. Apr. 15, 2022); *United States of America v. Igor Y. Danchenko,* No. 1:21-cr-00245-AJT, Doc. 1 ¶¶ 3– 6, 10–12, 18–22, 27–36, 41, 45–57, 49, 51–52 (E.D. Va. Nov. 3, 2021); Letter from the Hon. John Ratcliff to the Hon. Lindsey Graham (Sep. 29, 2020), https://bit.ly/3QkdkA1; U.S. DEP'T OF JUST., OFFICE OF INSP. GEN., *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* at vi, 2, 63, 68–76, 156–163, 256–263 (Dec. 9, 2019), https://bit.ly/45fCS5S.

---

Crossfire Hurricane was opened "immediately" by an official with "pronounced hostile feelings toward Trump" - using unverified information from Australia as a pretext - without anyone ever having spoken to the persons who provided the information; any significant review of FBI or other U.S. intelligence agency databases; any witness interviews; or "using any of the standard analytical tools typically employed by the FBI in evaluating raw intelligence." Durham Report at 8–9.

- Despite strong evidence that the Clinton campaign and its allies were running a disinformation operation to smear Donald Trump as a Russian asset, "the FBI never opened any type of inquiry, issued any taskings, employed any analytical personnel, or produced any analytical products in connection with the information." According to Durham, "The evidence that "Russia collusion" was fabricated by the Clinton Campaign "prompted the Director of the CIA to brief the President, Vice President, Attorney General, Director of the FBI, and other senior government officials …. [and] send a formal written referral memorandum to Director Corney and the Deputy Assistant Director of the FBI's Counterintelligence Division, Peter Strzok, for their consideration and action." Durham Report at 10. *Id.* at 9-10. In other words, *then-Vice President Biden and other high-ranking Democrat political officials knew well before Trump ever took office that "Russia collusion" allegations were a Clinton campaign trick.*

- The FBI significantly relied "on investigative leads provided or funded (directly or indirectly) by Trump's political opponents. The Department did not adequately examine or question these materials and the motivations of those providing them, even when at about the same time the Director of the FBI and others learned of significant and potentially contrary intelligence." *Id.* at 18. And "*the FBI discounted or willfully ignored material information that did not support the narrative of a collusive relationship between Trump and Russia.*" Durham Report at 305 (emphasis added).

The former President had the binder created to make it public. Declassification Memo at § 1; Pl.'s Statement of Undisputed Material Facts ¶ 10. On the other hand, the Defendants have a deeply vested political interest in obstructing the public's right to know the whole truth about Crossfire Hurricane, including the details of the intelligence community's partisan interference in the 2016 election and subsequent efforts to cripple a legitimately elected government. Durham Report at 10, 85, 91, 97; *see also* Letter from the Hon. Chuck Grassley and Hon. Ron Johnson to the Hon. Merrick Garland (Feb. 15, 2022), https://bit.ly/3OEkfmB. It is hard to come up with a more compelling case for mandamus.

## CONCLUSION

The facts and the law provide compelling reasons for this Court to grant Mr. Solomon a writ of mandamus and to order that the Defendants make the Crossfire Hurricane binder, exactly as it was transferred to the Attorney General on January 20, 2021, available for his review. Accordingly, he respectfully requests that the Court grant his motion for partial summary judgment.

Dated: August 18, 2023        Respectfully submitted,

/s/ *Michael Ding*
Reed D. Rubinstein (D.C. Bar No. 400153)
James K. Rogers (AZ Bar No. 027287)*
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, D.C. 20003
Tel.: (202) 964-3721
E-mail: reed.rubinstein@aflegal.org
E-mail: james.rogers@aflegal.org
E-mail: michael.ding@aflegal.org
*Application for Pro Hac Vice forthcoming*