UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN SOLOMON,<br><br>　　　　　*Plaintiff,*<br><br>　v.<br><br>MERRICK GARLAND, *et al.*<br><br>　　　　　*Defendants.* | Case No.: 1:23-cv-00759-RJL |

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 7(h)(1), the plaintiff John Solomon submits this statement of material facts as to which there is no genuine issue.

1.　　Exhibit 1 is a true copy of the letter by former President Donald J. Trump designating Mr. Solomon as his representative for access to presidential records of the Trump administration pursuant to 36 C.F.R. § 1270.44(a)(4).

2.　　Exhibit 2 is a true copy of the emails referenced in paragraphs 46–47, 48–52, and 55–66 below.

3.　　Exhibit 3 is a true copy of former President Trump's January 19, 2021, declassification order published in the Federal Register at 86 Fed. Reg. 6,843.

4.　　Exhibit 4 is a true copy of the January 20, 2021, memorandum from Mark Meadows to the Attorney General.

5.　　Exhibit 5 is a true copy of Mr. Solomon's affidavit.

1

6. At the President's request, the Department of Justice provided the White House with a binder of materials related to the Federal Bureau of Investigation's Crossfire Hurricane investigation on December 30, 2020. Ex. 1 at 1.

7. Portions of the documents in the binder were classified and had not been released to Congress or the public. *Id.*

8. The President requested the documents so that a declassification review could be performed and so that he could determine to what extent materials in the binder should be released in unclassified form. *Id.*

9. He determined that the materials in that binder should be declassified to the maximum extent possible. *Id.*

10. The President intended to make the binder public so that the American public would know what its government had done. Ex. 5 ¶¶ 15, 17–19, 28.

11. As part of the iterative process of the declassification review, under a cover letter dated January 17, 2021, the Bureau noted its continuing objection to any further declassification of the materials in the binder and, on a review that included Intelligence Community equities, identified the passages that it believed were most crucial to keep from public disclosure. Ex. 1 at 1.

12. Among other things, the binder contained embarrassing information about the Bureau's officials and about the government's conduct in the case. Ex. 5 ¶ 15.

13. The President decided to accept the proposed redactions and declassified the rest of the binder. Ex. 1 at 1.

14. The President directed the Attorney General to make the redactions proposed in the Bureau's January 17 letter and return to the White House an appropriately redacted copy of the binder. *Id.*

15. At this point, the binder contained about 2,700 pages and was approximately ten inches thick. Ex. 5 ¶ 9.

16. The Department of Justice Office of Legal Counsel opined that the Privacy Act did not apply to the binder. Ex. 4 at 1.

17. At all times relevant, the President considered the binder a Presidential record and intended to maintain control over it. Ex. 5 ¶ 17.

18. Sometime in mid-January 2021, White House Chief of Staff Mark Meadows informed Mr. Solomon that former President Trump was going to authorize the declassification of Crossfire Hurricane investigation documents. *Id.* ¶ 5.

19. Meadows told him that the White House had gathered the records from agencies, that Trump was preparing a declassification order, and that the records would be made available to him and other reporters before Trump's departure from office on January 20, 2021. *Id.* ¶ 6.

20. In the final 48 hours before Trump left office, both the President and Meadows told Mr. Solomon that the Crossfire Hurricane binder had been declassified. *Id.* ¶ 7.

21. On January 19, 2021, Meadows invited Mr. Solomon to the White House to review several hundred pages of declassified documents from the binder and to discuss a plan for the binder's release to the American public on the morning of January 20, 2021. *Id.* ¶ 8.

22. Mr. Solomon quickly thumbed through the binder to understand the nature and quantity of the records after being assured by Meadows and a White House lawyer that the binder had been declassified and after being shown a copy of the President's signed declassification order. *Id.*

23. Mr. Solomon saw lightly redacted versions of the fourth Crossfire Hurricane FISA warrants, a 2017 FBI 302 interview report with Christopher Steele, several tasking orders related to a second Confidential Human Source named Stefan Halper, and other documents. *Id.* ¶ 9.

24. The records had markings consistent with declassified documents that Mr. Solomon had seen in prior Freedom of Information Act cases, such as lines through words like "NOFORN." *Id.* ¶ 10.

25. Mr. Meadows told Mr. Solomon that the White House had made the final decisions on which passages to declassify and which to keep redacted in each document. *Id.*

26. Meadows discussed a strategy for releasing the documents to the public with Mr. Solomon via the "Just the News" website. *Id.* ¶ 11.

