UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN SOLOMON,

    *Plaintiff,*

v.

MERRICK GARLAND, *et al.*

    *Defendants.*

Case No.: 1:23-cv-00759-RJL

## AFFIDAVIT OF JOHN SOLOMON

1. I am over eighteen years of age, of sound mind, and understand the meaning of an oath. I have personal knowledge of the matters contained herein.

2. I am an award-winning investigative journalist, author, and digital media entrepreneur who serves as Chief Executive Officer and Editor in Chief of "Just the News," https://justthenews.com/. Before founding "Just the News," I reported for The Associated Press, The Washington Post, The Washington Times, Newsweek, The Daily Beast, and The Hill.

3. Throughout the time that the events described below occurred, I was working as a journalist and as Editor in Chief of "Just the News."

4. While I no longer have access to all of my e-mails and text messages from the relevant time period, the following statement includes my best recollection of these events:

5. Sometime in mid-January 2021, I was informed by White House Chief of Staff Mark Meadows that President Donald Trump was going to authorize the

declassification of documents from the Federal Bureau of Investigation and other agencies from the Crossfire Hurricane investigation.

6. Meadows told me the White House had gathered the records from agencies, President Trump was preparing a declassification order, and the records would be made available to me and other reporters before President Trump's departure from office on January 20, 2021.

7. In the final 48 hours before Trump left office, the President and Meadows told me that the records had been declassified.

8. Meadows invited me to the White House to quickly review a binder of several hundred pages of documents that had been declassified and to discuss a plan for dissemination of the records to the American public on the morning of January 20, 2021. I quickly thumbed through the binder to understand the nature and quantity of the memos after being assured by Meadows and a White House lawyer that the binder had been declassified and after being shown a copy of the signed order.

9. My recollection is that I conducted a quick review of the binder—about 10 inches thick—and that I found lightly redacted versions of the fourth Crossfire Hurricane FISA warrants, a 2017 FBI 302 interview report with Christopher Steele, several tasking orders related to a second Confidential Human Source named Stefan Halper, and other documents from the probe that I had written about and advocated for release.

10. The documents had markings consistent with those I had seen declassified in prior FOIA cases, such as lines through words like "NOFORN." While

Exhibit 5 Page 2 of 10

I don't have notes from that review, my recollection is that Meadows told me the White House had made the final decisions on which passages to declassify or which to keep redacted in each document.

11. Meadows discussed a strategy with me to release the documents to the public via the Just the News Web site. That strategy included getting one set of the documents that my staff could begin scanning on the evening of January 19, 2021, on an embargoed basis for release the following morning and getting a smaller second set of the documents that I could write on that night.

12. My recollection is that either my colleague or I met outside the White House early in the evening of January 19, 2021, to get a complete set of the documents under embargo to begin the scanning operation. The documents were in a paper bag and embargoed until the next morning. Separately, a Department of Justice envelope was delivered to my office around the same time with a small subset of the documents I was permitted to write about that evening. The envelope included about a half dozen documents. I scanned them and began writing a quick story that evening.

13. Separately, my staff began to set up a scanning operation for the complete set of documents to be released the next morning. As they were setting up the equipment and processes for scanning, my recollection is that we received a call from the White House asking that the documents—still under embargo—be returned because the White House wished to make some additional redactions to unclassified information that might involve the Privacy Act. The scanning operation was stood down, and the documents were returned the next morning to a White House official.

Exhibit 5 Page 3 of 10

Though Meadows promised to provide us a new set, we never received a new set of documents.

14. Before my team returned the embargoed full set of documents, we checked to make sure the documents in the DOJ envelope were identical to those in the full set. They were.

15. Based on conversations with Meadows, my understanding was that the Bureau opposed almost all declassification because the records contained embarrassing information about the FBI's conduct in the case, but that the President had authorized their release because he wanted the public to know what the government had done, for history's sake.

16. Long after President Trump left office, the National Archives later informed me that one set of the records had been delivered to the National Archives and that a separate set in a binder was sent to the DOJ for Privacy Act redactions and was never returned to the Archives. I was denied access to both sets of documents as a journalist and a designated representative of President Trump.

17. In subsequent interviews, the President told me he was not aware the documents he ordered declassified and released had been sent to DOJ and never released, and he expressed disappointment. He made clear that his intention was for the records to be public and to be part of his official historical records at the National Archives.

18. In spring 2022, I had a conversation with the former President's office and asked for permission to search the non-public section of his presidential records

Exhibit 5 Page 4 of 10

at the National Archives. I had taken on a similar task in 1992 as a reporter for The Associated Press when I gained access to non-public records in Richard Nixon's collection at the National Archives that detailed then-presidential candidate Ross Perot's contacts with the Nixon administration during the Watergate era. The subsequent reporting became a major campaign story and won a prestigious honorable mention award in the Raymond Clapper news writing competition. The Trump office said they would discuss my proposal with the President and his lawyers.

19. At all times, the former President's office understood I was making this request as a professional journalist and that I would not use my access to the Archives in any other capacity except to write stories about the declassified Crossfire Hurricane documents.

20. On June 17, 2022, Evan Corcoran, the former President's attorney, sent an e-mail to Gary Stern, General Counsel of the National Archives and Records Administration, stating that the former President would sign a letter informing the Acting Archivist of the United States that he had designated Kash Patel and me to be his representatives and that we would like to begin reviewing the documents at the Archives on June 21, 2022.

