## Appendix A Table of Contents

Carter Page FISA                              A001

Notes of FBI 2016                             A117

Payment Request                               A121

McCabe Notes                                  A122

Halper Tasking Orders                         A131

Chris Steele Interview                        A168

Notes of Steele Interview 2017                A194

Clinton Defensive Brief                       A204



TOP SECRET//NOFORN/FISA

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D.C.

(B)(6)

(S) IN RE **CARTER W. PAGE, A U.S.**
**PERSON.**

Docket Number:

**17 - 679 _**

## (U) **VERIFIED APPLICATION**

(S) The United States of America hereby applies to this Court for authority to

conduct **electronic surveillance and physical search**, as described herein, pursuant

to the Foreign Intelligence Surveillance Act of 1978, as amended, Title 50, United

States Code (U.S.C.), §§ 1801-1812 and 1821-1829 (FISA or the Act).

50 U.S.C.
§ 1804(a)(1) and
823(a)(1)]

1.   (U) **Identity of Federal Officer Making Application**  This application is

made by ▮Non-SES PII▮, a Supervisory Special Agent (SSA) of the Federal Bureau

of Investigation (**FBI**) whose official duties at FBI Headquarters include supervision

of the FBI's investigation of the above-captioned target based upon information

officially furnished to **SSA** ▮PII▮.

NSC Declassification Review [EO 13526]
Declassify in Part by DJT on 1/19/2021

TOP SECRET//NOFORN/FISA

Classified by:     Chief, Operations Section, OI, NSD, DOJ
Derived from:      Multiple Sources
Declassify on:     20420626

OI Tracking No. 147743

Solomon Aff. App. A001

TOP SECRET//NOFORN//FISA




[50 U.S.C.
§ 1804(a)(2) and
1823(a)(2)]

2.   (S) **Identity of the Target**  The target of this application is Carter W. Page, a U.S. person, and an agent of a foreign power, described in detail below.  The status of the target was determined in or about June 2017 from information provided by the U.S. Department of State.  The premises or property to be searched and the information, material, or property to be seized, reproduced, or altered are described in detail below.


[50 U.S.C.
§ 1804(a)(3) and
1823(a)(3)]

3.   (S) **Statement of Facts**  The United States relies upon the following facts and circumstances in support of this application.


[50 U.S.C.
§ 1804(a)(3)(
A) and
1823(a)(3)(A)]

a.   (S) **The target of this application is an agent of a foreign power.**

(S) The following describes the foreign power and sets forth in detail a description of the target and the target's activities for or on behalf of this foreign power.



(S) This verified application reports on developments in the FBI's investigation of the above captioned target since the most recent application described herein.  Unless stated otherwise herein, information presented in previous applications has been summarized or removed not because it was factually inaccurate but in order to create a more concise document.



(S) The Government of the Russian Federation is a foreign power as defined by 50 U.S.C. § 1801(a)(1).

TOP SECRET//NOFORN//FISA



-2-

Solomon Aff. App. A002

(B)(6)

(B)(6)

TOP SECRET//NOFORN/FISA

(S) The Government of the Russian Federation (Russia) is an internationally recognized foreign government and, as of the execution of this application, is listed in the Diplomatic List, published by the United States Department of State, and in Permanent Missions to the United Nations, published by the United Nations, and its establishments in the United States are components thereof.

(B)(6)

(S) Clandestine Intelligence Activities Of The Russian Federation

Foreign Power Statement for Russia

TOP SECRET//NOFORN/FISA

-3-

(B)(6) 

Solomon Aff. App. A003

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

Foreign Power Statement for Russia

(B)(6)

(S) Carter W. Page knowingly aids or abets other persons, who, pursuant to the direction of an intelligence service or network of Russia, knowingly engage in clandestine intelligence activities (other than intelligence gathering activities) for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States, or knowingly conspires with other persons to engage in such activities and, therefore, is an agent of a foreign power as defined by 50 U.S.C. § 1801(b)(2)(E).

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

-4-

Solomon Aff. App. A004

TOP SECRET//NOFORN/FISA

(B)(6)

I.      (U) **Overview**.

(B)(6)

~~(S//NF)~~ This application seeks renewed authority to conduct electronic

surveillance and physical search of Carter Page.  The FBI believes that Page has been

the subject of targeted recruitment by the Russian Government for a number of

years and currently is acting as an unregistered agent of the Russian Government.

(B)(6)

(S//NF) Page is a former foreign policy advisor to a Candidate for U.S.

President (Candidate #1).[1]  As discussed in greater detail below, the FBI believes that

the Russian Government engaged in efforts to undermine and influence the outcome

of the 2016 U.S. Presidential election.  Although the election has concluded, for the

reasons described below, the FBI believes that the Russian Government will

continue attempting to use U.S.-based individuals, such as Page, to covertly

influence U.S. foreign policy and to support the Russian Government's perception

management efforts in violation of U.S. criminal law.  The FBI expects that the

collection requested herein will continue to produce foreign intelligence information

that will assist the FBI in more fully understanding the capabilities, activities, plans,

(B)(6)

———————————

[1] ~~(S)~~ On or about November 8, 2016, Candidate #1 was elected President.
Although Candidate #1 is now the President, in order to maintain the historical
accuracy of the background information, unless otherwise stated, the original
references to Candidate #1 and members of Candidate #1's campaign team will
remain the same as in previous applications filed in this matter (*see* docket numbers
2016-1182, 2017-0052, and **2017-0375**).



TOP SECRET//NOFORN/FISA

-5-

Solomon Aff. App. A005

TOP SECRET//NOFORN//FISA

(B)(6)

and intentions of the Russian Government to influence U.S. foreign policy. Such information will better enable the FBI and the U.S. Intelligence Community (USIC) to deter, disrupt, and defeat the Russian Government's and Page's activities in this regard.

(B)(6)

II. ~~(S//NF)~~ **The FBI Believes that the Russian Government Engages in Influence Operations Against the United States.**

(B)(6)

    A. ~~(S//NF)~~ **RIS Efforts to Influence U.S. Presidential Elections.**

(B)(6)

    ~~(S//NF)~~ During a September 2016 interview with an identified news organization, the then Director of National Intelligence (DNI) stated, "Russia has tried to influence U.S. elections since the 1960s during the Cold War" and "there's a tradition in Russia of interfering with elections, their own and others." The then DNI commented that this influence included providing money to particular candidates or providing disinformation. The then DNI added that "it shouldn't come as a big shock to people, … I think it's more dramatic maybe because they have the cyber tools that they can bring to bear in the same effort." Sensitive Information

TOP SECRET//NOFORN//FISA

-6-



Solomon Aff. App. A006



~~TOP SECRET//NOFORN/FISA~~

Sensitive Information

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

~~(S//NF)~~ In or about July 2016, WikiLeaks released a trove of e-mails from the Democratic National Committee (DNC).[2] FBI investigation has determined that WikiLeaks obtained the DNC e-mails as a result of computer intrusions by malicious actors. There has been speculation in the U.S. media that the Russian Government was behind the hack. Russia has publicly denied any involvement in the hack. Russian President Vladimir Putin said in or about September 2016 that Russia was not responsible for the hack, but said that the release of the DNC documents was a net positive: "The important thing is the content that was given to the public." Despite Russia's denial, Sensitive Information

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---



[2] ~~(S//NF)~~ According to information on its website, WikiLeaks is a multi-national media organization and associated library. WikiLeaks specializes in the analysis and publication of large datasets of censored or otherwise restricted official materials involving war, spying, and corruption. According to open source information, in or about July 2016, WikiLeaks released thousands of e-mails it says are from the accounts of DNC officials. As noted herein, the FBI is investigating the role of the RIS in hacking into these accounts.

~~TOP SECRET//NOFORN/FISA~~

Solomon Aff. App. A007



TOP SECRET//NOFORN//FISA

████████ Sensitive Information ████████████████

██████████████████████████████████████ In

addition, according to an October 7, 2016 *Joint Statement from the Department of Homeland Security and the Office of the Director of National Intelligence on Election Security* (Election Security Joint Statement), the USIC is confident that the Russian Government directed the recent compromises of e-mails from U.S. persons and institutions, including from U.S. political organizations. The Election Security Joint Statement states that the recent disclosures of e-mails on, among others, sites like WikiLeaks are consistent with the methods and motivations of Russian-directed efforts. According to the Election Security Joint Statement, these thefts and disclosures were intended to interfere with the U.S. election process; activity that is not new to Moscow – the Russians have used similar tactics and techniques across Europe and Eurasia, for example, to influence public opinion there. The Election Security Joint Statement stated that, based on the scope and sensitivity of these efforts, only Russia's senior-most officials could have authorized these activities. More recently, on December 29, 2016, the White House issued a statement that the U.S. President had ordered a number of actions in response to the Russian Government's aggressive harassment of U.S. officials and cyber operations aimed at the U.S. election. According to this December 29th statement, the U.S. Presidential



Solomon Aff. App. A008

(B)(6)

TOP SECRET//NOFORN/FISA

Administration publicized its assessment in October [2016] that Russia took actions intended to interfere with the U.S. election process and that these activities could only have been directed by the highest levels of the Russian Government [in context, this is likely a reference to the Election Security Joint Statement].

(B)(6)

(S//NF) Based on the Russian Government's historical efforts to influence U.S. and foreign elections, the information regarding Russia's role in hacking into the DNC, and the information discussed herein regarding Russia's coordination with Carter Page and others, the FBI believes that the Russian Government used an intelligence network, which consists of, among others, Russian Government officials, Russian state media, and elements of the RIS, to attempt to undermine and improperly and illegally influence the 2016 U.S. Presidential election.  Now that the election is over, the FBI believes that the Russian Government will continue to use this intelligence network to engage in perception management activities against the United States that are designed to influence U.S. foreign policy as well as U.S. public opinion of Russia.

(B)(6)

(S//NF) The FBI assesses that efforts by the Russian Government to attempt to undermine and influence the 2016 U.S. Presidential election and conduct perception management activities against the United States have the effect of harming U.S. national security.  As stated in the legislative history of FISA:

(B)(6)

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A009



TOP SECRET//NOFORN/FISA

Not only do foreign powers engage in spying in the United States to obtain information, they also engage in activities which are intended to harm the Nation's security by affecting the course of our Government, the course of public opinion, or the activities of individuals. Such activities may include political action (recruiting, bribery or influencing of public officials to act in favor of the foreign power), disguised propaganda (including the planting of false or misleading articles or stories), and harassment, intimidation, or even assassination of individuals who oppose the foreign power. Such activity can undermine our democratic institutions as well as directly threaten the peace and safety of our citizens.

H.R. Rep. No. 95-1283, pt. 1, at 41 (1978).

**B. (S//NF) The Russian Government's Coordinated Efforts to Influence the 2016 U.S. Presidential Election.**

(S//NF) In or about March 2016, George Papadopoulos[3] and Carter Page (the target of this application) were publicly identified by Candidate #1 as part of his/her foreign policy team. Based on reporting from a friendly foreign government, ▮▮▮ Sensitive Information ▮▮▮ the FBI believes that the Russian Government's efforts to influence the 2016 U.S. Presidential election were being coordinated with Page and perhaps other individuals associated with Candidate #1's campaign. In or about July 2016, the above-referenced friendly foreign government provided information to a ▮▮▮ US Government Official ▮▮▮ regarding efforts made by the Russian

---

[3] (S) Papadopoulos is a current subject of an FBI investigation.

TOP SECRET//NOFORN/FISA

-10-



(B)(6)

TOP SECRET//NOFORN/FISA

Government to influence the 2016 U.S. Presidential election.  Specifically, according to this information, during a meeting in or about April 2016 between officials of the friendly foreign government and Papadopoulos, Foreign Government Third Party Equity

Papadopoulos suggested that Candidate #1's campaign had received some kind of suggestion from Russia that Russia could assist with the anonymous release of information during the campaign that would be damaging to another candidate for U.S. President (Candidate #2).  It was unclear whether Papadopoulos or the Russians were referring to material acquired publicly or through other means.  It was also unclear from this reporting how Candidate #1's campaign reacted to the alleged Russian offer.  Nevertheless, as discussed below, the FBI believes that Russia's efforts to influence U.S. policy were likely being coordinated between the RIS and Page, and possibly others.[4]

(B)(6)

(S//NF/FISA)  As discussed below, Page has established relationships with

(B)(6)

[4] (S//NF)  As of March 2017, the FBI has conducted several interviews with Papadopoulos.  During these interviews, Papadopoulos confirmed that he met with officials from the above-referenced friendly foreign government, but he denied that he discussed anything related to the Russian Government during these meetings.  Based on the FBI's investigative efforts and some of the comments made by Papadopoulos, the FBI believes that Papadopoulos provided misleading or incomplete information to the FBI during the interviews.

(B)(6)

TOP SECRET//NOFORN/FISA

-11-

Solomon Aff. App. A011



TOP SECRET//NOFORN/FISA

Russian Government officials, including Russian intelligence officers, and was

identified by source reporting as an intermediary with Russian leadership in "a

well-developed conspiracy of co-operation" to influence the 2016 U.S. Presidential

election. Although, as discussed below, Page no longer appears to be an advisor to

the now President, FISA-Acquired Information Subject to Sequestration



III.    (S)  Carter Page.

    A. (S) Page's Connections to Russia and the RIS.

    (S//NF) Page, a U.S. citizen, is the founder and managing partner of Global

Energy Capital LLC (GEC), an investment management and advisory firm that

focuses on the energy sector primarily in emerging markets. According to Page's

biography on GEC's website, Page is a graduate of the United States Naval

Academy and has a background in investment banking, and transactional

experience in the energy and power sector, with specific experience in Russia, where



TOP SECRET//NOFORN/FISA

Solomon Aff. App. A012



TOP SECRET//NOFORN/FISA

he was an advisor on key transactions for Gazprom.[5]  The FBI's investigation of Page has determined that he has had financial, political, and business ties with the Russian Government.  The FBI believes that the Russian Government exploited these ties to solicit Page's cooperation with Russia's influence operations against the United States.

(S//NF)  Based on the results of FBI investigation, which includes review of open source information and information provided by Page during interviews with the FBI, from approximately 2004 - 2007, Page lived in Russia and worked as Chief Operating Officer for a U.S. investment firm (Firm #1).  During this time, Page began business dealings with Gazprom and advised Gazprom on some of its largest deals and helped broker relationships with investors in both New York and London.  In or about 2008, Page left Firm #1 and started GEC.  According to GEC's website, GEC acts in an advisory role for individuals and organizations that wish to establish a business presence overseas.  Since founding GEC, Page has mostly done advisory assignments, such as counseling foreign investors on buying assets in Russia.

---

[5] (S//NF) According to information on Gazprom's website, Gazprom, which was established in Russia, is a global energy company that is among Russia's top four oil producers. Sensitive Information

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A013



~~TOP SECRET//NOFORN/FISA~~

~~(S//NF)~~ According to information provided by Page during a June 2009 interview with the FBI,[6] shortly after Page's return to the U.S. in or about 2007, Page began a professional relationship with Aleksandr Bulatov.[7] During the course of their relationship, which lasted about one year, Page offered to introduce Bulatov to his political and business contacts and provided a copy of Firm #1's annual report, which was not available through open sources at the time. ███Sensitive Information███ ████████████████████████████████████ the FBI believes Bulatov likely requested the report from Page as part of the recruitment cycle and to further assess Page's openness to provide non-public information, which would also indicate Page's willingness to act as a source for the Russian Government. According to Page, his last contact with Bulatov was in or about August 2008, approximately two months after Bulatov returned to Moscow.

---

[6] ~~(S//NF)~~ The FBI conducted a series of interviews of Page to discuss his relationships with Aleksandr Bulatov and Victor Podobnyy, who, as discussed in detail below, ███Sensitive Information███.



[7] ~~(S//NF)~~ Bulatov is a ███Sensitive Information███ ████████████████████████ Bulatov was a Russian diplomat who was assigned to the Trade Representation Office of the Russian Federation in New York City, NY from approximately 2004 - 2007. ██████ ███████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████

~~TOP SECRET//NOFORN/FISA~~

Solomon Aff. App. A014



TOP SECRET//NOFORN/FISA

(S//NF) According to information provided by Page during a 2013 interview with the FBI, which was conducted to discuss his relationship with Victor Podobnyy, who, as discussed below, ▓Sensitive Information▓, the FBI believes that, in or about January 2013, Page began a professional relationship with Podobnyy, likely after they met at an energy symposium in New York. Podobnyy, a Russian citizen who was assigned to the Russian Federation Mission to the United Nations in New York City from approximately December 2012 to September 2013, ▓Sensitive Information▓

██████████████████████████████████

██████████████████████████████████

██████████████

(S//NF) In or about January 2015, Podobnyy, along with Evgeny Buryakov and Igor Sporyshev, were charged by a sealed complaint in the U.S. District Court for the Southern District of New York for violations of 18 U.S.C. §§ 371 and 951 (conspiring to act, and acting as, an unregistered agent of a foreign government). According to the complaint, Buryakov worked in the United States as an agent of the SVR. Specifically, Buryakov operated under non-official cover, posing as an employee in the Manhattan office of a Russian bank. Buryakov worked with two other SVR agents, Podobnyy and Sporyshev, to gather intelligence on behalf of

Solomon Aff. App. A015



TOP SECRET//NOFORN/FISA

Russia.[8]  The complaint states that the intelligence gathering efforts of Podobnyy and Sporyshev included, among other things, attempting to recruit New York City residents as intelligence sources for Russia.

(S//NF) The FBI believes that Page is one of the individuals that Podobnyy and Sporyshev attempted to recruit.  As noted above, Page began a relationship with Podobnyy in or about January 2013.  According to the complaint, in or about April 2013, Podobnyy and Sporyshev discussed Podobnyy's efforts to recruit "Male-1," who was working as a consultant in New York City, as an intelligence source.  In or about March 2016, the FBI again interviewed Page about his relationship with Podobnyy.  Based on information provided by Page during this interview, the FBI determined that Page's relationship with Podobnyy was primarily unidirectional, with Page largely providing Podobnyy open source information and contact introductions.  During one interview, Page told the FBI that he approached a Russian Minister, who was surrounded by Russian officials/diplomats, and "in the

---

[8] (S//NF) Buryakov was arrested in or about January 2015. At the time of Buryakov's arrest, Podobnyy and Sporyshev no longer lived in the United States and were not arrested.  In or about March 2016, Buryakov pled guilty to conspiring to act in the United States as an agent of Russia without providing prior notice to the Attorney General.  In or about May 2016, Buryakov was sentenced to 30 months in prison.  According to information provided by the Federal Bureau of Prisons, Buryakov was released on March 31, 2017.



TOP SECRET//NOFORN/FISA

-16-

Solomon Aff. App. A016

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

spirit of openness," Page informed the group that he was "Male-1" in the Buryakov complaint. The FBI believes that this information reveals that Page was targeted as part of an RIS recruitment operation and that Podobnyy had started the actual recruitment of Page by tasking him to respond to somewhat innocuous requests. The FBI also believes that Page knew that the RIS was attempting to recruit him by self-identifying as the individual named as "Male-1" in the complaint.

(B)(6)

**B.** ~~(S//NF)~~ **Page's Coordination with Russian Government Officials on 2016 U.S. Presidential Election Influence Activities.**

(B)(6)

~~(S//NF)~~ According to open source information, in July 2016, Page traveled to Russia and delivered the commencement address at the New Economic School.[9] In addition to giving this address, the FBI learned that Page met with at least two Russian officials during this trip. First, according to information provided by an FBI confidential human source (Source #1),[10] Sub-Source #1[11] reported that Page had a

(B)(6)

[9] ~~(S//NF)~~ The FBI confirmed, ▮Sensitive Method▮ that Page traveled to Russia in July 2016.

(B)(6)

[10] ~~(TS//NF)~~ Source #1 is a ▮Foreign Government Third Party Equity▮ ▮▮▮▮▮▮▮▮▮▮ and was opened as an FBI source in or about October 2013. Source #1 has been compensated approximately $95,000 by the FBI. As discussed below in footnote 22, in or about October 2016, the FBI suspended its relationship with Source #1 due to Source #1's unauthorized disclosure of information to the press. Subsequently, the FBI closed Source #1 as an FBI source. Nevertheless, the FBI assesses Source #1 to be reliable as previous reporting from Source #1 has been corroborated and used in criminal proceedings. Moreover, the

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

Solomon Aff. App. A017

(B)(6)

**FBI notes that the incident that led the FBI to terminate its relationship with Source #1 occurred after Source #1 provided the reporting that is described herein.**

(B)(6)

(TS//NF) Source #1, who now owns a foreign business/financial intelligence firm, was approached by an identified U.S. person, who indicated to Source #1 that a U.S.-based law firm had hired the identified U.S. person to conduct research regarding Candidate #1's ties to Russia (the identified U.S. person and Source #1 have a long-standing business relationship). The identified U.S. person hired Source #1 to conduct this research. The identified U.S. person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. person was likely looking for information that could be used to discredit Candidate #1's campaign.

(B)(6)

(TS//NF) Source #1 tasked his sub-source(s) to collect the requisite information. After Source #1 received information from the sub-source(s) described herein, Source #1 provided the information to the identified U.S. person who had hired Source #1 and to the FBI. In addition to the specific information pertaining to Page reported in this application, Source #1 provided other information relating to the Russian Government's efforts to influence the election that do not directly pertain to Page, including the possibility of Russia also possessing a dossier on Candidate #1.

(B)(6)

(TS//NF) Notwithstanding Source #1's reason for conducting the research into Candidate #1's ties to Russia, based on Source #1's previous reporting history with the FBI, whereby Source #1 provided reliable information to the FBI, the FBI believes Source #1's reporting herein to be credible. Moreover, because of outside corroborating circumstances discussed herein, such as the reporting from a friendly foreign government that a member of Candidate #1's team received a suggestion from Russia that Russia could assist with the release of information damaging to Candidate #2 and Russia's believed hack and subsequent leak of the DNC e-mails, the FBI assesses that Source #1's reporting contained herein is credible.

(B)(6)

(TS//NF) Source #1 maintains a network of sub-sources, who, in many cases, utilize their own sub-sources. The source reporting in this application, which was provided to the FBI by Source #1, is derived primarily from a Russian-based sub-source, who uses a network of sub-sources. Thus, neither Source #1 nor the Russian-based sub-source had direct access to the information being reported by the sub-

Solomon Aff. App. A018

**(B)(6)**

TOP SECRET//NOFORN/FISA

secret meeting with Igor Sechin, who is the President of Rosneft [a Russian energy

company] and a close associate to Russian President Putin.[12]  Sub-Source #1 reported

sources identified herein (each sub-source will be separately identified herein based on the information provided by Source #1).  The FBI has no control over the Russian-based sub-source or any of the sub-sources used by the Russian-based sub-source.

**(B)(6)**

(TS//NF)  In an effort to further corroborate Source #1's reporting, the FBI has met with Source #1's Russian-based sub-source described immediately above. During these interviews, the FBI found the Russian-based sub-source to be truthful and cooperative.  The Russian-based sub-source provided identifying information regarding the other sub-sources identified herein.  The FBI is undertaking additional investigative steps to further corroborate the information provide by Source #1 and, where feasible, contact the sub-sources identified herein.

**(B)(6)**

(TS//NF)  Source #1 reported the information contained herein to the FBI over the course of several meetings with the FBI from in or about June 2016 through August 2016.

**(B)(6)**

[11](TS//NF)  Sub-Source #1 is an independent sub-source operated by Source #1's Russian-based sub-source.  The FBI believes that Sub-Source #1 did not know his/her reporting would be directed to the FBI. ▮▮▮▮▮▮▮▮▮▮

**(B)(6)**

[12](S//NF)  In or about April 2014, the U.S. Department of the Treasury (USDOT) announced sanctions that would be taken against Russian Government officials and entities as a result of Russian efforts to destabilize Ukraine.  Sechin was identified as an official of the Russian Government, and further identified as the President and Chairman of the Management Board for Rosneft, a position he continues to hold.  The USDOT announcement also stated Sechin was formerly the Deputy Prime Minister of the Russian Federation from 2008 until 2012, and from 2004 until 2008, Sechin was the Deputy Chief of Staff for Russian President Putin. The USDOT sanctions announcement identified Sechin as someone who has "shown utter loyalty to Vladimir Putin – a key component to his current standing."

**(B)(6)**


TOP SECRET//NOFORN/FISA

-19-

Solomon Aff. App. A019



TOP SECRET//NOFORN/FISA

(B)(6)

that, during the meeting, Page and Sechin discussed future bilateral energy

cooperation and the prospects for an associated move to lift Ukraine-related Western

sanctions against Russia.  Although Sub-Source #1 reported that Page had reacted

positively to the discussions, Sub-Source #1 commented that Page was generally

non-committal in a response.

(B)(6)

(S//NF) As discussed below, the FBI believes that it has obtained

additional information consistent with the above-described reporting from Sub-

Source #1 that Page met with Sechin while Page was in Moscow in July 2016.

Specifically, in or about June 2017, the FBI interviewed ▓an individual▓

▓ who is closely tied to the president of the New Economic School in Moscow.

During this interview, ▓the individual▓ informed the FBI that an individual

identified as Andrej Krickovic[13] presented the idea of Page giving the New

[13] Sensitive Information

Sensitive Information
the FBI determined Sensitive Information
▓Krickovic had contact with Russian intelligence officers,
Sensitive Information ▓ The FBI believes ▓
▓was attempting to recruit Krickovic to wittingly or unwittingly work for
the RIS.

(B)(6)

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A020

TOP SECRET//NOFORN/FISA

**(B)(6)**

Economic School commencement address.  Although ███████ individual

characterization of Page was negative, and the commencement speakers were

typically heads of state and Nobel Laureates, nevertheless ███ individual ███ said they

invited Page because Page was "[Candidate #1's] Russia-guy." ███ individual ███ also

informed the FBI that ███ Sensitive Information ███████████ of Page's July

2016 trip to Moscow, and while ███ individual ██████████████████

███ individual ███ recalled an instance where Page was picked-up in a chauffeured car

and that it was rumored at that time that Page had met with Igor Sechin.

**(B)(6)**

~~(TS//NF)~~ Second, according to Source #1, Sub-Source #2[14] reported that, in or

about July 2016, an official close to S. Ivanov, who the FBI assesses to be Sergey

Ivanov, the Head of the Russian Presidential Administration, confided to a

compatriot that Divyekin [who is assessed to be Igor Nikolayevich Divyekin], a

███ Sensitive Information ████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████

**(B)(6)**

[14] ~~(TS//NF)~~ Sub-Source #2 is an independent sub-source operated by Source
#1's Russian-based sub-source.  The FBI believes that Sub-Source #2 did not know
his/her reporting would be directed to the FBI. ████████████████████
████████████████████████

**(B)(6)**



TOP SECRET//NOFORN/FISA

Solomon Aff. App. A021



senior colleague in the Internal Political Department of the PA [assessed to be a reference to the Russian Presidential Administration], had met secretly with Page and that their agenda for the meeting included Divyekin raising a dossier or "kompromat"[15] that the Kremlin possessed on Candidate #2 and the possibility of it being released to Candidate #1's campaign.[16]  According to reporting from Sub-Source #3[17], this dossier had been compiled by the RIS over many years, dating back to the 1990s.  Further, according to Sub-Source #4,[18] this dossier was, by the direct instructions of Russian President Putin, controlled exclusively by Senior Kremlin

---



[15] (S) Kompromat is a Russian term for compromising material about a politician or political figure, which is typically used to create negative publicity or blackmail.



[16] (S//NF) As noted above, in or about April 2016, Papadopoulos suggested, during a meeting with a friendly foreign government, that Russia could assist with the anonymous release of information that would be damaging to Candidate #2. The FBI assesses that Divyekin planned to offer the "kompromat" to Page during their July 2016 meeting to further influence the 2016 U.S. Presidential election by providing derogatory information about Candidate #2 to Candidate #1's campaign.

[17] (TS//NF) Sub-Source #3 is an independent sub-source operated by Source #1's Russian-based sub-source. The FBI believes that Sub-Source #3 did not know his/her reporting would be directed to the FBI. ████████████████████



[18] (TS//NF) Sub-Source #4 is an independent sub-source operated by Source #1's Russian-based sub-source. The FBI believes that Sub-Source #4 did not know his/her reporting would be directed to the FBI. ████████████████████
████████████████

Solomon Aff. App. A022



TOP SECRET//NOFORN/FISA

Spokesman Dmitriy Peskov. Accordingly, the FBI assesses that Divyekin received direction by the Russian Government to disclose the nature and existence of the dossier to Page. In or about June 2016, Sub-Source #5[19] reported that the Kremlin had been feeding information to Candidate #1's campaign for an extended period of time. Sub-Source #6[20] also reported that the Kremlin had been feeding information



[19] (TS//NF) Sub-Source #5 is an independent sub-source operated by Source #1's Russian-based sub-source. The FBI believes that Sub-Source #5 did not know his/her reporting would be directed to the FBI. ███████████████████

[20] (TS//NF) Sub-Source #6 is an independent sub-source operated by Source #1's Russian-based sub-source. The FBI believes that Sub-Source #6 did not know his/her reporting would be directed to the FBI. S███████████████ .

Source Descriptive
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

(S//NF) Of note, Source Descriptive the identified individual denies having any compromising information regarding the President. ████████ aides to the President ████████ reject this individual's claims to have had close access to the President.

TOP SECRET//NOFORN/FISA

-23-

Solomon Aff. App. A023

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

to Candidate #1's campaign for an extended period of time and added that the information had reportedly been "very helpful." The FBI assesses the information funneled by the Russians to Page was likely part of Russia's efforts to influence the 2016 U.S. Presidential election.

(B)(6)

~~(TS//NF)~~ According to information provided by Sub-Source #6, there was "a well-developed conspiracy of co-operation between them [assessed to be individuals involved in Candidate #1's campaign] and the Russian leadership." Sub-Source #6 reported that the conspiracy was being managed by Candidate #1's then campaign manager, who was using, among others, foreign policy advisor Carter Page as an intermediary. Sub-Source #6 further reported that the Russian regime had been behind the above-described disclosure of DNC e-mail messages to WikiLeaks. Sub-Source #6 reported that WikiLeaks was used to create "plausible deniability," and that the operation had been conducted with the full knowledge and support of Candidate #1's team, which the FBI assessed to include at least Page. In return, according to Sub-Source #6, Candidate #1's team, which the FBI assessed to include at least Page, agreed to sideline Russian intervention in Ukraine as a campaign issue

(B)(6)

~~(S//NF)~~ The FBI is investigating what, if any, of the reporting discussed herein and in ▐Source Descriptive▌ can be attributed to the identified individual.

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

-24-

Solomon Aff. App. A024

**(B)(6)**

TOP SECRET//NOFORN/FISA

and to raise U.S./NATO defense commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine.

**(B)(6)**

(TS//NF) Notably, following Page's July 2016 meeting with Sechin during which he discussed prospects for lifting Ukraine-related Western sanctions against Russia, a July 2016 article in an identified news organization reported that Candidate #1's campaign worked behind the scenes to make sure Political Party #1's platform would not call for giving weapons to Ukraine to fight Russian and rebel forces, contradicting the view of almost all Political Party #1's foreign policy leaders in Washington. The article stated that Candidate #1's campaign sought "to make sure that [Political Party #1] would not pledge to give Ukraine the weapons it has been asking for from the United States." Further, an August 2016 article published by an identified news organization, which characterized Candidate #1 as sounding like a supporter of Ukraine's territorial integrity in September [2015], noted that Candidate #1 had recently adopted a "milder" tone regarding Russia's annexation of Crimea. The August 2016 article further reported that Candidate #1 said Candidate #1 might recognize Crimea as Russian territory and lift punitive U.S. sanctions against Russia. The article opined that while the reason for Candidate #1's shift was not clear, Candidate #1's more conciliatory words, which contradict Political Party #1's official platform, follow Candidate #1's recent association with several people

**(B)(6)**

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A025

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

sympathetic to Russian influence in Ukraine, including foreign policy advisor Carter Page. Thus, the FBI assesses that, following Page's meetings in Russia, Page helped influence Political Party #1 and Candidate #1's campaign to alter their platforms to be more sympathetic to Russia.

(B)(6)

~~(TS//NF)~~ In addition to the foregoing, in or about August 2016, Sub-Source #6 reported that the above-described leak of the DNC e-mails to WikiLeaks had been done, at least in part, as an attempt to swing supporters of an identified individual, who had been running against Candidate #2 for their political party's nomination, away from Candidate #2 and to Candidate #1. Sub-Source #6 reported that this objective had been conceived and promoted by, among others, Page, who had discussed the objective directly with Sub-Source #6.

