**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN SOLOMON,

               Plaintiff,

    v.

MERRICK GARLAND, *et al*.,

               Defendants.

No. 23-cv-00759-RJL

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

On January 20, 2021, the Department of Justice (DOJ) received a package of documents

from the White House comprising materials related to the Federal Bureau of Investigation (FBI)

Crossfire Hurricane investigation.[1]  Accompanying the binder on January 20, 2021, was Mr.

Meadows's instruction:  DOJ was to exercise its discretion to apply redactions under the Privacy

Act and then to release the redacted materials to the public.  The instructions included no request

to return the documents, no reservation of legal control, and no requirement of confidentiality.

As to each of these facts, there is no genuine dispute.  They are established conclusively

by the materials submitted alongside Plaintiff's motion for partial summary judgment.  But, far

from demonstrating Plaintiff's entitlement to relief, they establish that summary judgment should

---

[1] It is not clear whether the records that Mr. Meadows returned were delivered to DOJ in a binder or simply as a package of documents.  The term "binder" is used herein for ease of reference.

be entered for the Defendants as to both of Plaintiff's claims—to the extent any claim remains after adjudication of Defendants' pending Motion to Dismiss.

Both the replevin and mandamus claims depend on Plaintiff's contention that the binder Mr. Meadows returned to DOJ on January 20, 2021, is a Presidential record.   But, while copies of records from the binder were sent to the National Archives and Records Administration (NARA)—albeit in undifferentiated form, with what appear to be copies of documents at multiple stages of declassification review—and are maintained there as Presidential records, there can be no genuine dispute that the version of the binder that Mr. Meadows sent to DOJ fulfills all the elements of the well-established test for determining whether a document is an "agency record."  By definition, such materials are excluded from the scope of the definition of "Presidential record" that Congress supplied in the Presidential Records Act.  *See* 44 U.S.C. § 2201(2)(B)(i); *Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1 F.3d 1274, 1292 (D.C. Cir. 1993).  In sum, the binder is an agency record because DOJ "obtained" it "in the legitimate conduct of its official duties," *see U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144 (1989), when Mr. Meadows returned it to DOJ for application of redactions based on its discretion and subsequent release.

The D.C. Circuit uses four factors to assess whether a document meets the second half of the *Tax Analysts* standard:  "1) the intent of the document's creator to retain or relinquish control of the records; 2) the ability of the agency to use and dispose of the record as it sees fit; 3) the extent to which agency personnel have read or relied upon the document; and 4) the degree to which the document was integrated into the agency's record system or files." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013).  As discussed herein, each of those factors readily supports a finding that the collection at issue is an agency record.  First, Mr.

Meadows transmitted the binder to DOJ and evinced no intent to retain control of that record. Indeed, rather than trying to restrict its dissemination, he instructed DOJ to exercise its discretion in redacting the binder's contents, and to release the unredacted portions publicly. Second, in light of that instruction—and the attendant absence of any requirement that DOJ return the records or keep them confidential—the second factor is easily fulfilled here too. Third, agency personnel have indisputably read and relied upon the contents of the binder, since they comprise materials related to an FBI investigation that originated with the agency in the first instance. And, finally, the binder plainly is integrated into DOJ's records system or files since it is being processed in response to a Freedom of Information Act (FOIA) request, with a redacted version posted on the FBI's FOIA reading room.

Plaintiff would turn the *Judicial Watch* test on its head. *See* Mem. of P. & A. in Supp. of Mr. Solomon's Partial Mot. for Summ. J. ("Plaintiff's motion" or "Pl.'s Mot."), ECF No. 16-1. Although the test was devised to determine whether materials were treated as agency records, Plaintiff asks the Court to deploy the test in reverse—to assess whether records that have been treated as agency records *should* have been treated differently, and removed from agency control. Even if the Court were to apply the test for this novel purpose, it would not support Plaintiff's cause for all the reasons discussed herein; in sum, the precedent equates "control" under this test with *protection* from disclosure; an instruction that DOJ use its discretion to apply redactions and then make the redacted materials public is evidence not of control, but of the relinquishment of control.

Plaintiff also argues that—if the Presidential Records Act and FOIA permit the treatment of the binder as an agency record, and if the binder can consequently be released with redactions in addition to those that, according to Plaintiff, the former President intended—then both statutes

are unconstitutional.  But there is no basis in the Constitution—or any other law—on which to enforce the former President's instructions or alleged subjective intentions concerning the binder, as Plaintiff evidently seeks to do here.  Nor are there compelling equitable grounds supporting the issuance of the writ in this case.

For all the reasons explained herein, the undisputed facts establish that the subject records are agency records and Plaintiff has failed to establish a right—much less a clear and indisputable right—to an order from this Court requiring their transfer from DOJ to NARA.  This is especially so given the exacting standard applicable to a request for mandamus relief. Defendants therefore respectfully ask that this Court deny Plaintiff's motion for partial summary judgement on Plaintiff's request for mandamus, and enter summary judgment for Defendants on both Plaintiff's mandamus and replevin claims.[2]

## FACTUAL BACKGROUND

On January 19, 2021, then-President Trump issued a Memorandum concerning a binder of materials related to the FBI's Crossfire Hurricane investigation.  These were federal records that DOJ had provided to the White House at the President's request.  Mem., Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation, 86 FR 6843 (Jan. 19, 2021), Pl.'s Mot., Ex. 3, ECF No. 16-5.  Therein, President Trump noted that he had "requested the documents so that a declassification review could be performed," *id.*, and that—with the exception of the portions that the FBI in consultation with the Intelligence Community had determined "most crucial" to protect—he was ordering declassification of the materials in the