27. The strategy included getting him a copy of the binder on an embargoed basis so that his staff could begin scanning it on the evening of January 19, 2021, for release the following morning. *Id.*

28. It also included getting Mr. Solomon a smaller second set of records that he could write about that night. *Id.*

29. These records are attached as Appendix A to Mr. Solomon's affidavit.

30. Either Mr. Solomon or his staff went to the White House early in the evening of January 19, 2021, to get the binder to begin scanning. *Id.* ¶ 12.

31. A copy of the documents in the binder had been made by the White House and was given to them in a paper bag. *Id.*

32. Separately, a Department of Justice envelope was delivered to Mr. Solomon's office containing the documents that he was permitted to write about that evening. *Id.*

33. The records in the Department's envelope were identical to those in the binder. *Id.* ¶ 14.

34. Mr. Solomon scanned them and began writing a story. *Id.* ¶ 12.

35. Mr. Solomon's staff began setting up a scanning operation for the entire binder to be released the next morning. *Id.* ¶ 13.

36. As they were setting up the equipment and processes for scanning, they received a call from the White House asking that the documents—still under embargo—be returned because the White House wished

to make some additional redactions to unclassified information consistent with the same standards established by the Privacy Act. *Id.*

37. One of the President's subordinates had decided on his own initiative that the records in the binder should be redacted under the same standards contained in the Privacy Act prior to public release, even though the Office of Legal Counsel had determined that the Privacy Act did not actually apply to the records. *Id.*

38. The scanning operation was halted, and the records returned to the White House. *Id.*

39. Meadows promised Mr. Solomon that he would receive the revised binder. *Id.*

40. This never occurred. *Id.*

41. On January 20, 2021, Mr. Meadows sent the Crossfire Hurricane binder to the Department of Justice with a cover memorandum directing the Attorney General to apply "the standards of the Privacy Act," redact accordingly, and then publicly release it. Mr. Meadows fully expected the Department to redact and disseminate the documents within, at most, a few days. Ex. 4 at 1; Ex. 5 ¶¶ 15–16, 28.

42. The Department of Justice received the Crossfire Hurricane binder on the morning of January 20, 2021. Ex. 5 ¶¶ 16, 24, 30.

43. The President did not know that Mr. Meadows was taking such action. *Id.* ¶ 17.

44. The President did not authorize Mr. Meadows to send the binder to the Department of Justice for Privacy Act redactions or to modify his directions with respect to it. *Id.*

45. On January 20, 2021, Mr. Meadows placed a copy of the documents in the binder sent to the Department of Justice in a box for transfer to the Archives as Presidential records. Ex. 5 ¶¶ 16, 24, 30.

46. On June 17, 2022, Evan Corcoran, the former President's attorney, e-mailed Gary Stern, General Counsel of the National Archives and Records Administration stating that the former President intended to sign a letter designating Kash Patel and Mr. Solomon as his representatives, and informing him that they would like to begin reviewing the documents at the Archives on June 21, 2022. Ex. 2 at 15–16; Ex. 5 ¶ 20.

47. On June 17, 2022, Mr. Stern replied that the Archives could begin the process of providing them with access to Trump Presidential records once it received both the former President's letter and a specific description of the records for review. Ex. 2 at 14–15; Ex. 5 ¶ 21.

48. On June 19, 2022, the former President designated Mr. Patel and Mr. Solomon as his representatives for access to Presidential records from his administration. Ex. 1 at 1; Ex. 5 ¶ 21.

49. On June 22, 2022, Mr. Solomon e-mailed Mr. Stern stating that he understood the former President's authorization letter had been received and that the first request was for "a binder of documents from the Russia

7

investigation that the President declassified with an order in his last few days in office. It is about 10 inches thick. It includes documents such as the last two approved FISA warrants the FBI sought in their fully declassified state, the debriefing documents, tasking orders and validation reports for confidential human sources Christopher Steele and Stefan Halper and other documents." Mr. Solomon further stated that he intended to make copies of every document that was declassified by the former President's order. Ex. 2 at 14; Ex. 5 ¶ 23.

50. On June 23, 2022, Mr. Stern e-mailed Mr. Solomon that the Archives did not have the binder because it had been "returned" to the Department of Justice on January 20, 2021, in accordance with Chief of Staff Mark Meadows's memorandum to the Attorney General. Ex. 2 at 13–14; Ex. 5 ¶ 24.

51. Mr. Stern also stated that the Archives was separately able to locate a box that contains roughly 2,700 "undifferentiated pages of documents with varying types of classification and declassification markings." Ex. 2 at 13–14; Ex. 5 ¶ 24.

52. Mr. Stern also stated that because the Archives could not ascertain the classification status of any of the information in the box that it would treat the contents of the box as "classified at the TS/SCI level." Ex. 2 at 13–14; Ex. 5 ¶ 24.