21. On June 17, 2022, Mr. Stern replied to Mr. Corcoran's e-mail, stating that the National Archives could begin the process of providing us with access to Trump Presidential records once they receive the letter from the former President and that the National Archives would need us to describe the specific records that we wanted to review.

Exhibit 5 Page 5 of 10

22. On June 19, 2022, the former President signed a letter to the Acting Archivist of the United States formally designating Kash Patel and me as his representatives for access to Presidential records from his administration, under the Presidential Records Act.

23. On June 22, 2022, I replied to Mr. Stern's e-mail, stating that I understood the former President's authorization letter had arrived at the National Archives and that our first request is for "a binder of documents from the Russia investigation that the President declassified with an order in his last few days in office. It is about 10 inches thick. It includes documents such as the last two approved FISA warrants the FBI sought in their fully declassified state, the debriefing documents, tasking orders and validation reports for confidential human sources Christopher Steele and Stefan Halper and other documents." In that e-mail, I stated that we would like to make copies of every document declassified by the former President's order and included in the binder.

24. On June 23, 2022, Mr. Stern replied to my e-mail, stating that the National Archives did not have the binder because it had been returned to the Department of Justice on January 20, 2021, as a result of Chief of Staff Mark Meadows's memorandum to the Attorney General. In that e-mail, Mr. Stern also stated that the National Archives was separately able to locate a box that contains roughly 2,700 "undifferentiated pages of documents with varying types of classification and declassification markings." Because the National Archives was

Exhibit 5 Page 6 of 10

unable to ascertain the classification status of any of the information in the box, however, it would treat the box's contents as "classified at the TS/SCI level."

25.     On July 7, 2022, I sent an e-mail to Mr. Stern, stating that I believed the pile of documents possessed by the National Archives were the same documents that the former President had declassified, and that they were copied from the binder in preparation for release to the news media on the morning of January 20, 2021. In that e-mail, I requested a Mandatory Declassification Review of those documents to confirm that they are the same as the declassified records, and I requested that Kash Patel—who had an active TS/SCI clearance and was familiar with the documents in the binder—could simultaneously review the pile of documents at the National Archives to confirm whether they were the same as the documents from the binder covered by the former President's declassification order.

26.     On July 12, 2022, Mr. Stern replied to my e-mail, stating that "the Trump Presidential records" were not available for the Mandatory Declassification Review procedures under the Presidential Records Act. In that e-mail, Mr. Stern also stated that the binder was now subject to a FOIA lawsuit, which meant that the Department of Justice was conducting the type of review I had requested, and that I should try to obtain a copy of the records released by the Department of Justice in that case.

27.     On July 14, 2022, Mr. Stern replied to an e-mail from Mr. Patel, stating that, while the National Archives did have multiple copies of documents that appeared to be from the binder, there was no clear organization or delineation to the

Exhibit 5 Page 7 of 10

various documents in the box. In that e-mail, Mr. Stern also stated that the National Archives review of the contents of the box found instances of the same document being redacted differently, and some documents did not have the required declassification marking. In that e-mail, Mr. Stern also claimed that the binder that was sent to the Department of Justice was a federal record managed separately under the Federal Records Act.

28. On July 19, 2022, I interviewed Meadows about the declassified documents. During the interview, he stated that "President Trump was the one that continued to make sure that transparency with the American people on this issue was what it was all about." Meadows also stated that, on the morning of January 20, 2021, the Department of Justice had "some concerns about privacy—even though I think it's very clear that some of the privacy issues that they were raising was not an issue—but, out of an abundance of caution, we wanted to make sure that we didn't harm anyone, and so we gave them those declassified documents … to do a final redaction for some of that personal information, with the instruction that they were to go ahead and disseminate those, and we expected fully that they would do that within at the most a few days, but here we are a few years later." A video clip of this interview is posted online at https://justthenews.com/videos/brief-one-one-john-solomon-and-mark-meadow.

29. On August 14, 2022, I sent an e-mail to Mr. Stern, stating that the declassified Russia records met the definition of a presidential record under the

Exhibit 5 Page 8 of 10

Presidential Records Act, and I asked what efforts had been made to retrieve them from the Department of Justice.

30. On August 17, 2022, Mr. Stern replied to my e-mail, stating that the "bulk of the binder" returned according to Meadows's January 20, 2021, memorandum was "intended … to remain with" the Department of Justice, while the White House separately retained copies of those documents as Presidential records, but "not in an easily discernible manner." In that e-mail, Mr. Stern also stated that he had asked the Department of Justice to complete its review as quickly as possible and release the records, as they were subject to a FOIA lawsuit.

31. The Bureau has been releasing Crossfire Hurricane records under the Freedom of Information Act and posting them online at https://vault.fbi.gov/crossfire-hurricane-part-01.

32. These records are much more heavily redacted than the records in the declassified binder.

33. I know this because my team compared the declassified records that were delivered to me in a Department of Justice envelope on January 19, 2020, and compared them to the records published by the Bureau. The records published by the Bureau have been altered with additional redactions, and they are therefore different from the records that were in the Crossfire Hurricane binder that Mr. Meadows sent to the Department of Justice on January 20, 2021.

34. I declare under penalty of perjury that the above statements are true and correct to the best of my personal knowledge and belief.

Exhibit 5 Page 9 of 10

Dated this 17th day of August 2023

_____
JOHN SOLOMON

Exhibit 5 Page 10 of 10