(B)(6)

~~(S//NF/FISA)~~ Based on reporting from another FBI confidential human source (Source #2),[21] as well as information obtained through ███████████

**FISA-Acquired Information Subject to Sequestration**

(B)(6)

[21] ~~(S)~~ In or about December 2008, Source #2 was opened as an FBI source. In or about January 2011, Source #2 was closed as an FBI source for, among other things, motivation for reporting, but not for validity of reporting. Source #2 was re-opened in or about March 2011. Since that time, Source #2 has routinely provided reliable information that has been corroborated by the FBI. Source #2 and the target met initially in or about July 2016 and, at the behest of the FBI, Source #2 has remained in contact with Page. ███████ ██ █ ████████

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

-26-

Solomon Aff. App. A026



~~TOP SECRET//NOFORN/FISA~~

FISA-Acquired Information Subject to Sequestration   Specifically, on or about August 20, 2016, Page met with Source #2 and an Unknown Female, which meeting was consensually monitored and recorded. During the course of their meeting, Source #2 discussed the 1980 "October Surprise" [in context, the FBI believes this refers to the conspiracy theory that, in October 1980, a candidate for U.S. President conspired with Iran to beat his opponent in the election by making a deal with Iran by which Iran would continue to hold hostages at the U.S. Embassy in Tehran until after the election]. Page claimed that there would be a "different October surprise" this year. Later, according to Source #2, the Unidentified Female asked Page, "So before you leave you have to tell us, what is the October surprise you are planning?" Page responded, "No well I – well I want to have the conspiracy theory about the, uh, the Ru- the next email dump with these, uh 33 thousand, you know."



~~(S//NF)~~   FISA-Acquired Information Subject to Sequestration



~~TOP SECRET//NOFORN/FISA~~

-27-

Solomon Aff. App. A027



TOP SECRET//NOFORN/FISA

FISA-Acquired Information Subject to Sequestration

IV.   (S//NF) **Page's Denial of Cooperation with the Russian Government to Influence the 2016 U.S. Presidential Election.**

(S//NF) On or about September 23, 2016, an identified news organization published an article (September 23rd News Article), which was written by the news organization's Chief Investigative Correspondent, alleging that U.S. intelligence officials are investigating Page with respect to suspected efforts by the Russian Government to influence the U.S. Presidential election.  According to the September 23rd News Article, U.S. officials received intelligence reports that when Page was in Moscow in July 2016 to deliver the above-noted commencement address at the New Economic School, he met with two senior Russian officials.  The September 23rd News Article stated that a "well-placed Western intelligence source" told the news organization that Page met with Igor Sechin, a longtime Putin associate and former



TOP SECRET//NOFORN/FISA

-28-

(B)(6)

TOP SECRET//NOFORN/FISA

Russian deputy minister who is now the executive chairman of Rosneft. At their

alleged meeting, Sechin raised the issue of the lifting of sanctions with Page.

According to the September 23rd News Article, the Western intelligence source also

reported that U.S. intelligence agencies received reports that Page met with another

top Putin aide - Igor Divyekin, a former Russian security official who now serves as

deputy chief for internal policy and is believed by U.S. officials to have

responsibility for intelligence collected by Russian agencies about the U.S. election.[22]

(B)(6)

[22] (S) As discussed above, Source #1 was hired by a business associate to conduct research into Candidate #1's ties to Russia. Source #1 provided the results of his research to the business associate, and the FBI assesses that the business associate likely provided this information to the law firm that hired the business associate in the first place. Source #1 told the FBI that he/she only provided this information to the business associate and the FBI. Given that the information contained in the September 23rd News Article generally matches the information about Page that Source #1 discovered during his/her research, the FBI assesses that Source #1's business associate or the law firm that hired the business associate likely provided this information to the press. The FBI also assesses that whoever gave the information to the press stated that the information was provided by a "well-placed Western intelligence source." The FBI does not believe that Source #1 directly provided this information to the identified news organization that published the September 23rd News Article.

(B)(6)

(TS//NF) In or about late October 2016, however, after the FBI Director sent a letter to the U.S. Congress, which stated that the FBI had learned of new information that might be pertinent to an investigation that the FBI was conducting of Candidate #2, Source #1 told the FBI that he/she was frustrated with this action and believed it would likely influence the 2016 U.S. Presidential election. In response to Source #1's concerns, Source #1 independently, and against the prior admonishment from the FBI to speak only with the FBI on this matter, released the reporting discussed

(B)(6)

Solomon Aff. App. A029



TOP SECRET//NOFORN//FISA

(S//NF) According to the September 23rd News Article, certain members of Congress were "taken aback" after being briefed on the alleged meetings between Page and Russian officials and viewed the meetings as a possible back channel to the Russians that could undercut U.S. foreign policy. The September 23rd News Article also stated that, following the briefing, the Senate Minority Leader wrote to the FBI Director, and citing the reports of meetings between an advisor to Candidate #1 [the advisor was unnamed in the letter, but the article indicated that the advisor is Page] and "high ranking sanctioned individuals" [in context, likely a reference to Sechin] in Moscow over the summer as evidence of "significant and disturbing ties" between Candidate #1's campaign and the Kremlin that needed to be investigated by the FBI.

(S//NF) Based on statements in the September 23rd News Article, as well as in other articles published by identified news organizations, Candidate #1's campaign repeatedly made public statements in an attempt to distance Candidate #1's campaign from Page. For example, the September 23rd News Article noted that Page's precise role in Candidate #1's campaign is unclear. According to the article, a spokesperson for Candidate #1's campaign called Page an "informal foreign

herein to an identified news organization. Although the FBI continues to assess Source #1's reporting is reliable, as noted above, the FBI closed Source #1 as an active source.



TOP SECRET//NOFORN//FISA

-30-

Solomon Aff. App. A030



TOP SECRET//NOFORN/FISA

advisor" who "does not speak for [Candidate #1] or the campaign." In addition, another spokesperson for Candidate #1's campaign said that Page "has no role" and added "[w]e are not aware of any of his activities, past or present." However, the article stated that the campaign spokesperson did not respond when asked why Candidate #1 had previously described Page as an advisor. In addition, on or about September 25, 2016, an identified news organization published an article that was based primarily on an interview with Candidate #1's then campaign manager. During the interview, the campaign manager stated, "[Page is] not part of the campaign I'm running." The campaign manager added that Page has not been part of Candidate #1's national security or foreign policy briefings since he/she became campaign manager. In response to a question from the interviewer regarding reports that Page was meeting with Russian officials to essentially attempt to conduct diplomatic negotiations with the Russian Government, the campaign manager responded, "If [Page is] doing that, he's certainly not doing it with the permission or knowledge of the campaign . . . ." Although it appears that Candidate #1's campaign was attempting to publicly distance itself from Page, the FBI assesses, based on the totality of circumstances described herein, that Page was engaged in efforts to influence U.S. foreign policy on behalf of the Russian Government.



(S//NF) On or about September 25, 2016, Page sent a letter to the FBI Director.

TOP SECRET//NOFORN/FISA

-31-



(B)(6)

TOP SECRET//NOFORN/FISA

In this letter, Page made reference to the accusations in the September 23rd News Article and denied them. Page stated that the source of the accusations was nothing more than completely false media reports and that he did not meet with any sanctioned official in Russia. Page also stated that he would be willing to discuss any "final" questions the FBI may have.[23]

(B)(6)

(S//NF) Additionally, on or about September 26, 2016, an identified news organization published an article that was based on an interview with Page (September 26th News Article). In the September 26th News Article, Page stated that all of the accusations were complete "garbage" and that he did not meet with Sechin or Divyekin. Page also stated that he was taking a leave of absence from his work with Candidate #1's campaign because the accusations were a "distraction." Similar to the above-noted comments from officials with Candidate #1's campaign, the FBI believes that Page's comments were self-serving and, based on the source reporting described above, untrue. At the time, notwithstanding public comments from officials affiliated with Candidate #1's campaign that distanced the campaign from Page, Page's public denial about the accusations in the September 23rd News Article, and Page's subsequent statement about taking a leave of absence from his

(B)(6)

---

[23] (S//NF) As discussed below, the FBI conducted a series of interviews with Page in or around March 2017.

(B)(6)

TOP SECRET//NOFORN/FISA

-32-



TOP SECRET//NOFORN/FISA

work with the campaign, because Page was one of the first identified foreign policy advisors for Candidate #1's campaign, the FBI believes that Page likely established close relationships with other members of Candidate #1's campaign and likely would have continued to have access to members of Candidate #1's campaign, which he could exploit to attempt to exert influence on foreign policy matters, regardless of whatever formal role he played in the campaign.

V. ~~(S//NF)~~ Page's Additional Interactions with Source #2.

~~(S//NF)~~ On or about October 17, 2016, Page met with Source #2, which meeting the FBI consensually monitored and recorded. According to the FBI's review of the recorded conversation, Source #2 made general inquiries about the media reporting regarding Page's contacts with Russian officials. Although Page did not provide any specific details to refute, dispel, or clarify the media reporting, he made vague statements that minimized his activities. Page also made general statements about a perceived conspiracy against him mounted by the media. However, notwithstanding these vague and general statements, Page admitted that he has had a "longstanding constructive relationship with the Russians, going back, throughout my life." In addition to this statement, Page made comments that lead the FBI to believe Page continues to be closely tied to Russian officials. Specifically, Page mentioned a foreign policy think tank project (but did not disclose the specifics

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A033

(B)(6)

~~TOP SECRET//NOFORN//FISA~~

of the project to Source #2). With respect to funding the project, Page said, "I don't want to say there'd be an open checkbook, but the Russians would definitely [fund it] ... but, that has its pros and cons, right?" The FBI believes this statement reflects Page's belief that he has significant relationships with Russian officials who will provide financial support for this foreign policy project.

(B)(6)

(S//NF) During this meeting with Source #2, Page said that he was no longer officially affiliated with Candidate #1's campaign, but added that he may be appearing in a television interview within the next week when he travels to the United Kingdom. According to Page, the interview was to discuss the potential change in U.S. foreign policy as it pertains to Russia and Syria if Candidate #1 won the election. Accordingly, although Page claimed that he was no longer officially affiliated with the campaign, the FBI assesses that Page continued to coordinate with the Russian Government, and perhaps others, in efforts to influence U.S. foreign policy.

VI.   (U) **Additional Investigative Results**.

(B)(6)

(S//NF) ███████ FISA-Acquired Information Subject to Sequestration

███████████████████████████████████

███████████████████████████████████

█████████████████████████████

(B)(6)

~~TOP SECRET//NOFORN//FISA~~

-34-

Solomon Aff. App. A034

**TOP SECRET//NOFORN/FISA**

(B)(6)



FISA-Acquired Information Subject to Sequestration ████████████████

████████████████████████████████ Now that the 2016 U.S. Presidential

election is over, the FBI believes that Russia will shift its focus from the short-term

goal of influencing the election to engaging in long-term perception management

activities that are directed by the Russian Government. Accordingly, the FBI

believes that Page is continuing to try to influence U.S. foreign policy for the benefit

of Russia.

(B)(6)

      A. (S//NF) Page ██████████████ **Meeting with Russian
Officials in July 2016.**

(B)(6)

    (S//NF,██████) Although Page publicly, and in interviews with the FBI, has

denied meeting with Sechin and Divyekin during his July 2016 trip to Moscow,

FISA-Acquired Information Subject to Sequestration ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

(B)(6)

**TOP SECRET//NOFORN/FISA**

-35-

Solomon Aff. App. A035

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

FISA-Acquired Information Subject to Sequestration

(B)(6)

B. (S) Page's Security Conscious Behavior.

(B)(6)

(S//NF) FISA-Acquired Information Subject to Sequestration

(B)(6)

(S//NF) The FBI believes that Page may have taken steps to destroy

evidence of his involvement with Russian efforts to undermine and influence the

outcome of the 2016 U.S. Presidential election. During the above-referenced

March 2017 interviews, Page informed the FBI that, in or about mid-October 2016,

his cell phone had been accidentally destroyed and that as a result he lost all of

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

Solomon Aff. App. A036

(B)(6)

TOP SECRET//NOFORN/FISA

▓▓▓▓▓▓▓▓ communications ▓Sensitive Information▓ ▓▓▓▓▓ Specifically, Page said that he dropped his cell phone while crossing a street, but did not realize that he had dropped the cell phone until after it was run-over by a vehicle. The FBI finds this suspicious because this is around the same time that Page was being explicitly referenced in media reports as possibly being investigated for his ties to Russia. ▓FISA-Acquired Information Subject to Sequestration▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(B)(6)

(S//NF) ▓▓▓▓ FISA-Acquired Information Subject to Sequestration

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[24] Sensitive Information

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(B)(6)

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A037



TOP SECRET//NOFORN/FISA



FISA-Acquired Information Subject to Sequestration

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A038



TOP SECRET//NOFORN//FISA

(S//NF) In or about June 2017, the FBI interviewed Klimentov. During this interview, Klimentov revealed that he believed that Page was in Moscow for only two and a half days on the July 2016 trip.[25] When asked if he was aware of any meeting between Page and Sechin, Klimentov said that he did not think it was likely that the two met. Notwithstanding Klimentov's statement that he does not think that Page met with Sechin during Page's July 2016 trip to Moscow, the FBI believes, based on the above-described information provided by `Sensitive Information` that it was rumored that Page met with Sechin, that Page and Sechin likely met prior to the time that Page joined Klimentov at the New Economic School.

(S//NF) The FBI also assesses that Klimentov does not know about all of the meetings that Page had when he was in Moscow in July 2016. For example, during the FBI's interview of Klimentov, the FBI asked him if he had any knowledge about a meeting between Page and Arkadiy Dvorkovich, who is the Russian Deputy Prime Minister. Klimentov said that he knew Page attempted to schedule a meeting with the New Economic School board, which would have included Dvorkovich, but the meeting never took place. Klimentov told the FBI that he had no memory of any meeting between Page and Dvorkovich.

---

[25] `Sensitive Method`



TOP SECRET//NOFORN//FISA

Solomon Aff. App. A039

(B)(6)

TOP SECRET//NOFORN//FISA

FISA-Acquired Information Subject to Sequestration

(B)(6)

C. (S//NF) Page's International Travel.

(B)(6)

(S//NF)          FISA-Acquired Information Subject to Sequestration

███████ the FBI believes that the RIS and Page may have previously met face-to-face.  According to the FBI's Sensitive Information

█████████████ Based on information developed through its ongoing investigation, the FBI believes that Page works in the New York City metropolitan area, and, Sensitive Information

(B)(6)

TOP SECRET//NOFORN//FISA

Solomon Aff. App. A040

~~TOP SECRET//NOFORN/FISA~~

**(B)(6)**

███Sensitive Information███████████████. Additionally, the FBI's

ongoing investigation has revealed that Page has moved out of his ███Sensitive Information███

████████████████████████████████████████████

██████████████████████████. Thus, the FBI assesses that

the New York City metropolitan area provides the RIS and Russian officials with a

viable area to clandestinely meet with Page.

**(B)(6)**

(S//NF) ███Sensitive Information████████████████

████████████████████████████████████████

███████ The FBI assesses, based on Page's self-admitted meetings with "████

████████████████████████████████" during his July

2016 travel to Russia, that he has already displayed a willingness to use his

international travel to meet with Russian officials.  FBI investigation has revealed

that Page traveled internationally at least three times since October 2016.  First, Page

traveled to the United Kingdom and South Africa on or about October 22 –

November 3, 2016.  Second, and more notably because the travel occurred after the

conclusion of the 2016 U.S. Presidential election, Page traveled to Moscow in or

about December 2016.  Third, Page traveled to Singapore in or about February 2017.

As discussed below, during at least two of these trips, the FBI believes that Page met

with Russian Government officials.

**(B)(6)**

~~TOP SECRET//NOFORN/FISA~~

-41-

Solomon Aff. App. A041



TOP SECRET//NOFORN/FISA

(S//NF) As discussed in greater detail below, the FBI conducted a series of interviews with Page in or about March 2017. During the course of these interviews, Page discussed his December 2016 travel to Moscow. Page informed the FBI that, during this trip, he unexpectedly met the Russian Deputy Prime Minister Arkadiy Dvorkovich. According to Page, Dvorkovich is on the Board of the New Economic School and, like Page, Dvorkovich delivered remarks at the New Economic School graduation in July 2016. Page stated that Dvorkovich congratulated Page for Candidate #1's election and asked how to connect for future cooperation. Although Page told the FBI that he informed Dvorkovich that he (Page) was no longer part of the campaign or administration, the FBI believes that Dvorkovich's request to connect for "future cooperation" reveals Russia's continued interest in using Page as an influence agent.

(S//NF) ██████ FISA-Acquired Information Subject to Sequestration

TOP SECRET//NOFORN/FISA

-42-



Solomon Aff. App. A042



TOP SECRET//NOFORN/FISA

(S//NF) In addition, during his interviews with the FBI, Page also revealed that he had traveled to Singapore to participate in the 2017 Gazprom Investor Day, which occurred on February 28, 2017.  Page disclosed that while he was at the Gazprom Investor Day, he met Denis Shulakov of Gazprombank[26] and they scheduled a breakfast in New York, NY for later in March [2017].  According to Page, he thought that the breakfast meeting would be about future business ventures, but there was no specific agenda.  As with Dvorkovich's outreach, the FBI assesses that Shulakov is interested in continuing to develop a relationship with Page in order to use Page as an influence agent for or on behalf of Russia.  The FBI also assesses that "future business ventures" may include ventures with Page that the Russian Government could exploit to engage in influence operations against the United States, like the proposed think tank discussed immediately below.

---

[26] ████████ Sensitive Information

████████████████

████████      The FBI assesses that this is likely the same individual who Page interacted with in Singapore.



(S//NF) According to information on its website, Gazprombank was founded by Gazprom to provide banking services for gas industry enterprises.  The authorized capital of Gazprombank is divided into ordinary shares, Type A preferred shares, and Type B preferred shares.  The Russian Federation owns 100% of the Type A preferred shares and the State Corporation Deposit Insurance Agency owns 100% of the Type B preferred shares.

TOP SECRET//NOFORN/FISA

-43-

Solomon Aff. App. A043



TOP SECRET//NOFORN/FISA

**D.** (S//NF) **Page's Russian-Funded Think Tank.**

(S//NF) As discussed above, Page appeared to be interested in establishing a Russian-funded think tank. Page approached Source #2 about being part of this project, and, as mentioned above, told Source #2 that the Russians would be willing to fund it. According to more recent reporting from Source #2, who met with Page shortly after Page's return from Moscow in or about December 2016, Source #2 asked Page for additional information regarding the financials for the proposed think tank. According to Source #2, Page initially attempted to distance the think tank from Russian funding. When Source #2 reminded Page of his previous statement regarding the "open checkbook," Page did not refute his previous comment and provided some reassurance to Source #2 about the likelihood of Russian financial support. The FBI assesses that Page's attempts to downplay Russian funding for the think tank can be attributed to Page likely trying to distance himself from Russia due to media reporting that continues to tie Page to Russia, Page's desire to appear to be separate and independent, or perhaps Page was instructed by Russian officials during his recent meetings with them that he should not discuss any possible Russian financial involvement.

TOP SECRET//NOFORN/FISA

-44-

TOP SECRET//NOFORN/FISA

(B)(6)

(B)(6)

(S//NF) Based on more recent information developed through its ongoing investigation of Page, the FBI now assesses that Page is no longer interested in establishing a think tank, likely due to the lack of funding.

E.　　　FISA-Acquired Information Subject to Sequestration

(B)(6)

(S//NF)　　FISA-Acquired Information Subject to Sequestration

(B)(6)

(S//NF)

(B)(6)

TOP SECRET//NOFORN/FISA

-45-

Solomon Aff. App. A045



(B)(6)

TOP SECRET//NOFORN/FISA

FISA-Acquired Information Subject to Sequestration

(B)(6)

(C//NF)

(B)(6)

TOP SECRET//NOFORN/FISA

-46-

Solomon Aff. App. A046

(B)(6)

TOP SECRET//NOFORN/FISA

FISA-Acquired Information Subject to Sequestration ▮▮▮▮

▮▮▮▮

(B)(6)

(S//NF) ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



TOP SECRET//NOFORN/FISA

(B)(6)

Solomon Aff. App. A047

**(B)(6)**

~~TOP SECRET//NOFORN/FISA~~

FISA-Acquired Information Subject to Sequestration

████████████████████████████████████████

**(B)(6)**

~~(S/NF)~~ FISA-Acquired Information Subject to Sequestration, the FBI assesses that Page continues to have access to senior U.S. Government officials. Moreover, the FBI further assesses that Page is attempting to downplay his contacts with the Russian Government and to dispel the controversy surrounding him, so as to make him more viable as a foreign policy expert who will be in a position, due to his continued contacts with senior U.S. Government officials, to influence U.S. foreign policy towards Russia.

**(B)(6)**

F. (S/NF) Page's Perception Management Efforts.

**(B)(6)**

~~(S/NF)~~ ████ FISA-Acquired Information Subject to Sequestration

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ FISA-Acquired Information Subject to Sequestration

████████████████████████████████████████

**(B)(6)**

~~TOP SECRET//NOFORN/FISA~~

Solomon Aff. App. A048

(B)(6)

TOP SECRET//NOFORN//FISA

FISA-Acquired Information Subject to Sequestration

(B)(6)

(B)(6)

**G. (S//NF)** Page's Letter to the U.S. Department of Justice.

(S//NF) In or around February 2017, Page sent a letter to the U.S. Department of Justice, Civil Rights Division, Voting Section, urging the review of what Page claimed was "severe election fraud in the form of disinformation, suppression of dissent, hate crimes and other extensive abuses led by members of [Candidate #2's] campaign and their political allies last year." In his letter, Page claims that he has

(B)(6)

TOP SECRET//NOFORN//FISA

-49-



TOP SECRET//NOFORN//FISA

not directly supported a political campaign since September 2016, but continues to be subjected to personal attacks by former members of Candidate #2's campaign based on fictitious information. Page wrote that his academic lecture and related meetings with scholars and business people in Moscow had no connection to the U.S. election. Page attributes the assertions in the September 23rd News Article that Page met with two senior Russian officials (i.e., Sechin and Diveykin) while he was in Moscow in July 2016 to give the commencement address at the New Economic School, which Page claims is "false evidence," to Candidate #2's campaign. Page further claims that the information relied on by Candidate #2's campaign, certain members of the U.S. Congress, and the media are lies that were completely fabricated by Candidate #2's paid consultants and private investigators. Notwithstanding Page's assertions that the claims against him are false, baseless, and completely fabricated, based on information developed by the FBI through its ongoing investigation of Page that is described herein, the FBI believes that Page's claims in this letter are self-serving and untrue.

H. (S//NF) The FBI's Interviews of Page.

(S//NF) In or about March 2017, the FBI met with Page for a series of interviews. At the start of these interviews, Page provided the FBI with a written outline of the facts and events he believed to be pertinent to the FBI's investigation.

TOP SECRET//NOFORN//FISA

-50-

Solomon Aff. App. A050



TOP SECRET//NOFORN/FISA

The FBI assesses that Page was not completely forthcoming during his interviews. For example, one of the topics Page covered with his prepared comments was his previous experience with Evgeny Buryakov, Igor Sporyshev, and Victor Podobnyy [these individuals are discussed above on pgs. 15-17]. In a reference to the Buryakov complaint, Page stated that "nobody knows that I'm Male-1 in this report," and also added that he never told anyone about this. As discussed above however, during a March 2016 interview with the FBI regarding his relationship with Podobnyy, Page told the FBI that he informed a group of Russian officials that he (Page) was "Male-1" in the Buryakov complaint. Thus, during the March 2017 interview, the FBI specifically asked Page if he told any colleague that he (Page) was "Male-1." In response, Page stated that there was a conversation with a Russian Government official at the United Nations General Assembly. The FBI again asked Page if he had told anyone that he was "Male-1." Page responded that he "forgot the exact statement."

(S//NF) Additionally, the FBI questioned Page about his previous relationship with Aleksandr Bulatov. [As discussed above, Bulatov is believed to be Sensitive Information ; during a June 2009 interview with the FBI, Page stated that he formed a professional relationship with Bulatov in or around 2007-2008.] Initially, Page claimed to not recall the name, but after further FBI questioning and

TOP SECRET//NOFORN/FISA

-51-

Solomon Aff. App. A051



TOP SECRET//NOFORN/FISA

looking in his phone contact list, Page claimed that he and Bulatov may have had lunch in New York.

(S//NF) At a later point in the interviews, after the FBI explained to Page how Page could be viewed as having a source-handler or co-optee relationship with the Russian intelligence officers, Page claimed that he believed that he was "on the books," but that he only provided the Russian intelligence officers with "immaterial non-public" information. Page further explained, "the more immaterial non-public information I give them, the better for this country." In the context of this part of the interview, during which the FBI was specifically discussing ████ intelligence officers and their patterns of recruitment, the FBI assesses that Page was referring to the ████ when he said that he was "on the books." Although the FBI asked Page to explain any current contact he had with any possible Russian intelligence officers, Page would only discuss the time frame 2008 to 2013.

(S//NF) Also during the interviews, Page denied ever meeting with Sechin or Divyekin, but, as discussed above, admitted to meeting with Russian Deputy Prime Minister Arkadiy Dvorkovich. The FBI assesses Page made this disclosure because it was publicly known that Dvorkovich was at the July 2016 graduation and that the two would have likely interacted at that time. Also, because Dvorkovich is the Russian Deputy Prime Minister, the FBI assesses that Page, by making this

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A052

(B)(6)

TOP SECRET//NOFORN/FISA

admission, believed he could explain the media claims that Page met with Russian officials in July 2016.

(B)(6)

(S//NF) With respect to Page's associations with Russian officials, the FBI believes that Page's strategy during these interviews was to initially deny an inculpatory allegation regarding such associations until Page could determine the extent of the FBI's knowledge. If the FBI appeared to know more about the allegation, the FBI believes that Page would then make a partial admission but also downplay its importance.

(B)(6)

(S//NF)          For example, Page downplayed his interactions with Dvorkovich during his March 2017 interviews with the FBI. During these interviews, Page characterized his interaction with Dvorkovich in July 2016 as a simple introduction in passing and a brief handshake. ▮▮▮▮▮▮▮▮▮

(B)(6)

TOP SECRET//NOFORN/FISA

-53-

Solomon Aff. App. A053



TOP SECRET//NOFORN//FISA

FISA-Acquired Information Subject to Sequestration



(S//NF) Page's strategy of initially denying an inculpatory allegation

regarding his associations and then making a partial admission also appears to be

Page's approach to interviews he has conducted with the news media.  For example,

in or about February 2017, Page was interviewed by a national news organization

and was asked specifically if he had any meetings last year with Russian officials in

Russia or elsewhere.  Page replied that he had no meetings but may have greeted a

few people as they walked by him at the graduation [in context, a reference to the

commencement ceremony at the New Economic School].  Then, in or about March

2017, Page was interviewed by a different national news organization and was

TOP SECRET//NOFORN//FISA

-54-

(B)(6)

TOP SECRET//NOFORN//FISA

directly asked if he had met with the Russian Ambassador to the United States in July 2016 during a political function held in Cleveland, OH.  Initially, Page said he would not comment on meetings that took place there due to confidentiality rules.  The interviewer continued to press this line of questions, and Page eventually admitted that he talked "off-the-record" with the Russian Ambassador.

(B)(6)

(S//NF)  During these March 2017 interviews, the FBI also questioned Page about the above-referenced reports from August 2016 that Candidate #1's campaign worked to make sure Political Party #1's platform would not call for giving weapons to Ukraine to fight Russian and rebel forces [this matter is discussed above on pgs. 25-26].  According to Page, he had no part in the campaign's decision.  Page stated that an identified individual (who previously served as manager of Candidate #1's campaign) more likely than not recommended the "pro-Russian" changes.  As the FBI believes that Page also holds pro-Russian views and appears to still have been a member of Candidate #1's campaign in August 2016, the FBI assesses that Page may have been downplaying his role in advocating for the change to Political Party #1's platform.

(B)(6)

(S//NF)  Finally, during these interviews, the FBI questioned Page about his removal from Candidate #1's campaign.  According to Page, on or about September 24, 2016, Page was told by an identified member of Candidate #1's campaign that

(B)(6)

Solomon Aff. App. A055



TOP SECRET//NOFORN/FISA

Page was no longer part of the campaign. However, Page added that another identified member of the campaign told Page that he would still be in the "orbit" of the campaign. FISA-Acquired Information Subject to Sequestration

(S//NF) ████ FISA-Acquired Information Subject to Sequestration

the FBI believes this may be the result of multiple factors, such as the media exposure that Page has received in relation to the FBI's investigation into allegations of Russian Government interference into the 2016 U.S. Presidential election as well as multiple media reports from in or about April 2017 that the FBI obtained a FISA warrant to surveil Page. Additionally, based on Page's history of willingness to assist Russian IOs, which as discussed above the FBI believes began as early as 2007 (see page 14), and his comment to the FBI that he believes he is "on the ████ books," the FBI believes that Page remains favorable to future RIS taskings.

TOP SECRET//NOFORN/FISA

-56-

Solomon Aff. App. A056



(B)(6)
(B)(6)

TOP SECRET//NOFORN//FISA

(S//NF) The FBI also notes that Page continues to be active in meeting with media outlets to promote his theories of how U.S. foreign policy should be adjusted with regard to Russia and also to refute claims of his involvement with Russian Government efforts to influence the 2016 U.S. Presidential election. The FBI believes that Page may have been instructed by Russian officials to aggressively deny, especially in the media, any Russian involvement with the 2016 U.S. Presidential election. The FBI believes this approach is important because, from the Russian Government's point-of-view, it continues to keep the controversy of the election in the front of the American and world media, which has the effect of undermining the integrity of the U.S. electoral process and weakening the effectiveness of the current U.S. Administration. The FBI believes Page also may be seeking media attention in order to maintain momentum for potential book contracts.

VII.  (S) <u>Facilities Used by Page</u>.



Sensitive Information

(B)(6)

TOP SECRET//NOFORN//FISA

-57-

Solomon Aff. App. A057



TOP SECRET//NOFORN//FISA

Sensitive Information



Sensitive Information

TOP SECRET//NOFORN//FISA

Solomon Aff. App. A058



(B)(6)

TOP SECRET//NOFORN/FISA

Sensitive Information



(B)(6)

TOP SECRET//NOFORN/FISA

-59-

Solomon Aff. App. A059

(B)(6)



(B)(6)

Solomon Aff. App. A060



TOP SECRET//NOFORN/FISA

Sensitive Information

Sensitive Information

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A061

(B)(6)

TOP SECRET//NOFORN/FISA

Sensitive Information

TOP SECRET//NOFORN/FISA

(B)(6)

Solomon Aff. App. A062

(B)(6)

TOP SECRET//NOFORN/FISA

Sensitive Information

VIII.   (U)   **Conclusion**.

(S//NF) As discussed above, the FBI believes that Page has been collaborating and conspiring with the Russian Government, to include elements of the RIS, to influence public opinion and affect the course of the U.S. Government.  Based on the foregoing facts and circumstances, the FBI submits that there is probable cause to believe that Page knowingly aids or abets other persons, who, pursuant to the

(B)(6)

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A063



TOP SECRET//NOFORN//FISA

direction of an intelligence service or network of Russia, knowingly engage in

clandestine intelligence activities (other than intelligence gathering activities) for or

on behalf of such foreign power, or knowingly conspires with other persons to

engage in such activities and, therefore, is an agent of a foreign power as defined by

50 U.S.C. § 1801(b)(2)(E).

(S//NF) As the activities discussed herein involve Page aiding, abetting, or

conspiring with Russian Government officials and elements of the RIS in clandestine

intelligence activities, the FBI submits that there is probable cause to believe that

such activities involve or are about to involve violations of the criminal statutes of

the United States, including 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 951 (Agents of

Foreign Governments), and 22 U.S.C. §§ 612, et seq. (Foreign Agents Registration

Act).

Sensitive Information

b. (S)  The premises or property to be searched contains foreign intelligence
information.

(S)  The premises or property to be searched contains foreign intelligence

information, in that investigation by the FBI has determined that there is probable

cause to believe that Page is an agent of Russia, a foreign power, all as described

Solomon Aff. App. A064



TOP SECRET//NOFORN/FISA

herein. Based upon its investigations of this foreign power and its agents, the FBI believes that this target maintains information, material, and/or property related to such activities secreted in the premises or property specified herein. Thus, the FBI expects that foreign intelligence information, such as that described herein, will be contained in the premises or property to be searched.

(B)(6) [U.S.C. § 1804(a)(3)(B) and 1823(a)(3)(C)]

   c. ——(S)—The facilities or places at which electronic surveillance will be directed, and the premises or property to be searched.