---

[2] Defendants continue to maintain that the Court lacks jurisdiction over Plaintiff's mandamus claim for the reasons explained in their motion to dismiss, *see* Defs.' Mot. to Dismiss, ECF No. 10-1 at 13–17; Defs.' Reply in Supp. of their Mot. to Dismiss, ECF No. 14 at 7–15, and submit the instant motion for summary judgment as an alternative basis on which judgment should be entered for Defendants.

binder.  *Id.*  He clarified, however, that the decision to disclose materials in the binder "[did] not

extend to materials that must be protected from disclosure pursuant to orders of the Foreign

Intelligence Surveillance Court and [did] not require the disclosure of certain personally

identifiable information or any other materials that must be protected from disclosure under

applicable law."  *Id.*

The next day, Mr. Meadows returned the "bulk of the binder" to DOJ with instructions

that DOJ conduct a Privacy Act review and then release the remaining material with redactions

applied.  *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1.  Since then, NARA

received and maintains as Presidential records "roughly 2700 undifferentiated pages" that appear

to be multiple copies of the documents from the binder at various stages of declassification

review.  *See* Email from Gary Stern to John Solomon (June 23, 2022), Pl.'s Mot., Ex. 2, ECF No.

16-4, at 13–14.  The records that then-Chief of Staff Meadows transferred back to DOJ—

consistent with "routine practice for agency records that are undergoing declassification or

similar review by other agencies or the White House," Email from Gary Stern to Kash Patel

(Aug. 17, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 1—have properly remained with DOJ as

agency records subject to the Federal Records Act.  Indeed, at the time of the correspondence

that Plaintiff submits alongside his motion for partial summary judgment, these records were

already "the subject of a FOIA lawsuit with DOJ," *id.*, and most of the materials have now been

released in redacted form on the FBI's FOIA reading room:  https://vault.fbi.gov/crossfire-

hurricane-part-01.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit," and a dispute is genuine if "the evidence is such that a reasonable [trier of fact] could" rule in favor of the nonmoving party on that issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  After the moving party has made such a showing, the nonmoving party may avoid summary judgment only by adducing evidence demonstrating "specific facts showing that there is a genuine issue for trial."  *See id.*

On a motion for summary judgment, "[t]he evidence presented must be admissible at trial or at least 'capable of being converted into admissible evidence.'"  *Allen v. Brown*, 435 F. Supp. 3d 16, 22 (D.D.C. 2020) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) and citing Fed. R. Civ. P. 56(c)).  To the extent the parties rely on affidavits or declarations, those documents also "must be made on personal knowledge."  *Allen*, 435 F. Supp. 3d at 22 (Fed. R. Civ. P. 56(c)(4)).

## ARGUMENT

### I.  The Binder that Mr. Meadows Returned to DOJ Meets All the Elements of the Definition of an Agency Record, and therefore Cannot be a Presidential Record.

"The Presidential Records Act exclu[des] . . . records subject to the FOIA from the class of materials that may be treated as presidential records." *Armstrong II*, 1 F.3d at 1292; 44 U.S.C. § 2201(2)(B)(i) (providing "Presidential records" "does not include any documentary materials that are . . . official records of an agency").  Thus, any materials that fulfill the test for "agency records," by definition, cannot be Presidential records.  There can be no genuine dispute that the binder that Mr. Meadows returned to DOJ fulfills each element of that test.

A document is an "agency record" if it fulfills two requirements:  "First, an agency must either create or obtain the [record]."  *Tax Analysts*, 492 U.S. at 144.  "Second, the agency must be in control of the requested materials at the time [a Freedom of Information Act request for the document] is made."  *Id.* at 145.  The Supreme Court clarified:  "[b]y control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties."  *Id.*  The latter element is intended to exclude such items as "personal materials in an employee's possession, even though the materials may be physically located at the agency."  *Id.*  The baseline presumption is that a document possessed by an agency *is* an agency record.  *See id.* at 142 n.3 ("[t]he burden is on the agency to demonstrate . . . that the materials [at issue] are not 'agency records.'").

## A. DOJ obtained the binder when the then-Chief of Staff transmitted it on January 20, 2021.

The first factor of the *Tax Analysts* test is that "an agency must either create or obtain the [record]."  *Tax Analysts*, 492 U.S. at 144.  Here, DOJ obtained the existing version of the binder when Mr. Meadows transmitted it alongside his January 20, 2021, Memorandum.  *See* Pl.'s Mot., Ex. 4, ECF No. 16-6; *id.*, Ex. 2, ECF No. 16-4 at 1.  Thus, the first element of the applicable test plainly is fulfilled in this case.  Moreover, contrary to Plaintiff's treatment of the "binder," the record received from the White House on January 20, 2021 was not the same as the "binder" that existed at the White House—the undisputed evidence shows that the then-President's Chief of Staff altered that collection and transferred a different, diminished set of materials to DOJ.  Mr. Meadows's January 20, 2021, Memorandum clearly states that he was, on that date, transferring only "the bulk of the binder," and "includ[e]d all [portions] that appear to have a potential to raise privacy concerns."  Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1.  Thus, because of the actions of the then-President's Chief of Staff, what the Plaintiff terms "the

President's Crossfire Hurricane binder" no longer exists as such.  Instead, the "record" at issue comprises the altered binder that Mr. Meadows transferred to DOJ, and Plaintiff effectively concedes that this binder was received in the ordinary course of business by DOJ.