53. The Archives could have ascertained the classification status of these records at any time simply by comparing the binder with the boxed records.

54. The Archives never requested the binder from the Department.

55. On July 7, 2022, Mr. Solomon e-mailed Mr. Stern stating that he believed the records held by the Archives were the same documents that had been declassified by the former President and that they were copied from the binder in preparation for release to the news media on the morning of January 20, 2021. Ex. 2 at 12; Ex. 5 ¶ 25.

56. Mr. Solomon further requested a Mandatory Declassification Review of those documents to confirm that they are the same as the declassified records. Ex. 2 at 12; Ex. 5 ¶ 25.

57. Mr. Solomon further requested that Kash Patel—who had an active TS/SCI clearance and was familiar with the documents in the binder—simultaneously review them to confirm their provenance. Ex. 2 at 12; Ex. 5 ¶ 25.

58. On July 12, 2022, Mr. Stern replied that "the Trump Presidential records" were not available for the Mandatory Declassification Review procedures under the Presidential Records Act. Ex. 2 at 11–12; Ex. 5 ¶ 26.

59. Mr. Stern also stated that the binder was now subject to a FOIA lawsuit, which meant that the Department of Justice was conducting the type of review Mr. Solomon requested and that he should try and obtain a copy of the records released by the Department of Justice in that case. Ex. 2 at 11–12; Ex. 5 ¶ 26.

60. On July 14, 2022, Mr. Stern e-mailed Mr. Patel stating that, while the Archives did have multiple copies of documents from the binder, there was

9

no clear organization or delineation to the various documents in the box. Ex. 2 at 9; Ex. 5 ¶ 27.

61. Mr. Stern also stated that the Archive's review of the box found instances of the same document being redacted differently, and some documents did not have the required declassification marking. Ex. 2 at 9; Ex. 5 ¶ 27.

62. Mr. Stern also stated that the binder sent to the Department of Justice by Mr. Meadows for the specific purpose of Privacy Act redactions and public release was a federal record managed separately under the Federal Records Act. Ex. 2 at 9; Ex. 5 ¶ 27.

63. On August 14, 2022, Mr. Solomon e-mailed Mr. Stern stating that the declassified Crossfire Hurricane records were presidential records and asking what efforts had been made to retrieve them from the Department of Justice. Ex. 2 at 2; Ex. 5 ¶ 29.

64. On August 17, 2022, Mr. Stern replied stating that the "bulk of the binder" returned according to Meadows's January 20, 2021, memorandum was intended to remain with the Department of Justice. Ex. 2 at 1; Ex. 5 ¶ 30.

65. Mr. Stern also stated that while the White House separately retained copies of those documents as Presidential records, the records were "not in an easily discernible manner." Ex. 2 at 1; Ex. 5 ¶ 30.

66. Mr. Stern also stated that he had asked the Department of Justice to complete its review as quickly as possible and release the records, as they were subject to a FOIA lawsuit. Ex. 2 at 1; Ex. 5 ¶ 30.

67. The Bureau has been releasing Crossfire Hurricane records under the Freedom of Information Act and posting them online at https://vault.fbi.gov/crossfire-hurricane-part-01. Ex. 5 ¶ 31; Defs.' Mot. Dismiss 9, ECF No. 10-1.

68. A comparison of records from the binder (<u>Appendix A</u> of Mr. Solomon's Affidavit) and the records in the FBI Vault (<u>Appendix B</u> of Mr. Solomon's Affidavit) demonstrates that the FBI Vault records have been altered with additional redactions. Ex. 5 ¶¶ 31–33.

69. The FBI Vault records are different from the records in the Crossfire Hurricane binder Mr. Meadows sent to the Department on January 20, 2021, for Privacy Act redactions and public release. *Id.*

70. The Department has not complied with Mr. Meadows's instructions in his memorandum of January 20, 2021.

71. The Department currently retains possession of the Crossfire Hurricane binder and will not send it to the Archives. Ex. 2 at 1.

72. Mr. Solomon has been denied access to the binder. Defs.' Mot. Dismiss 18, ECF No. 10-1.

73. The Defendants say that the Crossfire Hurricane binder is an agency record subject to the Freedom of Information Act and that Mr. Solomon has no right to it under the Presidential Records Act. *Id.*

Dated: August 18, 2023                    Respectfully submitted,


                                          /s/ *Michael Ding*

Reed D. Rubinstein (D.C. Bar No. 400153)
James K. Rogers (AZ Bar No. 027287)*
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, D.C. 20003
Tel.: (202) 964-3721
E-mail: reed.rubinstein@aflegal.org
E-mail: james.rogers@aflegal.org
E-mail: michael.ding@aflegal.org

**Application for Pro Hac Vice forthcoming*