Sensitive Information



TOP SECRET//NOFORN/FISA

Solomon Aff. App. A065



TOP SECRET//NOFORN/FISA



Sensitive Information

Solomon Aff. App. A066



TOP SECRET//NOFORN//FISA

Sensitive Information



New

Solomon Aff. App. A067

(B)(6)

TOP SECRET//NOFORN/FISA

Sensitive Information

4.   (S) **Proposed Minimization Procedures** As to all information acquired

through the authorities requested herein, the FBI will follow its

Sensitive Information

(B)(6)
U.S.C.
§§ 1804(a)(4)
and
1823(a)(4)]

(B)(6)

TOP SECRET//NOFORN/FISA

-70-

Solomon Aff. App. A068



TOP SECRET//NOFORN/TISA

Sensitive Information



TOP SECRET//NOFORN/TISA

Solomon Aff. App. A069



TOP SECRET//NOFORN/FISA

Sensitive Information



TOP SECRET//NOFORN/FISA

-72-

Solomon Aff. App. A070



TOP SECRET//NOFORN/FISA

Sensitive Information

5.  (🕉) **Nature of the Information Sought** Through the authorities

requested herein, the United States is seeking foreign intelligence information with

respect to the activities of the target described above and detailed further in the

certification set forth below.  As indicated by the facts set forth herein, the FBI is

seeking foreign intelligence information that relates and is necessary to the ability of

the United States to protect against clandestine intelligence activities by an

intelligence service or network of this foreign power or by agents of this foreign

power, and information with respect to a foreign power or foreign territory that

relates and is necessary to the national defense, security, and the conduct of the

foreign affairs of the United States.  These same authorities may also incidentally

acquire other foreign intelligence information, as defined by the Act.

Sensitive Information

TOP SECRET//NOFORN/FISA

-73-

Solomon Aff. App. A071



(B)(6)

(B)(6) [50 U.S.C.
§§ 1804(a)(6)(A)-
(F)
and
1823(a)(6)(A)-(E)]

TOP SECRET//NOFORN//FISA

6.   (S) **Certification**  The certification of the Assistant to the President for
National Security Affairs or an Executive branch official duly designated by the
President as a certifying official in Executive Order Numbers 12139 (electronic
surveillance) and 12949 (physical search), as amended, is set forth below.

Sensitive Information

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(U) **The Purpose of the Authorities Requested**

(B)(6)

(S)  The FBI's foreign intelligence goals for this investigation are set forth in
the certification of the Executive Branch official contained herein.  However, the
authorities requested in this application may produce information and material
which might, when evaluated by prosecutive authorities, constitute evidence of a

(B)(6)


TOP SECRET//NOFORN//FISA

-75-

Solomon Aff. App. A072



~~TOP SECRET//NOFORN/FISA~~

violation of United States law, and this investigation may result in an eventual

criminal prosecution of the target. Nevertheless, as discussed in the certification, at

least a significant purpose of this request for electronic surveillance and physical

search is to collect foreign intelligence information as part of the FBI's investigation

of this target.

[50 U.S.C.
§ 1804(a)(7)]

■ ■ ▇sitive Information ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇


[50 U.S.C.
§§ 1804(a)(8)
and 1823(a)(8)]

8.   (S)  <u>**Facts Concerning Previous Applications**</u>  Previous applications

made to and approved by this Court for authorities under the Act regarding the

target, facilities, places, premises or property targeted herein, are as follows:

~~TOP SECRET//NOFORN/FISA~~

-76-

Solomon Aff. App. A073



TOP SECRET//NOFORN/FISA

three combined applications for electronic surveillance and physical search. The

most recent application was filed in docket number 2017-0375.

9. ~~(S)~~ **Duration of the Authorities Requested** (*See also*, 50 U.S.C. § 1824(d))

The authorities requested should not automatically terminate when foreign

intelligence information has first been obtained. Additional information of the same

type will be obtained on a continuous basis throughout the entire period requested.

The activities which the United States must identify and monitor are incremental

and continuous, and communications relating to such activities are often disguised

to appear innocuous. The type of foreign intelligence information being sought and

the fact that the activities of this target are ongoing preclude the conclusion that, at a

given time, all such information has been obtained and collection can be ended.

Accordingly, the United States requests the authorities specified herein **for a period

of ninety (90) days.**



TOP SECRET//NOFORN/FISA

-77-

Solomon Aff. App. A074

TOP SECRET//NOFORN/FISA

Sensitive Information

Solomon Aff. App. A075



Solomon Aff. App. A076



TOP SECRET//NOFORN/FISA

Sensitive Information



TOP SECRET//NOFORN/FISA

Solomon Aff. App. A077

~~TOP SECRET//NOFORN/FISA~~

(B)(6)

(B)(6) ~~(S) Specific Authorities Requested~~ Based upon the foregoing information,

the United States requests that this Court authorize the FBI to conduct the activities

described immediately below for the period requested herein.

(B)(6)       ~~(S)~~ Carter W. Page:



Sensitive Information

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

-82-

Solomon Aff. App. A078

(B)(6)

TOP SECRET//NOFORN//FISA





TOP SECRET//NOFORN//FISA

-83-

(B)(6)

Solomon Aff. App. A079

(B)(6)

TOP SECRET//NOFORN/FISA



Sensitive Information

TOP SECRET//NOFORN/FISA

(B)(6)

-84-

Solomon Aff. App. A080



Solomon Aff. App. A081



TOP SECRET//NOFORN/FISA

Sensitive Information

Solomon Aff. App. A082


(B)(6)

TOP SECRET//NOFORN//FISA

Sensitive Information

(S) The FBI has reviewed this verified application for accuracy in accordance with its April 5, 2001 procedures, which include sending a copy of the draft to the appropriate field office(s). A copy of those procedures was previously provided to the Court.

----- *The remainder of this page is intentionally left blank.* -----

(B)(6)

TOP SECRET//NOFORN//FISA

-88-

Solomon Aff. App. A083



TOP SECRET//NOFORN/FISA

### (U) VERIFICATION

(S) I declare under penalty of perjury that the foregoing information

regarding **Carter W. Page** is true and correct.  Executed pursuant to Title 28, United

States Code, § 1746 on _06/28/2017_ .



TOP SECRET//NOFORN/FISA

-89-

Solomon Aff. App. A084



(B)(6)

TOP SECRET//NOFORN/FISA

## (U) CERTIFICATION

(B)(6)

(S) I, the undersigned, having been designated as one of the officials authorized to make the certifications required by the Foreign Intelligence Surveillance Act of 1978, as amended, do hereby certify with regard to the electronic surveillance and physical search requested in this verified application targeting **Carter W. Page**, an agent of the Government of Russia, a foreign power, as follows:

[50 U.S.C. §§ 1804(a)(6)(A) and 1823(a)(6)(A)]

(A) (U) The information sought through the authorities requested herein is foreign intelligence information.

[50 U.S.C. §§ 1804(a)(6)(B) and 1823(a)(6)(B)]

(B) (U) At least a significant purpose of the authorities requested herein is to obtain foreign intelligence information and, notwithstanding the related criminal matters described in this application, the primary purpose of the authorities requested herein is **not** to obtain information for the prosecution of crimes other than those referred to in the Act, 50 U.S.C. § 1801(a)-(e), or related to such foreign intelligence crimes.

[50 U.S.C. §§ 1804(a)(6)(C) and 1823(a)(6)(C)]

(C) (U) The foreign intelligence information sought by the authorities requested herein cannot be reasonably obtained by normal investigative techniques.

(B)(6) U.S.C. §§ 1804(a)(6)(D) and 1823(a)(6)(D)]

(D) (S) The type of foreign intelligence information being sought through the authorities requested herein is that described in 50 U.S.C. § 1801(e)(1)(C), i.e.,

(B)(6)

TOP SECRET//NOFORN/FISA

-90-

Solomon Aff. App. A085



TOP SECRET//NOFORN/FISA

information that relates and is necessary to the ability of the United States to protect against clandestine intelligence activities by an intelligence service or network of this foreign power or by agents of this foreign power, and 50 U.S.C. § 1801(e)(2)(A)-(B), i.e., information with respect to a foreign power or foreign territory that relates and is necessary to the national defense or security, and the conduct of the foreign affairs of the United States. These same authorities may also incidentally acquire foreign intelligence information as defined by other subsections of 50 U.S.C. § 1801(e).

(B)(6) 50 U.S.C. § 1804(a)(6)(E) and 1823(a)(6)(E)]

(E) ~~(S)~~ The basis for my certification that the information sought is the type of foreign intelligence information specified herein and that such information cannot be obtained by normal investigative techniques is as follows.

(B)(6)

—— ~~(S)~~ **Foreign Intelligence Information** The foreign intelligence information sought through the authorities requested herein is the type specified herein because it may, among other things, enable the U.S. Government to:



TOP SECRET//NOFORN/FISA

-91-

(B)(6)

Solomon Aff. App. A086


(B)(6)

TOP SECRET//NOFORN/FISA

Sensitive Information

(B)(6)

TOP SECRET//NOFORN/FISA

Solomon Aff. App. A087

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

Sensitive Information

(B)(6)

(8) <u>Potential for Use in Criminal Proceedings</u> Another purpose of the

authorities requested herein is to obtain information which may assist at some

future time in the criminal prosecution of Page or others, including possibly

U.S. persons.  Such assistance may include:

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

-93-

Solomon Aff. App. A088



(B)(6)

TOP SECRET//NOFORN/FISA

(1) obtaining information to support a prosecution, or a legitimate threat of prosecution, of Page for federal foreign intelligence-related criminal offenses, including, but not limited to, 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 951 (Agents of Foreign Governments), and 22 U.S.C. §§ 612, et seq. (Foreign Agents Registration Act); and/or

(2) obtaining information to support prosecutions of others, including U.S. persons, for federal foreign intelligence-related criminal offenses.

(B)(6)

(S) **Limitations of Normal Investigative Techniques**

(B)(6)



TOP SECRET//NOFORN/FISA

-94-



(B)(6)

TOP SECRET//NOFORN/FISA

Sensitive Information

TOP SECRET//NOFORN/FISA

(B)(6)

Solomon Aff. App. A090



(B)(6)

TOP SECRET//NOFORN/FISA

Sensitive Information

(B)(6)

TOP SECRET//NOFORN/FISA

-96-

Solomon Aff. App. A091

TOP SECRET//NOFORN/FISA

(B)(6)

Sensitive Information

(B)(6)

(TS) In short, none of these normal investigative techniques, or others like them, can provide the same kind of information, with the same reliability and safety, as the authorities requested herein.

(B)(6)

(S) Based upon the foregoing information, it is the Government's belief that the authorities requested herein targeting Page are critical investigative means for obtaining the foreign intelligence information identified herein.

(B)(6)

TOP SECRET//NOFORN/FISA

-97-



(B)(6)
(B)(6)

~~TOP SECRET//NOFORN//FISA~~

(S) Accordingly, I execute this certification regarding **Carter W. Page** in accordance with the requirements of the Foreign Intelligence Surveillance Act of 1978, as amended.

| | |
|---|---|
| _____<br>Director<br>Federal Bureau of Investigation | _____<br>Rex Tillerson<br>Secretary of State |
| _____<br>Andrew G. McCabe<br>Deputy Director<br>Federal Bureau of Investigation | _____<br>John J. Sullivan<br>Deputy Secretary of State |
| _____<br>Michael Pompeo<br>Director of the Central<br>Intelligence Agency | _____<br>James N. Mattis<br>Secretary of Defense |
| _____<br>Daniel R. Coats<br>Director of National Intelligence | _____<br>H.R. McMaster<br>Assistant to the President for<br>National Security Affairs |
| _____<br>Principal Deputy Director of<br>National Intelligence | |

_06/28/2017_
Date

(B)(6)

~~TOP SECRET//NOFORN//FISA~~

-98-

Solomon Aff. App. A093

(B)(6) 

TOP SECRET//NOFORN/FISA

## (U) APPROVAL

(B)(6)

(S) I find that this application regarding **Carter W. Page** satisfies the criteria and requirements for such applications set forth in the Foreign Intelligence Surveillance Act of 1978, as amended, and hereby approve its filing with this Court.

Sensitive Information

(B)(6)

TOP SECRET//NOFORN/FISA

-99-

Solomon Aff. App. A094


(B)(6)

~~TOP SECRET//NOFORN/FISA~~

Sensitive Information

Rod J. Rosenstein
Deputy Attorney General of the United States

6/29/17
Date

(B)(6)

~~TOP SECRET//NOFORN/FISA~~

-100-

Solomon Aff. App. A095



TOP SECRET//NOFORN//FISA

(S) WHEREFORE, the United States submits that this application

regarding **Carter W. Page** satisfies the criteria and requirements of the Foreign

Intelligence Surveillance Act of 1978, as amended, and therefore requests that

this Court authorize the activities described herein, and enter the proposed

orders and warrants which accompany this application.

Respectfully submitted,

**Non-SES PII**

Attorney
U.S. Department of Justice

(B)(6)

TOP SECRET//NOFORN//FISA



-101-



<del>SECRET</del>

Filed
United States Foreign
Intelligence Surveillance Court

JUN 2 9 2017

LeeAnn Flynn Hall, Clerk of Court

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D. C.

| | |
|---|---|
| IN RE **CARTER W. PAGE, A U.S.** **PERSON** | Docket Number: **17 - 6 7 9** |

## PRIMARY ORDER AND WARRANT

1.  An application having been made by the United States of America pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829 (FISA or the Act), for an order and warrant (hereinafter "order") for **electronic surveillance and physical search**, and full consideration having been given to the matters set forth therein, the Court finds as follows:

50 U.S.C.
§ 1805(a)(1) and
824(a)(1)]

2.  The application has been made by a Federal officer and approved by the Attorney General;

50 U.S.C.
§ 1805(a)(2) and
824(a)(2)]

3.  On the basis of the facts submitted in the verified application, there is probable cause to believe that:

(B)(6)

<del>SECRET</del>

Derived from:   Application to the USFISC
                in Docket Number captioned above
Declassify on:  20420626

Solomon Aff. App. A097



SECRET

(A)  The Government of the Russian Federation (Russia) is a foreign

power and Carter W. Page is an agent of Russia, as defined by

50 U.S.C. § 1801(b)(2)(E);

(B)  as specified herein, the facilities or places at which electronic

surveillance will be directed are being used or are about to be used by,

and the premises or property to be searched is or is about to be owned,

used, possessed by, or is in transit to or from, this target;

50 U.S.C.
§ 1805(a)(3) and
824(a)(3)]

4.  The minimization procedures proposed in the application have been

adopted by the Attorney General and meet the definition of minimization

procedures under 50 U.S.C §§ 1801(h) and 1821(4);

50 U.S.C.
§ 1805(a)(4) and
824(a)(4)]

5.  The application contains all statements and certifications required by 50

U.S.C. §§ 1804 and 1823, and the certification is not clearly erroneous on the basis

of the statements made under 50 U.S.C. §§ 1804(a)(6)(E) and 1823(a)(6)(E), and

any other information furnished under 50 U.S.C. §§ 1804(c) and 1823(c).

WHEREFORE, IT IS HEREBY ORDERED, pursuant to the authority

conferred on this Court by the Act, that the application of the United States is

GRANTED, and it is

FURTHER ORDERED, as follows:



SECRET

-2-

Solomon Aff. App. A098



SECRET


.S.C.
§ 1805(c)(1) and
824(c)(1)]

1. The United States is authorized to conduct electronic surveillance and physical search of the target as follows; provided that the electronic surveillance shall be directed only at the facilities and places described below, using for each only the means specified below for such particular facility or place, and the physical search shall be conducted only of the premises or property described below, using for each only the manner specified below for such particular premises or property.



Sensitive Information


(B)(6)

SECRET
-3-

Solomon Aff. App. A099

(B)(6)

SECRET



SECRET
-4-

(B)(6)

Solomon Aff. App. A100

SECRET



SECRET

-5-

Solomon Aff. App. A101



SECRET

-6-

Solomon Aff. App. A102

(B)(6)

SECRET



(B)(6)

SECRET
-7-

Solomon Aff. App. A103

(B)(6)

SECRET



[50 U.S.C. 1805(j)]

[See 50 U.S.C. 1842(d)(2)(C)]

(B)(6)

SECRET

-8-

Solomon Aff. App. A104

(B)(6)

SECRET



(B)(6)

SECRET

-9-

Solomon Aff. App. A105

(B)(6)

SECRET

50 U.S.C.
§ 1805(c)(1)(C)
nd
824(c)(1)(C)]



50 U.S.C.
1805(c)(1)(D)]

(B)(6)

SECRET

-10-

Solomon Aff. App. A106



Solomon Aff. App. A107

(B)(6)

SECRET

50 U.S.C.
§ 1805(c)(1)(E)
nd
824(c)(1)(E)]

6. The authorities approved are for the period indicated below unless

otherwise ordered by this Court.

50 U.S.C.
§ 1805(c)(2)(A)
nd
824(c)(2)(A)]

As to all information acquired through the authorities approved herein,

the FBI shall

(B)(6)

SECRET
-12-

SECRET



Solomon Aff. App. A109

(B)(6)



SECRET

SECRET
-14-

Solomon Aff. App. A110

(B)(6)

[b]U.S.C.
§ 1805(c)(2)(B)-
D)
nd
824(c)(2)(B)-(D)]

SECRET



SECRET

(B)(6)

Solomon Aff. App. A111



SECRET

(B)(6)

i0 U.S.C.
1824(c)(2)(E)]

(B)(6)

SECRET

-16-

Solomon Aff. App. A112

(B)(6)



SECRET

-17-

Solomon Aff. App. A113

(B)(6)

SECRET



(B)(6)

SECRET

-18-

Solomon Aff. App. A114

(B)(6)

SECRET

----- The remainder of this page is intentionally left blank. -----

(B)(6)

SECRET

-19-

Solomon Aff. App. A115

(B)(6)

~~SECRET~~

This authorization regarding **Carter W. Page** expires at **3:00 p.m. Eastern Time**

on the _____ 82nd _____ day of September, 2017.

Signed _____ 06-29-2017 P12:41 _____ **Eastern Time**

        Date            Time

RAYMOND J. DEARIE
Judge, United States Foreign
Intelligence Surveillance Court

(B)(6) ____, Deputy Clerk, ____, certify that this document is a true and correct copy of the original.

~~SECRET~~

-20-

Solomon Aff. App. A116

**From:** MOFFA, JONATHAN C. (CD) (FBI)
**Sent:** Wednesday, December 14, 2016 10:10 AM
**To:** STRZOK, PETER P. (CD) (FBI)
**Subject:** RE: Lates ▇▇ --- ~~SECRET//NOFORN~~

**SentinelCaseId:** NON-RECORD

Classification: ~~SECRET//NOFORN~~

Classified By: ▇▇▇▇
Derived From: FBI NSIC dated 20130301
Declassify On: 20411231
=====================================================

They do. They were highlighted when he received them by someone on the McCain side of things presumably.

---

**From:** STRZOK, PETER P. (CD) (FBI)
**Sent:** Wednesday, December 14, 2016 8:08 AM
**To:** MOFFA, JONATHAN C. (CD) (FBI)
**Subject:** RE: Lates ▇▇ --- ~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified By: ▇▇▇▇
Derived From: FBI NSIC dated 20130301
Declassify On: 20411231
=====================================================

D said they had highlighting on them?

---

**From:** MOFFA, JONATHAN C. (CD) (FBI)
**Sent:** Wednesday, December 14, 2016 6:27 AM
**To:** ▇▇▇▇ (WF) (FBI) ▇▇▇▇ (CD) (FBI)
**Cc:** STRZOK, PETER P. (CD) (FBI) ▇▇▇▇ (OGC) (FBI) ▇▇▇▇ (OGC) (FBI)
**Subject:** RE: Lates ▇▇ --- ~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified By: ▇▇▇▇
Derived From: FBI NSIC dated 20130301
Declassify On: 20411231
=====================================================

I should add that none of them are new and all of them are duplicative of reports on your chart below...

1

Solomon Aff. App. A117

J

**From:** MOFFA, JONATHAN C. (CD) (FBI)
**Sent:** Wednesday, December 14, 2016 6:25 AM
**To** ▮▮▮▮▮▮ (WF) (FBI) ▮▮▮▮▮▮▮▮ (CD) (FBI)
**Cc:** STRZOK, PETER P. (CD) (FBI) ▮▮▮▮▮▮ (OGC) (FBI) ▮▮▮▮▮▮▮▮ (OGC) (FBI)
**Subject:** RE: Lates ▮▮▮▮ ---~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified By: ▮▮▮▮▮▮
Derived From: FBI NSIC dated 20130301
Declassify On: 20411231
=========================================================

I have an envelope o ▮▮▮▮ reports that the D received from John McCain as well that can be added to the chart below. ▮▮▮▮▮, swing by this morning and I'll give them to you to put into the file…

Thanks,

J

---

**From** ▮▮▮▮▮▮ (WF) (FBI)
**Sent:** Tuesday, December 13, 2016 4:19 PM
**To** ▮▮▮▮▮▮ (WF) (FBI) ▮▮▮▮▮▮▮▮ (CV) (FBI) ▮▮▮▮▮▮▮ (NY) (FBI) ▮▮▮▮▮▮
(CG) (FBI) ▮▮▮▮▮▮ (CD) (FBI) ▮▮▮▮▮▮▮▮ (CD) (FBI) ▮▮▮▮▮▮ (CD) (FBI)
▮▮▮▮▮▮ (CD) (FBI) ▮▮▮▮▮▮▮▮ (WF) (FBI) ▮▮▮▮▮▮ (CD) (FBI) ▮▮▮▮▮▮ (CD)
(FBI)
**Cc:** STRZOK, PETER P. (CD) (FBI); MOFFA, JONATHAN C. (CD) (FBI) ▮▮▮▮▮▮ (OGC) (FBI) ▮▮▮,
▮▮▮▮ (OGC) (FBI)
**Subject:** RE: Lates ▮▮▮▮ ---~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified By: ▮▮▮▮▮▮
Derived From: FBI NSIC dated 20130301
Declassify On: 20411231
=========================================================

Following up on the new information on the thumb drive – please see this tracking matrix which is also saved on the share drive:

| Report Number | Report Dated | Simpson file date * | CROSSFIRE received | ▮▮▮ to FBI | Corn to Baker | Simpson to Ohr | Comm |
|---|---|---|---|---|---|---|---|
| 80 | 6/20/2016 | 11/1/2016 ? | 9/19/2016 | | | | It appears file mod |
| 86 | 7/26/2016 | 7/28/2016 | 12/12/2016 | | | ▮▮▮ | Obtained from Si |
| 94 | 7/19/2016 | 7/19/2016 | 9/19/2016 | | | | |

2

Solomon Aff. App. A118

Folks,

As many of you know we obtained a USB drive from Glenn Simpson via a DOJ colleague.  We are handling as evidence and a working copy is in the share drive – where we have historically kep ▓▓▓▓ reporting, the folder labeled ▓▓▓ Reporting, sub folder Simpson 121216.  A cursory look at the files appears they are indee ▓▓▓▓ reports.   Please review and lets discuss tomorrow morning.

In addition, we will resume 0900 meetings every Wednesday until we no longer need to meet.  Lets start up again tomorrow.

Thanks,

▓▓

**SS** ▓▓▓▓▓▓▓▓
▓▓▓ *Washington Field Office*
▓▓▓ *@ic.fbi.gov (NIPR)* - *(Unavail during work hours)*
▓▓▓ *@fbi.sgov.gov (SIPR)*
▓▓▓ *@fbi.ic.gov (SCION)*
▓▓▓ *Cell* - *(Unavail during work hours)*
▓▓▓ *Desk*
▓▓▓ *STE*
▓▓▓ *NSTS* - *((call desk first))*


=================================================
Classification: ~~SECRET//NOFORN~~

=================================================
Classification: ~~SECRET//NOFORN~~

=================================================
Classification: ~~SECRET//NOFORN~~

=================================================
Classification: ~~SECRET//NOFORN~~

=================================================
Classification: ~~SECRET//NOFORN~~

=================================================
Classification: ~~SECRET//NOFORN~~

Senate HSGAC_TransitionReq_Fusion GPS Docs - FBI000014 - DOJ Review
DOJ REVIEW ONLY.  DO NOT DISSEMINATE FURTHER WITHOUT THE APPROVAL OF FBI OGC

Solomon Aff. App. A119



**(CD) (FBI)**

**From:**         ███████ CD) (FBI)
**Sent:**         Tuesday, December 20, 2016 4:15 PM
**To:**           ███████ (WF) (FBI)
**Subject:**      RE: Fusion GPS thumb drive --- ~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified B ███████
Derived From: FBI NSIC dated 20130301
Declassify On: 20411231
========================================================

Got it – we'll take a look no ███████

**Fro** ███████ (WF) (FBI)
**Sen** December 20,
**T** ███████ (WF) (FB █████ CV) (FB ████ (CD) (FB █████ (NY) (FBI █████ CD) (FBI
███ (CD) (FB █████ (WF) (FBI █████ (CD) (FBI) ████ CD)
(FBI)
███ EA, JONATHAN C. (CD) (FB █████ (OGC) (FBI); STROZK, PETER P. (CD) (FB
███ OGC) (FBI)
**Subject:** Fusion GPS thumb drive --- ~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified B ███████
Derived From: FBI NSIC dated 20130301
Declassify On: 20411231
========================================================

I just uploaded to our share drive the documents and files that Bruce Ohr's wife (through Bruce) voluntarily provided to the FBI this morning. They are reports/work she completed for Fusion GPS/ Glenn Simpson (similar to the one she gave us on Manafort last week). They are under the Fusion GPS file on the share drive. Please review (there are approx 85 docs...) and once we have a grasp of whats on there I can submit to the appropriate case files.



**S** ███████
**Washington Field Office**
███ **@ic.fbi.gov (NIPR)** - *(Unavail during work hours)*
███ **fbi.sgov.gov (SIPR)**
███ **fbi.ic.gov (SCION)**
███ **Cell** - *(Unavail during work hours)*
███ **Desk**
███ **STE**
███ **NSTS** - *((call desk first))*

Solomon Aff. App. A120

UNCLASSIFIED/~~FOUO~~  Confirmed AG guidelines are public

FD-794b

# FEDERAL BUREAU OF INVESTIGATION
## PAYMENT REQUEST

The Attorney General's Guidelines dated 12/13/2006 require that the payment of any FBI funds to a CHS be made by an FBI Agent and another government official. However, in extraordinary circumstances, the SAC is authorized to approve an exemption to this requirement, which allows the FBI Agent to be the payer and only witness.

Is SAC approval for an exemption to the second witness requirement requested for this payment?                                                                                    NO        b7E -2

Period covered for this payment:

Begin: 06/30/2015                                    End: 11/30/2015

### Payment Request Amount

| Substantive Case File Number | Financial Program | Financial Subprogram |
|---|---|---|
| 800H-RO-C3402086 | 66 | RC |

b3 -1
b7E -2,4

| Payment Description | Expense Incurred By | Payment Amount |
|---|---|---|
| Other Miscellaneous | CHS/Expense | $5,500.00 |

### Operational Payment Justification narrative:

From the end of June 2015 through November 2015, the CHS engaged a sub-source at the FBI's direction to organize and facilitate meetings in Berlin, Germany between at WMD? components and an individual with knowledge of the Government of Russia's bio-weaponization efforts. From the outset, the CHS identified the sub-source to the FBI, whom then identified the sub-source to its German authorities and ???. After the approval of the sub-source's efforts to facilitate a meeting. The sub-source whose contact was limited to the CHS, endeavored to do ??? and set meetings twice (September and November). However, on both occasions at each time by the CHS or the sub-source, the FBI (WMD?) cancelled at the last minute and the meeting was never consummated. Despite this, the CHS and sub-source continue to be willing to facilitate a meeting. Attached is a bill dated January 25, 2016, that was submitted to the CHS by the sub-source for the services (meetings, briefings, reports, travel accommodations, meals) for 5000.00 Euros, or 5,102.50 ??? regarding the matter as documented in the file as the emails between Legat Rome, Legat Berlin, WMD? describing the planning and ultimate cancellation of the meetings. Payment will be made to the CHS to reimburse expenses paid to the sub-source in this regard.

| Total CHS Services: | $0.00 |
|---|---|
| Total CHS Expenses: | $5,500.00 |
| Total Agent Expenses: | $0.00 |

b3 -1
b7D -2
b7E -1,2,6,8

### SIGNATURE

Submitted By
First Level Approved By
Second Level Approved By

| FD-794b | Page 2 of 2 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED/~~FOUO~~

1370340-13

Solomon Aff. App. A121

SECRET//NOFORN

Tuesday, May 16, 2017

At 12:30 pm on 05/16/2017, I met with Deputy Attorney General (DAG) Rod Rosenstein in his office at the Department of Justice. Also present were Tashina Gauhar and Jim Crowell. The following is a contemporaneous recollection of the main topics we discussed.

I began by telling him that today I approved the opening of an investigation of President Donald Trump. I explained that the purpose of the investigation was to investigate allegations of possible collusion between the president and the Russian Government, possible obstruction of justice related to the firing of FBI Director James Comey, and possible conspiracy to obstruct justice. The DAG questioned what I meant by collusion and I explained that I was referring to the investigation of any potential links between the Trump campaign and the Russian government. I explained that counterintelligence investigations of this sort were meant to uncover any the existence of any threat to national security as well as whether or not criminal conduct had occurred. Regarding the obstruction issues, I made clear that our predication was based not only on the president's comments last week to reporter Lester Holt (that he connected the firing of the director to the FBI's Russia investigation), but also on the several concerning comments the president made to Director Comey over the last few months. These comments included the President's requests for assurances of loyalty, statements about the Russia investigation and the investigation of General Michael Flynn. I also informed the DAG that Director Comey preserved his recollection of these interactions in a series of contemporaneously drafted memos. Finally, I informed the DAG that as a result of his role in the matter, I thought he would be a witness in the case.

The DAG then related his experiences at the White House on Monday, 05/08/2017. He began by stating that he had the feeling that the decision to fire the Director had been made before he arrived. At the White House, he first met with White House Counsel Donald McGahn, who told him that the President had drafted a letter to Director Comey that McGahn did not want the President to send. Shortly thereafter they met with the President and Attorney General Jeff Sessions, and possibly others, in the Oval Office. President Trump told the DAG he had written a letter to Director Comey, asked the DAG if he had seen the letter, and instructed McGahn to provide the DAG with a copy. The DAG described the letter to me as being a long list, possibly several pages, of the President's complaints with Director Comey. Among those complaints was a discussion about the FBI's Russia investigation, as well as a paragraph about the FBI Deputy Director. The DAG indicated to me that he retained a copy of the President's letter. The DAG said he told the President that he did not think the President should send the letter he had written. The President then directed the DAG to write a memo explaining the reasoning for Director Comey's termination and that the DAG should include Russia. The DAG said to the President he did not think this was a good idea and that his memo did not need to include Russia. The President replied that he understood, but that he was asking the DAG to include Russia anyway. As our conversation continued the DAG proposed that he could potentially wear a recording device into the Oval Office to collect additional evidence on the President's true intentions. He said he thought this

Classified By: D98B56S65
Derived From: FBI NSIC CG
Declassify On: 50X1-HUM

SECRET//NOFORN

Solomon Aff. App. A122

SECRET//NOFORN

might be possible because he was not searched when he entered the White House. I told him that I would discuss the opportunity with my investigative team and get back to him.

We discussed the issue of appointing a Special Counsel to oversee the FBI's Russia investigation. The DAG said he has two candidates ready, one of whom could start immediately. The DAG and Mr. Crowell indicated that they had made the decision to appoint a Counsel last week, but were thrown off their intended execution by the firing of Director Comey. The DAG said that he left a copy of the delegation with Acting Assistant Attorney General for National Security Dana Boente to execute in the DAG's absence if the DAG were suddenly removed from his position. However, the DAG indicated he now intended to wait a few days before selecting a Special Counsel so he could remain actively involved in providing input regarding the selection of the new Director of the FBI. He anticipated that he may be terminated when he puts the Special Counsel in place, in light of the president's anger with AG Sessions when the AG recused himself from the Russia investigation. The DAG further stated that he was told that others heard the President tell the AG "you were supposed to protect me."

We discussed the President's capacity and the possibility that he could be removed from office under the 25th Amendment. The DAG indicated that he looked into the issue and determined he would need a majority, or eight of 15 cabinet officials and that he might already have two supporters in the AG and Secretary of Homeland Security General John Kelly.

The DAG related to me that on Sunday, 05/14/2017, the AG asked him to participate in the interview of Sec. Kelly for the position of FBI Director. The President had requested that they interview Sec. Kelly. The DAG informed the AG that he did not believe Sec. Kelly would be a good candidate for many reasons and stated that making him FBI Director would be a "strategy of disruption." The DAG told me that if Sec. Kelly were placed in the job, the DAG would request Sec. Kelly's resignation.

The DAG told me that he informed the AG that I should remain in my role as Acting Director until the permanent Director was chosen. The DAG opined that my only "problem" was that some people believe that I was involved in my wife's 2015 campaign for State Senate in Virginia. The DAG said it was a "credibility problem" because after having told him during my May 13 interview that I played no role in her campaign and attended no campaign events, the DAG said a staffer had provided him with a photograph found on the internet of me and my wife wearing Dr. Jill McCabe campaign t-shirts. The DAG suggested that this photograph contradicted my statement that I had not campaigned for my wife. I pointed out to the DAG that the photograph he saw was taken not at a campaign event, but rather at ███████████████████ I further informed the DAG that I confirmed with my ethics counsel at FBI that the Hatch Act does not prohibit wearing a campaign button or shirt away from the office, and that attending ███████████████ wearing such a shirt does not constitute proscribed political activity.