### B.  The binder has come into DOJ's possession in the legitimate conduct of its official duties.

As to the second component of the *Tax Analysts* test, four factors can inform the determination of whether an agency is "in control of the materials" such that they are subject to FOIA.  *Tax Analysts*, 492 U.S. at 144; *Judicial Watch, Inc.*, 726 F.3d at 218 n.11 (explaining that the D.C. Circuit has regarded the four-factor test "as a gloss" on the Supreme Court's statement that "'control' means 'that the materials have come into the agency's posssssion in the legitimate conduct of its official duties'") (quoting *Tax Analysts*, 492 U.S. at 145).  Those four factors are: "1) the intent of the document's creator to retain or relinquish control of the records; 2) the ability of the agency to use and dispose of the record as it sees fit; 3) the extent to which agency personnel have read or relied upon the document; and 4) the degree to which the document was integrated into the agency's record system or files."  *Judicial Watch, Inc.*, 726 F.3d at 218.

In a setting in which an agency creates or obtains records in the course of its official duties, the first two factors may be determinative.  *See United We Stand Am. v. IRS*, 359 F.3d 595, 600–603 (D.C. Cir. 2004).  *United We Stand* is instructive on this point.  That case concerned a plaintiff's request for a document created by the IRS in response to a request from a Congressional committee.  *See id.* at 597.  Having applied the first two factors, the Court determined that the agency's response to the Congressional committee's request was not an "agency record" to the extent—but only to the extent—that the response would disclose the content of the committee's request, which the committee intended to remain confidential.  *See id.* at 600–02.  The IRS argued that the remaining factors counseled against finding the entirety of

the response to be an agency record, but the Court held that the first two factors were dispositive—although the agency "created the document only to respond to Congress, used it for no other purpose, and [kept] it in a separate file," *id.* at 602, such considerations could not remove the entirety of the document from the definition of agency records "for doing so would conflict with the Supreme Court's *Tax Analysts* definition of agency control: 'by control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties.'" *Id.* at 603 (quoting *Tax Analysts*, 492 U.S. at 145). The D.C. Circuit concluded that, where the agency "created and retains the response [to the Congressional request] in the course of its official obligation to communicate with the [Congressional committee]," "absent clear . . . expression of congressional intent to control the entire response" the IRS's handling of the document could not "turn the entire agency-created record into a congressional document." *Id.* (quotation omitted).

The same reasoning applies here. DOJ initially provided the binder to the White House for declassification review, *see supra* at 4, and the White House then returned the binder with no accompanying expression of an intent to control it. On January 20, 2021, DOJ obtained a binder from Mr. Meadows in the course of its "official obligation to communicate with" the White House. Indeed, Mr. Meadows indisputably charged DOJ with additional "official duties" in connection with the binder, *i.e.*, the application of the Department's discretion to redact the binder's contents for Privacy Act concerns. Pl.'s Mot., Ex. 4, ECF No. 16-6, at 1. And, as discussed below, in connection with the first and second factors, Mr. Meadows expressed his intent to relinquish control of the binder when he transferred it, permitting DOJ to use and dispose of the record after using its discretion to apply redactions. *See supra* at 5. Under such circumstances, just as in *United We Stand*, removal of this record from the definition of "agency

records" "would conflict with the Supreme Court's *Tax Analysts* definition of agency control." *United We Stand*, 359 F.3d at 602.

1. **Mr. Meadows created the current version of the binder, and evinced his intent to relinquish control of it when he transferred it to DOJ for application of DOJ's discretion and subsequent release.**

The first element of the D.C. Circuit test examines "the intent of the document's creator to retain or relinquish control of the records." *Judicial Watch, Inc.*, 726 F.3d at 218. The focus is on "stated intent" expressed in writings concerning the subject records, and the conduct of the agency. *Judicial Watch, Inc. v. U.S. Secret Serv.*, 803 F. Supp. 2d 51, 58 (D.D.C. 2011), *aff'd in part, rev'd in part on other grounds*, 726 F.3d 208 (D.C. Cir. 2013). Plaintiff relies extensively on *Judicial Watch*, which involved White House visitor records that were in the physical possession of the Secret Service (which is an agency subject to FOIA), where the D.C. Circuit held the subject records were not under agency control. *See* Pl.'s Mot. at 1, 12, 13, 14, 15 (citing *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013)). In so ruling, the Court focused on a memorandum of understanding (MOU) in which "the White House at all times assert[ed], and the Secret Service disclaim[ed], all legal control over any and all [those records]." 726 F.3d at 218. That MOU clearly stated that the records remained "at all times Presidential records . . . under the exclusive legal custody and control of the White House." *Id.* at 231.[3] In addition, as the D.C. Circuit remarked in *Judicial Watch*, the White House visitor records at issue in that case reflected White House information, *i.e.*, appointments within the White House complex. The Court reasoned: "At bottom, we do not believe Congress intended that FOIA requesters be able to obtain from the gatekeepers of the White House what they are unable to

---

[3] *See also Judicial Watch, Inc.*, 726 F.3d at 231 (noting this provision as evidence of "the way in which both parties historically regarded and treated the documents.").

obtain from its occupants." *Id.* at 233.  In this case, by contrast, the information at issue is the

agency's information, obtainable under FOIA directly from the agency.  It was provided to the

White House for the sole purpose of conducting a declassification review, and a subset was

returned to DOJ for DOJ to apply redactions in its sole discretion.