SECRET//NOFORN

Solomon Aff. App. A123

UNCLASSIFIED/~~FOUO~~

May 21, 2017

On Friday, May 12, 2017, at 9:30 am, I went to the Department of Justice Command Center to brief the Attorney General (AG) and the Deputy Attorney General (DAG) and others on the President's Daily Briefing materials. We do this every Monday, Wednesday, and Friday morning.

After the briefing, I asked the DAG to remain for a private discussion regarding some issues we were having with Congress on the Russia investigation. Specifically, the Intelligence Committees were requesting access to personnel and materials that might have an impact on our investigation and future prospects for prosecution. As the Acting AG for this investigation (due to AG Sessions' recusal on the issue), I wanted the DAG and DOJ to take responsibility for negotiating a deconfliction agreement with the Senate Intelligence Committee and others on the Hill.

Once the other personnel left the room the DAG and I began talking. I explained my issue and he told me to direct all such requests from the Committees to DOJ. The DAG began discussing recent developments related to the firing of Director Comey, and became visibly emotional and upset. He indicated that he had been ordered by the President to write the memo justifying the firing. However, he stated that he did not know his memo would be publicly released and used to justify the Director's termination. He said he was shocked when he learned that the White House was making it seem as if the DAG had initiated the firing on his own. The DAG made it clear that he had been instructed to write the memo. I asked if he was ok and how his family was doing. He said that he was not sleeping and that he did not feel that he could talk to anyone.

The DAG stated that he had been thinking about appointing a Special Counsel to oversee the investigation but that he was concerned that such a designation would lead to his termination. The DAG feared what would happen to the Department and the investigation if he were also fired. The DAG asked for my thoughts on whether or not we needed a Special Counsel and I indicated that I thought it would help to preserve the credibility of the investigation. He remarked that he wished he could talk to Director Comey about the situation.

I returned to my office and spent the next few hours thinking about the appointment of a Special Counsel and how that could best be done. I had my staff request a follow up meeting with the DAG.

At approximately 4:30 pm, I returned to DOJ to meet with the DAG in his office. No other people were present. I told the DAG that I recognized the decision to designate a Special Counsel was entirely his, but that I thought he deserved to hear my best formed thoughts on the issue, which I had not had the chance to do earlier in the morning. I explained that I felt strongly that the investigation would be best served by having a Special Counsel. I indicated that had DOJ taken the same step in the early stages of the Clinton email case, it was likely that the FBI would not have felt compelled to announce the results of the investigation the way we did in July 2016. I told him that the possibility that we might someday close the investigation without charging anyone only heightened the need to have a completely impartial, highly credible, independent Special Counsel announcing that result. Finally, I pointed out that DOJ and the FBI were likely to take withering criticism from the Hill and others until the decision was made, and that we stood to lose credibility as those attacks wore on.

The DAG indicated that he had not yet made the decision to appoint a Special Counsel. He believed doing so might cause him to get fired and he was worried about what the Department would do without

UNCLASSIFIED/~~FOUO~~

Solomon Aff. App. A124

UNCLASSIFIED//~~FOUO~~

a confirmed DAG, especially in light of the AG's recusal on the Russia issue. In addition, he wanted to remain actively involved in the selection of the next Director of the FBI. We had a brief discussion about the candidates and whether or not the President and the AG would decide to appoint an interim director to serve until the new permanent director was selected and confirmed.

We returned to our discussion from the morning meeting about the DAG's memo and the firing of Director Comey. The DAG stated that based on conversations he had with the AG as early as January 2017, he knew Director Comey was going to get fired. He repeated that although he was asked to write the memo, he did not anticipate that the White House would release it publicly to justify Comey's termination. He stated that someone in the White House requested that he do a press conference to explain his memo and the firing, but he refused to do it.

At the conclusion of our meeting the DAG indicated that he would continue to consider the appointment of a Special Counsel, but he did not believe that he needed to do it quickly.

After returning to my office I received a call from the AG inviting me to meet with him and the DAG on Saturday, May 13, 2017, at 2:00 pm to interview for the FBI Director position. I accepted the invitation and met them for the interview at that time.

On Sunday, May 14, 2017 at approximately 10:00 am, the DAG called me on my cellphone. Using coded language, he asked me that if I had the opportunity to speak to Director Comey, he would be very interested to hear what the Director thought about the Special Counsel issue. I told him I would consider it.

At 3:00 pm later that day, I convened a conference call with James Baker, James Rybicki, and Lisa Page to discuss whether or not I should seek Director Comey's opinion on the special counsel issue. We all concluded that I should not, and that in light of the fact that he was no longer an FBI employee, it would be inappropriate to continue discussing investigative issues with him.

UNCLASSIFIED//~~FOUO~~

Solomon Aff. App. A125

UNCLASSIFIED/~~FOUO~~

May 22, 2017

On Saturday, May 20, 2017, Deputy Attorney General (DAG) Rod Rosenstein called my cell phone [REDACTED] at approximately 10:15 am. He asked if I was working and, if so, if I could meet him and Special Counsel (SC) Robert Mueller at 1:00 pm. I indicated that I was not working and that I was busy. I asked if we could meet on Sunday morning. He offered to check SC Mueller's availability for Sunday. While still on the phone with me, he called "Bob" on another phone and asked if Bob could meet Sunday. I assumed he was speaking to the SC. We agreed to meet at DOJ at 11:00 am on Sunday. The DAG informed me that the purpose of the meeting was to discuss "coordination and logistics issues."

On Sunday, May 21, 2017, I met with the DAG, the SC, Aaron Zebley and FBI EAD Carl Ghattas (who attended at my request). We convened in the DAG's conference room. The DAG opened the meeting by thanking me for the work I was doing, and stating that he continued to support my staying in the position of Acting FBI Director. I assumed he meant until the permanent Director is selected. He then stated that he had the highest regard for my integrity, and that he had read and agreed with the memorandum written by FBI Assistant Director Patrick Kelley addressing the issue of whether or not there were any conflict issues with my involvement in the Russia investigation. He stated that he did not believe I had a conflicts with the Russia investigation. Despite this, he then stated that he thought I should consider recusing myself from the investigation. He said he was not ordering me to recuse, but merely suggesting that I consider it in order to ensure the credibility of the investigation. He then stated that in the past I have maintained that I did not play a role in my wife Dr. Jill McCabe's 2015 run for Virginia State senate, but noted that there was a photograph on the internet of us wearing campaign t-shirts. He stated that this potential "credibility issue" could cause some people to complain about my involvement in the investigation.

I reminded him that the photograph he referenced did not in any way contradict my statement of not having played a role in my wife's campaign and not attending any campaign events. The photograph was not evidence of proscribed political activity, but rather a photograph taken [REDACTED] [REDACTED]. I offered to explain the entire matter to the SC and to provide him with a copy of AD Kelley's memo, which concludes that there is no basis in law or in fact that would establish a conflict, the appearance of a conflict, or call for my recusal from the Russia matter.

SC Mueller said he did not want to be briefed on the matter or review the memo. He thought the issue might be beyond the scope of his authority as SC. He asked EAD Ghattas and me to leave the room briefly so he could talk to the DAG privately. We left.

A few minutes later we reentered the room. SC Mueller stated that he would not weigh in on the recusal issue, but he wanted to let me know that he thought I would likely be a witness in the investigation. I told the DAG that I did not believe he was in a position to order me, or anyone, to recuse from the Russia investigation, in light of his appointment of the Special Counsel. He repeated that he was not ordering me to recuse, but was rather suggesting that I consider it. I told him I would discuss it with FBI counsel and get back to him at a later date.

We ended the meeting at approximately 1130. There was no discussion of any "coordination and logistics issues". I left DOJ with EAD Ghattas and returned to FBI HQ.

UNCLASSIFIED/~~FOUO~~

SECRET//NOFORN

(U//FOUO) On May 16, 2017, Acting Director McCabe and I met with the Deputy Attorney General (DAG) Rod Rosenstein in his office at the Department of Justice. Also present were Jim Crowell, Scott Schools, Tashina Gauhar, and Stuart Goldberg. We did not know the topic of the meeting in advance of our arrival, only that he had called earlier in the afternoon and asked if the Acting Director could meet at 7:30 that evening.

(U//FOUO) When we entered his office the DAG was in the middle of recounting for Scott Schools and Stuart Goldberg the events leading up to Director Comey's firing. The DAG interrupted his story, told them that he would return to it, then turned to the Acting Director and told him that he already knew all of this, that he was just bringing Scott and Stuart up to speed. About his meeting at the White House before the Director's firing (which may have been what he had just been describing), he stated that "a lot of this feels stage-managed." He didn't explain further what he meant.

(U//FOUO) The DAG then shifted into a chaotic discussion about his view that getting a good FBI Director nominated was his most important priority. It was chaotic because he frequently shifted between recounting conversations he had had with possible nominees, while at the same time referring to some of the same individuals as the possible Special Counsel over the Russia investigation. Among those individuals he listed as being under consideration for permanent Director of the FBI were Mark Philip, Robert Mueller, Paul Abbate, and Adam Lee. He said that Alice Fisher had withdrawn herself from consideration. The DAG said he began making calls to Mueller and Philip on Wednesday, after figuring out on Tuesday night that "something was dramatically wrong." He explained that Mueller had called and said he would do it (it appeared that this was a reference to the Special Counsel job, but the conversation was so disjointed that McCabe and I did not truly learn that Mr. Mueller would be so appointed until the DAG informed us on the day of the "Gang of 8" briefing on May 17, 2016).

(U//FOUO) During the course of this conversation the DAG also mentioned former DAG Jim Cole as an individual who would be willing to serve as Special Counsel, and stated that Cole could start within 24 hour notice. (The DAG returned to this topic repeatedly; for ease of reading, I have included all information related to the appointment of a Special Counsel in this paragraph, even if it came later in the conversation). The DAG further explained that while he was committed to appointing a Special Counsel, it was an issue of timing, because he believed he would be fired as soon as one was appointed. He stressed that didn't think it would be in the best interest of the Department of Justice or the AG to not have a DAG or Acting AG.

(U//FOUO) The DAG then interrupted himself to talk about the Acting Director's "political problem," referring to the claim that the Acting Director should have recused himself from the Hillary Clinton email investigation as a result of his wife having run for a Virginia State Senate seat in 2015. The DAG mentioned as an aside that Senator Grassley was "all over" Mr. McCabe and that the President's draft letter (described in more detail later in this memo) stated that allowing Mr. McCabe to remain on as Deputy was one of the reasons that Director Comey was being fired. The DAG raised with the Acting Director a photograph that had been taken off the Internet that showed the Acting Director and his wife

1

```
Classified By: F23M41K20
Derived From: FBI NSIC CG
Declassify On: 20421231
```

SECRET//NOFORN

Solomon Aff. App. A127

SECRET//NOFORN

wearing "Jill McCabe for State Senate" t-shirts, and stated this was evidence that the Acting Director had engaged in prohibited political activity. (The DAG had raised this issue with Mr. McCabe on several prior occasions). The Acting Director explained again that he wore that t-shirt ███████████████████, and that regardless, wearing a t-shirt or political button does not constitute proscribed political activity.

(U//FOUO) The DAG then returned to the topic of the appointment of a permanent FBI Director, and stated that the President had suggested that current DHS Secretary John Kelly serve as FBI Director, which the DAG viewed as a "disruption strategy." (It was not clear whether the DAG was referring to the permanent Director position, or someone to hold the position as interim Director; the DAG's conversational style was quite frenetic and jumped a great deal from topic to topic without warning). The DAG expressed that he thought this plan didn't make any sense, that Secretary Kelly wasn't going to leave a Cabinet-level position to become Director of the FBI, and that additionally, Secretary Kelly didn't have the experience to be the Director. He said that either the President or Secretary Kelly (it wasn't clear to whom he was referring) seemed to think that perhaps Secretary Kelly could do both jobs at once, to which the DAG responded again that this was all a "disruption strategy."

(U//FOUO) The DAG said he had concern about what was going on at the White House, unrelated to the nomination of FBI Director, but didn't expand further.

(U//FOUO) With respect to current contenders for permanent Director, the DAG indicated that there were two problems with selecting Bob Mueller: that his firm represents Manafort, and that the law would need to be changed as he had already served a term as FBI Director. The DAG stated they were scrambling to find a new Director, but that he didn't believe that Paul Abbate or Adam Lee (both current agents, serving in positions of executive management at the FBI) were qualified. He said they were great agents and supervisors, but were not right for Director. He again mentioned reaching out for Mark Philip, and said that former Attorney General Michael Mukasey planned to call him.

(U//FOUO) The DAG then described some of the actual interviews that the President had conducted for FBI Director. The DAG said that the individuals present for them were the President, Vice President, Attorney General Sessions, Jody Hunt (Chief of Staff to the AG), and himself. (Additional personnel may have been present as well). The DAG said that Mueller had been interviewed recently, but that his interview had been relatively brief. The DAG described the Lee and Abbate interviews in much the same way, saying that the President asked very superficial questions, ("So, would you like the job?" and "It's really good for you that you're here, right?" which the DAG described as a reference to it being "good press" for them) and appeared ready to end the interviews. The DAG said he took over both interviews, because he was concerned that both candidates would leave the interview thinking, "This is it? This is the interview for Director of the FBI?" (The DAG then interjected that the Acting Director should have Abbate and Lee write up 302s of their interviews so that there was a record of them). The DAG believed that there would be a negative impact on the FBI for the President to nominate an SAC to head the organization, and further said that the Vice President and Attorney General "get it." The DAG reiterated that Mueller was the only individual who was qualified, and that he told the President that nominating a current agent wasn't only "rare" (as had been characterized by the President), but was unprecedented. The DAG mentioned that the President tried to get Mr. Abbate to say that the Bureau had been in chaos last year, and ended this topic by saying that he had recruited Rick McFeely (a former FBI agent) who was scheduled to be interviewed the following day, and that the President was very interested in Joe Lieberman for the position. (In the middle of this conversation the

2

SECRET//NOFORN

Solomon Aff. App. A128

SECRET//NOFORN

DAG interrupted himself to describe an odd series of events in which he was helping Bob Mueller locate his phone, which he had misplaced somewhere at the White House, and that Dina Powell offered to help him with "this FBI thing."  No additional relevant information was conveyed, though the story went on for some time).  At the end of our meeting (but still related to this topic), the DAG called McGahn while in our presence, who confirmed that the President planned to interview McCabe, Philip, and McFeely, but that he was currently fascinated by Lieberman.

(U//FOUO)  The DAG then turned to Jim Crowell and asked, "Should I tell the phone call story?" He described the events of "Tuesday afternoon [the day Director Comey was fired], when I start[ed] to get the clue that they are firing by email."  He said the Department's public affairs office reached out to him and told him that the White House wanted to say that the firing was the DAG's idea.  The DAG said he responded, "Sarah, this is the U.S. Department of Justice, they can do whatever they want, but we're not going to put out a false statement."  After the firing, the DAG said that the President had called his cell phone and told the DAG that he was watching Fox News and that the reporting was saying that it was great, that Rupert Murdoch was saying it was great, amazing.  The DAG says he reiterated that if they asked him who came up with the idea, I'm going to tell them.  The DAG said that his press person, Sarah, received several screaming phone calls from Reince Priebus, Chief of Staff to the President, and there were several back and forth conversations about the "tick tock," in essence, the timeline of events leading up to Director Comey's firing.   (Author's note:  The DAG then mentioned "Pence was there, he knew to come" which I believe refers to at the original meeting when they discussed firing Director Comey, and not during the timeline discussions).  The DAG explained he knew he was getting "blasted" but that he was unwilling to say that it was his idea to fire the Director, which was what the White House wanted.

The DAG then turned to the events surrounding the Director's firing.  He said that he had been called to the White House in the evening on Monday, May 8th, by the President.  Once there, the DAG stated that Don McGahn, the White House Counsel, informed him that the President had written a letter enumerating the bases for the Director's firing, but that McGahn was trying to convince the President not to send it.  The DAG said he was led to the Oval Office by McGahn, and present there was the President, the Vice President, AG Session, Jody Hunt, McGahn, and possibly others.  The DAG said it was hard to reduce what happened to a couple of sentences, but said that they had decided to fire Jim Comey before they told me, but that they were "acting like they cared about my opinion."  (Author's note:  This was a strange comment because it was my understanding that the DAG had previously indicated that he and AG Sessions had been discussing firing Director Comey since January, but given the nature of the conversation there was no room for follow-up).  The DAG was provided a copy of the President's letter, and publicly agreed with McGahn that the President should not send it.  (Around this time the DAG also informed us that he had the President's letter, and told us that he would provide it to us upon our departure, which he did).  Upon our return to HQ, I made one copy of the letter, Mr. McCabe put it in an envelope, sealed and signed it, and placed it in his safe).

(U//FOUO)  The DAG then indicated that the President asked him to write a memo explaining the loss of confidence he had in Director Comey's continued ability to lead the FBI.  The DAG stated that the White House didn't tell him what to put in the memo, but then later stated that the President had specifically requested that he mention "Russia" as a reason that the DAG had lost confidence.  The DAG said that he had concerns about Comey, but that Russia was not a part of those concerns and so he

3

Solomon Aff. App. A129

SECRET//NOFORN

refused. He said the President he would "appreciate it if you put Russia in." The DAG also said that the President asked him to include the fact that Comey had told him three times that he wasn't under investigation, but the DAG said to us that he refused to put that in the memo because he wasn't sure if it was a true statement. Finally, the DAG also indicated that it hadn't occurred to him that the letter would be released. The DAG explained that once written his memo and AG Sessions' recommendation were delivered to the White House on Tuesday by Jody Hunt, the AG's Chief of Staff, and that he spent two hours in the Oval Office with the President planning how to coordinate the firing.

(S//NF)[1] At some point during the DAG's description of the Director's firing, the Acting Director informed the room that the FBI had decided to open an investigation against the President, as well as AG Sessions. The Acting Director also informed the group that the FBI had made arrangements to brief the Gang of 8 the following evening. The DAG indicated that he wanted to attend, which launched a conversation in which several of us implored the DAG that he should make the announcement of his intention to appoint a Special Counsel *before* he attended the Gang of 8 briefing, or the All-Member briefs scheduled for that Thursday and Friday. The DAG initially resisted, saying that he only wanted to tell the Gang of 8 that he was taking appropriate steps, and that he had reason to believe that Senator Schumer would trust him. Stuart Goldberg then asked a number of probing questions about why the FBI had decided to open the investigation, and said that we would have to explain what had changed between the last time Director Comey had stated that he wasn't under investigation and the decision to open. (We had already explained in depth what we thought had changed, and the various facts we relied on as predication to open the investigation).

(U//FOUO) Near the end of the meeting, the DAG returned to several topics which had been previously discussed, including the controversy surrounding Mr. McCabe (this time raising the "Circa News" story, which reported that Mr. McCabe had high-fived when Lt. Gen. Flynn was fired and said pejorative things about President Trump. Mr. McCabe and I tried to explain how resoundingly this had been discounted, given the number of people who were purportedly in the room when it occurred, but the DAG explained he just wanted us to know what people told him about Mr. McCabe. He also mentioned that the President had asked Adam Lee whether or not he was a Republican, and in reference to Mr. McCabe's upcoming interview with President Trump (which had not been scheduled and for which Mr. McCabe had no awareness) inexplicably yelled, "Do you think this is a real interview?!" and suggested that he and Mr. McCabe should wear a wire to record the conversation.

(U//FOUO) We left the meeting at 9:10 pm, everyone else remained in the room with the DAG.

Lisa Page

---

[1] Author's note: I am marking this paragraph S//NF, because at the time of this writing, the existence of the case against the President and AG Sessions is still classified. During the course of the conversation with the DAG, however, he paused at one point and turned to Tashina Gauhar to ask about the classification level of the meeting, which he assumed would be "TS." She offhandedly said, "yes" which caused me to raise the concern that while the discussion we were having was sensitive, that I didn't believe that disclosure of this meeting could be fairly characterized to cause exceptionally grave damage to national security, and something being sensitive or potentially embarrassing was not a basis to classify the contents of a meeting. As such, I believe the appropriate classification of most of this memo is U//FOUO.

4

SECRET//NOFORN

Solomon Aff. App. A130

FD-1057 (Rev. 5-8-10)

SECRET//ORCON/NOFORN

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (S//OC/NF) Meeting with CHS to discuss        **Date:** 08/15/2016
CROSSFIRE HURRICANE

**From:** NEW YORK
NY-CD1
**Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-HQ-2063661        (S//OC/NF) CROSSFIRE HURRICANE;
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER
97F-HQ-2067747        (S//OC/NF) CROSSFIRE DRAGON
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER
97F-HQ-2067748        (S//OC/NF) CROSSFIRE TYPHOON
FOREIGN AGENTS REGISTRATION ACT-RUSSIA;
SENSITIVE INVESTIGATIVE MATTER
97F-HQ-2067749        (S//OC/NF) CROSSFIRE FURY
FOREIGN AGENTS REGISTRATION ACT-RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** (S//OC/NF) Meeting with CHS on 8/11/2016 to discuss
CROSSFIRE HURRICANE.

**Reason: 1.4(b)**
**Derived From: National**
**Security Information SCG**
**Declassify On: 20411231**

**Full Investigation Initiated:** 07/31/2016

**Details:**

(S//OC/NF) On 08/11/2016, SA ▮Non-SES Employee▮, SOS ▮Non-SES Employee▮

SECRET//ORCON/NOFORN

Solomon Aff. App. A131

SECRET//ORCON/NOFORN

Title: (S//OC/NF) Meeting with CHS to discuss CROSSFIRE HURRICANE
Re: 97F-HQ-2063661, 08/15/2016

and SA Stephen M. Somma met with [Source ID] to discuss CROSSFIRE
HURRICANE. The meeting took place at the CHS' home and lasted
approximately 1 1/2 hours. After introduction of SA [Non-SES] to the
CHS the following discussion took place:

## (S//OC/NF) CROSSFIRE TYPHOON

(S//OC/NF) The CHS was informed by the interview team that they were
currently assigned to a project looking at the roll of the Russian
Federation in the current U.S. Presidential campaign. As such, there
were some individuals associated with the Trump Campaign that were of
particular interest to the team. The team asked the CHS if s/he had
heard of CROSSFIRE TYPOON (CT), the CHS stated that s/he did not but
asked for some background information on CT, which the team provided.
The CHS, upon hearing of CT's pedigree information, stated that s/he
was unaware of CT.

(S//OC/NF) The team inquired if the CHS would be able and/or willing
to invite CT to his/her [Source ID]. The team
explained that it would allow the FBI to obtain assessment information
on CT as well as possibly conduct an operation against CT. The CHS
stated that s/he would be willing to help, however, prior to the
invitation, the CHS would want to meet CT first, as without knowing CT,
CT could be [Source ID]. The team agreed
with the CHS and agreed to work with the CHS to obtain an initial
meeting.

## (S//OC/NF) CROSSFIRE DRAGON

(S//OC/NF) The CHS asked the team if they would be interested in
CROSSFIRE DRAGON (CD). The CHS stated that CD had been invited to
speak, earlier in July, at a presentation put together by [Source ID]
[Source ID], who had asked CD to attend. The CHS said that former
Secretary of State Maldeline Albright was also at the presentation.
CD, was described by the CHS, as being "very guarded" during the
presentation and stating that his/her views were his/her own and not of
the Trump campaign.

SECRET//ORCON/NOFORN

2

Solomon Aff. App. A132

SECRET//ORCON/NOFORN

Title: (S//OC/NF) Meeting with CHS to discuss CROSSFIRE HURRICANE
Re: 97F-HQ-2063661, 08/15/2016

(S//OC/NF) The CHS explained to the team that s/he had a private
meeting with CD on or about 7/18/2016 when CD was Source ID

Source ID

Source ID

Source ID                                                    The CHS told the team that the
purpose of the meeting was to ask the CHS if the s/he would want to
join the Trump campaign as a foreign policy adviser. The CHS stated
that s/he was non-committal to CD about joining the campaign. The CHS
told the interviewing team that he had no intention of joining the
campaign.

(S//OC/NF) The CHS met with CD in the CHS' office and the meeting
lasted approximately 2 hours. During the course of the meeting CD
discussed his/her relationship with Gazprom, CD's views on Putin, the
current U.S. Presidential campaign and that CD "retold Russia's view on
the Ukraine."

(S//OC/NF) The CHS also related that when CD had heard that the CHS
had recently been in Dubai, CD mentioned that s/he was in Abu Dhabi
around the same time as the CHS. CD told the CHS that s/he was in Abu
Dhabi representing Gazprom. When asked by the team what s/he thought
CD was advising Gazprom on, the CHS opined that it was most likely
about American policy as CD does not have a background in geology and
Gazprom "certainly doesn't need any more advisers" on energy.

(S//OC/NF) As stated previously the CHS stated that s/he had no
intention of joining the campaign, but the CHS had not conveyed that to
anyone related to the Trump campaign. The CHS was willing to assist
with the ongoing investigation and to not notify the Trump campaign
about the CHS' decision not to join.

(S//OC/NF)   CROSSFIRE FURY

(S//OC/NF) In discussions with the interviewing team about the
investigation, the CHS stated the s/he has known CROSSFIRE FURY (CF)
for over 30 years. The CHS worked with CF on several political

SECRET//ORCON/NOFORN

3

Solomon Aff. App. A133

SECRET//ORCON/NOFORN

Title: (S//OC/NF) Meeting with CHS to discuss CROSSFIRE HURRICANE
Re: 97F-HQ-2063661, 08/15/2016

campaigns.  The CHS described CF as a savvy political operator.  The
CHS offered to reach out to CF, but stated, given the timing of the
campaign, the CHS doubted CF would have time to respond or meet with
the CHS.

**(S//OC/NF)  CROSSFIRE RAZOR**

(S//OC/NF)  The CHS relayed an incident s/he witnessed when CROSSFIRE
RAZOR (CR) spoke at Source ID                 .  The CHS was unsure of the
date, but noted that CR was still in his/her position within the USIC.
Source ID
Source ID          ]  The CHS told the team that after CR spoke and socialized
with Source ID                     at dinner and over drinks, Source ID
Source ID          got CR a cab to take CR to the train station to bring
him/her to London.  The CHS stated that a woman, SVETLANA LOKHOVA,
surprised everyone and got into CR's cab and joined CR on the train
ride to London.  The CHS recalled that LOKHOVA "latched" onto CR when
he was at the Source ID          The CHS stated that s/he is somewhat
suspicious of LOKHOVA, as she has been affiliated with several
prominent members of Source ID              The CHS believes taht LOKHOVA's
father may be a Russian Oligarch living in London. The CHS could not
provide further information on CR and LOKHOVA's trip.

**Other**

(S//OC/NF)  The CHS expects to hear from Sam Clovis soon about joining
the Trump campaign.  The CHS described Clovis as the "type of guy who
could make a campaign work."

(S//OC/NF)  The CHS advised that Source ID   Peter Navaro, who is a
professor at a university in California, is one of the Trump Campaign's
senior policy adviser related to Trade.

(S//OC/NF)  The CHS provided atmospherics about the current situation
at Source ID          and at his/her new company.

SECRET//ORCON/NOFORN

Solomon Aff. App. A134

SECRET//ORCON/NOFORN

Title: (S//OC/NF) Meeting with CHS to discuss CROSSFIRE HURRICANE
Re: 97F-HQ-2063661, 08/15/2016

◆◆

SECRET//ORCON/NOFORN

Solomon Aff. App. A135

FD-1057 (Rev. 5-8-10)

~~SECRET//ORCON/NOFORN~~

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ~~(S//OC/NF)~~ CHS Meeting 08/12/2016          **Date:** 08/15/2016

**From:** NEW YORK
       NY-CD1
       **Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III

**Drafted By:** SOMMA STEPHEN M

**Case ID #:**

| | |
|---|---|
| 97F-HQ-2063661 | (S//OC/NF) CROSSFIRE HURRICANE;<br>FOREIGN AGENTS REGISTRATION ACT -<br>RUSSIA;<br>SENSITIVE INVESTIGATIVE MATTER |
| 97F-HQ-2067747 | (S//OC/NF) CROSSFIRE DRAGON<br>FOREIGN AGENTS REGISTRATION ACT -<br>RUSSIA;<br>SENSITIVE INVESTIGATIVE MATTER |
| 97F-HQ-2067748 | (S//OC/NF) CROSSFIRE TYPHOON<br>FOREIGN AGENTS REGISTRATION ACT-RUSSIA;<br>SENSITIVE INVESTIGATIVE MATTER |
| 97F-HQ-2067749 | (S//OC/NF) CROSSFIRE FURY<br>FOREIGN AGENTS REGISTRATION ACT-RUSSIA;<br>SENSITIVE INVESTIGATIVE MATTER |

**Synopsis:** ~~(S//OC/NF)~~ CHS meeting 08/12/2016 regarding captioned subjects.

               **Reason: 1.4(b)**
               **Derived From: National**
               **Security Information SCG**
               **Declassify On: 20411231**

**Full Investigation Initiated:** 07/31/2016

**Details:**

~~(S//OC/NF)~~  On 08/12/2016, SA ▮Non-SES▮, SOS ▮Non-SES▮ and SA Stephen M. Somma met with ▮Source ID▮ (CHS) to discuss CROSSFIRE

~~SECRET//ORCON/NOFORN~~

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CHS Meeting 08/12/2016
Re: 97F-HQ-2063661, 08/15/2016

HURRICANE.  The meeting took place at the CHS' home and lasted
approximately 2 hours.

**(S//OC/NF)  CROSSFIRE DRAGON**

(S//OC/NF)   The interviewing team informed the CHS that CROSSFIRE
DRAGON (CD), whom they had spoken about the prior day, was of interest
to them.  The team explained that due to CD's ties back to the Russian
Federation (RF), CD would be the logical conduit for the RF to message
to the Trump Campaign.  The team asked if the CHS would be willing to
contact CD, based off of their previous discussions in the [Source ID],
and invite CD to a private meeting.  The CHS agreed to contact CD and
offered [Source ID] for the meeting or at a private club in the
Washington, DC area.  The team suggested that the [Source ID] would be
preferable, as it would allow for a more private atmosphere, but would
work with wherever the CHS and CD agree to meet.

(S//OC/NF)   The team and the CHS discussed, that given the Trump
Campaign's desire to hire the CHS as an adviser, the CHS is in a
prefect position to ask CD direct questions about the Trump campaign's
alleged ties to the RF.  The team provided the CHS with several open
source articles about the Trump Campaign.

(S//OC/NF)   The team asked the CHS if s/he recalled when CD said he was
in Abu Dhabi for Gazprom (discussed with the CHS the previous day).
The CHS said that s/he beleives that it was approximately 3 months
ago.  The team asked if it was unusual for a senior foreign policy
adviser to a presidential campaign to still be advising a company like
Gazprom, the CHS thought it was.  The CHS stated that s/he was under
the impression that CD was connected to the Russian Government either
through Gazprom or through other connections.

(S//OC/NF)   The CHS was going to contact [Source ID] to
obtain CD's e-mail address so that the CHS could recontact CD.  The
team told the CHS that if [Source ID] is unable to provide one, they
could give the CHS the e-mail address they have. The team told the CHS
that they would like to have the CHS contact CD as soon as possible.

SECRET//ORCON/NOFORN

2

Solomon Aff. App. A137

~~SECRET//ORCON/NOFORN~~

Title: (S//OC/NF) CHS Meeting 08/12/2016
Re:  97F-HQ-2063661, 08/15/2016


(S//OC/NF)   **CROSSFIRE RAZOR**

(S//OC/NF)   The CHS was asked to recall the incident that s/he spoke about the previous day regarding CR.  The team asked if the CHS recalled how CR was invited to [Source ID]             .  The CHS believed that the invite was most likely sent out by another member of the committee who shared responsibility of inviting speakers [Source ID] [Source ID]             The CHS stated that s/he could contact someone on the committee and inquire how CR was invited.

(S//OC/NF)  The CHS was asked if s/he recalled if CR was alone during the presentation at [Source ID]           or if CR was joined by a staff officer.  The CHS did not remember another officer with CR, but said that that there was a representative from CR's organization there from a local military base.  The CHS did clarify to the team that SVETLANA LAKHOVA got into the cab with CR at [Source ID]        and then joined CR on the train to London.

(S//OC/NF)  The team thought, that given that the Trump Campaign was interested in the CHS joining, the CHS may be able to meet with CR as part of the CHS' due diligence of the campaign.  During a meeting with CR, the team thought it would be another opportunity for the CHS to address the RF ties to the Trump campaign.