Nor does *ACLU v. CIA* support Plaintiff's position.  That case addressed a copy of a

Senate Committee report concerning a CIA program that the Committee had transmitted to the

CIA.  *See ACLU v. CIA*., 823 F.3d 655, 658–59 (D.C. Cir. 2016).  In that case, as in *Judicial

Watch*, Congress's statement of intent to exert continued control over the report at issue was

clear:

> These documents remain congressional records in their entirety and disposition and
> control over these records, even after the completion of the Committee's review,
> lies exclusively with the Committee. As such, these records are not CIA records
> under the Freedom of Information Act or any other law.... If the CIA receives any
> request or demand for access to these records from outside the CIA under the
> Freedom of Information Act or any other authority, the CIA will immediately notify
> the Committee and will respond to the request or demand based upon the
> understanding that these are congressional, not CIA, records.

*Id.* at 665 (quoting as "critical evidence" a letter from Senate Committee Chairman and Vice

Chairman to the Director of the CIA concerning Senate Committee Report transmitted to the

CIA).

There is nothing approaching such language in Mr. Meadows's January 20, 2021,

Memorandum.  His transmission of the modified binder stands in sharp contrast to the MOU in

*Judicial Watch* and the letter asserting continued Congressional control in *ACLU v. CIA*.  He did

not provide that the binder he was transmitting would remain a Presidential record; that it would

be subject to White House control; or that it should be returned to either the White House or

NARA.  Rather, Mr. Meadows gave DOJ the discretion to apply its own redactions prior to

making a public release.  This scenario presents the opposite of control; it evidences a

relinquishment of control and an intent to pass control to DOJ.[4]

Plaintiff argues that Mr. Meadows's transmission of the binder was "without the

President's knowledge or consent," and that the President's intent was to retain the complete

binder as a Presidential Record.  Pl.'s Mot. at 16; Pl.'s Stmt. of Undisputed Material Facts, ¶ 17.

Defendants are unaware of any case that examined an official's later-expressed subjective intent

in assessing a document's status as an agency record.  To the contrary, for expressions of an

intent to control, the D.C. Circuit looks to "*specific* instructions . . . to agencies limiting either

the use or disclosure of the documents" at issue. *United We Stand Am., Inc.*, 359 F.3d at 602

(quoting *Paisley v. CIA*, 712 F.2d 686, 694 (D.C. Cir. 1983)) (emphasis in original); *see id.*

("post-hoc objections to disclosure cannot manifest the clear assertion of  . . . control that our

case law requires"); *see also ACLU*, 823 F.3d at 664 (giving no weight to a letter from a Senate

Committee Chairman prepared after the commencement of FOIA action, because it constituted a

post-hoc objection to disclosure) (quotation omitted).

But even if such an inquiry into later-expressed subjective intent were consistent with

Circuit precedent, Plaintiff's allegation regarding the former President's subjective intent should

be given no weight by this Court.  Those allegations rest wholly on hearsay, *see* Pl.'s Mot., Ex.

5, ECF No. 16-7, ¶ 17, and are unsupported by any admissible evidence.  *See Allen*, 435 F. Supp.

3d at 22 (evidence presented at summary judgment "must be admissible at trial or at least

'capable of being converted into admissible evidence'") (quoting *Gleklen*, 199 F.3d at 1369).

---

[4] Mr. Meadows's January 20, 2021, Memorandum makes plain that he returned only "the bulk of the binder" to DOJ, "including all [portions] that appear to have a potential to raise privacy concerns."  *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1.  This retention of control over some portions of the binder supplies further evidence that Mr. Meadows relinquished control over the portion of the binder that he returned.

Plaintiff presents no admissible evidence that the President did not support Mr. Meadows's actions or that Mr. Meadows was acting in rogue fashion, without the President's imprimatur. Mr. Meadows was the former President's Chief of Staff and is presumed to have acted on his behalf in transmitting the subject record to DOJ.

To the extent Plaintiff's underlying complaint is that Mr. Meadows should not have altered the binder or transferred it to the Department; that he should have done so with an instruction that the binder be returned to the White House or NARA; or that he should have retained an exact copy of what was transferred, D.C. Circuit precedent provides that the Court lacks jurisdiction to review such day-to-day White House records management decisions under the Presidential Records Act. *See Citizens for Resp. & Ethics in Washington v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019); *see also* Defs' Mot. to Dismiss, ECF No. 14, at 14–16 (discussing case law). Plaintiff's motion is silent as to the Court's jurisdiction, stating only: "[t]his court has found, and the government has acknowledged, that a plaintiff may seek mandamus for Presidential Records Act violations." Pl.'s Mot. at 1 (citing *Citizens for Resp. & Ethics in Washington* (*CREW*) *v. Cheney*, 593 F. Supp. 2d 194, 217 (D.D.C. 2009) (quoting the government's brief)). But the Court's holding in *CREW* was not so broad. Rather, the Court held that a request for mandamus properly could be predicated on an alleged Presidential Records Act violation as to which the Court possessed jurisdiction.[5] *See id.* The Court separately discussed that, while jurisdiction exists for review of certain claims, there is no

---

[5] Likewise, the government did not concede the Court's jurisdiction over such claims. Rather, the government acknowledged only that "the absence of a private right of action under the [Presidential Records Act] alone does not necessarily foreclose mandamus relief." *CREW*, 593 F. Supp. 2d at 217 (quoting the government's brief in that action) (emphasis added).

jurisdiction to review "'creation, management, and disposal' decisions," *id.* (quoting *Armstrong II*, 1 F.3d at 1278), such as the decision of Mr. Meadows here.