(S//OC/NF)   **CROSSFIRE TYHPOON**

(S//OC/NF)  The team asked the CHS if s/he thought an invitation to CT for CT to speak at [Source ID]          would be better if extended via the [Source ID]          The venue would be a small setting for CT to speak with current students and then travel to London.  The CHS stated that s/he thought of an institute/think tank in London where CT might be able to speak as well, thereby allowing the FBI or others to have access to CT.  The CHS opined that the [Source ID]      would be open around the first or second week of October. The team asked if there was an opportunity to have CT to [Source ID] sooner, the CHS said s/he would look into it.


~~SECRET//ORCON/NOFORN~~

3

Solomon Aff. App. A138

~~SECRET//ORCON/NOFORN~~

Title: (S//OC/NF) CHS Meeting 08/12/2016
Re:  97F-HQ-2063661, 08/15/2016

(S//OC/NF)  The team provided the CHS with CT's e-mail address.

**(S//OC/NF)  SENATOR SESSIONS**

(S//OC/NF)  The CHS was asked about Senator Sessions role as a senior foreign policy adviser on the Trump Campaign.  The CHS does not know Sessions, but opined that Sessions is a conservative who would not be friendly to Russia.

**OTHER**


Source ID

(S//OC/NF)  The team inquired what the role of a foreign policy adviser consists of.  The CHS explained that the main job is to put together position papers for the candidate.  As the campaign progresses, the advisers help prepare the candidate for debates, playing the role of reporters in the rehearsals.  After the debates are over, the CHS stated that the main role is to "put out fires" for the candidate.

(S//OC/NF)  The CHS signed, under her/his codename, a FD-472 allowing the FBI to consensually monitor any conversations related to the CROSSFIRE HURRICANE investigation.

♦♦

~~SECRET//ORCON/NOFORN~~

4

Solomon Aff. App. A139

FD-1057 (Rev. 5-8-10)

~~SECRET//ORCON/NOFORN~~



## FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (S//OC/NF) CROSSFIRE DRAGON Operational Plan

**Date:** 08/24/2016

**CC:** ████ Non-SES ████

**From:** NEW YORK
NY-CD1
        **Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III
████ Non-SES ████
STRZOK PETER P II

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-HQ-2067747        (S//OC/NF) CROSSFIRE DRAGON
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** ████(S//OC/NF)████ Operational plan for a CHS to meet with CROSSFIRE DRAGON on ████ Source ID ████

> **Reason: 1.4(b)**
> **Derived From: National**
> **Security Information SCG**
> **Declassify On: 20411231**

**Full Investigation Initiated:** 08/10/2016

**Enclosure(s):** Enclosed are the following items:
1. (S//OC/NF) FD-472
2. (S//OC/NF) FD-759

**Details:**

<u>BACKGROUND</u>

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A140

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CROSSFIRE DRAGON Operational Plan
Re: 97F-HQ-2067747, 08/24/2016

(S//OC/NF) The CROSSFIRE HURRICANE (CH) investigative team is
attempting to determine if anyone in the Trump Campaign is in a
position to have received information either directly or indirectly
from the Russian Federation (RF) regarding the anonymous release of
information during the campaign that would be damaging to Hillary
Clinton. CROSSFIRE DRAGON (CD) is one of the main subjects in the
investigative effort. CD has extensive ties to the various state-owned
entities of the RF, most notably, Gazprom. Additionally, CD has, in the
past, been in direct contact with SVR officers and continued his
contact after FBI defensive briefings.

(S//OC/NF) In July 2016, CD spoke at a conference in Moscow, Russia,
whereby CD stated he went to Moscow as a "private person" and was not
representing the Trump Campaign. After his speech in Moscow, CD flew to
the United Kingdom (UK). While in the UK, CD took part in a
presentation at Cambridge University with Madeleine Albright. A FBI CHS
was present at the presentation and described CD as "guarded" during
the presentation and as being "careful" while speaking with Albright.

(S//OC/NF) The following operational plan is being proposed in
furtherance of the CROSSFIRE DRAGON and CROSSFIRE HURRICANE
investigative efforts.

**CD/FBI CHS RELATIONSHIP**

Source ID

(S//OC/NF) Source ID CD met privately with the FBI-NY CHS
(CHS) for approximately 2 hours. During the meeting, CD asked if the
CHS would be interested in joining the Trump Campaign as a foreign
policy adviser. While the CHS has no intention of joining the campaign,
the CHS was non-committal and agreed to continue a dialogue with CD for
the benefit of the FBI.

SECRET//ORCON/NOFORN

2

Solomon Aff. App. A141

SECRET//ORCON//NOFORN

Title: (S//OC/NF) CROSSFIRE DRAGON Operational Plan
Re: 97F-HQ-2067747, 08/24/2016

## Initial Contact

(S//OC/NF) The CHS received an e-mail from CD [Source ID] CD
stated that he and another individual, would like to meet with the CHS
to discuss the CHS potentially joining the Trump Campaign. The CHS
responded to the e-mail [Source ID] to set up a meeting with CD. The
CHS invited CD to meet with the CHS privately at [Source ID]
[Source ID] since it offers a relaxed, yet intimate setting [Source ID]
The CHS and CD have had several e-mail exchanges regarding the date and
time. CD, in these exchanges, has indicated that he will be meeting
with the CHS without the previously mentioned individual. [Source ID]
[Source ID] the CHS received an e-mail from CD confirming a meeting at
the [Source ID]

(S//OC/NF) The main goal of the operation is to have CD admit that
he has direct knowledge of and is either helping coordinate or
assisting the RF conduct an active measure campaign with the "Trump
Team." The CHS will press CD on the Trump Campaigns alleged ties to the
RF. The FBI believes the CHS is in a unique position to ask direct
questions about the ties, as the CHS would be conducting proper due
diligence prior to possibly joining the campaign. The FBI assesses CD
is an opportune target for the CHS to question given their prior
relationship and since CD is not a professional political operator. The
FBI believes the CHS may be able to elicit information from CD due to
CD's inexperience and CD's ego.

(S//OC/NF) Depending on how much information CD provides to the CHS
during their meeting and how CD reacts to the CHS' questions the writer
believes that there are two possible scenarios.

## SCENARIO 1

(S//OC/NF) CD provides direct knowledge of RF involvement in the
campaign and admits to being the conduit of information from the RF to
the Trump Campaign. If this occurs, the CH Team will meet with FBIHQ
and make a determination as to next steps to take with CD. The CH Team

SECRET//ORCON//NOFORN

3

Solomon Aff. App. A142

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CROSSFIRE DRAGON Operational Plan
Re: 97F-HQ-2067747, 08/24/2016

will direct the CHS to continue to meet with CD, while a decision is
made by FBIHQ.

**SCENARIO 2**

(S//OC/NF) If CD does not provide tangible information during the
meeting, or if CD explicitly states he does not know of any RF
involvement in the campaign the FBI will focus on a second target of
the investigation.

**POSSIBLE COMPLICATIONS**

(S//OC/NF) CD may recognize this meeting as a way to collect
information about the Trump Campaign that he is not willing to share.
The conversation may be relayed to others in the Trump Campaign and
create a possible issue for the CHS. However, because CD reached out to
the CHS and given the CHS' ties to several senior members of the Trump
Campaign the FBI assesses this to be a low risk operation.

**OPERATIONS**



(S//OC/NF) The CHS has signed a FD-472 allowing for consensually
monitored conversations between the CHS and CD. The CHS has offered for
the FBI to install recording devices in Source ID
Source ID                                                    and
applicable FD-759s for CCTV and audio are attached.

(S//OC/NF) The CH team had met with Source ID  who will install audio
and video recording devices in Source ID  in order to record the
meetings. Redundant systems will be utilized and the CHS will be
wearing recording devices on his person. The CH team will be present on
Source ID            in order to live monitor the conversations between
the CHS and CD. The CH team will minimize any conversations when the
CHS is not present.

(S//OC/NF) SSG assets from Source ID will cover CD during CD's time in
Source ID          CD has indicated to the CHS that he will be in the

SECRET//ORCON/NOFORN

4

Solomon Aff. App. A143

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CROSSFIRE DRAGON Operational Plan
Re: 97F-HQ-2067747, 08/24/2016

Source ID

## OUTCOMES

(S//OC/NF) The FBI sees various possible outcomes from the meeting.
CD could refuse to meet with the CHS or be uncooperative during the
initial meeting, which would end the operation. The team would then
change its posture and move forward with an operation against CROSSFIRE
TYPHOON. However, CD could either fully divulge RF connections or
provide an ambiguous answer, the CHS has been tasked to press CD with a
direct question if CD is evasive.  If, even after being directly
questioned, CD is still evasive, a determination would be made if the
information obtained would be worth continuing the operation or ending
it.

(S//OC/NF) If the meeting is successful, the FBI could obtain
information from CD about the RF, which would allow for additional
investigative techniques.

## SPECIAL NOTE

(S//OC/NF) The CHS will not be joining the Trump Campaign at the
behest of the FBI. The CH Team will continue to encourage the CHS to
make contact with individuals in furtherance of the CH investigation.

◆◆

SECRET//ORCON/NOFORN

5

Solomon Aff. App. A144

FD-1057 (Rev. 5-8-10)

~~SECRET//ORCON/NOFORN~~

 **OFFICIAL RECORD**

## FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ~~(S//OC/NF)~~ Meeting with CHS discussing Sam Clovis     **Date:** 09/06/2016

**From:** NEW YORK
NY-CD1
**Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-HQ-2063661     ~~(S//OC/NF)~~ CROSSFIRE HURRICANE;
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

97F-HQ-2067747     ~~(S//OC/NF)~~ CROSSFIRE DRAGON
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** ~~(S//OC/NF)~~ Meeting with CHS and FBI discussing Sam Clovis

> **Reason:** 1.4(b)
> **Derived From:** National
> Security Information SCG
> **Declassify On:** 20411231

**Full Investigation Initiated:** 07/31/2016

**Details:**

~~(S//NF/OC)~~ On 08/28/2016, SAs ▮Non-SES▮ and ▮Stephen M.
Somma▮ as well as SOS ▮Non-SES▮ met with FBI-NY CHS ▮Source ID▮ at
the CHS' home. During the course of the meeting the CHS informed the
interviewing team that s/he had heard from CROSSFIRE DRAGON (CD) on
▮Source ID▮. During the call, CD informed the CHS that Sam Clovis will
be in the Washington, D.C. area the following week and asked if the CHS
would like to meet with him. The CHS told CD that he would like to,

~~SECRET//ORCON/NOFORN~~

SECRET//ORCON/NOFORN

Title:    (S//OC/NF) Meeting with CHS discussing Sam Clovis
Re:    97F-HQ-2063661, 09/06/2016


however, during the course of the conversation it seemed as though CD
wasn't sure if the meeting might actually take place.


(S//NF/OC) The interviewing team gave the CHS an e-mail for Sam Clovis,
which it had obtained via open source.  The team instructed the CHS to
reach out directly to Clovis in the hope of setting up a meeting.  The
CHS stated that s/he would send an e-mail to Clovis Source ID ▮.

♦♦

SECRET//ORCON/NOFORN

2

Solomon Aff. App. A146

FD-1057 (Rev. 5-8-10)

SECRET//ORCON/NOFORN

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (S//NF) Observation of CROSSFIRE DRAGON          **Date:** 10/05/2016
using a Smartphone

**From:** NEW YORK
NY-CD1
**Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-HQ-2063661     (S//OC/NF) CROSSFIRE HURRICANE;
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** (S//NF) Observation of CROSSFIRE DRAGON utilizing a
smartphone during a meeting with a CHS.

> **Reason: 1.4(c)**
> **Derived From: Multiple Sources**
> **Declassify On: 20411231**

**Full Investigation Initiated:** 07/31/2016

**Details:**

(S//NF)  During the course of a meeting between a CHS and CROSSFIRE
DRAGON (CD) Source ID , CD was observed by the FBI utilizing a
smartphone to show the CHS articles written about CD.

SECRET//ORCON/NOFORN

Solomon Aff. App. A147

SECRET//ORCON/NOFORN

Title: (S//NF) Observation of CROSSFIRE DRAGON using a Smartphone
Re: 97F-HQ-2063661, 10/05/2016

◆◆

SECRET//ORCON/NOFORN

2

Solomon Aff. App. A148

FD-1057 (Rev. 5-8-10)

~~SECRET//ORCON/NOFORN~~

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (S//NF) Observation of CROSSFIRE DRAGON       **Date:** 10/19/2016
using a Smartphone

**From:** NEW YORK
NY-CD1
**Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-HQ-2063661         (S//OC/NF) CROSSFIRE HURRICANE;
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

97F-NY-2067747         (S//OC/NF) CROSSFIRE DRAGON
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** (S//NF) Observation of CROSSFIRE DRAGON utilizing a
smartphone during a meeting with a CHS.

> **Reason: 1.4(c)**
> **Derived From: Multiple**
> **Sources**
> **Declassify On: 20411231**

**Full Investigation Initiated:** 07/31/2016

**Details:**

(S//NF)  During the course of a meeting between a CHS and CROSSFIRE
DRAGON (CD) on Source ID , CD was observed by the FBI utilizing a
smartphone to show the CHS articles written about CD.

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A149

SECRET//ORCON/NOFORN

Title: ~~(S//NF)~~ Observation of CROSSFIRE DRAGON using a Smartphone
Re: 97F-HQ-2063661, 10/19/2016

◆◆

SECRET//ORCON/NOFORN

Solomon Aff. App. A150

FD-1057 (Rev. 5-8-10)

SECRET//ORCON/NOFORN

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ~~(S//OC/NF)~~ CROSSFIRE DRAGON Operational Plan    **Date:** 10/25/2016

**From:** NEW YORK
NY-CD1
**Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III
Non-SES
STRZOK PETER P II

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-NY-2067747    ~~(S//OC/NF)~~ CROSSFIRE DRAGON
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** ~~(S//OC/NF)~~ Operational plan for a CHS to meet with CROSSFIRE DRAGON Source ID

                        **Reason:** 1.4(b)
                        **Derived From:** National
                        **Security Information SCG**
                        **Declassify On:** 20411231

**Full Investigation Initiated:** 08/10/2016

**Details:**

**BACKGROUND**

~~(S//OC/NF)~~ The CROSSFIRE HURRICANE (CH) investigative team is attempting to determine if anyone in the Trump Campaign is in a position to have received information either directly or indirectly from the Russian Federation (RF) regarding the anonymous release of information during the campaign that would be damaging to Hillary Clinton. CROSSFIRE DRAGON (CD) is one of the main subjects in the

SECRET//ORCON/NOFORN

Solomon Aff. App. A151

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CROSSFIRE DRAGON Operational Plan
Re: 97F-NY-2067747, 10/25/2016

investigative effort. CD has extensive ties to the various state-owned
entities of the RF, most notably, Gazprom. Additionally, CD has, in the
past, been in direct contact with SVR officers and continued his
contact after FBI defensive briefings.

(S//OC/NF) In July 2016, CD spoke at a conference in Moscow, Russia,
whereby CD stated he went to Moscow as a "private person" and was not
representing the Trump Campaign. After his speech in Moscow, CD flew to
the United Kingdom (UK). While in the UK, CD took part in a
presentation at Cambridge University with Madeleine Albright. A FBI CHS
was present at the presentation and described CD as "guarded" during
the presentation and as being "careful" while speaking with Albright.

(S//OC/NF) The following operational plan is being proposed in
furtherance of the CROSSFIRE DRAGON and CROSSFIRE HURRICANE
investigative efforts.

**CD/FBI CHS RELATIONSHIP**

Source ID

(S//OC/NF) Source ID CD met privately with the FBI-NY CHS
(CHS) for approximately 2 hours. During the meeting, CD asked if the
CHS would be interested in joining the Trump Campaign as a foreign
policy adviser. While the CHS has no intention of joining the campaign,
the CHS was non-committal and agreed to continue a dialogue with CD for
the benefit of the FBI.

(S//OC/NF) Source ID the CHS and CD met for approximately 3
hours at Source ID . During the time at Source ID the CH team
was able to obtain valuable assessment information on CD. CD viewed
the CHS as a potential mentor. As a result of the meeting, the CH team

SECRET//ORCON/NOFORN

2

Solomon Aff. App. A152

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CROSSFIRE DRAGON Operational Plan
Re: 97F-NY-2067747, 10/25/2016

was able to conduct several operations utilizing the CHS against other
targets of the CH investigation.

(S//OC/NF) **OPERATIONS**

(S//OC/NF) The CHS, at the FBI's request, sent an e-mail to CD ▉Source ID▉
▉Source ID▉ after several news articles came out about CD and CD's
alleged ties to the Russian Federation. As a result of the articles,
the Trump campaign distanced themselves from CD. Additionally, CD
wrote a letter to the FBI asking to be interveiwed by the FBI. The
CHS' e-mail was to ▉Source ID▉                    As a result of
the e-mail, the CHS and CD set-up a ▉Source ID▉
▉Source ID▉

(S//OC/NF) The time of the meeting is scheduled for ▉Source ID▉
▉Source ID▉. The CH team anticipates the meeting lasting no longer than 3
hours. During the course of the meeting the FBI will task the CHS to
ask CD specific questions related to the CH investigation.

(S//OC/NF) The CHS has signed a FD-472 allowing for consensually
monitored conversations between the CHS and CD. The CHS has offered for
the FBI to install recording devices ▉Source ID▉
▉Source ID▉                    and
applicable FD-759s for CCTV and audio are attached.

(S//OC/NF) The CH team will have ▉Source ID▉ install audio and video
recording devices in ▉Source ID▉     in order to record the meetings.
Redundant systems will be utilized and the CHS will be wearing
recording devices on his person. The CH team will be present on ▉Source ID▉
▉Source ID▉     in order to live monitor the conversations between the
CHS and CD. The CH team will minimize any conversations when the CHS is
not present.

(S//OC/NF) SSG assets from ▉Source ID▉ will cover CD during CD's time in
▉Source ID▉     CD has indicated to the CHS that he will be in the
▉Source ID▉

SECRET//ORCON/NOFORN

3

Solomon Aff. App. A153

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CROSSFIRE DRAGON Operational Plan
Re: 97F-NY-2067747, 10/25/2016

**SPECIAL NOTE**

(S//OC/NF) The CHS will not be joining the Trump Campaign at the behest of the FBI. The CH Team will continue to encourage the CHS to make contact with individuals in furtherance of the CH investigation.

◆◆

SECRET//ORCON/NOFORN

4

Solomon Aff. App. A154

FD-1057 (Rev. 5-8-10)

~~SECRET//ORCON/NOFORN~~


OFFICIAL RECORD

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (S//OC/NF) CD Meeting with FBI CHS ▮
Source ID

**Date:** 11/16/2016

**From:** NEW YORK
NY-CD1
**Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Joe Pientka III

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-NY-2067747   (S//OC/NF) CROSSFIRE DRAGON
FOREIGN AGENTS REGISTRATION ACT -
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** (S//OC/NF) CD Meeting with FBI CHS Source ID

Reason: 1.4(b)
Derived From: National
Security Information SCG
Declassify On: 20411231

**Full Investigation Initiated:** 08/10/2016

**Enclosure(s):** Enclosed are the following items:
1. (S//OC/NF) CD Mitch Meet Source ID

**Details:**

(S//OC/NF) Source ID CROSSFIRE DRAGON (CD) visited a FBI CHS
Source ID . The CHS had set-up the
meeting with CD at the FBI's request via e-mail. The two had
previously met Source ID in August 2016 and in the United
Kingdom in July 2016. During the course of the August meeting, the FBI
was able to obtain assessment information about CD. The meeting was
consensually recorded by the FBI.

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A155

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CD Meeting with FBI CHS [Source ID]
Re: 97F-NY-2067747, 11/16/2016

(S//OC/NF)  The FBI had recently learned that CD was traveling to London, U.K. and Johannesburg, South Africa.  The goal of the meeting was to have the CHS determine the reason for CD's overseas travel, this was CD's first international trip since being dismissed from the Trump campaign.  The FBI had recently received information from another CHS that CD may have a "handling agent" in London, U.K., the FBI's goal was to determine if CD was meeting with anyone that would be of interest in furtherance of the CD investigation.

(S//OC/NF)  CD arrived at [Source ID] as CD had done in the past, and was greeted by the CHS [Source ID].  The CHS had been instructed to have a private meeting with CD [Source ID] [Source ID].  The FBI hoped the intimate nature of the private meeting may relax CD and CD may elicit information about CD's recent interactions with the campaign and possibly any connections with the Russian Federation.

(S//OC/NF)  When asked about CD's trips, CD mentioned that he was staying in Bromley, a suburb of London, and that he has stayed in an area of Johannesburg called Sandton in the past.  CD informed the CHS that he was going to be on a television show on Channel 4 on Monday 10/24/2016 with John Snow, discussing the U.S. election.

(S//OC/NF)  During lunch with the CHS [Source ID] CD referenced George Kennan, the author of containing the Soviet Union during the Cold War.  CD stated he wanted to start a think tank.  When asked by the CHS, CD said "...I don't want to say there'd [SIC] be an open checkbook, but the Russians would definitely..." The CHS said "They would fund it-yeah you could do alright there." and CD responded "Yeah, but that has its pros and cons, right?"  The exact language is attached.  CD intimated that he may be visiting with potential backers of his proposed think tank when he was overseas, however, there was no further information.

(S//OC/NF)  CD departed [Source ID] shortly after lunch and promised to be in touch with the CHS.

SECRET//ORCON/NOFORN

Solomon Aff. App. A156

SECRET//ORCON/NOFORN

Title: (S//OC/NF) CD Meeting with FBI CHS Source ID
Re: 97F-NY-2067747, 11/16/2016

(S//OC/NF) Specific excerpts of the meeting is attached.

◆◆

SECRET//ORCON/NOFORN

3

Solomon Aff. App. A157

SECRET//NOFORN

## (1) PLANS TO DEVELOP RESEARCH INSTITUTE

11:30:02 – There's a guy George Kennan... there's an interesting overlap between his predicament and the things he's dealt with and today... and well I'm the Kennan equivalent. Again, cause he kind of put out the idea of containment or a perceived idea of containment... and he spent 50 years arguing against this...

11:31:19 – So here's my kind of thought on... you know, like I've always said... in terms of personal ambitions... I think this beltway... this is one of the dirtiest places in the world and I've never had any ambitions to go into government regardless of who won... the analogy I always make is like... Biden when he's not doing political stuff, his big ambition is to fight cancer... I'm the same thing, fighting the cancerous foreign policy that's leading to so many deaths, so this is kind of my mission if you will. So I'm sort of thinking about if Kennan found his Institute of Advanced Study, I'd love to you... [analyst note: create something similar]

11:48:25 – There's a lot of similarities between what – although I've been much more in the public light than he ever was back in those years, cause you know there was the old school diplomacy of working discreetly backstage, but you know, here's a guy who... he came out with these concepts related to containment and et cetera... and people built up on these containment ideas and became much more hawkish and aggressive in a lot of ways against the Russians. And he spent the next fifty years of his life fighting against this... but what we're talking about... it's being a rare voice that talks against this consensus, this hawkish... it's also getting out some ideas and working on some research that will kind of state this in a more you know, instead of these sound bites on CNN

12:28:54 (Russians will fund his development of a research institute akin to Kennan Institute and some of his work in London may be related to this)

| CHS: | So you're in London for a couple of days... |
| --- | --- |
| DRAGON: | I really appreciate that, that was a great idea I need to think about that though... I like the entrepreneurial approach. The only big question obviously like most things, is the funding for it, but I need to... |
| CHS: | I imagine you could probably find funds because people are distressed with U.S. foreign policy |
| DRAGON: | Well I know... the interesting thing – and I've got a growing... [break in conversation]... well the only interesting question, on your point, is I **don't want to say there'd be an open checkbook, but the Russians would definitely** [laughs]... |
| CHS: | They would fund it – yeah you could do alright there |
| DRAGON: | Yeah but that has its pros and cons right? |
| CHS: | Well, nobody needs to know exactly where it's from |
| DRAGON: | Yeah that was my letter to Comey right? Everyone is so interested that I owned a couple of American depository receipts of Gazprom. |

## (2) OTHER RUSSIAN CONNECTIONS

11:08:20 – Look, when I first moved to Moscow, people say to me, "the key is to develop relationships... this place is all about relationships". And you know, you're never going to be in a situation where everyone likes you. You gotta' find a couple of companies, executives that really trust you. You know, it's a typical banker term: *trusted relationship.* It's all about trusted relationships.

11:37:08 – this is extremely off the record, I've been talking to – I forwarded you that Sputnik news article, they were – some of the journalists I've been talking to there, which is the Russian state media organization...

Solomon Aff. App. A158

SECRET//NOFORN

12:00:19 – The same thing in Russia, so just as he [Bill Clinton] received more work from Monica [Lewinsky]… you know she's more attractive than Hillary… but you know so, the exact same thing with me and Russia. The Russians really, you know CHS and I were talking about relationships, I have a longstanding constructive relationship with the Russians going back throughout my life. This is so annoying to them, that you know…

12:01:06 – She [Hillary Clinton] doesn't care about lacking love and respect from her husband, but Russia is a strategically important country and, you know, love/hate, Bill/Hillary, who cares about that? But Russia is really important, and that goes back to my point of the op-ed I wrote last week

## (3) IDEOLOGY/DEFENSE OF WIKILEAKS

10:48:33 – I think there's been this vicious downward circle of relations where each side – particularly in the west – antagonizes the other and then they're surprised when people, you know reciprocate the bad-will. You know, there's zero good will left.  And a lot of it actually… I was talking with someone from one of the think tanks in town here and they were saying particularly in Eastern Europe, with the NATO commitment mutual defense, it's a lot of risk for our military as well if some of these border countries – the Baltics et cetera – start antagonizing, and also not only antagonizing, but also false information. There's so much false information… you know, referring to something that happens that might be an overstatement.

10:55:26 (DRAGON's views on WIKILEAKS' release of the DNC emails and discussion of what happened to the GOP platform at the RNC)

| | |
|---|---|
| CHS: | I guess what they're trying to do is work out the link between the Russians and Wikileaks, what do we know about that? |
| DRAGON: | You know, I-I-I've made clear in a lot of you know, subsequent discussions/interviews that I've been part of… I know nothing about that – on a personal level, you know no one's ever said one word to me. But it's interesting, you know, off the record between us – if the only source of transparency and the truth is an external source, you know, c'est la vie right? I mean, that's Podesta's and Clinton's main argument right? This is tainted information because it came from the Russians, it's sort of that downward cycle and that's you know, when we were ▇Source ID▇ in mid-July there was starting to be these conspiracy theories and started to spin up – but then it wasn't until Cleveland and things percolated a little… the following week is when it really got out of control cause of Philadelphia – Debbie Wasserman Schultz… Let's distract from all the bad information – the damning information that's in these documents – and talk about the source, or the purported source. |
| CHS: | You mentioned Cleveland – you stopped by in Cleveland didn't you? So what about the platform committee? Did you chat with them at all? |
| DRAGON: | [laughs] I stayed clear of that – there was a lot of conspiracy theories that I was one of them, yeah. |
| CHS: | Cause I would've thought the platform committee would be a place where there'd be an opportunity to clarify our relationship with the Russians or others, and you could've been very helpful. |
| DRAGON: | Well again, totally off the record, but I – members of our team were working on that, and you know, again, in retrospect it's way better off that I, you know remained at arms length. But again, our team was working on that. |

10:59:13 (DRAGON mentions a relationship with the PM of a NATO ally country and shoes his disdain for current policies regarding Russia/sanctions)

| | |
|---|---|
| CHS: | Your point is well taken, you can provoke the hell out of the Russians and you can get a reaction, and that then is very costly |

SECRET//NOFORN

Solomon Aff. App. A159

SECRET//NOFORN

| DRAGON: | But there's more to it... here's my fear – it's less of a fear for myself – a NATO ally, Prime Minister of a NATO ally said to me – and you know, they've been hurt by sanctions... that's the interesting thing for the Americans, it doesn't have any impact on us. We can kind of put all of these restrictions. But for Europeans it's hard, it's a hardship on both sides. So – and his economy has been significantly negative impact given the whole sanctions thing – but then he says to me when all these lies started coming out on me over the summer: 'Well what do you think? Do you fear for your life?' |
| CHS: | What? What country is this? |
| DRAGON: | W-w-well [laughs] we're very off the record already but... |
| CHS: | Why would he be thinking such a thing?! |
| DRAGON: | But it's true!  And what I told him is I don't fear for my life, I fear for the lives of service members and other people in government who if these ridiculous approaches and these failed policies continue next January, you know... we're on the brink of war. |

11:40:39 – Let me tell you something, we could talk for the next 5 hours about all these sneaky little approaches that the USG has been taking against Russia – going back you know a couple decades. Perfect example is this Victoria Nuland... her infamous thing is – we talk about Russia interfering in our elections – you compare her level of interference in Ukraine, the democratic processes in Ukraine, to some Wikileaks – which is essentially on par with listening in on Merkel's phone calls. So she's recorded – she had this leaked [laughs] phone call where she's talking to the U.S. Ambassador to Kiev deciding who the next government leader should be.

## (4) DEFENSE OF MEDIA ACCUSATIONS (SECHIN/DIVEYKIN & LAWYERS)

10:51:32 – it's beyond rumor though, a lie is a lie.

10:51:49 – (In discussing the Yahoo! News claim about meetings with Sechin and Diveykin in Moscow July 2016, DRAGON referenced advice from lawyers)

| CHS: | What's the core argument they're making? |
| DRAGON: | Well the core argument – one of the core lies – and this is also the irony of it right? The core lie is that I met with these sanctioned Russian officials, several of which I've never even met in my entire life, but they said that I met them in July, right? |
| CHS: | This is uh.. S..s..s... |
| DRAGON: | Sechin is the main guy, the head of Roseneft... there's another guy I had never even heard of, you know he's like, in the inner circle... |
| CHS: | What's his name again? |
| DRAGON: | I can't even remember, it's just so outrageous |
| CHS: | He's in the inner circle; he works in the Kremlin or something |
| DRAGON: | But he's you know not someone again, I was asking, I wanted to double check, because I did meet, you know, I wanted to make sure, that at the graduation, I called up people that were, you know when I was a commencement speaker, did I happen to shake hands?  This guy, this is just completely...they didn't even know of him, I know it's like, for example a senior director on the NSC, right they're not household names. |
| CHS: | They're hardly known and they may have never met the president |
| DRAGON: | They're hardly known and they may not...it's just so outrageous, it defies any logic whatsoever. |
| CHS: | But so they said that you met with these people? |
| DRAGON: | But you know this is the irony of it, there's no law against meeting with sanctioned officials... |
| DRAGON: | ...And I have lawyers, you know I talk to lawyers about... the lawyer said as long as you don't take gifts or have any sort of business dealings |

SECRET//NOFORN

3

Solomon Aff. App. A160

SECRET//NOFORN

| CHS: | No tangible exchange... |
|------|-------------------------|
| DRAGON: | The tangible exchange – the lawyer quote was "don't even take a pen", you know don't even take a gift of a pen, you know just to kind of keep everything completely clean and so... |

10:55:03 (DRAGON denied meeting with Sechin/Diveykin and referenced legal advice again)

| CHS: | So they're claiming you met with these two guys – and you're saying it's perfectly legal to do |
|------|-------------------------|
| DRAGON: | Even if I had – which I didn't do by the way – but you know, so... |
| CHS: | And that is supposed to prove what? |
| DRAGON: | Well you know, I'm in bed with the Russians. And everyone hates the Russians, right, you know. |

11:15:20 (In discussing whether he could help facilitate invitations to Sechin and Diveykin to speak at a seminar in Cambridge, DRAGON immediately responded with advice from his lawyers, but did not deny knowing them)

| CHS: | It may be that the two people you mentioned – you mentioned the Rosneft guy... |
|------|-------------------------|
| DRAGON: | Yeah, Sechin |
| CHS: | And the other one who I can't remember, he was part of the administration, it would be very interesting to have them at Source ID and to have – if you wish – for you to come, and I could invite them, and... |
| DRAGON: | [laughs] |
| CHS: | ...it would be a very productive conversation. They'd enjoy it. |
| DRAGON: | [laughs] My lawyers would probably advise me to... [laughs] |
| CHS: | Not to come? |
| DRAGON: | To well, again, Harry Reid's letter to Director Comey – 'please look into Carter Page's connections to these people!' [laughs and conversation topic changes] |

11:18:10 (CHS asked him again – DRAGON brought up lawyer again; said he didn't have contact info, but never denied knowing them)

| CHS: | It occurred to me when I was thinking about all of this, what a wonderful event that would be, cause it would be an opportunity for a Moscow-based senior person to present the argument for reduction of tensions and sort of clean slate type idea, and it could be done so that there were Brits or even Americans - I hadn't thought of any in particular – Brits who might enter that conversation with a measure of skepticism but could be neutralized |
|------|-------------------------|
| DRAGON: | [laughs] my, you know...here's... |
| CHS: | Your lawyers? |
| DRAGON: | Again, I'm thinking, you know lawyers are always cautious... and you know I think this would be setting off such big alarm bells [laughs] just for my personal – you know – it might be a great idea... here let me just kind of... |
| CHS: | Maybe you could put me in touch with them? |
| DRAGON: | Again, I don't have their contact details |
| CHS: | Oh okay – well I could find them |
| DRAGON: | Yeah, it's better, you know [laughs], again... there's this great quote... [switches topic to Politico article] |

## (5) SOUTH AFRICA TRIP

10:43:56 (CHS asks DRAGON about travel plans and he omits his travel plans to South Africa)

| CHS: | Where are you off to? You said you were going someplace? |
|------|-------------------------|

Solomon Aff. App. A161

SECRET//NOFORN

DRAGON: Yeah, I'm uh, I actually have a couple days in Chicago at the tail end of this week and then I fly straight to Heathrow over the weekend and spend some time there in London and then uh... I was going to ask you about this guy...