In sum, Mr. Meadows's actions in transmitting the binder to DOJ and relinquishing control—especially when contrasted with his decision to retain control of some portions of the original binder, and transfer only "the bulk" of its content to DOJ—all weigh heavily in favor of finding that the version of the binder Mr. Meadows chose to transmit to DOJ is an agency record.

### 2. Mr. Meadows's transmission imbued DOJ with the discretion to use and dispose of the record as DOJ saw fit.

The second element of the D.C. Circuit test—whether the Department "has discretion to use and dispose of the record as it sees fit"—also weighs heavily in favor of finding that the binder is an agency record. Plaintiff conflates this element with the question of whether any instructions were provided to the agency regarding a document's subsequent use, arguing that the instructions to exercise discretion in applying redactions under the Privacy Act and then to publicly release the binder amount to restrictions of the Department's discretion under this factor. *See* Pl.'s Mot. at 12 ("The Attorney General *never* could use and dispose of the binder as he saw fit.") (emphasis by Plaintiff). Plaintiff is incorrect.

The test for whether a document is an agency record is used to determine whether a document is subject to the disclosure requirements of FOIA. *See, e.g., Judicial Watch*, 726 F.3d at 211; *see also United We Stand Am., Inc. v. I.R.S.*, 359 F.3d 595, 597 (D.C. Cir. 2004) (explaining that, in determining whether an IRS response to a Congressional committee request was an agency record subject to FOIA, the Court was "balancing Congress's authority to maintain the confidentiality of its own materials against the broad mandate of disclosure lying at the heart of FOIA"). The inquiry into whether an agency "has discretion to use and dispose of" materials in this context is thus tantamount to an inquiry into whether an agency may *disclose* the

14

subject record, or whether there are restrictions preventing it from doing so such as a requirement

that the record be kept confidential or returned by the agency to an entity not subject to FOIA.

In *Judicial Watch*, for example, the D.C. Circuit cited a requirement that the agency

"transfer the records to the White House within 60 days of [their creation] and then purge [the

records] from its system," as a restriction on the agency's discretion to use and dispose of the

subject records. *Judicial Watch*, 726 F.3d at 219.  Likewise, in *United We Stand America, Inc. v.

IRS*, the D.C. Circuit found that the agency "retain[ed] the 'ability to use and dispose of'" the

records at issue in that case, except to the extent that they would reveal a Congressional

Committee's request, which was accompanied by a "confidentiality directive" from the

Committee.  *United We Stand Am., Inc.*, 359 F.3d at 601, 602 (quoting the Committee's

instruction in the request that "[t]his document may not be disclosed without prior approval of

the Joint Committee.").

Here, Plaintiff's contention that the Department did not have "discretion to use and

dispose of the record as it sees fit" based on a White House instruction to DOJ to use its

discretion to apply Privacy Act redactions and then make the document *public* gets this factor

backwards.[6]  In *United We Stand*, the D.C. Circuit cautioned against an approach to this analysis

that would result in removing materials from the purview of FOIA, *i.e.*, treating them as non-

---

[6] The Privacy Act, *inter alia*, prohibits disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  5 U.S.C. § 552a(b).  Mr. Meadows's January 20, 2021, Memorandum instructed DOJ to redact the binder "under the standards that the Department of Justice normally would apply," consistent with the White House's intention that materials are not released which would constitute "an unwarranted invasion of personal privacy."  *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1.  Thus, far from a "ministerial application of very carefully specified redactions" as Plaintiff contends, Pl.'s Mot. at 20, execution of Mr. Meadows's instruction clearly entailed exercise of DOJ officials' judgment and discretion.

agency records, "even if Congress [or, as applied here, the White House] expressed no intent to keep them secret." *United We Stand Am., Inc.*, 359 F.3d at 603.  The D.C. Circuit cautioned that this approach would "undermin[e] the spirit of broad disclosure that animates [FOIA]." *Id.*

Mr. Meadows's January 20, 2021, Memorandum expressed no intent to keep secret the records at issue here.  There was no limitation on the agency's discretion to *disclose* the materials; to the contrary, he instructed that disclosure should occur once redactions were applied.  This instruction, and the accompanying lack of limitation on disclosure, weigh heavily in favor of finding that the subject record is an agency record under the *Tax Analysts* test.

### 3. DOJ's treatment of the binder likewise supports a finding that it is an agency record.

As explained above, where an agency created or obtained a record in the course of its official duties, and there is no "clear" expression of an intent to control that record by the entity not subject to FOIA, *United We Stand*, 359 F.3d at 603, the first two factors are determinative. *See supra* at 8–9.  However, if the Court reaches consideration of the third and fourth factors, the Court should conclude that they also favor a determination that the binder is an agency record.

With respect to the third factor, the extent to which agency personnel have read or relied upon the document, *see Judicial Watch*, 726 F.3d at 218:  the binder comprises materials related to an FBI investigation.  Indeed, the very name of the former President's January 19, 2021, Memorandum reflects as much; the Memorandum is entitled "Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation."  *See* 86 FR 6843 (Jan. 19, 2021).  Agency personnel, by definition, would have created, and read and relied upon such materials.