11:46:02 (DRAGON is asked about travel plans by UF and changes topic immediately)
UF: I think you need a nice long vacation, do you have travel plans?
DRAGON: Well, we were talking, so this is a strategy question, so...
UF: Yeah I think a nice warm...
DRAGON: Well, no, but here's my thing... [changes topic back to PM/fear discussion]
UF: ...but are you going to take a little break? Someplace warm?
DRAGON: Well, uh, well this is uh strategy sessions, again, as agreed with, we are completely off the record... [switches topic and brings up George Kennan then mentions his trip to London]

11:52:39 (DRAGON changes topic again when asked about travel plans)
UF: That's why I say that you must need a vacation, like I would say someplace warm that's very far away from...
DRAGON: Well I-I-I go back to my Chris Stevens quote, I'm not concerned about protecting my own skin, I'm more concerned about trying to come out with some more ideas that help counter these crazy arguments

12:14:25 (DRAGON appears to get uncomfortable answering questions about South Africa – there is a clear difference in his tone compared to other discussion topics)
UF: ...stay in London for a while – are you going to come back after your interview?
DRAGON: I got a, well, I got a what do you call it, I'm going to Johannesurg for a couple of days
UF: Oh! Well there's your vacation! You were hiding the best place!
DRAGON: Ah, well, it's alright. Cape Town is a vacation...
CHS: ...where are you staying down in Jo-burg?
DRAGON: I haven't pick-...I-I.........I'm like... this is like... you know I was telling him uh... I can't remember if I mentioned to you, breaking my iPhone, I mean I've been running one thing after the other, I haven't even... uh, figured it out yet.  I usually stay at Sandton – it's called the richest mile in Africa, it's like a little business community, and they've got some nice hotels. There's a Marriot I typically stay at.

12:34:34 (DRAGON appears to get uncomfortable answering questions about South Africa – there is a clear difference in his tone compared to other discussion topics)
CHS: So I just want to ask you, are you going to be in South Africa for a while?
DRAGON: Maybe five days, but I uh...
CHS: So maybe you could get over to Durban then?
DRAGON: I'm not gonna... I've got... there's a couple of companies I'm doing some work with, so
CHS: Are you making some investments there?
DRAGON: Uh we're looking at – we're thinking... no uh, we're looking at some possibilities, nothing imminent so, you know, anyway, to be continued though

## (6) <u>CLINTON INVESTIGATORS IN LONDON</u>

10:50:29 – And then they [Clinton campaign] put out a press release – oh, Yahoo! News reveals that Carter Page did X, Y, Z, and look, the other journalists – the ones that are closer to me – will say specifically that they were told this by the Clinton team in Brooklyn.

SECRET//NOFORN                                                                                    5

Solomon Aff. App. A162

SECRET//NOFORN

11:56:34 – This is also, you know I've never discussed this with anyone, and this is very deep off the record, but they've hired investigators to come after me, including some in London.

12:02:20 – They hired investigators to look into these women [Hillary Clinton re: Bill Clinton's accusers of sexual assault], so it's the same, it's the very same concept... it's well documented according to unofficial sources that the US government [holding that against me?]... but also the Clinton campaign, at somewhat arms length, they're careful about having this too well-documented. I have very good sources, I know the names of the investigators as well.

## (7) CONTINUING TO ACT AS SURROGATE FOR TRUMP CAMPAIGN

11:51:22 – Here's the question list [for an upcoming interview he's giving in London on 10/24]... topics covered will be your views in Russian involvement in Syria, how a Trump presidency would change U.S. involvement in Syria and what the U.S. relationship with Russia would be like, and your thoughts of British criticism of Putin

Solomon Aff. App. A163

FD-1057 (Rev. 5-8-10)

~~SECRET//ORCON/NOFORN~~

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ~~(S//NF)~~ [Source ID] CHS Meeting with CD    **Date:** 01/09/2017

**From:** NEW YORK
          NY-CD1
    **Contact:** SOMMA STEPHEN M, 212-384-1000

**Approved By:** Non-SES

**Drafted By:** SOMMA STEPHEN M

**Case ID #:** 97F-NY-2067747    ~~(S//OC/NF)~~ CROSSFIRE DRAGON
                                 FOREIGN AGENTS REGISTRATION ACT -
                                 RUSSIA;
                                 SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** ~~(S//NF)~~ CHS meeting with CD on [Source ID] discussing a think
tank.

               **Reason: 1.4(c)**
               **Derived From: Multiple**
               **Sources**
               **Declassify On: 20421231**

**Full Investigation Initiated:** 08/10/2016

**Details:**

~~(S//NF)~~ [Source ID] CD contacted NY FBI CHS [Source ID] about meeting
in Washington, D.C. [Source ID] After consulting with the case
agent, the CHS set-up a meeting for [Source ID] in
Washington, D.C.

~~(S//NF)~~ The CHS recorded the conversation, without being asked by the
case agent. The CHS provided a recording of the meting to the case
agent. A more detailed write-up of the meeting will follow.

~~(S//NF)~~ During the course of the meeting, the CHS questioned CD about
CD's comment in October 2016, where CD stated that he would have an

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A164

SECRET//ORCON/NOFORN

Title: (S//NF) [Source ID] CHS Meeting with CD
Re: 97F-NY-2067747, 01/09/2017

"Open Checkbook" from the Russians, in establishing a think tank.

(S//NF)  During the discussion, the CHS brought up CD's think tank, which was discussed in October 2016.  The CHS suggested an individual with whom CD may be able to speak with (the CHS did not mention the individuals name as per the instructions of the Case Agent).  The CHS explained that the individual who has moderate views on Russia and has may have an "easy relationship" with perhaps the Russian government, individuals or think tanks.  CD asked several detailed questions on the background on the individual, the CHS stated that he would be able to get CD his contact information for CD if CD wanted.  CD told the CHS that he wanted to update the CHS on the think tank.  CD said that he was in Moscow and brought the idea of the think tank up to individuals at the New Economic School (NES) and that "they were quite positive" about the think tank.  CD said NES mentioned maybe doing something either there (in Russia) or jointly.  CD then stated that they have a lot of "support internally."  The CHS asked CD: "support from faculty or government?" to which CD responded: "government...higher up."  The CHS stated "I guess the government is always involved in stuff" CD did not answer directly, but tried to draw a parallel with the Council of Foreign relations."  CD changed the conversation to individuals who may be considered for positions in the new Presidential administration.

(S//NF)  After some further discussion, the CHS asked CD where he is with the think tank.  CD stated that he's "making some progress on it" and brought up the NES.  The CHS asked CD directly, if the NES would finance it (the think tank), CD responded with "possibly" and that they're "enthusiastic about it."  The CHS stated "you said last time we met that, you though you had the funding lined up, you said the Russians will give you a blank check." CD responded saying "I don't know if I went that far, I thought there was some support, certainly this trip proved it...having an institutional base, they actually like the sort of blank slate, open questions, come back to us with a proposal, very high level people, who are quite supportive, not just at the university, but in general." CD said that some people have warned him about not having too much of a "Russian Connection."

SECRET//ORCON/NOFORN

2

Solomon Aff. App. A165

SECRET//ORCON/NOFORN

Title: (S//NF) Source ID CHS Meeting with CD
Re: 97F-NY-2067747, 01/09/2017

(S//NF)   The CHS and CD continued the conversation.

◆◆

SECRET//ORCON/NOFORN

3

Solomon Aff. App. A166

SECRET//NOFORN

**Statements from 09/15/2016 Meeting Between Source and George Papadopolous:**

During the meeting, Source asked Papadopolous about Russian/Wikileaks involvement in the release of Democratic National Committee emails.

Source: "...and given Hillary's weakness and your strengths, help from a third party like Wikileaks or some other third party like the Russians could be incredibly helpful. I mean it might make all the difference."

Papadopolous: "As again, of course we don't advocate for this type of activity, cause at the end of the day it's illegal. First and foremost, it compromises US national security and third it sets a very bad precedent so the campaign does not advocate for this, it does not support what is happening, if the indirect consequences are out of our hands, that's how, that's the best way I can. For example, our campaign is not engaged or reaching out to Wikileaks or to whoever it is to tell them please work with us collaboratively because we don't. No one does that. Unless there is something going on I don't know, which I doubt as I don't think anybody would risk their life or potentially going to prison over doing something like that because at the end of the day it's an illegal, illegal activity. Espionage is treason. This is a form of treason."

Source: "You know, well, particularly involvement with American elections."

Papadopolous: "Especially is somebody is collaborating with X group that no one yet knows who they are. I mean that's why it became a very big issue when Mr. Trump said 'Russia if you are listening.' Do you remember?

Source: "Yeah, I remember that moment."

Papadopolous: "We had to retract it. Of course he didn't, he doesn't mean for them to hack or engaging in espionage, but the media took it and ran with it."

SECRET//NOFORN

FD-302 (Rev. 5-8-10)



~~SECRET//ORCON/NOFORN~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    11/09/2017

On Monday, 18 September 2017 and Tuesday, 19 September 2017, CHRISTOPHER STEELE, ORBIS Business Intelligence, was interviewed at The Grosvenor Hotel, London, England, by FBI ▮▮▮▮▮▮ and FBI ▮▮▮▮▮▮ ▮▮▮. The following information was provided by STEELE over the course of the two-day interview.  On 18 September 2017, in the initial part of the interview, STEELE was accompanied by his fellow ORBIS executive, CHRISTOPHER BURROWS. After about 45-60 minutes on 18 September 2017, BURROWS departed, and STEELE remained with ▮▮▮▮▮ and ▮▮▮▮▮ for the duration of 18 September 2017 and for the entirety of the interview on 19 September 2017.

On 18 September 2017, BURROWS opened the interview by expressing concern over loose business ends with the FBI. BURROWS explained that he and STEELE were still pretty upset about how the relationship with the FBI concluded because of the time and effort that had been taken to get information to the FBI. BURROWS explained that we had a contract with ▮▮▮▮▮ adding that maybe the contract had been put together with STEELE serving as the "face" of ORBIS, but that there had been a contractual relationship.

STEELE and BURROWS apologized for going to the press back in the fall of 2016, but STEELE explained that as the election season went on, they as the company were "riding two horses" - their client and the FBI -- and after FBI Director James COMEY's reopening of the Hillary Clinton investigation, they had to pick "one horse" and chose the business/client relationship over the relationship with the FBI. They followed what their client wanted, and they spoke to the press. STEELE and BURROWS described the overall situation as being one where it was "your [FBI] fault" and "our fault." STEELE commented that it was not about the money owed, but BURROWS remarked that STEELE might not be that concerned about the money, but BURROWS was.

**Reason: 1.4(c)**
**Derived From: Multiple Sources**
**Declassify On: 20421231**

~~SECRET//ORCON/NOFORN~~

Investigation on  09/18/2017  at  London, United Kingdom (In Person)

File # ▮▮▮▮▮▮▮▮▮                                Date drafted  11/09/2017

by ▮▮▮▮▮▮▮▮

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Solomon Aff. App. A168

FD-302a (Rev. 05-08-10)

SECRET//ORCON/NOFORN

█ ██████████████

██████ Interview of Christopher
Continuation of FD-302 of Steele _____ .On  09/18/2017  . Page  2 of 26

STEELE and BURROWS were confused over whether ██████████ and ██
represented the FBI or the Office of the Special Counsel. BURROWS made the
point, in his former career, he "knew [Robert] Mueller." They wanted to
make sure that they were talking to the Office of the Special Counsel.

STEELE and BURROWS indicated frustration by the inclusion of their company'
s reporting in the United States (US) Intelligence Community's
Intelligence Community Assessment (ICA) of Russia interference in the 2016
election, particularly the ICA "annex" as reported in the media. STEELE
and BURROWS felt that they should have had advance warning that the
company's reporting was going to be used in the annex. The inclusion of
the company's information and the subsequent public leak of the annex put
STEELE's name out there and had a "massive impact on our lives." STEELE
and BURROWS wanted to know how the US █████████████████ governments
had worked all of this out, and also wanted to know ██████████████
was told that the information was going in the ICA.

STEELE and BURROWS described President TRUMP as their "main opponent" and
indicated that they were fearful about how TRUMP's presidency negatively
impacted the historical UK-US alliance and the US-UK special relationship.

STEELE said that GLENN SIMPSON of Fusion GPS was knowledgeable that STEELE
was sharing reports and information with the FBI.

STEELE explained that, in the run-up to the 2016 US presidential election,
they provided material to BRUCE OHR and were pushing OHR to do something
about the reports.

STEELE said that he had been unsure to whom ████████ he could provide
the election-related reports. ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

STEELE said that his primary subsource for the election reports – who he
would not identify by name for the entirety of the interview – had also
provided information used in earlier, non-election related reporting
provided to the FBI.

STEELE's primary subsource met with ████████. The primary subsource
had shared a photo with STEELE depicting ████████. STEELE tried
to have his primary subsource record a meeting between the primary
subsource and ████████ but it was not successful. ████████████████
████████████████████████████ has lost
contact with STEELE's primary subsource. STEELE said that ████████ is the

SECRET//ORCON/NOFORN

Solomon Aff. App. A169

FD-302a (Rev. 05-08-10)

SECRET//ORCON/NOFORN

████  ██████████████

(███████) Interview of Christopher

Continuation of FD-302 of Steele                    .On 09/18/2017   .Page 3 of 26

individual who originally provided the primary subsource with the Ritz
Carlton-related information about TRUMP. STEELE's primary subsource
followed up ████████ information with three people. ORBIS has the names
of the three people with whom the primary subsource followed up.

████████████████████████████████████████████████████████████

STEELE said that he had never heard of CARTER PAGE or MICHAEL COHEN or
GEORGE PAPADOUPOLOS before this whole thing. He had heard of PAUL MANAFORT
which STEELE said got the whole thing started. He had heard of ████
████████ before this, and told interviewers that he would describe this
in greater detail later in the interview.

When asked by interviewers about his vetting and validation of his primary
subsource, STEELE said that he knew the primary subsource's background and
the current positions of his primary subsource's sub-subsources. STEELE
said that his primary subsource's reporting was consistent over multiple
projects, which STEELE used as a vetting and validation point of
reference. STEELE also confirmed his primary subsource's reporting through
other sources.

STEELE said that ORBIS has four discrete, "hermetically-sealed" main agent
networks. The biggest of these was the network involved with his primary
subsource, which isn't active now. For one of the older networks, the
main agent had died. Another main agent network is up and running and is
now starting to get good information. It is based on a new main agent –
not the primary subsource for the election reports – and it is being
redirected to collect on Russia. STEELE also said that he has a source
████████████████████████████████████████████████████████████

STEELE said that his primary subsource feels like it is about time to
engage with the Office of the Special Counsel. STEELE spoke with his
primary subsource last night, and the primary subsource is coming along
with the idea of talking with Special Counsel, but was not there yet.
STEELE is still very concerned to protect his primary subsource. The
primary subsource has a very special story, especially how ██ came to work
for ORBIS. The primary subsource was introduced to STEELE and ORBIS by
FIONA HILL in or around 2011. ████████████ Emphasizing the sensitivity, STEELE
explained that HILL now worked for the White House on the National
Security Council. HILL has a very high opinion of the primary subsource,
and she told STEELE that he and ORBIS should take a look at him. HILL is
one of STEELE's close friends – STEELE later described in the interview

SECRET//ORCON/NOFORN

Solomon Aff. App. A170

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

████  ██████████

████████ Interview of Christopher

Continuation of FD-302 of   Steele                           , On  09/18/2017 , Page  4 of 26

that his wife went to university with HILL, and that HILL's daughter is
named after a now-deceased mutual college friend of HILL and his wife.

STEELE said that his primary subsource ████████████████████
████████████████████████  STEELE added that someone who was Ukrainian
could possibly have the type of access his source has. ████████████████

STEELE trained up his primary subsource, and STEELE described him as a
prolific asset. The primary subsource's motivations include the fact that
he considers ██████████████████████████████████████████████████
███████████  The primary subsource uses ████  prior university
contacts, and ████ reporting has become better over time. STEELE was asked
by interviewers if his primary subsource had anything happen to ██ while
collecting for ORBIS. STEELE indicated that his primary subsource had
reported being hauled in front of immigration authorities ██████. The
primary subsource was shaken down for money – ██ was forced to go to an
ATM and withdraw money and paid the bribe. STEELE took this as a good sign
for validation purposes, remarking that things haven't gone smoothly for
his primary subsource all the time.

STEELE said that his primary subsource took ██████ trips ██████ in 2016
for collecting information for the election-related ORBIS reports. STEELE
said that he was working on memory for some of this, as ORBIS destroyed
materials for legal reasons. STEELE said that his primary subsource took
trips in ████████████████████  STEELE would debrief his
primary subsource after these trips. STEELE also said that STEELE took
three trips himself ██████████████ in 2016 and talked with his
primary subsource. STEELE dated his ████████████████████████
████████████ – after STEELE had met with FBI
representatives in Rome.

STEELE said that his primary subsource uses ████████████████████
████████████. There was a push to get an audio capture of
primary subsource's conversations with one of ██ own sub-subsources, and
they were successful in obtaining audio of a conversation between the
primary subsource and ██ sub-subsource regarding MICHAEL COHEN's meeting
in Prague. STEELE told interviewers that he did not have that audio
capture in its original form. STEELE explained that he had to be careful
regarding legal issues, but they had audio capture and a transcription of
the audio capture. There may be an opportunity to obtain more on this
because this particular sub-subsource ████████████████ and in an
accessible place. STEELE's primary subsource is having dialogue with that
particular subsource, and that individual may be thinking of "coming in."

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A171

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

● ███████████  ~~(S//OC/NF)~~ Interview of Christopher

Continuation of FD-302 of **Steele** _____ , On __09/18/2017__ , Page __5 of 26__

STEELE described this particular sub-subsource in greater detail

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

STEELE said that another, different sub-subsource had provided information on cyber. This particular sub-subsource talked about how the Russian Federal Security Service (FSB) was able to turn an individual who had been caught money laundering and get him/her to work cyber operations for the FSB. STEELE commented about how this is a typical operating procedure for the FSB.

In reference to a question posed by interviewers about the primary subsource's reporting ████████████ , STEELE said that his primary subsource had traveled ██████ . The primary subsource ████████████████████████████████████████ STEELE could not recall exactly which of his primary subsource's 2016 trips ██████ involved a trip to ██████████ , but it may have been on the ██████ one.

STEELE said that the primary subsource's ██████ trip involved ██ being ████████████████████████████████ The ████ trip occurred at the time that STEELE was meeting with FBI representatives in Rome. This was why STEELE couldn't contact the primary subsource during that time – the primary subsource had said not to contact ████ because ████████ ██████ This is the event, STEELE added, during which time the primary subsource collected information about EDWARD SNOWDEN and also a senior FSB officer.

STEELE explained that, when collecting information for ORBIS, his primary subsource plays up ████ overt, academic interests. ████████ ██████████████ The primary subsource does favors for people.

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A172

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

(S//OC/NF) Interview of Christopher

Continuation of FD-302 of Steele _____ .On 09/18/2017 .Page 6 of 26

In fact, STEELE explained that STEELE had helped to recommend the best English language school for one of his primary subsource's sub-subsources.

With respect to the election-related reports, STEELE said that it did not take much effort early-on for his primary subsource to collect information because the whole thing was an "open secret" in Moscow. People would start talking in bars, and the primary subsource could easily elicit information. Later, as 2016 progressed, sources of information started shutting down and it became harder to obtain information.

STEELE said that the primary subsource has sub-subsources with serious access to named people ████████████████████ tight circles.

According to STEELE, the primary subsource has traveled ██████████████ ████████████████████████████. The primary subsource has contacts in different cities – for example, the primary subsource is close to, or has sub-subsources close to, ████████ ██████████████. STEELE commented that his primary subsource has collected information for many of ORBIS' litigation clients in the energy and mining sectors. ████████████████████████████████████ For the election-related reports, the primary subsource had about ████ trips ████ in ████████.

STEELE explained that ORBIS' initial interest in the US election-related material stemmed from a litigation-related issue. It involved potential litigation with PAUL MANAFORT, and ORBIS' interest started around May 2016. MANAFORT had disappeared for multiple years and appeared to be hiding from creditors. MANAFORT owed money -- $100 million to oligarchs and more money to Russians (NFI). STEELE explained that FUSION GPS had a different client for whom it was already doing research on MANAFORT. Around June 2016, STEELE met with FUSION GPS and they decided to start swapping notes. Soon thereafter, the decision was made to have FUSION GPS hire ORBIS on the election-related stuff - FUSION GPS would "take [ORBIS] on for the bigger issue." In June 2016, ORBIS took its own crack at the election-related stuff. STEELE said that it wasn't the only politically-sensitive investigation ORBIS was working at the time. For example, ORBIS was handling an English Football Association (FA) matter regarding a competitor for the bid process. STEELE also said - and emphasized the extreme sensitivity of this example -- ORBIS was also involved in doing work regarding the election campaign for the UN Secretary General post - a client wanted them to work up material on possible voting intentions.

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A173

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

Continuation of FD-302 of _(U//OUO)_ Interview of Christopher Steele ,On 09/18/2017 ,Page 7 of 26

In ████ 2016, ORBIS got election-related reporting from the primary subsource, as well as from a different subsource. In ████████ STEELE indicated that they got a debriefing about RYBOLOVLEV and the sale of property in Florida. STEELE remembered that the material on RYBOLOVLEV was received before STEELE took a holiday trip to Cyprus.

STEELE said that his primary subsource did a bit of work ████ on election-related collecting. ████████ the primary subsource talked to ████████ and one or two others. Regarding ████████ STEELE said that the primary subsource was introduced ████████ and the primary subsource met ████ . The primary subsource had ████████ . The primary subsource and ████ discussed a ████████ wasn't notional – ████████ . STEELE recalled seeing some documentation about ████████ . STEELE described it as a ████████

STEELE described his primary subsource's sub-subsource networks. While doing this, STEELE drew a diagram for interviewers. See attached.

On reporting regarding CARTER PAGE, STEELE said that it stemmed from Page's speech in Moscow in July 2016. The reporting about PAGE's meetings with IGOR SECHIN and IGOR DIVEYKIN all came from the same sub-subsource – ████████ .

On reporting about OLEG GOVORUN, STEELE identified this stream of reporting as stemming from a different sub-subsource --- ████████ .

On reporting involving DMITRIY PESKOV's office, this reporting stems from a "friend of a friend" of the primary subsource. Later, STEELE gave the identity of this individual ████████ .

On reporting about Prague and ROSSOTRUDNICHESTVO, STEELE said that ████████

STEELE talked in more detail about his decision to talk to the press. STEELE said that after COMEY's letter reopening the HILLARY CLINTON investigation, FUSION GPS felt like the gloves had come off. STEELE said that he had previous discussions earlier with BRUCE OHR about getting the

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A174

FD-302a (Rev. 05-08-10)

██████████████████████   SECRET//ORCON/NOFORN

● ██████████████████

███████████ (S//OC/NF)  Interview of Christopher
Continuation of FD-302 of  Steele                          , On  09/18/2017  , Page  8 of 26

election-related material out, but OHR had explained to STEELE about US
Department of Justice policy about needing to be hands-off prior to
elections. FUSION GPS put pressure on ORBIS to talk to Mother Jones.
STEELE initially said that his interview with Mother Jones was supposed to
have been off-the-record, but then he added that the interview was a
combination of off-the-record and on-the-record. STEELE said that, in the
end, he should not have given the interview. STEELE said that,
subsequently, with the rift that the interview had caused with the FBI,
they had no way of getting this information into the hands of people who
they believed needed it. That is when they decided to go the route of
Senator JOHN MCCAIN and DAVID KRAMER. In the end, however, STEELE believes
that the decision to go the MCCAIN and KRAMER route is how Buzzfeed got
the material and is why, now, STEELE has the legal problems he has.

BRUCE OHR is aware that STEELE is currently in touch with the FBI. OHR
knows about this meeting. STEELE said that he has reached out to OHR and
GLENN SIMPSON about the primary subsource.

STEELE believes that his primary subsource is coming around to the idea of
meeting with the Office of the Special Counsel. STEELE only wants that to
happen if the primary subsource agrees to it. It needs to be carefully
handled. For instance, ████████████████████████████████████████████
████████████

STEELE said that the primary subsource has been doing a bit of work for
ORBIS recently. ██ has been reaching out to some of the same sub-
subsources. ORBIS has had an interest in the "prophylactic efforts" by the
Russian government following the publicity of the dossier.

When asked what type of tradecraft STEELE's primary subsource has used
when collecting information for ORBIS, STEELE said that his primary
subsource uses ███████████████████████████████ The primary subsource
████████████████████████████████ The primary subsource is very thorough when
it comes to preparing ████████ to be debriefed; ██ takes time before being
debriefed to get ████ thoughts and recollections together. STEELE said that
the primary subsource uses ██████████████████████████████████████████████
████████████████ The primary subsource has used this
approach in the past – STEELE mentioned trips that the primary subsource
has taken █████████████████████████ on behalf of ORBIS' due diligence and
legal work, including for ████████████████████████████████ . The primary
subsource has a very good memory.

STEELE said that only four or five people in ORBIS' office have dealt with
the primary subsource. The primary subsource was debriefed the first time

Solomon Aff. App. A175

FD-302a (Rev. 05-08-10)

SECRET//ORCON/NOFORN

⬤ ████████████ )

(U//FOUO) Interview of Christopher

Continuation of FD-302 of Steele _____ . On 09/18/2017 , Page 9 of 26

in the office, but not after that. STEELE said that ORBIS is now very concerned about bugging, so they wouldn't debrief sources in their office.

STEELE has had substantive debriefings with the primary subsource. STEELE explained that the primary subsource was not just working on election-related collection during the primary subsource's 2016 trips to Russia. He was working on multiple projects at the same time. That said, STEELE indicated that the primary subsource definitely collected on election-related materials during ████████████ in 2016.

STEELE said that the primary subsource is currently working through obtaining ████████████ . The primary subsource hasn't been back ████████████ since his 2016 trips.

STEELE said that he is close enough to the primary subsource that the primary subsource would have told him that ████ been interviewed (NFI).

STEELE said FIONA HILL knows that the primary subsource was involved in the dossier. When the primary subsource went to ground in January and February 2017, STEELE contacted HILL and told HILL that he was worried about the primary subsource. STEELE said that she probably guesses that the primary subsource was involved. STEELE remembered seeing HILL in the UK in early 2016, while STEELE's wife was abroad. HILL was still at Brookings. STEELE does not recall the last time he saw HILL.

STEELE said that the primary subsource ████████████
████████████████████████████████████

When asked about STEELE's own validation and/or assessment of hostile control for the primary subsource, STEELE mentioned a number of things which he took to be positive signs. First, there was the incident involving the primary subsource being shaken down for money. Second, the primary subsource exhibits behavior indicative of someone who is scared – the primary subsource would not be talking about coming to the talk to the Special Counsel if there was a problem. STEELE does not believe that the primary subsource exhibits signs or behavior of someone who is under control. STEELE cannot guarantee that the primary subsource's sub-subsources aren't under control. STEELE said that it hasn't been easy for the primary subsource to get information – ████ has had to dig for it. Moreover, STEELE said that he is not sure why the primary subsource would still be hanging around or be ████████████ if ████ was under foreign control.

STEELE gave details of a REX TILLERSON-related report from the primary subsource – a report that STEELE is unsure the FBI possesses because

SECRET//ORCON/NOFORN

Solomon Aff. App. A176

FD-302a (Rev. 05-08-10)

SECRET//ORCON/NOFORN

██ ████████████████ ██ ████████ Interview of Christopher

Continuation of FD-302 of   Steele   ,On 09/18/2017   ,Page 10 of 26

STEELE didn't provide it to the FBI. STEELE said that in order to explain
the report, he has to first talk about earlier ORBIS reporting from
approximately 3 years ago, circa 2014. At that time, ORBIS was working on
a hydrocarbon project for a client. It became clear from reporting during
that project that Exxon-Mobil was well-placed in Russia and that TILLERSON
had an atypical type of relationship with SECHIN. It was odd, STEELE said,
to the point that STEELE thought that something was going on, particularly
with SECHIN. There was more between TILLERSON and SECHIN than just shared
hobbies like Harley-Davidsons. STEELE said that the reporting on this
subject died down, the client moved on, and the sanctions regime kicked
in. Then, circa December 2016, following the election, President-Elect
TRUMP was initially flirting with MITT ROMNEY as a possible candidate for
US Secretary of State. There was a long hiatus during which time there was
general speculation about whether the position would go to ROMNEY or not.
STEELE's primary subsource picked up information from sources in Russia's
Ministry of Foreign Affairs (MFA) that Washington, DC had received
messages from Russia indicating that ROMNEY was an unacceptable candidate
and that Russia wanted someone who was more acceptable and who might lift
sanctions. TILLERSON's name, according to STEELE, isn't in the report from
the primary subsource, but what happened in the end was, to STEELE,
surprising given the reporting. STEELE said that this report may have been
shared with DAVID KRAMER - STEELE sent it to GLENN SIMPSON with the idea
of having it shared.

STEELE explained how he shared the election-related reports with ████
████ He knew ████████████ from his previous career. STEELE was trying to
figure out the best way of sharing this information with his own
government, but wasn't completely comfortable ███████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

STEELE is hesitant about sharing his information ███████████████████ , as
well as with CIA and NSA. He is concerned about the existence of hostile
penetrations and his primary subsource's security. STEELE says that his
information needs to be handled in a need-to-know way.

STEELE said ████████████████████████████████████ was not given as
much information regarding the primary subsource's network as he has given
to the FBI.

Solomon Aff. App. A177

FD-302a (Rev. 05-08-10)

(S//OC/NF) Interview of Christopher

Continuation of FD-302 of  Steele _____ . On  09/18/2017  . Page  11 of 26

STEELE was asked about his primary subsource's physical security. STEELE said that the primary subsource ███████████████████. Someone in the primary subsource's

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

When asked about STEELE's knowledge of the primary subsource's contact with Russian establishments, STEELE said that the primary subsource had someone over ████████████████████████████ ████████. STEELE said that it was strange, but nothing alarming. ████████████ That was how the primary subsource knew that KALUGIN had been withdrawn from the United States. When the primary subsource asked about KALUGIN's leaving the United States, ███████████████████ KALUGIN did not explicitly say that he was withdrawn because of the election controversy.

When asked about STEELE's knowledge of any journalists who have approached the primary subsource, STEELE said that in ████████████████████ ████████████████████. The journalist told the primary subsource that he had heard ████████ that the primary subsource might have some information about the dossier. STEELE said that the primary subsource gave a bland answer, but the entire situation caused the primary subsource some consternation. The primary subsource took it as a warning that █ was found out. This is why, explained STEELE, the primary subsource went to ground ████████████ timeframe and is why STEELE reached out to FIONA HILL to check on the primary subsource's whereabouts and safety.

When asked about STEELE's knowledge of whether any of the primary subsource's sub-subsources knew that their information was used in the dossier, STEELE said that some of the primary subsource's sub-subsources

Solomon Aff. App. A178

FD-302a (Rev. 05-08-10)

SECRET//ORCON/NOFORN

● ████████ ████████████

████████ ) Interview of Christopher

Continuation of FD-302 of Steele                          . On 09/18/2017 , Page 12 of 26

have talked to ████ in a cryptic manner about the reports. In one case,
specifically the individual who provided the information to the primary
subsource about GUBAREV, ████████████████
█████████████████████ STEELE believes that the primary
subsource's sub-subsources have an idea that their information was used in
the dossier.

STEELE said that the primary subsource's ████████████████████
██████ STEELE understands that the primary subsource ███████████
████████████████. They did not indicate that they've had any problems
or have experienced any harassment.