And, as to the fourth factor—"the degree to which the document was integrated into the agency's record system or files," *Judicial Watch*, 726 F.3d at 218—this, too, favors treating the

16

binder as an agency record.  Indeed, the very processing of the binder via FOIA is evidence that these materials are part of the Department's official files, and bear no resemblance to materials analogous to "personal documents located within an agency," which this factor is intended to exclude.  *See United We Stand*, 359 F.3d at 603; *see also id.* (noting that "cases that employed the four factor analysis to determine agency control did not involve documents that were created and possessed by the agency "in the legitimate conduct of its official duties").

* * * * *

In sum, application of the well-established test used to determine whether material is an agency record to the undisputed facts of this case demonstrates that the binder at issue here satisfies that test.  Since it meets the requirements for an agency record, the binder, by definition, cannot be a Presidential record.  *See* 44 U.S.C. § 2201(2)(B)(i); *see also Armstrong II*, 1 F.3d at 1292 (recognizing that the Presidential Records Act "exclu[des] . . . records subject to the FOIA from the class of materials that may be treated as presidential records").  For this reason, because both Plaintiff's claim for replevin and his request for mandamus depend entirely on his contention that the binder is a Presidential record, *see* Compl. ¶¶ 34, 37–39, Defendants are entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The Court should therefore grant the Defendants' motion for summary judgment and deny the Plaintiff's partial motion for summary judgment.

## II.   Plaintiff's Concerns about Changes in the Status of the Record are Misplaced.

Plaintiff complains that Defendants "fail to explain precisely when the binder became an agency record," and criticizes a change in status from Presidential record to agency record as "alchemy unsupported by controlling statutory text or Circuit precedent."  Pl.'s Mot. at 17.  But Plaintiff is mistaken.  There is nothing anomalous about records changing status, depending on

their location—a phenomenon that is reflected in Circuit precedent.  Indeed, it is commonplace that records that were, for example, congressional records while in Congress become agency records when received by an agency.  Similarly, emails that are Presidential records while in the White House become agency records when shared with an agency, and are processed as federal records when responsive to a FOIA request.

For example, in *United We Stand*, the D.C. Circuit discussed an "exchange of documents" between an agency covered by FOIA and Congress, and concluded that the agency's receipt and control of the documents rendered them agency records.  *United We Stand*, 359 F.3d at 599.  The Court observed:  "In *Holy Spirit*, the FOIA requestor sought disclosure of documents that had been created by the CIA, sent to Congress, and then returned to CIA with no indication that the agency should keep them confidential.  Finding the documents to be agency records, we explained that 'even if these [requested] CIA-created records were once congressional documents because [they were] generated in response to Congressional inquiries and transferred to Congress, they subsequently lost their exemption as congressional records when Congress failed to retain control over them.'"  *United We Stand*, 359 F.3d at 599–600 (quoting *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, 636 F.2d 838, 843 (D.C. Cir. 1980), *vacated in part on other grounds*, 455 U.S. 997 (1982)).  In other words, in *Holy Spirit*, a document began as an agency record, was transferred to an entity not covered by FOIA, and then regained its status as an agency record when it was transferred back to the agency without any indication that the agency should keep it confidential.  Likewise, in this case, when Mr. Meadows sent the bulk of the binder to DOJ without a clear expression of continued White House control, DOJ "obtained" the binder "in the legitimate conduct of its official duties,"

18

*Tax Analysts*, 492 U.S. at 144, rendering it an agency record subject to FOIA under black letter law as discussed above.

### III. The Binder's Status as an Agency Record, and Resultant Processing under FOIA, Raises No Constitutional Issues.

Plaintiff argues that he is entitled to summary judgment on his mandamus claim because, in Plaintiff's view, the treatment of the binder as an agency record "creates constitutional issues." Pl.'s Mot. at 17.  Plaintiff is mistaken.

Plaintiff complains that the processing of the subject binder under FOIA raises constitutional issues with respect to the Presidential Records Act and the FOIA based on Presidents' "historical[] exercise [of] complete dominion and control over their papers."  Pl.'s Mot. at 18.  As a threshold matter, Plaintiff relies on a historical description that predates the Presidential Records Act, "which prospectively abolished private ownership of presidential papers."  *Nixon v. United States*, 978 F.2d 1269, 1296–97 (D.C. Cir. 1992) (citing 44 U.S.C. § 2201 *et seq.* (1988)).  To the contrary, under the Presidential Records Act of 1978, Congress reserved to the United States "complete ownership, possession, and control of Presidential records."  44 U.S.C. § 2202.[7]

Additionally, the contours of Plaintiff's concern are unclear.  Plaintiff asserts that "[n]either the Presidential Records Act nor the Freedom of Information Act could lawfully authorize the Defendants to alter or destroy the Crossfire Hurricane binder," Pl's Mot. at 18, but there is no question of alteration or destruction in this case.  The only instance in which the

---

[7] To the extent Plaintiff's objection is to the United States' ownership and control of Presidential papers, the Supreme Court considered and rejected a separation of powers challenge to the Presidential Records Act's predecessor statute in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), and Congress later relied on the Supreme Court's reasoning in that case when enacting the Presidential Records Act. *See* H.R. Rep. No. 95-1487.

binder is alleged to have been "altered" was when Mr. Meadows himself determined to return only "the bulk of the binder" rather than all of it, to DOJ.