STEELE talked about the EROVINKIN situation. EROVINKIN was the former top
aide to SECHIN in ROSNEFT who was found dead in December 2016. STEELE said
that some people and the press have mistakenly tied EROVINKIN to the
dossier - namely as a possible subsource on the SECHIN material. STEELE
does not believe that EROVINKIN was one of the primary subsource's sub-
subsources; nevertheless, STEELE takes this whole situation very seriously
and gives him pause. It reminds him of another, recent situation involving
████████ whose reporting is in the dossier. STEELE described ████████
as "out there" engaged with Westerners. STEELE believes that there is a
general feeling ████████ has been cultivated by Western
intelligence. On this note, about three or four months ago, there was a
shooting in the restroom of the Moscow restaurant named KOSMOS. The
shooting was in broad daylight and an individual named KOSTYA MYASKI or
MYANSKIY (sp) was the victim. STEELE believes that this was a warning shot
████████. The incident occurred in the May 2017 timeframe.

STEELE was asked about ORBIS' business security procedures since the
public release of the dossier. STEELE said that they had a situation arise
where someone tried to spoof or impersonate the outside contractor who
does ORBIS's IT security. There was an attempt to change the password for
their internal system, which was detected. The IT security contractor was
contacted to determine if the attempt was legitimate. If this had been
successful, it could have exposed clients, but not sensitive reporting as
that is kept offline.

STEELE was asked if ORBIS has had any situations, post-dossier, where
ORBIS thought that it was being offered dangles or was the object of
operational games. STEELE said that this question reminded him about the
CODY SHEARER situation and the offer of tapes, which STEELE said he would
talk about later. STEELE commented that the existence of tapes have been
played out of proportion, adding that just the fact that the Russian
government has leverage on President TRUMP is a problem. It would be
difficult to know if a tape has been doctored. STEELE said that there is a

SECRET//ORCON/NOFORN

Solomon Aff. App. A179

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

● ███████ ████████████

(S//OC/NF) Interview of Christopher

Continuation of FD-302 of Steele _____ .On 09/18/2017 .Page 13 of 26

concern, following the public release of the dossier, that any situation involving the provision of tapes can be a dangle or a controlled operation. STEELE has heard, and it is his understanding, that the situation involving CODY SHEARER and the tapes parallels something that the US Government has been involved with, but he plans on talking about that in more detail (see below). STEELE added that there are some "dark web" aspects to this, and STEELE asked about who was handling or analyzing "dark web" issues for the FBI.

STEELE did not provide funds to his primary subsource for payment to sub-subsources. STEELE said that he provided a monthly retainer to his primary subsources, and said that a primary subsource might, in turn, pay for food or drinks while collecting information from his or her sub-subsources, but the sub-subsources are not paid for information. STEELE also advised that he sometimes paid for his primary subsources' trip expenses, save for the primary subsource's █████████████████████ ████████████████████████████████████████████████████. The fact that sub-subsources are not paid for their information was, to STEELE, an important point when it came to the issue of reporting quality -- STEELE advised that the lack of payment meant there was no incentive for sources to exaggerate their information. In one situation, STEELE advised that his company and/or FUSION GPS were involved in obtaining ██████ for one of his primary subsource's sub-subsources, ██████████████. STEELE recalled that ORBIS may have provided money ███████████, which were then procured by FUSION GPS. ██████████ were wiped for prints before being provided to the source (NFI).

STEELE provided some overall comments regarding the election-related dossier reports. The time between ORBIS's receipt of information to report publication was generally quick -- the time could vary, but often a report was generated two days to one week after the debriefing of the primary subsource. In some cases, where the difference between the date of information and the date of published report was within a day, the information for the report had most likely been received ████████████ ████████████████████████, rather than through an in-person debriefing with the primary subsource.

In the election-related dossier reports, STEELE said that the commentary labeled "Company Comments" was generated by FUSION GPS. The first report from ORBIS to FUSION GPS was sent via direct courier; however, reports were typically encrypted and sent via email.

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A180

FD-302a (Rev. 05-08-10)

███ ██████████

SECRET//ORCON/NOFORN

(S//OC/NF)   Interview of Christopher
Continuation of FD-302 of  Steele                                    , On  09/18/2017 , Page  14 of 26

███████  , █████  and STEELE went over each of the election-related
dossier reports, with STEELE providing additional information on each
report, as appropriate. STEELE explained that he intentionally left
sequential gaps in the numbering of his election-related reports to
obscure the actual number of reports being produced on the subject as well
as to obscure the timing of the reports:

Company Intelligence Report 2016/80 (dated 20 June 2016)

Under "Detail," STEELE identified the "trusted compatriot" as his
unnamed primary subsource. In the same report, Source A was ████████
███████████████████████ , while Source B
██████ . STEELE said that his primary subsource
█████████████████████████████████████████████████
█████████████████████████ . In the report, Source C was ████
██████████ who was in direct contact with the primary
subsource. This ████████████████ had been a major sub-
subsource for a long time on other matters.

In the report, STEELE identified Source D as ███████████████
who, according to STEELE, was in direct contact with the primary
subsource. Sources E and F, according to STEELE, ████████████████
██████████████ . STEELE said that his primary subsource
personally visited the hotel ███████████████████████████ .

Source G was ██████████████ , a "friend of a friend" of his
primary subsource. During the primary subsource's trips ███████ ,
██████████ the one who advised the primary subsource that because
things were heating up, there had been a directive given advising that
they (NFI) should not speak to anyone regarding Russia's interest in,
or involvement with, the 2016 US Presidential Election.

STEELE indicated that the primary subsource collected the information
for this report (2016/80) during a trip █████████ .

Company Intelligence Report 2016/94 (dated 19 July 2016)

STEELE indicated that the information in this report was collected by
the primary subsource █████████████████████████ .

In paragraph 3 of the report, according to STEELE, the "compatriot" is
a ████████████████████████ . STEELE's primary subsource's sub-

SECRET//ORCON/NOFORN

FD-302a (Rev 05-08-10)

~~SECRET//ORCON/NOFORN~~

(S//OC/NF) Interview of Christopher

Continuation of FD-302 of  Steele                                      , On 09/18/2017 , Page 15 of 26

subsource is ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

The information in this report was not collected during an ████████
██████ by STEELE's primary subsource. ███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Company Intelligence Report 2016/100 (dated 5 August 2016)

STEELE referred to this reporting as being derived his primary
subsource's interaction with ████████████████████████████."
████████████████████████████████████████████████
████████████████████████████████████████████████
but STEELE was not sure about the sub-subsource's identity, adding
that he [STEELE] had destroyed all of his notes.  STEELE offered to
try and find out the identity of the unidentified sub-subsource.

Company Intelligence Report 2016/95 (handwritten date 29 August 2016)

STEELE said that Source E in paragraphs 1 through 5 in this report was
████████████████████ who was speaking to the primary subsource. It
was ██████████ who told the primary subsource the information in this
report about MANAFORT, WIKILEAKS, and Russia's use of diplomatic staff
and the emigre pension program as "cover."

In paragraph 6 of the report, the "separate source with direct
knowledge" was an unidentified individual who was involved in ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
STEELE could not remember the exact identity of the individual, but
████████████████████████████████████████████████
████████████████████████████████████████████████

Company Intelligence Report 2016/97 (dated 30 July 2016)

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A182

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

(S//OC/NF) Interview of Christopher

Continuation of FD-302 of ___Steele_____ , On ___09/18/2017___ , Page __16 of 26__

STEELE said that the "trusted associate" in the first paragraph was his primary subsource, and the "Russian emigre figure close to the Republican US presidential candidate," was ████████████████ STEELE said that ████████ provided the entirety of this report. provided this information directly to STEELE's primary subsource, including the information in the report about how the "intelligence exchange" between the TRUMP team and the Kremlin went back at least 8 years.

Company Intelligence Report 2016/101 (handwritten date 29 August 2016)

STEELE advised that paragraphs 1-3 of this report involve the primary subsource's obtaining of information ████████████████████████ ████████████████████████████ STEELE described this report as dealing with "fallout information" -- that is, information about how the Russian government was dealing internally with the publicity surrounding Russian involvement in the US election.

STEELE indicated that the "Kremlin official involved in US relations" noted in paragraph 4 of the report ████████████████████████ STEELE said that his primary subsource ████████████████████████████ ██████████████.

Company Intelligence Report 2016/102 (dated 10 August 2016; handwritten date 29 August 2016)

STEELE believed that the information in paragraphs 1 and 2 in this report -- though he was not 100% sure -- was derived from ████████. Based on the date of the report and on the information in the report, STEELE believes that the report was generated through personal contact between ████████ and his primary subsource. It also appears to STEELE that the report was generated ████. Because there is only one day between the date of information (9 August 2016) and the date of the report (10 August 2016), STEELE said that it doesn't appear that the report was generated following one of his primary subsource's trips ████. Instead, it appears that his primary subsource made contact while ██ [the primary subsource] was ████████████████, and could therefore report the information to STEELE right away.

Company Intelligence Report 2016/105 (dated 22 August 2016)

STEELE advised that this report was based on a unique reporting stream. His primary subsource has a relationship with sub-subsource,

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A183

FD-302a (Rev 05-08-10)

~~SECRET//ORCON/NOFORN~~

● ▮▮▮▮▮▮▮▮▮▮▮

(U//FOUO) Interview of Christopher
Continuation of FD-302 of Steele                    On 09/18/2017   Page 17 of 26

who is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

According to STEELE, the "American political figure associated with
Donald TRUMP and his campaign" noted in paragraph 3 of this report
could be ▮▮▮▮▮▮▮▮▮, speaking directly to STEELE's primary
subsource.

Company Intelligence Report 2016/111 (dated 14 September 2016)

STEELE described this report as another "fallout" piece -- that is, a
report about the Russian government was dealing internally with the
public accusations and news stories regarding Russian interference in
the 2016 election. The information in this report was derived from his
primary subsource's direct contact with multiple sub-subsources. These
sub-subsources included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ STEELE explained that his
primary subsource had ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. STEELE's primary
subsource had direct contact with all of these ▮▮▮▮▮▮▮ sub-
subsources -- ▮▮ contact with them was not brokered.

The "former top level Russian intelligence officer and Kremlin
insider" referenced in the "Company Comment" for this report was
▮▮▮▮▮▮▮▮▮

Company Intelligence Report 2016/112 (dated 14 September 2016)

This report is derived from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
STEELE indicated that he had no doubt that ▮▮▮ was the source of the
reporting for this entire report. Even though this ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ travels, and ▮▮▮ talks to STEELE's primary subsource via
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, STEELE advised that the
information for this particular report was obtained during one of his
primary subsource's trips ▮▮▮▮▮▮.

Company Intelligence Report 2016/113 (dated 14 September 2016)

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A184

FD-302a (Rev 05-08-10)

SECRET//ORCON/NOFORN

(U//FOUO) Interview of Christopher

Continuation of FD-302 of Steele _____ , On 09/18/2017 , Page 18 of 26

STEELE advised that the information in this report was derived from his primary subsource's visit ████████████ 2016. The primary subsource had ████████████████████████████ STEELE reiterated that his primary subsource traveled ████████████

Reflecting on the content of this report, STEELE commented that he had never heard of AGALAROV prior to this report, save for EMIN AGALAROV's music. STEELE did not know much about AGALAROV as he had not crossed paths with him professionally.

Company Intelligence Report 2016/130 (dated 12 October 2016)

STEELE believed that the information in this report was derived from his primary subsource's interaction with one of ████████████ but STEELE was not completely sure.

STEELE believes that this report was produced after STEELE's meeting with FBI representatives in Rome, which had happened the week prior, and after ████████████ attended by his primary subsource. STEELE's primary subsource ████████████

During ████████████ the primary subsource also spoke to a Russian Federal Security Service (FSB) officer at a party. One of the topics brought up during the primary subsource's conversation with the FSB officer was EDWARD SNOWDEN. This contact with the FSB officer was direct -- it was not brokered through another individual.

For the final paragraph of the report (paragraph 4), STEELE was unsure if the information was derived from the "SNOWDEN source" but thought it was unlikely to have been the FSB officer.

STEELE advised that his primary subsource had not had official contact with the FSB, though STEELE believes that his primary subsource may have talked to a local FSB officer ████████████.

Company Intelligence Report 2016/132 (dated 13 October 2016)

STEELE indicated that ████████████ was the source of the information in this report. This information was collected during the primary subsource's visit ████████████ 2016 -- the same trip

SECRET//ORCON/NOFORN

Solomon Aff. App. A185

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

⬤ ████████████████

(S//OC/NF) Interview of Christopher
Continuation of FD-302 of Steele                              , On  09/18/2017  , Page  19 of 26

during which the primary subsource collected the information in
Company Intelligence Report 2016/130.

Company Intelligence Report 2016/134 (dated 18 October 2016)

STEELE indicated that this information in paragraphs 1-3 of this
report is derived from his primary subsource's communication with
████████████████ about CARTER PAGE. The primary subsource spoke to
more individuals than just ██████████████ about this particular
subject. STEELE believes that the primary subsource spoke ████████,
who STEELE described as a ████████████████ ██████ had a possible surname
of ████     ████████████ and was either from the███████████████
████████████████████████████

STEELE said that the information about MICHAEL COHEN in the fourth
paragraph was derived from his primary subsource's interactions with
sub-subsources in the above-mentioned ████████████

Company Intelligence Report 2016/135 (dated 19 October 2016)

STEELE said that the information in this report was derived from the
primary subsource's interactions with sub-subsources in the ████████
████████ It was through this structure of reporting that the primary
subsource was told that MICHAEL COHEN had met with members of the
Russian presidential legal team. STEELE believed that his primary
subsource had met ████████████████. In STEELE's view,
this ████████ must have continued working inside ████
after ████████████████████████
████████████████████████████████
████████████████████████

Company Intelligence Report 2016/136 (dated 20 October 2016)

STEELE indicated that his primary subsource received this information
from ████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A186

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

Reflecting on the "Company Comment," STEELE emphasized that the information was obtained directly rather than by any of the brokered, ▮▮▮▮▮ reporting chains. STEELE's primary subsource obtained the information directly from his third-country sub-subsource.

Company Intelligence Report 2016/137 (dated 24 October 2016)

STEELE believes that this report was derived from his primary subsource's communication with ▮▮▮▮▮▮▮▮▮▮ but he was not 100% sure. Logically, STEELE said, since ▮▮▮ is the one who reported on IGOR DIVEYKIN in an earlier report, it would follow that this report's material on DIVEYKIN also came from ▮▮ . STEELE said that SECHIN would have told this sub-subsource about DIVEYKIN. STEELE added that ▮▮▮▮▮▮▮▮▮▮ SECHIN originally met ▮▮ through professional interaction. STEELE believed that ▮▮ professional work can be confirmed through open sources.

Company Intelligence Report 2016/139 (dated 27 October 2016)

STEELE indicated that the "senior Russian journalist working in the United States" in this report is ▮▮▮▮▮▮▮▮▮▮▮ STEELE believed that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

STEELE noted that, at this point, ▮▮▮▮▮▮ had disappeared. STEELE believes that ▮▮▮▮▮▮ . However, STEELE also knows that ▮▮▮▮▮▮▮▮▮▮

Intelligence Report, Information Dated 29 November 2016

This report was not included in the material STEELE provided to the FBI; he believes that it was provided to the FBI from Senator JOHN MCCAIN. The information in this report was generated through his primary subsource's communication with a senior MFA official. Reflecting on what he said earlier about some of the 2014 background of this particular report (see above), STEELE indicated that the earlier, 2014 information has been obtained from his primary subsource's communications

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A187

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

[REDACTED] Interview of Christopher

Continuation of FD-302 of  Steele                                ,On  09/18/2017 ,Page  21 of 26

Company Intelligence Report 2016/166, dated 13 December 2016

STEELE advised that this was his "favorite" report, involving MICHAEL
COHEN, WEBZILLA, and ALEXEJ GUBAREV. The information on MICHAEL COHEN
was obtained by the primary subsource's direct communication wi[REDACTED]
[REDACTED]

Company Intelligence Report 2016/086, dated 26 July 2015

First, STEELE was asked about the date of this report, specifically
the year. Upon reflection, STEELE said that he believes this is a
typo, and that the year was actually 2016 versus 2015.

STEELE advised that this cyber-related report in the dossier had been
tasked by the FBI. It had been tasked by[REDACTED]       and was passed
to the FBI.

Company Note, dated 19 October 2016

This is the CODY SHEARER and JON WINER report. STEELE advised that
this was not an ORBIS report. STEELE received this report from JON
WINER. The report pre-dates the dossier, and was produced circa April
2016. STEELE advised that SHEARER was an associate of SIDNEY
BLUMENTHAL. SHEARER is also friends with a Turkish-American
businessman with the last name of KHAN (NFI). KHAN was in touch with
RUSLAN MANSIMOV, aka ASLAN TURAN, aka ASLAN TURANCI. According to
STEELE, MANSIMOV was a "Southern Caucasus mongrel" -- Armenian/Azeri
/Russian -- and worked in Turkey and Rome. KHAN brokered contact
between SHEARER and MANSIMOV in New York and Istanbul. MANSIMOV worked
for the FSB -- STEELE said that MANSIMOV's affiliation with the FSB
was not a secret.

STEELE advised that this SHEARER/WINER report was not related to the
dossier and was based on long-standing relationships among the
identified individuals. STEELE said that the report had pluses and
minuses. The "plus" of the reporting was that it chimed with the Miss
Universe reporting, the Ritz-Carlton reporting, and the AGALAROVS. The
"minus" of the reporting was the fact that MANSIMOV was, according to
STEELE, neither the most sophisticated nor impressive person.
MANSIMOV's Russian language skills were not that great, as it was not
his first language. STEELE opined that MANSIMOV's first language may
be Azeri.

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A188

FD-302a (Rev 05-08-10)

~~SECRET//ORCON/NOFORN~~

⬤ ▮▮▮▮▮▮▮▮▮▮▮▮▮

(S//OC//NF) Interview of Christopher
Continuation of FD-302 of Steele _____ , On 09/18/2017 , Page 22 of 26

After the dossier was published, MANSIMOV was not an active contact.
MANISMOV had claimed to be part of a faction in Russia, along with
some other FSB officials, who were shocked at the attacks on the US
election. MANSIMOV thought that the "crazies" (NFI) were out of
control, and that it would blow up in their faces (NFI).

Recently, MANSIMOV has recontacted KHAN and was offering to provide
tapes of President TRUMP. At least one of those tapes was related to
the Miss Universe event and involved urine. KHAN brokered contact
between SHEARER and MANSIMOV. SHEARER and MANSIMOV were actively
discussing a deal for the tapes. MANSIMOV wanted money and "good
standing" (NFI). MANSIMOV also claimed that an FSB technical officer
with the rank of colonel was interested in defecting and wished to
speak to them. The FSB officer had difficulty traveling; therefore, it
was suggested that they meet in Kazakhstan.

SHEARER and MANSIMOV met in Istanbul and are considering an upcoming
meeting in Spain within the coming weeks.

⬤ STEELE advised that he wished to keep this interaction "at an arm's
length," as he does not want to fall into a trap. STEELE opined that
this could be genuine, or a fabrication, or a set-up -- suggesting
that it could involve a faction of the Democratic Party and he feared
a possible FCPA violation. STEELE advised that WINER was aware of the
situation, and was the one who informed STEELE about it. STEELE opined
that SHEARER was not acting discreetly. STEELE said that the media was
"sniffing" around MANSIMOV.

Additionally, STEELE advised he believed it was doubtful that IVANKA
TRUMP was collecting large amounts of money. STEELE was complementary
of IVANKA TRUMP and considered her a good friend. STEELE further
advised that his colleagues believed he was being naive about this,
but he was surprised by the reporting on IVANKA. STEELE said he was
skeptical about the IVANKA part of the reporting, but he could believe
the rest of the report.

STEELE advised that there was a rumor that a video existed of
President TRUMP "roughing up" his wife, MELANIA TRUMP, in an elevator.
The rumor further insinuated that the Russians had purchased this tape.

⬤ STEELE said that another rumor had also surfaced that an unidentified
American who had witnessed an argument about prostitutes at a hotel
involved in the earlier-mentioned Miss Universe incident. The desk

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A189

FD-302a (Rev. 05-08-10)

SECRET//ORCON/NOFORN

Interview of Christopher

Continuation of FD-302 of Steele _____ ,On 09/18/2017 ,Page 23 of 26

clerks wanted the prostitutes to sign in because of health and safety reasons, but the women refused. STEELE advised that the press could be in touch with the American witness.

STEELE discussed in greater detail DMITRIY RYBOLOVLEV and the property sale in Sunny Isles, Florida. STEELE said that RYBOLOVLEV had a client relationship with a Mongolian female who had been educated at MGIMO. This female worked in the United States with a PR/GR [public relations /government relations] firm. STEELE met her approximately 6 years ago and they worked together. She was very close to SERGEY LAVROV and RYBOLOVLEV. This female spoke with RYBOLOVLEV about the sale of the Sunny Isles property and the TRUMP connection with the sale. RYBOLOVLEV told her that he did not know anything about TRUMP, but the female did not believe him. STEELE sent this information as a report to FUSION GPS, but STEELE was not sure if he passed it to DAVID KRAMER, which is why STEELE believes it was not published publicly. STEELE added that there was a new person working for RYBOLOVLEV until very recently. There was information about this individual in a LE MONDE article. This individual had been kicked out of Monaco and had been involved in bribing officials. STEELE said there was also current reporting involving art fraud -- specifically, paying too much for art, reporting it lost, and laundering money (NFI)

STEELE talked about his other, newly-up-and-coming main agent network and that network's reporting on PAUL MANAFORT. ORBIS received reporting dated circa March-April 2017 regarding MANAFORT's involvement in the plot to elbow out PETRO POROSHENKO. This reporting also talked about the Ukraine peace plan, provided by a pro-Russian deputy – the material that was provided to MICHAEL COHEN and MICHAEL FLYNN. ORBIS pitched the circa March-April 2017 report about MANAFORT to ████████████████████████

STEELE said there are two memos regarding MANAFORT that were received by this newly-up-and-coming primary subsource. This individual understands that two entities, including the FBI, have received a larger amount of information or a bigger memo on MANAFORT based on access to MANAFORT's Security Service of Ukraine (SBU) file. The information in the FBI's possession talks about how MANAFORT has always been a Russian agent, about how he's always been with the FSB and how he's been run by named Russian case officers. STEELE says that this information is written in an exaggerated way (NFI). ORBIS believes the SBU file on MANAFORT itself has been doctored. The source claimed to know that the file had been doctored. STEELE said that the file has been doctored because that way, Kyiv is able to justify why it had MANAFORT under investigation. STEELE commented that, in Ukraine and all over Europe, they feel pressure from the White House to be able to justify any investigations that have been done.

SECRET//ORCON/NOFORN

Solomon Aff. App. A190

FD-302a (Rev. 05-08-10)

⬛ ~~SECRET//ORCON/NOFORN~~

⬛ ▬▬▬▬▬▬▬▬▬▬

(S//OC/NF) Interview of Christopher

Continuation of FD-302 of  Steele                                    , On  09/18/2017  , Page  24 of 26

This information was collected recently - within the last few months - and
was post-election. STEELE believes that the new agent network reporting
has a mixture of truth and falsehood. The new primary subsource has a good
view into things and has reported on things with which he has directly
been involved - in the actual room at the time. The new primary subsource
is good when being interviewed to state whether he thinks something is
right or something sounds wrong. STEELE said that the source is critically
assessing another memo regarding MANAFORT -- a memo which is approximately
three paragraphs long. STEELE said that ORBIS is receiving more
information about this next week. STEELE planned to sit down with his
source soon to go over all of the information and the source's assessment
of the bigger SBU memo (NFI). When the assessment is complete, STEELE
advised he would like to share it with the FBI. STEELE described his
source in Ukraine as "top-notch" and advised he has a significant, 3-4
year reporting record. STEELE advised that MANAFORT was still active in
Ukraine after the 2017 US Presidential Inauguration.

STEELE has heard separately that two US agencies (NFI) were working
together in Germany and that it involved the offer of tapes and other
documents. STEELE advised that a 'Volga German by the name of BITNER (NFI)
was an FSB agent under busines cover. A US agency was involved in an
exchange involving BITNER, but CIA Director MIKE POMPEO pulled the plug at
the end of last year. It was unclear to STEELE if this Germany-related
information was connected to the earlier-referenced SHEARER-MANSIMOV
information. STEELE also said that this was related to information in the
"dark web" where, STEELE added, there has been talk that STEELE and the
NSA are competing for the same materials (NFI). As with the MANSIMOV
information, the media is also "sniffing" around the Germany situation. It
is not the same media outlets who are "sniffing" around both stories,
however. STEELE said that the media was not asking questions per se, but
facilitating (NFI).

STEELE discussed two significant robberies that occurred in villas in the
south of France. A total of up to two billion dollars in cash had been
stolen from Ukrainian oligarch PINCHUK. PINCHUK's son-in-law had been
using a villa. Part of the stolen money originated from a defrauding of
Delta, a Ukrainian bank. PINCHUK's son-in-law embezzled hundreds of
millions of dollars from Delta. The Chechens (NFI) subsequently stole that
money, which went back into Russia. STEELE noted that the Chechens are
often used by the Russians for such activity. If true, STEELE opined, this
whole situation could create a huge slush fund for Russia.

ORBIS has also been getting reporting regarding Russian influence in the
French and German elections. Regarding the 2017 French election, STEELE

⬛ ~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A191

FD-302a (Rev. 05-08-10)

⬤  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

████████ **SECRET//ORCON/NOFORN**

███████ Interview of Christopher

Continuation of FD-302 of  Steele                              ,On  09/18/2017  ,Page  25 of 26

said that things got perilously close to working for the Russians. STEELE
said that it wasn't just about LE PEN, but that there was only one
candidate who wasn't untainted by the Russians, and that was MACRON – the
person who actually won. All three right-leaning candidates in France were
held by the Russians. FILLON was compromised by Russia. One of the
candidates was non-competitive. STEELE said the Russians attempted to
change their support back to LE PEN at the end of the campaign period.
STEELE advised that the Russians were now working on her niece.

Regarding the 2017 German election, STEELE said that the Russians were
working on many influence campaigns, but had scaled back. The plan
included propaganda about ANGELA MERKEL's health, but reportedly, MERKEL
pushed back and spoke to PUTIN personally, warning him not to interfere
with the election. PUTIN reportedly scaled back Russia's efforts.

STEELE advised that NIGEL FARAGE had been observed entering the Ecuadorian
Embassy in London -- presumably to speak with JULIAN ASSANGE. STEELE
believed that Russian funding had been funneling through the United
Kingdom to promote Brexit. STEELE said that a young American -- possibly
with the name of COTTRELL (NFI) -- had been caught laundering money.
STEELE also said that EKATERINA PADERINA and her husband, AARON BANKS were
two individuals involved in Russian influence and Brexit. FARAGE, TRUMP,
and BANKS go back approximately four years. STEELE further advised that
there was a Belize link with this, and that money was being laundered
through Belize.

STEELE said that ORBIS was involved in some Kazakhstan-related and Cyprus-
related business work, and some of the material from that work obviously
falls within the bounds of the Special Counsel. STEELE was working on a
Kazakh-related project involving an indivdual by the name of ABLYAZOV,
embezzlement from BTA BANK, pyramid schemes, and connections to FELIX
SATER and TRUMP SOHO. STEELE said that they want RICO up and running in
the United States (NFI). STEELE brought along a Power Point presentation
from the company ARCANUM explaning the SATER connection. STEELE provided a
copy of this Power Point presentation to ████████ and ████████ (see
attached). This information was slated to be provided to the US Department
of Justice and the FBI as it involves a corrupt American official
(NFI). SATER is also involved with the daughter of ABLYAZOV (NFI).

Regarding Cyprus, STEELE discussed a casino and golf complex. The GOLDEN
LADY CONSORTIUM was attempting to put a casino in Cyprus circa 2015-2016.
TRUMP, NAVIGANTE and SCENOPLUS (sp) were all involved, but the project
failed. TRUMP tried to get a resort deal worth 450 million through RCB, a
subsidiary of VNESHTORGBANK (VTB). The deal was submitted to regulators.
STEELE said that there were some references to this deal in the Cypriot

**SECRET//ORCON/NOFORN**

Solomon Aff. App. A192

FD-302a (Rev. 05-08-10)

~~SECRET//ORCON/NOFORN~~

372B-SM-2063661

Continuation of FD-302 of ~~(U//OUO)~~ Interview of Christopher
Steele                                               , On  09/18/2017 , Page  26 of 26

press. STEELE himself received this information from an American
journalist.

STEELE was available for recontact, and advised that he wished to remain
in contact with the FBI. Although STEELE believed the FBI owed money to
STEELE and ORBIS for services and travel provided, STEELE believed it was
more important that the United States government receive the information.
STEELE was willing to provide the information to the FBI regardless of
payment. STEELE advised that he would keep the same communication line
open for future contact with ████████████ , as necessary.

~~SECRET//ORCON/NOFORN~~

Solomon Aff. App. A193

████████ (DO) (FBI)

**From:** ████████ (DO) (FB ████ @fbi.sgov.gov>
**Sent:** Wednesday, October 4, 2017 12:05 PM
**To:** ████████ (CD) (FBI)
**Cc:** ████████ (DO) (FBI)
**Subject:** My notes re: first day --- ~~SECRET//NOFORN~~
**Attachments:** 2017091 ████ _London_Debriefing_Part_B_Draft.docx

Classification: ~~SECRET//NOFORN~~
DELIBERATIVE PROCESS PRIVILEGED DOCUMENT

Classified By: J71J32T41
Derived From: FBI NSIC CG
Declassify On: 20421231
==========================================================



See what you think.  Add/clarify anything please.

████ – for your review as well.

Out of abundance of caution – though we need to determine one way or another how we're handling classification – I'm
classifying this email S//NF.

Best,

████████
Supervisory Intelligence Analyst

NOTICE:  This email (including any attachments) is intended for the use of the individual or entity to which it is
addressed.  It may contain information that is privileged, confidential, or otherwise protected by applicable
law.  If you are not the intended recipient (or the recipient's agent), you are hereby notified that any
dissemination, distribution, copying, or use of this email or its contents is strictly prohibited.  If you received
this email in error, please notify the sender immediately and destroy all copies.

==========================================================
Classification: ~~SECRET//NOFORN~~

Solomon Aff. App. A194

Case 1:23-cv-00759-RJL   Document 16-8   Filed 08/18/23   Page 196 of 218

-- preliminaries with both business partners

  ███ very concerned about the loose business ends

-- Still pretty upset, as we spent time and effort getting material to you

-- We had a contract of some sort wit ███ – Orbis had a contract; maybe it was put together with just CS as the face of it [we indicated that we two were not involved; not privy to how any initial contract was set up]

-- Apologies for going to the press, but we found ourselves "riding two horses" as the election season went on, and eventually [after Comey's reopening of the HRC investigation] we had to pick "one horse" and we chose the business "horse" vs. the "FBI" horse – hence, we followed what our client wanted and spoke to the press

-- This was a combination of "your fault" and "our fault"

-- They were confused about FBI and SCO, wanted to make sure that they were talking to SCO; we ensured them that their information would be going straight to Mueller

-- Ensured them that only a small group of people knew that we were meeting and talking, including Mueller

  ███ made the point that, in his former career, he "knew Mueller"

-- They were certainly frustrated by the inclusion of their reporting in the ICA annex.  I explained that the ICA (which included the annex) was based on POTUS Obama's USIC-wide call for information on Russian influence and 2016 election.  Their reporting, as it was provided to the FBI, was part of the overall material that fit with that call for information.  They felt that they should have had advance warning that their information was going in the ICA.  They said that the use of their information, and the subsequent public leak of the annex, put CS' name out there and had a "massive impact on our lives. ███

███████████: They brought up the inclusion of their material in the ICA annex multiple times – almost to the point that it felt like fishing for information about how the ICA was constructed.  In the end, I made the point that I wasn't going to get into how the ICA was put together, how the annex came about, etc.]

-- They had strong statements about POTUS Trump – registered Trump as their 'main opponent" and registered fear about how Trump negatively impacted the historical UK-US alliance and special relationship.