Plaintiff also urges that as "a matter of Constitutional first principles" neither the "Presidential Records Act nor the Freedom of Information Act could lawfully authorize the Defendants . . . to keep the binder from Mr. Solomon," citing a case that addressed the separation of powers. *See* Pl's Mot. at 18 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)). Since Mr. Solomon represents the former head of the Executive Branch as his representative under the Presidential Records Act, and the document as to which he seeks mandamus relief is a federal record within an Executive Branch agency, it is difficult to see how separation of powers concerns could arise.

In sum, Plaintiff identifies no constitutional considerations that might justify the Court's intervention in this case.

**IV. The Binder's Status as an Agency Record, and Concomitant Processing under FOIA, Implies No "Absolute Veto" over a Former President's Access to his Records.**

Plaintiff also urges that the Court should grant mandamus relief in this case because declining to intervene "would give the party in power a perverse *de facto* power to ignore the law and an absolute veto over any former President's access to his records." Pl.'s Mot. at 17. But that is not so.

It is undisputed that the former President's own Chief of Staff returned a version of the binder to DOJ, with an affirmative instruction to DOJ to exercise control by applying redactions in its sole discretion. *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1. Not only did the former Chief of Staff not express an intent to retain confidentiality, but he instructed DOJ to apply its own redactions and then make the binder public, with no accompanying instruction that it remain a Presidential record or that it be sent to NARA. *See id.* Had White House staff

made an exact copy of the binder before removing pieces and returning it to DOJ, and had they

left it for NARA to take at the conclusion of the Administration, the former President's

representative, appropriately cleared, would have been able to access the binder at NARA.  Just

as the decision to return the binder to the Department—or not—rested with the former President

and his staff, any future President and that President's staff will have the authority to determine

how to manage the records of his or her Administration in accordance with the PRA.  Declining

to intervene in this case will not vest a subsequent Administration with any more or less control

over its own records.

### V.  Equitable Considerations Do Not Warrant Mandamus Relief.

Even if the threshold requirements for mandamus relief were satisfied, and they are not,

"the plaintiff must additionally show 'compelling equitable grounds' before [the Court] will

grant mandamus relief.  *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (quoting *In re*

*Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)).  Plaintiff proposes four.

First, Plaintiff asserts "the government has *never* denied a former President access to his

unclassified records."  Pl.'s Mot. at 19 (emphasis the Plaintiff's).  This argument assumes its

own conclusion, *i.e.*, that the subject records are properly regarded as Presidential records rather

than agency records.  For all the reasons discussed above, they are not.  Moreover, there are

copies of documents from the binder which were retained at the White House and transferred to

NARA as Presidential records, and Plaintiff has not been categorically denied access to those

materials.  Rather, he lacks the requisite security clearance to review those records.  *See* Email

from Gary Stern to John Solomon (June 23, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 13–14.

As NARA's General Counsel explained to Plaintiff:  the box in which those records were

retained contains "roughly 2700 undifferentiated pages of documents with varying types of

classification and declassification markings." *Id.*   Because NARA "could not be certain of the
classification status of any of the information in the box," NARA is "obligated under Executive
Order 13526 to treat the contents of the box as classified at the TS/SCI level." *Id.* at 14.[8]

Second, Plaintiff complains that the binder has not yet been made public notwithstanding
the former President's declassification. *See* Pl.'s Mot. at 19–20.  Plaintiff asserts that release of
the binder is "required by law." *Id.* at 20.  But the binder is being processed and released
consistent with FOIA, which is the applicable law in this setting; once the binder was received
by DOJ, it became an agency record and DOJ was required to process it under FOIA upon
receipt of a FOIA request seeking its disclosure. *See* 5 U.S.C. § 552.  By insisting that the binder
should have been released without protecting information exempt from disclosure under FOIA,
Plaintiff is asking the Court to disregard FOIA, a federal statute, and to enforce the former
President's January 19, 2021, Memorandum.  *See* Mem., Declassification of Certain Materials
Related to the FBI's Crossfire Hurricane Investigation, 86 FR 6843 (Jan. 19, 2021).  But, by its

---

[8] Plaintiff proffers, without citation to any underlying evidence in support, his position
that the binder "contained about 2,700 pages" prior to its transfer to DOJ.  *See* Pl.'s Stmt. of
Undisputed Material Facts, ECF No. 16-2, ¶ 15 (citing Pl.'s Mot., Ex. 5, ¶ 9); *compare* Pl.'s
Mot., Ex. 5, ¶ 9 (referring to Plaintiff's estimation of the thickness of the binder, but offering no
estimate of page count).  Taken with the inadmissible hearsay that Plaintiff offers—conveying
purported remarks by Mr. Meadows that the redactions in those materials were finalized on
January 19, 2021, Pl.'s Stmt. of Undisputed Material Facts, ECF No. 16-2, ¶ 25, and that Mr.
Meadows had "placed a copy of the documents in the binder sent to the [DOJ] in a box for
transfer to the Archives as Presidential records," *id.* ¶ 45—Plaintiff appears to be implying that
the box that NARA has includes full set of finalized, redacted records, duplicating the complete
binder.  But Plaintiff is clearly mistaken.  The version of the binder that Mr. Meadows
transferred, and which is being processed by the FBI, is less than 900 pages in length.  *See* Email
from Gary Stern to John Solomon (July 12, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 11.  And
the box of 2700 pages that NARA received includes "instances of the same document being
redacted differently," and some documents without "the required declassification marking."
Email from Gary Stern to Kash Patel (July 14, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 9.  The
Court should therefore reject Plaintiff's baseless and erroneous suggestion that the box of 2700
pages that NARA has is simply a finalized, redacted set duplicating the complete binder.

own terms, the memorandum forecloses such an argument.  In section 2(c), it provides:  "This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."  *Id.* at 6843–44.