-- Talked about what Bruce Ohr's connections with them during the run-up to the election; they gave material to Ohr and pushed Ohr to do something about it; Ohr explained DOJ policy re: hands-off prior to elections; then the Comey announcement happened and their client felt like the gloves had come off

-- Talked about p-sub an ██████████

-- Said that Glen Simpson, Fusion GPS, was aware that he was sharing reports/information with FBI

-- Wasn't sure who to go t ███ to give these reports in the en █████████

████████████████████████

████████████████████████

████████████████████████

████████████████ ██

1

Senate HSGAC_TransitionReq_Fusion GPS Docs - FBI000002 - DOJ Review
DOJ REVIEW ONLY. DO NOT DISSEMINATE FURTHER WITHOUT THE APPROVAL OF FBI OGC

Solomon Aff. App. A195



-- never heard of Page or Cohen before this, or Papadoupolos
-- had heard of Manafort, which got the whole thing started
-- heard of Tillerson; <u>more below</u>

-- knew p-sub's background, current positions of sub-sources, consistent reporting through multiple
projects → vetting/validating himself
-- confirming through other source reporting
-- Orbis has 4 discrete, hermetically-sealed main agent networks
      -- biggest was the p-sub network
      -- older one – main agent died
      -- one is up-running and is starting to get good info now
            -- being re-directed to do work re: Russia; not p-sub but new main agent
-- has source looking at Sunny Isles – Rybololvlev purchase – someone in PR/GR circles

--p-sub issue
      -- feels like it's about time he engages with special counsel
      -- s/w p-sub last night; he's "coming along" with the idea of talking with sc, but not there yet
      -- CS very concerned to protect p-sub
      -- very special story, esp how he came to work for Orbis
            -- introduced to CS and Orbis through FH circa 2011



            -- FH has a very high opinion of him; doing FH a favor – "you should take a look at him"
            -- FH is a close friend of CS [later said that his wife and FH went to uni together; in fact,
FH's daughter is named after a friend of theirs from college who died]

Ukrainian

      -- uses prior university contacts; reporting has become better over time
      -- anything happen to him while collecting?
           --said he was hauled in front of immigration authoritie
           -- shaken down for money – had to go to ATM and get money
           -- paid bribe
           -- CS felt this was good sign – things haven't gone smoothly all the time
    -- p-sub to      trips for election-related reports
    -- CS said they destroyed materials for legal reasons; working from memory on some of this

2

Solomon Aff. App. A196

-- Would debrief after these trips ████████████ and talked with p-su ████████
████████████████████ )

-- tried to get audio of p-sub and one of his subsources; successfully got audio of convo between p-sub and his subsource re: Cohen meeting in Prague

    -- don't have that audio in its original form; has to be careful re: legal issues here

    -- have audio and transcription of audio

    -- may have opportunity to get more on this b/ ████████████████████████
████████████████████ ; p-sub is having dialogue with that source and that person may be thinking of "coming in"

    -- this particular source provided information on Ivanov and Prague

████
████████████████████████████████

████████████████████

████████

████ provided details on Prague

       ████ knew someone in Prague who worked for Rosso

       ████ knows folks in the cyber business

    -- allegedly Rosso was the crucible for the Cohen meeting

    -- Prague contact was in the know about this meeting and scared

████ provided info on Prague and Ivanov

-- another source provided information on cyber

    -- talked about how the FSB was able to turn an individual who had been caught money laundering and get them to work cyber for FSB; main source commented about how this is the way that the FSB typically operates

-- asked in reference to the fact that some of the reporting discusse ████████ matter ████████

████████████████████████████████

████████████████████████████████

████ involved p-sub being asked to attend events as an expe ████████████

-- he gave a talk at the event or a seminar; he was a contributor, which was his cover for being there

-- th ████ occurred while we were in Rom ████ ████████
████

-- this is the event during which time he collected information re: Snowden and a senior FSB officer

-- what does p-sub tell other people about wh ████ doing, and wh ████ asking questions?

    ████ can play up overt academic interests; it's an "in-between" overt and clandestine cover

 ████ does favors for people – I helped recommend best English language school for one of his sources

-- with respect to the election-related material, it didn't take much to collect early-on because the whole thing was an "open secret" in Moscow; people would start talking in bars, and p-sub could easily elicit; later, as time went on, sources started shutting down and it became harder to get information

3

Solomon Aff. App. A197

-- many of Orbis' litigation-related clients for whom p-sub has collected reporting are ████████████

-- p-sub has been going back and forth to different cities for years for Orbis' litigation clients
-- for the election-related stuff, p-sub ha ██████ in abou ████████

-- for the election-related material
    -- Orbis' initial interest was a litigation-related issue – involving potential litigation with Paul Manafort; started around May 2016
    -- Manafort had "disappeared" for multiple years [AN: post-Maidan]; appeared to be hiding from creditors
    -- Manafort owed money – 100M to oligarchs and more money to Russians
    -- Fusion GPS had a different client for whom it was already doing research on Manafort
    -- Around June, met with Fusion GPS and they decided to start swapping notes
    -- Soon thereafter, the decision was made to have Fusion GPS hire Orbis on the election-related stuff ("take [Orbis] on for the bigger issue")
    -- In June, Orbis took its own crack at it
    -- This wasn't the only political sensitive investigation that Orbis was working
    -- Orbis was handling an English FA matter, regarding a competitor for the bid process; and [one that he was hesitant in sharing, caveat re: very sensitive], they were involved in doing work regarding the election campaign for the UN Secretary General – a client wanted them to work up material on possible voting intentions
    -- I ████ Orbis got reporting from p-sub and another source
    -- In earl ████ got a debrief [from other source?] on Dmitriy Rybolovlev and the sale of property in Florida; he remembered it was before a holiday trip he took to Cyprus
    -- P-sub did a bit of work in the United States – talked t ██████████████

-- Talked about different p-sub sub-networks
    -- Carter Page – the reporting stemmed from Page's speech in Moscow in July.  The reporting p-sub was able to get re: Page's meeting with Sechin and Page's meeting with Divyekin all came ████████████

    -- Govorun information – this reporting stemmed from a different sub-sourc ████████

    -- Peskov's office – this reportin stems from a "friend of a friend'" of p-su ██████████

4

Senate HSGAC_TransitionReq_Fusion GPS Docs - FBI000005 - DOJ Review
DOJ REVIEW ONLY. DO NOT DISSEMINATE FURTHER WITHOUT THE APPROVAL OF FBI OGC

Solomon Aff. App. A198

-- Talked in more detail regarding his decision to talk to media
    -- After Comey's letter reopening HRC case, Fusion GPS felt like gloves had come off
    -- Mentioned how there had been discussion earlier with Bruce Ohr about "getting this info out" but Ohr talked about DOJ policy about not taking actions prior to elections
    -- Fusion GPS put pressure on Orbis to talk to Mother Jones
    -- The interview was supposed to be off-the-record, but then he altered that and said it was a combination of "off" and "on" record; in the end, he said that he shouldn't have given the interview
    -- With the breakdown that the interview then caused with FBI, they had no way of getting this information into the hands of people that they believed needed it; after that, that's when they decided to go the McCain/Kramer route, which, in the end, he believes is how Buzzfeed got the material, and why now, given the Buzzfeed publication, he has the legal problems he has now

-- About Bruce Ohr
-- Bruce knows that we're in touch right now; he knows about this meeting that we're having
-- We talked about how he used Bruce to reach out to try and get us in contact; also reaching out to Bruce and Glen Simpson about p-sub
-- This led to additional discussion about p-sub meeting with Special Counsel
    -- He only wants this to happen if p-sub agrees
    -- He believes that p-sub is "coming around" but that it needs to be carefully handled
    -- ██████████████████████████████████████████████
-- This also led to a discussion about what p-sub is currently doing for Orbis
    ██ has been doing a bit of work for us recently"
    ██ has been reaching out to some of the same sources
    -- We've had an interest in the "prophylactic efforts" post-dossier re: what the Russian Govt has done
    -- They've been getting reporting re: election influence in France and Germany – indeed, a lot regarding the French elections, where, he said, things got "perilously close to working" for the Russians.  It wasn't just Le Pen, but there was only one candidate who wasn't "untainted" by the Russians, and that was Macron – the person who actually won.  All three right-leaning candidates in France "were held by the Russians."
-- He mentioned with this the issue of Russian money being used for Brexit, and later referenced two individuals with respect to Russian influence and Brexit: Ekaterina Paderina and her husband, Aaron Banks

-- What kind of tradecraft does p-sub use whe ██ is collecting information for you?

    ████████████████████████████████████████████████████
    ███████████████████████
    ██ is very thorough when it comes to preparing himself to be debriefe ██ takes some time before being debriefed to ge ██ thoughts and recollections together
    ████████████████████████████████████████████
    ██ used this approach before ████████████████████████████████
    ███████████████████████████████████
    ██ has a very good memory
-- Onl ██ people in the Orbis office have interacted with p-sub; they debriefe ██ the first time at the office, but then, after that, not.  Now, Orbis is very concerned about bugging, so wouldn't debrief sources in office

5

Solomon Aff. App. A199

-- He had substantive debriefings with p-sub

-- P-sub had been working on multiple projects durin ████████████████, but def collected during h ████████ for election-related projects

████ █ ████████████████████████████████

████████████████████████████████████████ ]

-- Does FH know that p-sub has been involved with the dossier?

    -- Yes, FH knows that he's involved

    -- Remember that p-sub went to ground in January-February 2017

    -- He contacted FH, indicated that he was worried about him.

    -- She probably guesses that p-sub was involved in the dossier.

    -- He remembered seeing FH in the UK in early 2016 – his wife was abroad at the time

    -- FH was still at Brookings

    -- He doesn't know when the last time he saw FH

████████████████████████████████████████

-- Discussion of p-sub validation/control issues

    ████████████

    -- His behavior is that of someone who is scared

    -- He wouldn't be talking about coming to talk to SCO if there was a problem

    -- Not, in his opinion, exhibiting signs/behavior of someone who is under control

    -- Can't guarantee that p-sub's sub-source aren't under control

    -- Hasn't been easy to get info – had to dig

    -- Not sure why he would still be hanging around – even in country – if he was under foreign control

-- Tillerson-related p-sub report from late 2016

    -- This is a p-sub report that I didn't provide to FBI; not sure if you have it

    -- Have to start by talking about earlier Orbis reporting from 3 years back – circa 2014

    -- Orbis working on a hydro-carbon project for a client.

    -- It became clear from reporting during that project that Exxon-Mobil was well-placed in Russia, and that Tillerson had an atypical type of relationship with Igor Sechin. It was odd – to the point that he thought something was going on, particularly with Sechin – it was more than just shared hobbies like Harley-Davidsons.

    -- The reporting died down, the client moved on, and the sanctions regime kicked off

    -- Circa December 2016, following the election, T was initially flirting with Mitt Romney as a possible candidate for SecState, but then there was a long hiatus during which time there were general speculations about whether it was going to be Romney or someone else

    -- From Russian MFA sources through p-sub, Washington DC received messages from Russia that Romney was an unacceptable candidate and that Russia wanted someone who was more acceptable and who might lift sanctions

    -- Tillerson's name isn't in the report, but what happened in the end was surprising given the repoting.

    -- This report may have been shared with David Kramer – he sent it to Glen Simpson with the idea of having it shared.

6

Solomon Aff. App. A200

-- Discussion of sharing these reports wit ███████████████████████████████
███████

    -- He kne ████████████████████████████



-- Manafort SBU file related reporting

    -- From his other, newly-up-and-coming main agent network and new p-sub, they have received reporting dated circa March-April 2017 regarding Manafort's involvement re: plot to elbow out Petro Poroshenko. Also, this reporting talks about the Ukraine peace plan, provided by a pro-Russian Ukrainian Deputy – the stuff that was provided to Michael Cohen and Michael Flynn

    -- There is also a 6-page memo regarding Manafort that has been provided by the source. The source understands that two entities – including the FBI – have received [greater than 6 pages of] information on Manafort based on access to Manafort's SBU file. This information in the FBI's possession talks about how Manafort has always been a Russian agent, about how he's always been in with the FSB and how he's been run by named Russian case officers – all in an exaggerated way. The SBU file itself, Orbis believes (based on source), has been doctored. It has been doctored because that way, Kyiv is able to justify why it had Manafort under investigation. He commented that, in Ukraine and all over Europe, they feel pressure from the White House to have to be able to justify any investigations that have been done. This reporting was collected recently – within the last few months – and is post-election.

    -- About this new p-sub's reporting, we believe there is a mixture of truth and falsehood

    -- We believe the new p-sub – he has a good view into these things, and has reported on things from being "in the actual room at the time"; the source is also good re: when interviewed with saying "this is right; this to me sounds wrong."

    -- They are getting more about this next week

-- More discussion regarding p-sub, p-sub's security and p-sub's current situation



7

Solomon Aff. App. A201

-- While she doesn't know all of the ins-and-outs of how things have worke ████ ████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

-- Re: p-sub's contact with Russian establishments ████████████████████

████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████.
████████████████████████████████████████████████

                 tha ██ might have some information about dossier; p-sub gave a bland answer;
this cause ██ consternation and was a warning tha ██ was found out. This is wh ██ went to
ground in January-February 2017 and why I reached out to FH about his whereabouts and safety
-- Do p-sub's sub-sources know that their information was used in the dossier? Some have tried
to talk to p-sub cryptically about the reports. In one case – the person who provided
information on Gubarev ████████████████████████████
     ███████. He believes that p-sub's subsources have an idea that their information was used.

████████████████████████████████████████████████

-- Discussion about the [Oleg Aleksandrovich] Erovinkin matte ████████ ; Kosmos restaurant shooting
     -- this is the former top aide to Sechin in Rosneft who was found dead in December 2016
     -- people/press have mistakenly tied Erovinkin to the dossier, as possible sub-source re: Sechin
material
     -- He doesn't believe that Erovinkin was one of the sub-sources for p-sub
     -- Nevertheless, he takes this situation seriously; gives him pause – reminds him of another,
recent situatio ████████████ , whose reporting is in the dossier

████████████████████████████████████████████
     -- On this note, 3-4 months ago, there was a shooting in the restroom of the Moscow restaurant
(Cosmos/Kosmos). The shooting was in broad daylight. Kostya Myaski [Myanskiy?] (sp) was the
victim. He believes that this was a warning sh ████████████ . The incident occurred in the May
2017 time frame.

-- Discussion about Orbis Business security procedures/situation post-dossier
     -- They had a situation arise where someone tried to spoof/impersonate the outside contractor
who does Orbis' IT security. There was an attempt to change the password for their internal
system, which was detected, and IT security contractor was contacted to determine if it was
legitimate.
     -- If successful, this could have exposed clients, but not sensitive reporting, as that is kept off-
line
     -- Have you had any situations, post-dossier, where you thought you were being offered
dangles? Operational games? This reminded him of the Cody Shearer situation and the offer of
tapes for money. We'll talk more about that later, but the existence of tapes have been played

                                                                                    8

Solomon Aff. App. A202

out of proportion – just the fact that the Russian government has leverage on POTUS is a problem. It will be difficult to know if a tape has been doctored. There is a concern, post-dossier publicity, that any situation involving the provision of tapes can be a dangle or a controlled operation. He understands and he's heard that the Cody Shearer + tapes situation parallels something that the USG has been involved with, but we'll talk about that tomorrow. Also, there are some dark web aspects to this – he wanted to know who is handling/analyzing dark web issues for the FBI?

-- Orbis is involved in some Kazakh-related and Cyprus-related business work, and some of the material obviously falls within the remit of Special Counsel. This brings up the issue of how we're going to go forward from here, how much support can be expected going forward.

Senate HSGAC_TransitionReq_Fusion GPS Docs - FBI000010 - DOJ Review
DOJ REVIEW ONLY. DO NOT DISSEMINATE FURTHER WITHOUT THE APPROVAL OF FBI OGC

Solomon Aff. App. A203

FD-1057 (Rev. 5-8-10)

~~SECRET//NOFORN~~


OFFICIAL RECORD

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (~~S//NF~~) Defensive Brief to David Kendall.     **Date:** 10/22/2015

**CC:** Charles F. McGonigal

███████████ ████
███████████
████████
██████
█████
███████████
██████████

**From:** COUNTERINTELLIGENCE

    **Contact:** ████████████████ █████████

**Approved By:** David W Archey

**Drafted By:** ████████████

**Case ID #:** ████████████   ███████████
████████████   ;
         SENSITIVE INVESTIGATIVE MATTER (SIM)

**Synopsis:** (~~S//NF~~) To document defensive briefing to David E. Kendall and his associate Katherine Turner, both of Williams & Connelly LLP, personal attorneys to Hillary Clinton.

             **Reason:** 1.4(c)
             **Derived From:** OCA
             **Declassify On:** 20401231

**Full Investigation Initiated:** 11/25/2014

**Details:**

(~~S//NF~~) On Thursday, 15 October, SC David W. Archey and ████████
████████████, met at FBIHQ, Room 5885, with David E. Kendall and

~~SECRET//NOFORN~~

Solomon Aff. App. A204

SECRET//NOFORN

Title: (S//NF) Defensive Brief to David Kendall.
Re: ████████████, 10/22/2015

Katherine Turner, both partners at Williams & Connolly LLP, located at
725 12th Street, N.W., Washington, DC.  Kendall and Turner are personal
attorneys for former Secretary of State Hillary Clinton.  Kendall and
Turner both hold security clearances.  The purpose of the meeting was
to provide a classified defensive briefing for Mrs. Clinton's
presidential campaign, as summarized below:

(S//NF//OC) Kendall and Turner were advised the FBI has information that
the ████████████ is attempting to influence Hillary Clinton through lobbying
efforts and campaign contributions. The campaign contributions may come
in a form outside established parameters for such contributions.

(U//FOUO) Kendall and Turner were advised the FBI was providing them
with this briefing for awareness and so Ms. Clinton could take
appropriate action to protect herself. They were also told the FBI was
seeking their assistance to identify other appropriate recipients of
the brief, if any.

(S//NF//OC) Kendall and Turner were asked to advise the FBI, Section
Chief Archey, if Ms. Clinton is approached by anyone connected to or acting
at the direction of the ████████████.

(U//FOUO) As examples of issues that were known to be potentially important to
the ████████████, Kendall and Turner were advised of the following:

a) ████████████
b) ████████████;
c) ████████████;
d) ████████████;
e) ████████████.

(S//NF//OC) As a take away from the meeting, SC Archey offered that the
campaign should increase its vigilance of contributions related to any
of the matters discussed above.

SECRET//NOFORN

2

Solomon Aff. App. A205

SECRET//NOFORN

Title: (S//NF) Defensive Brief to David Kendall.
Re: ███████████, 10/22/2015

(S//NF) Kendall and Turner were advised the FBI has an ongoing investigation and does not have further information at this time. SC Archey stated the FBI felt the information was sufficiently reliable and serious that the FBI had a duty to warn.

(S//NF) Kendall asked if that was all the information that could be shared, and SC Archey responded in the affirmative. Kendall advised he would reflect on the information and advise if he thought further defensive briefings were warranted. He mentioned the possibility, the legal counsel for the campaign, as well as the campaign financial manager might be appropriate persons to receive the brief. Kendall and Turner did not provide the names of these persons.

◆◆

Solomon Aff. App. A206

SECRET//NOFORN/ORCON

## DEFENSIVE BRIEFINGS RELATED TO
## ██Foreign Government██ POLITICAL INFLUENCE CAMPAIGN

- ████ If defensive briefings are to occur, ██ and ██ request ██Sensitive Information██ prior to the defensive briefs. ██Sensitive Information██ to the defensive brief will help us understand the totality of the activity and any potential shift in that activity.

- ████ Defensive briefings should not be specific to identify the ██ and ██ subjects.

- ████ The briefings should occur concurrently or as close to concurrently as possible. This strategy ensures that the FBI remains apolitical throughout this process.

- ████ Specific details of the brief to include individuals in attendance and what, if any, additional information was provided to the political candidate and/or elected official should be provided to ██ and ██ after the fact.

- █████ If the candidate/politician asks whether anyone else has received such a briefing, we can note that this briefing was provided to this person because of information specific to them. We won't be sharing this information with anyone else, so as to protect him/her from unfair scrutiny. As such, we likewise won't share any information about other briefing recipients with the candidate/politician.

- █████ If the candidate/politician asks for additional information, we will advise the candidate that we cannot provide any further information due to the singularity of the sourcing.

### WHAT WILL BE BRIEFED

- █████ We have information that the ██Foreign Government██ is attempting to influence you through lobbying efforts and campaign contributions. These campaign contributions may come in a form outside established parameters for such donations.

- █████ We are providing you with this briefing so you and your staff are aware of such attempts to negatively influence our political process and you can take appropriate action.

- █████ If approached by an individual that you believe may be connected to or acting at the direction of the ██Foreign Government██, we ask that you provide the nature of the contact to the FBI.

- ████ ██Sensitive Information██ ████████████████████████████████ ████████████

- ████ ██Sensitive Information██ ████████████████████████████████ ████████████████████████ ████████

SECRET//NOFORN/ORCON

Solomon Aff. App. A207

Classification: ~~SECRET//NOFORN~~

Classified By: C73W72B71
Derived From: FBI NSIC CG
Declassify On: 20431231
========================================================

**From:** ▮
**Sent:** Monday, March 02, 2015 2:07 PM
**To:** ▮
**Cc:** ▮
**Subject:** FW: 2016 election announcement --- ~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified By: J65J18T25
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
========================================================

▮

▮ ,

During our SVTC last week, ▮ indicated to ▮ he was going to relay the info to CD EM.

**From:** ▮
**Sent:** Monday, March 02, 2015 1:53 PM
**To:** ▮
**Cc:** ▮
**Subject:** 2016 election announcement --- ~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified By: J66J18T84
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
========================================================

▮ ,

WSJ is reporting that Hillary Clinton plans to formally announce her 2016 Presidential candidacy in April 2015.

To me, this underscores the need for us to push this FISA. By the time we get it signed and go up, we would only be up a few weeks before she announces, at best. On the other hand, if we wait for the events to unfold which we discussed on the SVTC, her announcement may occur in advance of us

Solomon Aff. App. A208

getting the FISA coverage.  That puts us even further behind the curve on the intel necessary for this operation.

I spoke with ▮Employee▮ of OI. ▮Sensitive Information▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  To me, this is merely an administrative matter and is no big deal. We should be able to do the updates rather quickly and painlessly and move it back through the process.

▮▮▮▮ did mention his concern about making sure that OI/AG and FBIHQ are on the same page.  I *think* his concern is that, from his end, it looks like FBI didn't want to pursue this FISA because we didn't send it over to the AAG with the Director's Certification.  He wants to make sure that his office and FBIHQ communicate and that his folks know that we really want this FISA.  I'm not sure how FBIHQ is going to manage that, because if we explain the reason we held it up, that probably won't sit well.

▮▮ position remains consistent, and we believe additional urgency now exists because the candidate is poised to declare fairly shortly. ▮ would request that the new FISA package be approved and sent to the AAG for approval rather than wait for the events previously discussed on the SVTC.

Thanks,

▮▮▮▮

▮▮▮▮▮▮▮
▮▮▮▮

============================================================
Classification: ~~SECRET//NOFORN~~

Solomon Aff. App. A209

**From:** ████████████████ )
**Sent:** Friday, March 06, 2015 4:24 PM
**To:** ███████████████████  ███████████ )
(FBI)
**Cc:** ████████████████
**Subject:** Clinton Defensive Brief --- ~~SECRET//NOFORN//FISA~~

**SentinelCaseId:** NON-RECORD

Classification: ~~SECRET//NOFORN//FISA~~

Classified By: C73W72B71
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
=====================================================

Good afternoon/evening,

I hope all is well up in ██Field Office██.

I know I am asking this on Friday afternoon, right before rush hour (something I don't miss from the ██ █████████████ ), but my Unit ██████ down here was asked today by DAD Jones to provide a defensive brief to Hillary Clinton regarding possible foreign aid money that might be contributed to her campaign should/when she announce her run for POTUS.

The DAD would like for us (the FBI) to provide a brief sooner than later ("a week or so"). We think that Clinton maintains her own set of offices at 120 West 45th Street, Suite 2700, in addition to the Clinton Foundations offices. We went online to Hillary Clinton's website at hillaryclintonoffice.com, as well as the Clinton Foundation's website, but neither website has telephone contact information.

The current thought from my front office is that we will provide to ██Field Office██ the briefing material, if ██████ would be able to send out a couple of appropriate individuals to conduct the brief (as well as set it up). Right now, the direction we have been given is that it should be Hillary Clinton or someone within her office. An alternate person could be Nick Merril, who appears to function as her spokesman.

Though the information we ██Field Office██ received is currently specific to ██foreign Government██ wanting to give money to Clinton and the, thus far, unknown republican candidate, we would like this to be a general defensive brief. However, I've attached a baseball card with all the information.

Please let me know if ████ concurs with the general plan, and what we can do to help. I'll reach out on Monday if one of you has the opportunity to discuss this.

Thanks, an hope you all have a great weekend!



Solomon Aff. App. A210



```
==========================================================
```
Classification: ~~SECRET//NOFORN/FISA~~

Solomon Aff. App. A211

From:
Sent:         Monday, March 09, 2015 11:28 AM
To:
Cc:                                    DIGUISEPPI, JANEEN (CID)(FBI)
Subject:                      case --- ~~SECRET//NOFORN~~

Classification: ~~SECRET//NOFORN~~

Classified By: J65J18T25
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
===============================================

Good morning, everyone.

█ and █,
I'm writing about ████, the █Field Office█ case regarding the █Foreign Government█ and their plans to offer funds to Mrs. Clinton. ████████████. News reports are pointing towards this announcement happening either this month or in April.

CD Executive Management is considering providing Mrs. Clinton and/or someone in her office a defensive brief. CD EM would like for us to have a meeting about this and discuss pros and cons, the legal aspects, criminal aspects, etc.

Please let me know when you are available this week to conduct this meeting. We in ████ are available for this meeting Mon, Tue, or Wed. CD EM needs the information before Friday, 3/13.

████, NSLB needs to be present. I don't know anyone on the OGC criminal side that handles these matters but I'm sure you do. Someone there also needs to be present.

SC Diguiseppi,
████ front office wanted to insure you were aware of this.

Thank you.

===============================================
Classification: ~~SECRET//NOFORN~~

**From:** ███████████████
**Sent:** Wednesday, April 15, 2015 10:58 AM
**To:** ███████████████
**Subject:** Chronology of ███████ ████████████ ---

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

**Categories:** Red Category
**SentinelCaseId:** TRANSITORY RECORD

████████████████████████████
████████████████████████
████████████████████
=================================================

██,

Attached is the Chronology of ██████████

Sensitive Information
████████████████
████████████████

Thanks,
████

**From:** █████████████████
**Sent:** Wednesday, April 15, 2015 10:19 AM
**To:** ████
**Subject:** FW: ████████ - ████████████ --- ████████████
**Importance:** High

████████████████████████
██████████████████████
█████████████████
=================================================

██,

Please see me on the below.

Thanks,

▮

---

**From:** ARCHEY, DAVID W. (CD)(FBI)
**Sent:** Wednesday, April 15, 2015 9:16 AM
**To:** ▮
**Subject:** FW: ▮ - ▮ ---SECRET//ORCON/NOFORN/FISA

Classification: SECRET//ORCON/NOFORN/FISA

Classified By: J23J75T91
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
================================================

▮,

Please see below.  Please coordinate Section's response to the below.  Most of this is contained in White paper that ▮ completed last night.  Please make a priority for today.  Thank you.

**From:** COLEMAN, RANDALL C. (CD) (FBI)
**Sent:** Wednesday, April 15, 2015 7:30 AM
**To:** ARCHEY, DAVID W. (CD)(FBI)
**Cc:** JONES, ROBERT ALLAN (CD)(FBI)
**Subject:** FW: ▮ - ▮ ---SECRET//ORCON/NOFORN/FISA

Classification: SECRET//ORCON/NOFORN/FISA

Classified By: J27J14T52
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
================================================

▮

Dave, please prepare a response to SAC ▮ email regarding this matter.  Also, speak with Dina about the briefing and add some information to the response concerning the fact the brief for the Director was not going to contain any case specific information (as I understand)

The response should include:

1. Sensitive Information ▮

Solomon Aff. App. A214

2. ████████████ Sensitive Information

3. ████████████ Sensitive Information

4. ██ makes reference to "not being allowed to use one of the only tools available against a target ████████████ Sensitive Information

5. ████████████ Sensitive Information

6. Is there any investigative tool that ███ should/could have right now that they don't?

7. CD SC has conducted multiple SVTC with ██ and ██ to discuss and implement strategy going forward

8. ██ cites translation issues? What is the problem? Is there a problem?

████ advised that she and I have spoken about this case several times???? I have not talked to her one time about this case. I think she is confusing me with Bob Jones. I asked John Giacalone if she had spoken to him about it and he said no.

I don't understand what ███ point is. What investigative action are they not allowed to do against their targets? Why are they advising they are unclear about the strategy going forward?

**From:** ████████████
**Sent:** Tuesday, April 14, 2015 3:31 PM
**To:** COLEMAN, RANDALL C. (CD) (FBI)
**Subject:** FW: ████████ - ████████ ---SECRET//ORCON/NOFORN/FISA

Classification: SECRET//ORCON/NOFORN/FISA

Classified By: F83M36K73
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
==================================================
████████████

**From:** COMEY, JAMES B. (DO) (FBI)
**Sent:** Tuesday, April 14, 2015 1:15 PM
**To:** ████████████
**Cc:** VOGT, STEPHEN E. (BA) (FBI); GIULIANO, MARK F (DO) (FBI)
**Subject:** RE: ████████ - ████████ ---SECRET//ORCON/NOFORN/FISA

Classification: SECRET//ORCON/NOFORN/FISA

Classified By: D94B67S31
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
==================================================
████████████

Thanks ████. Don't know anything about this but will get smarter.

Solomon Aff. App. A215

With respect to the most time-sensitive part: Do you know why this is not included in the briefing for tomorrow? I finished the read-ahead, which includes a variety of stuff about ▮Foreign Government▮ efforts in the U.S., but didn't see a mention of this. Why is that? Is the DI team coming tomorrow aware of the matter?

**From:** ▮▮▮▮▮▮▮
**Sent:** Tuesday, April 14, 2015 3:07 PM
**To:** COMEY, JAMES B. (DO) (FBI)
**Cc:** VOGT, STEPHEN E. (BA) (FBI); GIULIANO, MARK F (DO) (FBI)
**Subject:** ▮▮▮▮ - ▮Foreign Government▮ --- ~~SECRET//ORCON/NOFORN/FISA~~

Classification: ~~SECRET//ORCON/NOFORN/FISA~~

Classified By: F83M36K73
Derived From: FBI NSIC, dated 20120629
Declassify On: 20401231
=====================================================

▮▮▮▮▮▮▮▮

Director Comey -

▮▮▮   I hope I am not overstepping in this matter, but I learned earlier today that you will be receiving a briefing on ▮Foreign Government▮ on Wednesday, 4/15/15, which is what prompted me to contact you. Based upon what we have been able to ascertain, it does not appear that you will be briefed on ▮Field Office▮ pending investigation involving the ▮Foreign Government▮, code named ▮▮▮▮▮, with a companion investigation in ▮Field Office▮. This information came to us through ▮Sensitive Information▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In short, ▮▮▮▮▮▮ has identified attempts by the ▮Foreign Government▮ to influence the U.S. presidential election, U.S. presidential candidates, and U.S. politicians through illegal campaign contributions

▮Sensitive Information▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

▮Sensitive Information▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮Sensitive Information▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Solomon Aff. App. A216

███████████ ██ Division submitted a FISA application requesting coverage ▇▇▇▇▇▇▇▇▇▇▇▇ ███████████████; on 12/15/14, OI sent the Certification Copy of the FISA application to the FBI for final approval. The FISA application has remained in limbo for the last four months, even though subsequent investigative activity by ██ provided additional probable cause for the FISA application. ██ is still uncertain as to why the application has not been sent to DOJ for final approval, although several reasons have been put forth by CD, most recently that the decision to put the application on hold originated "on the seventh floor."

████████ While ██ has pursued the matter through other avenues, ▇▇▇▇▇▇▇▇▇▇▇ ████████████████████████████████████████████████████████████ ████████████████and we have received no feedback from CD on the proposed neutralization strategy.

████████ I discussed this matter with DD Giuliano when this information initially came to our attention, and more recently with AD Coleman, but have not received a clear answer as to why we are not being allowed to use one of the only tools available against a target ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ – in spite of clear legal justification. While superficially connected to political candidates, the investigation targets a NONUSPER involved in illegal activity; it does not target the candidate(s), and there is no evidence the candidate is even aware of the potential targeting.

██ I would like to either see this investigation move forward, or at least get an understanding of why we are not being allowed to move forward. My team has put a lot of time and effort into this matter, and they don't understand why they are not being allowed to vigorously investigate this case. At this point, I don't have any answers for them. I would be happy to discuss further, or provide more information if needed. I appreciate your attention to this matter.

*(U) FBI Minimized FISA: This report includes information from FBI FISA collection. Such information, and any information derived therefrom, may only be used in a US legal or administrative proceeding with the advance authorization of the Attorney General. Any recipient interested in obtaining authorization for such use in a US legal or administrative proceeding should contact FBI Headquarters. Any further dissemination outside of intelligence channels and/or for law enforcement purposes must be made through FBI Headquarters. Any reproduction, dissemination, or communication (including, but not limited to oral briefings) of this information must be accompanied by a statement of these restrictions.*

████

*SAC,* ███████████
████████████
█████████████████

=====================================================
Classification: ~~SECRET//ORCON/NOFORN/FISA~~

=====================================================
Classification: ~~SECRET//ORCON/NOFORN/FISA~~

=====================================================
Classification: ~~SECRET//ORCON/NOFORN/FISA~~

Solomon Aff. App. A217