Third, Plaintiff reprises his contention that NARA has provided a "series of pretextual justifications" for why he could not access the subject records, implying that the answers he has received were internally inconsistent, and have changed over time.  Pl.'s Mot. at 20.  In response to similar contentions in Plaintiff's prior filing, Defendants explained that Plaintiff is demonstrably wrong, and provided a detailed description of the correspondence to which Plaintiff referred.  *See* ECF No. 14 at 13–15.  Evidently lacking an answer to that detailed discussion, Plaintiff simply ignores it.  *See* Pl.'s Mot. at 20.

Finally, Plaintiff concludes with allegations characterizing the Crossfire Hurricane investigation and his view of what he terms the Defendants' "deeply vested political interest." *See id.* at 20–22.  It is difficult to understand how publishing records on a public website in accordance with FOIA demonstrates a "deeply vested political interest."

Moreover, in any event, Plaintiff's contentions concerning what he characterizes as equitable grounds supporting his request for mandamus relief are inapposite; as discussed below, the requirements that there be a "clear and indisputable right to relief" and a "clear duty to act" are jurisdictional.  *See Illinois*, 60 F.4th at 714.  Where, as here, Plaintiff cannot meet his burden to establish those threshold elements, *see infra* Section VI, there is no jurisdiction to reach the additional question of whether there are equitable grounds that could support the issuance of the writ.

**VI. In Light of the Undisputed Evidence, Plaintiff Cannot Meet the High Threshold Required for Mandamus Relief.**

Denial of Plaintiff's motion for partial summary judgment, and entry of judgment for Defendants on Plaintiff's second claim, are warranted because of the extraordinary showing required for a successful mandamus claim. "Few legal standards are more exacting than the requirements for invoking mandamus jurisdiction under § 1361." *Illinois*, 60 F.4th at 710. A plaintiff seeking a writ of mandamus must demonstrate 1) a clear and indisputable right to the particular relief sought against the federal official, 2) that the federal official is violating a clear duty to act, and 3) that the plaintiff has no adequate alternate remedy." *Id.* at 713–14 (citing *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)). The Court "can" and "often do[es]" "analyze the clear right to relief and clear duty to act requirements for mandamus concurrently." *Id.* at 715. The D.C. Circuit has described both the "clear and indisputable right to relief" and "clear duty to act" standards as "stringent," noting "we will deny mandamus even if a petitioner's argument, though 'pack[ing] substantial force,' is not clearly mandated by statutory authority or case law." *Id.* at 714–15 (quoting *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (internal quotations omitted)).

The D.C. Circuit's high standard is insurmountable in this case. Plaintiff asks this Court to recharacterize an agency record as a Presidential record, and to order its transfer from a federal agency to NARA. Any right to relief or duty by Defendants to act—in this case, for NARA to provide Plaintiff access to the record under the PRA, *see* Compl., ECF No. 1, ¶¶ 38, 39—depends wholly on Plaintiff's assertion that the record at issue is properly regarded as a Presidential record under the Presidential Records Act. Yet the legal theory that Plaintiff advances in support of that argument—inverted application of a test the D.C. Circuit developed to ascertain whether a record is properly subject to FOIA's requirements—has, to Defendants'

knowledge, never been applied by any court in the manner that Plaintiff proposes.  *See supra*.

That, alone, forecloses mandamus relief.  *See Illinois*, 60 F.4th at 710 (quoting *Rep. of Venezuela v. Philip Morris, Inc.,* 287 F.3d 192, 199 (D.C. Cir. 2002), as holding that petitioners did "not come close" to showing clear and indisputable right because they "identif[ied] no precedent of this court or of the Supreme Court" on point).

Moreover, as discussed above, because DOJ obtained the record at issue "in the legitimate conduct of its official duties," *Tax Analysts*, 492 U.S. at 144, that record plainly satisfies all the elements of the definition of an agency record, excluding it from the statutory definition of "Presidential record" under the Presidential Records Act, *see* 44 U.S.C. § 2201(2)(B).  *See supra* at 6–16.  For this reason, too, Plaintiff cannot demonstrate *any* right to relief or duty to act in this case, much less the "clear" and "indisputable" showing necessary to establish mandamus jurisdiction.

The D.C. Circuit has cautioned that "[t]he grounds on which a district court may grant mandamus relief are narrow, and the demands are austere."  *Illinois*, 60 F.4th at 710.  For all the reasons explained herein, Plaintiff misses the mark, and by a country mile.

## CONCLUSION

For all the reasons explained herein, the Court should grant Defendants' cross-motion for summary judgment and deny the Plaintiff's motion for partial summary judgment.


Dated:  September 7, 2023                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
                                            Deputy Director
                                            Federal Programs Branch

*/s/ Julia A. Heiman*_____
JULIA A. HEIMAN (D.C. Bar No. 986228)
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 616-8480 / Fax (202) 616-8470
julia.heiman@usdoj.gov
*Attorneys for Defendants*